## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| OMNI HEALTHCARE INC.; INTERVENTIONAL SPINE INSTITUTE OF FLORIDA; CRAIG DELIGDISH, MD; C. HAMILTON BOONE, PA; BRIAN DOWDELL, MD; RICHARD GAYLES, MD; STAN GOLOVAC, MD; LANCE GRENEVICKI, MD; ALEKSANDER KOMAR, MD; SCOTT SEMINER, MD; INSTITUTE OF FACIAL SURGERY INC.; THE PAIN INSTITUTE INC. d/b/a/ FLORIDA PAIN; and PHYSICIAN ASSISTANT SERVICES OF FLORIDA, L.L.C., | CASE NO. 6:13-CV-01509 |

CASE NO. 6:13-CV-01509

**<u>AMENDED COMPLAINT</u>**

**JURY TRIAL DEMANDED**

**INJUNCTIVE RELIEF SOUGHT**

Plaintiffs,

vs.

HEALTH FIRST, INC.; HOLMES REGIONAL MEDICAL CENTER, INC.; HEALTH FIRST PHYSICIANS INC.; HEALTH FIRST HEALTH PLANS, INC.; HEALTH FIRST INSURANCE, INC.; MICHAEL D. MEANS, and JERRY SENNE,

Defendants.

Plaintiffs bring this action for treble damages and injunctive relief under the antitrust laws of the United States and the State of Florida (common law and Florida's Deceptive and Unfair Trade Practices Act - Chapter 501, <u>Florida Statutes</u>) against Defendants, Health First, Inc. ("Health First Inc."); Holmes Regional Medical Center, Inc. ("Holmes RMC"); Health First Physicians Inc. (now doing business as Health First Medical Group; referred to herein as "HF Physicians"); Health First Health Plans, Inc. ("HF Health Plans"); Health First Insurance, Inc. ("HF Insurance"); Michael D. Means ("Defendant Means"); and Jerry Senne ("Defendant Senne") (collectively, "Health First" or "Defendants"), based upon personal knowledge as to facts pertaining to themselves, and upon information and belief as to all other matters, and hereby allege as follows:

## INTRODUCTION

1.      Health First has a monopoly in inpatient hospital services in Southern Brevard County, Florida (the "Hospital Monopoly").  At its inception in 1995, Health First owned and operated the only two inpatient hospitals in that geographic area—Holmes RMC and Palm Bay Hospital, Inc. (formerly known as Palm Bay Community Hospital; referred to herein as "Palm Bay Hospital").  Competitor Wuesthoff Medical Center, Melbourne ("Wuesthoff-Melbourne") entered the market in 2002.

2.      Health First maintains and strengthens its Hospital Monopoly by, *inter alia*, intimidating physicians or otherwise obstructing their ability to practice medicine in Southern Brevard County if they do not "play ball" with Health First and refer their patients exclusively to Health First's hospitals and physician specialists.  These referrals are valuable because Health First can capture incremental margins associated with hospital services (that might otherwise go to a rival hospital) and ancillary care such as x-rays and other diagnostic services (that might otherwise be performed at the facilities of an independent physician group).  The most efficient way to control a doctor's referral is to use a "carrot":  employ the doctor directly; the next best way is to use a "stick": those physicians that refuse to obey Health First's mandates have their provider contracts terminated by Health First, lose their medical privileges at Health First's hospitals, and/or are otherwise retaliated against in such a way as to curtail their practice and significantly impair competition among physicians in Southern Brevard County.

3.      To perfect its control over the referral process, Health First recently acquired Melbourne Internal Medicine Associates ("MIMA"), the largest independent physicians group in the area.  The MIMA acquisition substantially lessened competition in the market for physician services in Southern Brevard County, while simultaneously augmenting Health First's Hospital Monopoly, and ensuring that it could continue charging supra-competitive prices for hospital

services while delivering healthcare at very low quality.  The MIMA acquisition permits Health First to control the referrals of MIMA's physicians relating to inpatient hospital services and ancillary services (*i.e.*, auxiliary or supplemental services—such as diagnostic services, home health services, durable medical equipment, radiation therapy, physical therapy, etc.—used to support diagnosis and treatment of a patient's condition).  Allowing this merger to take further root and expand will significantly affect the ability of physicians to enter this market, and will significantly restrain competition in the market for physicians' services and the market for inpatient hospital services in Southern Brevard County.

4.      Health First is not just content with monopolizing the market for inpatient hospital services; it wants to capitalize on its illegally-maintained dominant position by extending that power into adjacent markets.  In particular, Health First is leveraging its monopoly into other healthcare-related markets—including those for ancillary services, physicians' services, commercial health insurance, and Medicare Advantage Plans.  By leveraging its monopoly, Health First damages competition in these markets and increases revenue by creating a vertically integrated, self-reinforcing, illegally maintained healthcare monopoly in Southern Brevard County.  Indeed, one of Health First's newest high-level executives has recently conceded that the quality of care provided to patients by Health First is so shockingly low that the new management team, which recently replaced the management team identified in this Complaint as individual defendants, may not be able to improve that level, even if they try.

5.      In addition to its Hospital Monopoly, Health First now owns and controls the largest multi-specialty physicians' group and the largest private health insurance company in Southern Brevard County.  It is thus impossible to meaningfully participate in any healthcare-related market in Southern Brevard County without doing business with Health First and, more

importantly, on Health First's terms.  Those terms are specifically designed with the purpose and effect of maintaining and/or enhancing Health First's market dominance and to further hinder economic competition in the healthcare-related markets in Southern Brevard County.

6.     Independent physician groups generally require certain inputs in their practice to compete effectively, namely: (1) access to patients enrolled in health plans; and (2) access to hospitals.  Health First controls both.  By threatening to deny physician groups access to these vital inputs, Health First could extract certain concessions, including *de facto* agreements by physicians to refer exclusively or nearly exclusively to Health First's hospitals and to perform ancillary services at Health First's premises.  This requirement to refer on an exclusive basis, by which many physician groups abided, foreclosed rival hospitals in Southern Brevard County from competing in the supply of acute care inpatient services.  In particular, it became too costly for independent physicians to refer patients to rival hospitals: while having the freedom to refer a patient to the best facility is desirable from a medical perspective, Health First's penalty regime made it economically unwise to exercise that freedom.  And physician groups that did not abide by Health First's exclusivity requirement were impaired in their ability to compete in the market for physician services, as they were foreclosed from access to insured patients and Health First's facilities.  Indeed, they were so impaired that they lost physicians to rival groups that abided by the restrictions.

7.     As a result of anticompetitive acts described in this Complaint, Health First has unlawfully maintained its Hospital Monopoly while obtaining market power (or conditions under which there is a dangerous probability that it will obtain market power) in various interconnected, healthcare-related secondary markets.  Moreover, this conduct has injured

Plaintiffs while, simultaneously, resulting in supra-competitive prices and lower quality of care for consumers.

8.      Defendants' conduct as set forth herein constitutes unfair, deceptive, or unconscionable acts and practices.  Along with maintaining and increasing their monopoly power in violation of the Sherman Act (which is a *per se* violation of Florida's Deceptive and Unfair Trade Practices Act), Defendants' business practices were meant to destroy competition and damage not only the doctors and other participants in healthcare-related markets in Southern Brevard County, but the community and patients they serve as well.

9.      This case is being filed to reinstate competition on the merits for acute care inpatient hospital services, physician services, and health insurance in Southern Brevard County, Florida, and to recover injuries sustained by Plaintiffs both as a result of Health First's anticompetitive conduct and its unfair, deceptive, and/or unconscionable conduct.

## PARTIES

### Plaintiffs

10.      Plaintiff OMNI Healthcare, Inc. ("OMNI") is a multi-specialty group practice organized and existing under the laws of the State of Florida.  It was founded in 1994 as the Melbourne Medical Group, P.A.  OMNI's physicians practice in Southern Brevard County and admit patients to both Health First's and Wuesthoff's facilities in Southern Brevard facilities.

11.      Plaintiff Interventional Spine Institute of Florida, doing business as Spine, Orthopedics and Rehabilitation ("S.O.A.R."), is a group practice founded in 2003 with its main office in Melbourne.  S.O.A.R. provides pain management services through the application of advanced interventional pain therapy.  Its physicians practice in Southern Brevard County.

12.      Plaintiff Craig Deligdish, M.D. is a board-certified hematologist, oncologist, and internal medicine practitioner practicing in Southern Brevard County, Florida.  Dr. Deligdish is

5

the President of OMNI, an Associate Professor of Medicine at the University of Central Florida College of Medicine and Editor in Chief of Value Based Cancer Care.   He was Chairman of the subsection of Hematology and Medical Oncology, Chairman of the Neoplastic Disease Committee at Holmes Regional Medical Center, a faculty member at the University of Texas Southwestern Medical School, Harvard Medical School, Associate Chief of Staff of Ambulatory Care at Dallas Veteran's Administration Medical Center, and Chief of the Medicine Section at the Dallas Veteran's Administration Medicine Center.

13.     Plaintiff Brian Dowdell, M.D., M.S. is licensed to practice medicine in the State of Florida, and is a member of the medical staff of Holmes RMC.  Dr. Dowdell was formerly President of the Medical Society of Brevard County.   In addition, he is a member of the American Board of Physical Medicine and Rehabilitation, the American Academy of Pain Medicine, North American Spine Society, the Physiatric Association of Spine, Sports and Occupational Rehabilitation, and he is the owner of a clinic which provides pain management services.

14.     Plaintiff Richard Gayles, M.D. is a board-certified anesthesiologist licensed to practice medicine in the State of Florida.

15.     Plaintiff Stan Golovac, M.D. is an anesthesiologist licensed to practice medicine in the State of Florida.  He is board certified by the American Board of Anesthesiology, and certified by the American Board of Pain Medicine, by the National Board of Medical Examiners, and by the American Heart Association in Basic and Advanced Cardiac Life Support.  He is also a Diplomat of the American Academy of Pain Management.

16.     Plaintiff Lance Grenevicki, D.D.S., M.D., FACS, is a medical doctor and a dentist licensed to practice medicine in the State of Florida and was previously the Chief of the

Department of Surgery at Holmes RMC.  He was a member of the MEC of Holmes RMC.  He was also the Vice President and President of the Medical Society of Brevard County.

17.     Plaintiff Aleksander Komar, M.D., is a board-certified general surgeon licensed to practice medicine in the State of Florida, and is a member of the medical staff of Holmes RMC.

18.     Plaintiff Scott Seminer, M.D., is a physician licensed to practice medicine in the State of Florida.  He is board certified in internal medicine and gastroenterology.

19.     Plaintiff C. Hamilton Boone, P.A., is a physician assistant licensed to practice in the State of Florida, and is a member of the medical staff of Holmes RMC.  He is a current or former member of the following associations: the American Academy of Physician Assistants, the Association of Family Practice Physician Assistants, the Florida Association of Physician Assistants, the Georgia Association of Physician Assistants, and North Carolina Association of Physician Assistants, and the National Commission on Certification of Physician Assistants.

20.     Plaintiff Institute of Facial Surgery, Inc. ("Institute of Facial Surgery") is a practice founded in 2001 by Lance Grenevicki, D.D.S., M.D., FACS, with its main office in Melbourne. The Institute of Facial Surgery team is dedicated to the highest quality of care for dental implant surgery, corrective, cosmetic, and reconstructive jaw surgery and the specialty of oral & maxillofacial surgery.

21.     Plaintiff The Pain Institute, Inc. d/b/a Florida Pain ("Florida Pain") is a group practice founded in 2005 with its offices in Melbourne, Merritt Island, and Jupiter. The Pain Institute, Inc. d/b/a Florida Pain is a multi-service facility specializing in neck, back and cancer pain that offers pain management consultation and management services for acute and chronic pain.

22.     Plaintiff Physician Assistant Services of Florida, LLC ("Physician Assistant Services"), is a practice founded in 1999 with its main office in Melbourne.  Plaintiff Physician

Assistant Services of Florida, LLC, provides surgical physician assistants as first assistants in multiple surgical specialties saving the surgeon valuable time while reducing costs.

23.     Plaintiffs Deligdish, Dowdell, Gayles, Golovac, Grenevicki, Komar, Seminer, and Boone are collectively referred to herein as the "Individual Plaintiffs."  Together with OMNI, S.O.A.R., Institute of Facial Surgery, Florida Pain, and Physician Assistant Services, they are collectively referred to as "Plaintiffs."

24.     Each of the Plaintiffs were excluded from the Health First network, denied referrals by HF Physicians and MIMA doctors, lost hospital privileges at one or more of Health First's hospitals for failing to admit patients exclusively to Health First's hospitals, and/or were otherwise punished by Health First for failing to refer patients exclusively to Health First's physicians, and/or otherwise refusing to support Health First's monopoly.

### Defendants

25.     Defendant Health First Inc. is a not-for-profit corporation organized and existing since 1995 under the laws of the State of Florida, with its principal place of business in Southern Brevard County, Florida.  Health First Inc. is the parent corporation of four affiliated hospitals located in Brevard County Florida: Holmes RMC, Cape Canaveral Hospital Inc. ("Cape Canaveral Hospital"), Palm Bay Hospital, and Viera Hospital, Inc. ("Viera Hospital").  Health First Inc. also is the parent corporation of a physicians' group, HF Physicians, and two health insurance companies, HF Health Plans and HF Insurance.  Health First Inc. bills itself as "Central Florida's only fully integrated health system."

26.     Holmes RMC, a non-profit corporation organized and existing under the laws of the State of Florida, is a 514-bed general acute care hospital located in Melbourne, Florida, which is in Southern Brevard County.  Holmes RMC is owned and controlled by Health First Inc.

27.     HF Health Plans is a for-profit corporation organized and existing under the laws of the State of Florida, with its principal place of business in Rockledge, Florida.  HF Health Plans opened in late-1995 and operates both health maintenance organization ("HMO") and point-of-service ("POS") health benefit plans; it is, when including Medicare Advantage plan enrollees, the largest health insurance company in terms of covered persons in Southern Brevard County.  HF Health Plans is owned and controlled by Health First Inc.

28.     HF Insurance is a for-profit corporation organized and existing under the laws of the State of Florida, with its principal place of business in Rockledge, Florida.  HF Insurance was created in late-2011 to offer insurance products such as Medicare Supplement policies; HF Insurance is also licensed to operate health maintenance organization ("HMO") and point-of-service ("POS") health benefit plans.  HF Insurance is owned and controlled by Health First Inc.

29.     HF Physicians is a for-profit corporation organized and existing under the laws of the State of Florida, with its principal place of business in Rockledge, Florida.  HF Physicians is the managing member of Health First Medical Group, LLC ("HF Medical") which, after the MIMA acquisition, is Brevard County's largest multi-specialty physicians group with approximately 250 physicians.  The physicians which comprise HF Physicians admit exclusively or almost exclusively to Health First hospitals, and refer exclusively or almost exclusively to other HF Physicians.  HF Physicians is owned and controlled by Health First Inc.

30.     Michael D. Means ("Defendant Means") is an individual residing in Marco Island, Florida.  Defendant Means, along with Defendant Senne, is a co-founder of Health First and formerly its President and Chief Executive Officer.

31.     Jerry Senne ("Defendant Senne") is an individual residing in Winter Park, Florida.  Defendant Senne is the former President and CEO of Holmes RMC.

32.     Defendants Means and Senne will be referred to herein as the "Individual Defendants."

33.     The term "Health First" is used herein to refer to all Health First-related entities, as well as the Individual Defendants insofar as they were acting on behalf and for the benefit of Health First.  Where necessary, however, Defendants will be referred to individually.

## CO-CONSPIRATORS

34.     Various other physicians, individuals, firms, and corporations, not named as defendants herein, may have participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy.  Plaintiff reserves the right to name subsequently some or all of these persons as defendants.

35.     Whenever in this Complaint reference is made to any act, deed, or transaction of any business entity, the allegation means that the business entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

## JURISDICTION AND VENUE

36.     This action is brought pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 14 and 26). Plaintiff seeks statutory damages and injunctive relief from ongoing violations of the antitrust laws of the United States, specifically, Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 & 2), and Section 7 of the Clayton Act (15 U.S.C. §18).

37.     This Court has subject matter jurisdiction over the First, Second, Third, and Fourth Causes of Action pursuant to 28 U.S.C. § 1331 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26; it has supplemental jurisdiction over the Fifth and Sixth Causes of

Action pursuant to 28 U.S.C. § 1367 since those claims form part of the same case or controversy and derive from a common nucleus of operative facts.

38.     This Court has personal jurisdiction over each Defendant, because each Defendant: resides in this District; transacted business in this District; and/or committed over acts in furtherance of the illegal scheme and conspiracy alleged herein in this District.

39.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants resided, transacted business, were found, or had agents in this District; most or all of the events giving rise to these claims occurred in this District; and/or a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

## INTERSTATE TRADE AND COMMERCE

40.     The activities of Defendants and their co-conspirators, as described in this Complaint, occurred within the flow of and substantially affected interstate commerce.

41.     During the relevant period, a large percentage of the Defendants' revenues came from sources located outside of Florida, including the federal government (through the Medicare and Medicaid programs).

42.     The Defendants purchase a substantial portion of their medicine and supplies from sellers located outside of Florida.

43.     Many employers that have made payments to the Defendants (either directly or through health insurers) sell products or services in interstate commerce.

## MARKET DEFINITION

44.     Defining a relevant market is unnecessary where, as here, there is direct evidence of Health First's monopoly power—*i.e.*, its ability to exclude competitors and raise prices to supra-competitive levels.   Insofar as the Court requires a defined market for purposes of analyzing the claims made herein, for the reasons discussed below, the relevant market in this

action is that for general acute care inpatient hospital services in Southern Brevard County (the "Relevant Market").

45.     In addition to the Relevant Market, however, there are several healthcare-related markets ("secondary product markets") which are also negatively impacted by Defendants' conduct and which assist Health First in unlawfully maintaining its monopoly in the Relevant Market.  Accordingly, these secondary product markets are also discussed below.

**Relevant Geographic Market**

46.     The relevant geographic market in this action is no larger than Southern Brevard County.  The hospital facilities located in that geographic market would have the economic power, if acting collectively, to increase prices above competitive levels.

47.     The outflow rate—*i.e.*, those Southern Brevard County residents who receive general acute care inpatient hospital services at hospitals outside of Southern Brevard County—is low and has not varied significantly year-to-year, despite supra-competitive prices and less-than-competitive quality.

48.     Similarly, the inflow rate—*i.e.*, those residents outside of Southern Brevard County who receive general acute care inpatient hospital services inside Southern Brevard County—is also low and has not varied significantly year-to-year despite changes in relative prices.

49.     The low outflow and inflow rates for the primary relevant product support a conclusion that general acute care hospitals located outside of Southern Brevard County do not provide sufficient competitive discipline to those within Southern Brevard County to warrant their inclusion in the relevant geographic market.  There is extremely low cross-elasticity of demand between general acute care hospitals located inside and outside of Southern Brevard County.

50.     Only physicians can admit patients to hospitals and there is little overlap between the physicians that admit to general acute care hospitals located within Southern Brevard County, and those that admit to hospitals outside of Southern Brevard County.

51.     General acute care hospitals located within Southern Brevard County offer prices to managed care plans without regard to prices charged to those plans by non-affiliated general acute care hospitals located outside Southern Brevard County.

52.     General acute care hospitals located outside Southern Brevard County offer prices to managed care plans without regard to prices charged to those plans by non-affiliated general acute care hospitals located within Southern Brevard County.

53.     If all of the general acute care hospitals located within Southern Brevard County were to raise prices at least 5%, they would not lose enough volume to make such a price increase unprofitable to those hospitals.

54.     There is also low cross elasticity of demand between general acute care hospitals located in Southern Brevard County, and general acute care hospital facilities located outside of Southern Brevard County.

55.     Similarly, there is relatively little physician overlap between the physicians that admit to general acute care hospitals located within Southern Brevard County, and physicians that admit to general acute care hospitals located outside of Southern Brevard County.

56.     Managed care plans cannot substitute general acute care hospitals, or physicians located outside Southern Brevard County for hospitals and physicians located within that area.

57.     Patients located within Southern Brevard County typically do not utilize general acute care hospitals, or physicians, located outside Southern Brevard County for general acute care hospital or physician services available within Southern Brevard County.

58.     Indeed, Defendants themselves have argued that South Brevard County is a separate geographic market for antitrust purposes.   This assertion was made in a 1995 Submission to the Federal Trade Commission ("FTC") in support of the then-proposed affiliation of Cape Canaveral Hospital and Holmes RMC.   In that submission, Health First argued that the combination of the two facilities would not reduce competition because the two hospitals were in different geographic markets.   Health First's argument to the FTC was successful and, as a consequence, the FTC elected not to challenge the transaction.   There has been no material difference between hospital usage patterns over time.

## Primary Relevant Product Market

59.     The primary relevant product market involves general acute care inpatient hospital services.   There is extremely low cross elasticity of demand between general acute care inpatient hospital services and other services, such as outpatient services.

60.     A small but significant price increase in the price of general acute care inpatient hospital services will not cause patients to switch to outpatient services.   The choice of inpatient, as opposed to outpatient, services is largely determined by physicians, and is based on the medical needs of the patient, not on the relative cost of the services.

61.     Within the relevant geographic market of Southern Brevard County, Health First has more than a 70% market share of the general acute care inpatient hospital services market as measured by patient admissions.   Health First's market dominance and anticompetitive conduct in the market for general acute care inpatient hospital services has required managed care plans to include all the Health First hospitals.   Health First's prices for general acute care inpatient services are above competitive levels and, more specifically, are above the prices of its only competitor in Southern Brevard County, Wuesthoff-Melbourne.

**Secondary Product Markets**

62.     In addition to the primary relevant product market, there are several secondary product markets at issue in this action, including: a) the market for physician services (or more appropriately, the distinct markets for each physician specialty that collectively comprise physician services); b) the market for ancillary services; c) the market for private health insurance plans; and d) the market for Medicare Advantage plans.

63.     There is low cross-elasticity of demand between physician services and services from other non-physician healthcare providers.  A small but significant price increase in the price of physician services will not cause patients or managed care plans to switch to non-physician healthcare providers.

64.     There is low cross-elasticity of demand between ancillary services and other services for diagnostic, therapeutic, or custodial medical treatment.  A small but significant price increase in the price of physician services will not cause patients or managed care plans to switch to non-physician healthcare providers.

65.     There is low cross-elasticity of demand between private, non-Medicare Advantage health insurance plans and other types of health insurance plans.  A small but significant increase in the price for health insurance plans would not be expected to cause consumers to switch to substitute products as there are no substitute products (other than no insurance).

66.     There is low cross-elasticity of demand between Medicare Advantage Plans and other types of health insurance plans.  A small but significant increase in the price of Medicare Advantage Plans would not be expected to cause consumers to switch to substitute products.

67.     Following its acquisition of MIMA, Health First, through its wholly owned subsidiaries HF Physicians and HF Medical, has a majority share in the physician services market in Southern Brevard County.  Moreover, this control of the physicians' services market, which

includes primary care physicians and hospitalists, allows them to control the referral sources for physician specialists, and reinforces its dominance in the market for physician services. Health First's dominant market share in physician services enables it to control the referral sources for hospitals. By having control over primary care physicians and hospitalists, Health First controls the physician specialists, and ensures that their hospitals are given preference by the specialist. Their dominant share in the market for physician services, and their ability to exercise economic power in that market, allows them to control patient referrals and maintain their monopoly in the primary relevant product market, acute care inpatient hospitals, as well as secondary markets including that for Medicare Advantage plans, other private health insurance, and physician services.

68.     Health First, through its hospitals and physician services group, also has a majority share in the ancillary services market in Southern Brevard County. Health First is able to leverage its other healthcare-related monopolies or near-monopolies in Southern Brevard County—including hospital services, physician services, private insurance, and Medicare Advantage insurance—to maintain its market power in the ancillary services by controlling where its hospitals, doctors, patients, and insureds receive such treatments.

69.     Health First, through its wholly owned subsidiary HF Health Plans, also is a dominant player in the private health insurance market, with the largest market share of any single private health insurer in Southern Brevard County. Health First is able to leverage its market power in acute care inpatient hospitals to gain share in the health insurance market by providing its own health plans with preferential pricing for its hospital facilities. In turn, HF Health Plans helps Health First maintain its market power in the inpatient hospital and physician services markets by controlling the facilities and physicians at which its enrollees receive treatment.

70.     HF Health Plans also has a monopoly or near-monopoly in the Medicare Advantage market (a sub-segment of the larger private health insurance market), with the largest market share of any Medicare Advantage provider in Southern Brevard County.   Similar to private health insurance generally, Health First is able to leverage its market power in acute care inpatient hospitals to gain market share in the Medicare Advantage market by denying competing plans access to its inpatient hospitals and physician services.   In turn, HF Health Plans helps Health First maintain its market power in the inpatient hospital, physician, and ancillary services markets by controlling the facilities and providers at which/from whom its enrollees receive treatment and preventing those patients from accessing competitors' facilities/providers.   Additionally, Health First leverages its dominant position in the physician services market to gain market share in the Medicare Advantage Market by preventing its physicians from accepting any competitor's Medicare Advantage Plans.

71.     Health First's ownership and control of HF Health Plans effectively gives Health First control over every physician practicing medicine in Southern Brevard County.   By dropping a physician from these plans, Health First forecloses physicians from the largest group of patients in Southern Brevard County, having a significant economic effect on any physician not allowed to be part of these insurance plans.

### Barriers to Entry

72.     Barriers to entry exist in the acute-care inpatient hospital service market in Southern Brevard County making *de novo* entry difficult, costly, unlikely, and untimely. Building an acute care inpatient hospital is expensive and time consuming.

73.     Other than Health First and Wuesthoff, no hospital firm has proposed building a general acute care inpatient hospital in Southern Brevard County in at least ten (10) years. Health First built Viera Hospital in that time but, since Viera Hospital is owned by Health First, that hospital is only an additional Health-First point of access, not a *de novo* entrant.

**FACTUAL ALLEGATIONS**

I.      **Background: The Healthcare Industry, Health First, And Southern Brevard County**

A.      **The United States Healthcare Industry**

74.     In the United States, about 84% of the population has some form of health insurance.  Health insurance coverage is typically divided into two basic categories: public (which includes Medicare, Medicaid, and military health benefits) and private (which includes employer-sponsored, individual, and college-sponsored plans).

75.     According to the United States Census Bureau, of those persons with health insurance coverage, approximately 55% of Americans obtain it through an employer, 10% purchase it directly, 14.5% are enrolled in Medicare, 15.9% are enrolled in Medicaid, and 4.2% have military health insurance.

76.     Most persons with private insurance, approximately 90%, utilize some form of managed care plan that contracts with health care providers and medical facilities to provide healthcare for its members at reduced costs.  Those contracts cover a wide range of healthcare-related products and services, including, *inter alia*, physician services, laboratory tests, non-physician provider servicers, inpatient and outpatient hospital services, and (sometimes) prescription drugs.  Providers and facilities with which the managed care plan has negotiated contracts are commonly referred to as being "in network."

77.     Some managed care plans are "fully insured" plans whereby the managed care organization accepts the insurance risk for healthcare-related expenditures.  For other plans, the employer will accept the insurance risk itself and use the managed care plan simply to provide its employees with access to the managed care plan's network of providers and facilities, as well as handle administration (*e.g.*, processing and paying claims).  Such plans are called "self-funded plans."

78.     The three most common types of managed care plans are Health Maintenance Organizations ("HMOs"), Preferred Provider Organizations ("PPOs"), and Point of Service ("POS") plans.  Typically, an HMO requires patients to select a primary care provider who coordinates most of the patients' care and the HMO only covers care provided by in-network providers and facilities; a PPO allows patients to go out of network but will cover a smaller portion of the overall bill; while a POS plan allows patients to choose each time they receive services whether or not stay in network, but requires those patients to pay more if they do so.

79.     In addition, some managed care plans are permitted by the federal Medicare program to offer their services on a "risk basis" to Medicare beneficiaries as an alternative to the traditional Medicare program.  Such plans, called Medicare Advantage Plans, offer Medicare beneficiaries incentives in the form of benefits not available under the traditional Medicare plan in order to encourage participation.  Most Medicare Advantage Plans have an out-of-pocket maximum that, once reached, the plan will pay 100% of Medicare-approved services for the remainder of the calendar year so long as the individuals utilize in-network providers.

80.     The core element underlying each of the plans discussed above is the managed care organization's network—*i.e.*, its ability to selectively contract with providers and facilities to obtain discounted pricing in exchange for access to the organizations' members.  Accordingly, the importance of provider networks and selective contracting in the delivery of affordable healthcare coverage to consumers is widely recognized.

81.     If a medical provider or facility refuses to negotiate with a managed care plan, it runs the risk of losing patient volume to competing providers or facilities.  Thus, in a competitive market, selective contracting encourages medical providers and facilities to accept discounted contractual prices to assure participation in the managed care plan's network of preferred

providers.  The result of this competitive pressure is the lowering of net prices to managed care plans and, ultimately, for their members.

**B.      The History of Health First**

**1.      Holmes Regional Medical Center**

82.      Health First was formed in 1995 by the joining of three hospitals: Holmes RMC, Palm Bay Hospital, and Cape Canaveral Hospital.  This affiliation granted Health First an instant monopoly in Southern Brevard County as it owned and controlled the only two general acute care inpatient hospitals in that geographic area.

83.      Soon afterwards, also in 1995, Health First formed its own physicians group, HF Physicians.  In 1996, Health First created HF Health Plans to offer HMO plans in Brevard County.  And later, in 2011, Health First created HF Insurance specifically to focus on Medicare-related plans.

84.      Health First has long recognized its monopoly power and has publicly (and flippantly) acknowledged its existence.  For example, when the head of the Central Brevard Health Care Coalition urged Mr. Means, then President of Health First, to obtain an improved health information system he responded that he did not have to because "he was a monopolist."

85.      Holmes RMC (formerly known as Brevard Hospital) began in 1937, and is the largest hospital in Brevard County.  It is also the only hospital in Southern Brevard County with a Level II Trauma Center, Level II Neonatal Intensive Care Unit, and air ambulance (First Flight helicopter).

86.      Due to its size and unique offerings, Holmes RMC is considered what healthcare experts refer to as a "must-have" hospital.  In other words, any managed care plans which intend to market their products in Brevard County have little choice but to include Holmes RMC in their network.  Wuesthoff-Melbourne, Health First's only hospital competitor in Southern Brevard

County, is currently too small to provide the same range of services that Holmes RMC provides and is only a limited competitor to Holmes RMC.

### 2. Health First and Wuesthoff

87.    Moreover, as discussed more fully herein, Health First has taken affirmative, anticompetitive steps to ensure that Wuesthoff-Melbourne does not gain the ability to compete effectively with Holmes RMC.

88.    Historically, the leadership of Health First has always overtly resisted competition on the merits.  Going back to 1995, when Health First was initially formed, its leaders attempted to merge all the hospitals in Brevard County, thereby preventing any competition whatsoever.  At that time, however, one of the hospitals, Parrish Medical Center ("Parrish"), was unable to go along with the plan because of its status as a public hospital.  But in discussing a subsequent affiliation with Parrish, Health First's written "Action Plan" took the position that "the public doesn't care one whit about Wuesthoff's cries of antitrust."

89.    In any event, Wuesthoff refused to go along with the plan to merge all the hospitals and, instead, attempted to build a hospital in Southern Brevard County to compete directly with the Southern Brevard Health First facilities, something which Health First effectively resisted for approximately six years through challenges to Wuesthoff's Certificate of Need ("CON") applications.  Ultimately, Wuesthoff's CON application was approved over the objections of Health First because, as the agency stated, there was a critical need for competition in Southern Brevard County, even though there were questions about the financial feasibility of the new hospital facility.

90.    Health First disagreed.  When asked how the dispute between Wuesthoff and Health first could be resolved, the President of Health First, Defendant Means, reportedly told the CEO of Wuesthoff "stay out of South [Brevard] County."  Mr. Means also reportedly told the

physicians at a Medical Staff meeting at Holmes RMC, "If you sign letters of support for Wuesthoff, we will know who you are."

## II.    Health First Is A Monopolist

### A.    Health First's Merger-To-Monopoly

91.    Health First did not grow into its Monopoly by virtue of superior business acumen.  At its very inception in 1995, Health First willfully acquired a pre-existing Hospital Monopoly by purchasing the two general acute care hospitals located in Southern Brevard County—Holmes RMC and Palm Bay Hospital.

92.    Thus, Health First's monopoly was not the result of normal methods of development; rather, it was a means of excluding competition.  Acquiring both Holmes RMC and Palm Bay Hospital was accomplished by Health First with the specific purpose and effect of obtaining a monopoly.

93.    Later, after Wuesthoff-Melbourne opened, Health First actively sought to eliminate its only hospital competitor in Southern Brevard County, not by competing on the merits, but rather by engaging in exclusionary conduct through its fully-integrated healthcare system.  In particular, Health First required all physicians who wanted to participate in the HF Health Plans network to refer all or nearly all of their patients to only Health First hospitals—*i.e.*, not just those that were enrolled in HF Health Plans, but even patients covered by other private insurers.  As a result, physicians that participated in HF Health Plans only sent 15% of their non-HF Health Plans patients (which they could send anywhere) to Wuesthoff.

94.    There is also significant direct evidence of Health First's monopoly power, including the existence of barriers to entry and control of pricing.  Health First's foreclosure of competition has given Holmes RMC the freedom to dramatically raise prices.

95.     Health First's power overpricing is exacerbated dramatically by extreme quality of care concerns.  Therefore, not only are prices higher, but purchasers get less for every dollar they spend; this shockingly poor quality of care both increases the already extremely high nominal pricing of Health First's hospitals and represents visible evidence of the existence of monopoly power.  Defendants do not care about the quality of care because, quite simply, they don't have to.

**B.     Health First's Vertically Integrated Healthcare Monopoly**

96.     To maintain its monopoly in the hospital market, Health First has leveraged its market power in inpatient hospital services to distort and restrain competition in other healthcare-related markets.

97.     Health First openly bills itself as "Central Florida's only fully integrated healthcare system."  In this context, the term "fully integrated" means vertical integration—*i.e.*, controlling the markets for hospitals, physicians, and health insurance in Southern Brevard County.  This can best be described as a vertically-integrated or fully-integrated healthcare monopoly.

98.     To that end, Health First has leveraged its Hospital Monopoly to gain market power in other healthcare-related markets, including those for physicians' services, ancillary services, private health insurance, and Medicare Advantage plans.  At the same time, Health First also augments its Hospital Monopoly by leveraging its dominance in those same related markets.  Thus, by being "fully integrated," Health First's market power reinforces itself across each of these inter-related healthcare markets.

99.     Health First's "fully integrated" model was created with the specific intent to use its market power to exclude competition in the Relevant Market and other healthcare-related markets in which Health First competes (including the physician services, ancillary services, private health insurance, and Medicare Advantage markets).  As described throughout this

23

Complaint, that model has achieved its intended effect—*i.e.*, Health First has successfully excluded or restrained its competitors, including Plaintiffs, and Health First has been able to charge supra-competitive prices while lowering the quality of care received at its facilities.

100.    Health First's use of its vertically or fully integrated healthcare monopoly severely hinders competition at all market levels, resulting in both higher prices and lower quality of care. Thus, there is no valid business justification for Health First's actions, including the restrictions it imposes on independent physicians, as they were undertaken specifically to exclude competition and not to create cost savings or increase quality of care.

C. **Health First Maintains, Enhances, and Exploits Its Monopoly Power Through Various Forms of Exclusionary Conduct**

1. **Controlling Physicians' Choice of Hospital And Referrals Through Conspiratorial Conduct, Exclusive Dealing Arrangements, And Intimidation**

101.    Health First further strengthens and maintains its Hospital Monopoly by forcing independent physicians in Southern Brevard County into contractual and/or *de facto* exclusive dealing arrangements, or by refusing to deal with those physicians who admit or refer patients to Health First's competitors.

102.    Health First owns and controls Brevard County's largest multi-specialty physicians group, HF Physicians (now doing business as "Health First Medical Group" followings its acquisition of MIMA, as discussed below).  Thus, Health First can directly dictate those physicians' choice of hospital for inpatient services and their choices of facilities for ancillary services.   Not surprisingly, the physicians in HF Physicians admit their patients exclusively or nearly exclusively to Health First's hospitals.  Moreover, when their patients need to see another physician, they also refer their patients exclusively or nearly exclusively to other providers employed by HF Physicians.

103.     Although not as effective as direct employment, Health First also controls where independent physicians admit their patients by leveraging its market power in the primary Relevant Market (*i.e.*, general acute care hospitals) and related secondary markets (*i.e.*, health insurance services).  This leveraging included retaliating against independent physicians who were deemed insufficiently loyal to Health First, and providing benefits and/or kickbacks to those physicians willing to cooperate with Health First's anticompetitive practices.

104.     For example, even prior to acquiring MIMA (then the largest remaining independent physician group), Health First was also able induce MIMA's physicians into admitting exclusively or nearly exclusively to Health First hospitals.  This was accomplished by offering MIMA perks and other preferential treatment in exchange for exclusivity.

105.     One such perk was to grant MIMA an exclusive right to provide radiation therapy services to Health First's members, with Health First shutting down its competing radiation therapy department and selling its equipment to MIMA.  That radiation oncology program became the most profitable of all of MIMA's ancillary services.

106.     Another example of preferential treatment is when the federal government required MIMA to pay $12,000,000 for Medicare fraud relating to that program, Health First did nothing to hold MIMA accountable for its over-utilization of those same services with respect to HF Health Plans' patients.

107.     Health First also conspired to facilitate the election of MIMA physicians elected to positions on the Medical Executive Committees ("MECs") at Health First's hospitals.  This not only rewarded MIMA for its participation in the conspiracy, but reinforced Health First's ability to influence medical decisions that could maximize revenue and ensure maintenance of its monopoly.

108.    In exchange for these and other benefits, MIMA providers referred less than 1% of their patients to rival Wuesthoff-Melbourne even prior to its acquisition by Health First. MIMA's reasons for not using Wuesthoff are pretextual.   They claimed that Wuesthoff-Melbourne was too far, but MIMA built a newer building closer to Wuesthoff than Holmes, and admission patterns never changed.   They also claimed that physicians did not want to have to be on two staffs, but they are on the staff of both Palm Bay and Holmes RMC, even though the distances are greater.   Additionally, groups routinely split their staffing requirements so physicians who staff the hospital primarily take all the on call responsibilities at that hospital within their group.

109.    Health First actively conspired with physicians, like those at MIMA, willing to agree to contractual or *de facto* exclusivity in exchange for preferential pricing and treatment. On information and belief, other unnamed physicians/co-conspirators conspired with Health First to restrain competition in the Relevant Market by agreeing to *de facto* exclusivity agreements designed and intended to foreclose competitors.

110.    For other physicians and physician groups, such as OMNI, exclusivity was sought through coercion and intimidation.   While, as discussed below, OMNI resisted Health First's attempts to impose exclusivity, many other physicians fell victim to Health First's threats and ultimately agreed to its demands.

111.    For example, like in all hospitals, physicians cannot perform services at Health First's hospitals without first obtaining medical privileges.   Those privileges can and have been arbitrarily and unjustifiably revoked in retaliation for refusing to comply with Health First's demands.   Given its Hospital Monopoly, losing medical privileges at Health First's hospitals severely limits a provider's ability to effectively compete in Southern Brevard County.

112.    Health First's tendency to retaliate against those that dare oppose it is well documented.  In fact, in one antitrust case currently pending in Florida state court against Health First, the court found that "[s]ome of the allegations [regarding intimidation] appear to be supported by the evidence presented" and held that "each of the parties and their attorneys are admonished not to harass, intimidate, punish, or otherwise retaliate against any opposing party or any potential witness in this action."

113.    Similarly, since Health First also owns and controls the largest private health insurance company in Brevard County, Health First can and does leverage that dominant position by refusing to contract with physicians/groups that fail to demonstrate sufficient loyalty to Health First by, *inter alia*, refusing to admit exclusively to Health First's hospitals.  For example, as discussed more fully below, OMNI's provider contract with HF Health Plans was terminated after it refused to comply with Health First's requests to refer exclusively to Health First's hospitals.

114.    In essence, by threatening to terminate physicians from its health plans, Health First had absolute power to control the market for physicians in Southern Brevard County. Failure by any physician to accede to the demands of Health First–*e.g*., by refusing to exclusively admit patients to their facilities or refer to their physicians—resulted in termination from the health plan and, thus, exclusion from the largest source of patients in Southern Brevard County.

115.    This power to exclude is demonstrated by the fact that physicians who participate in HF Health Plans only send 15% of their non-HF Health Plans patients (which they could send anywhere) to Wuesthoff.  In contrast, physicians that do not participate in HF Health Plans utilize Wuesthoff 45% of the time.

116.     Thus, it is clear that performing services at Health First hospitals, gaining access to patients enrolled in HF Health Plans, and obtaining referrals from Health First's hospitals and/or primary care providers is preconditioned on the understanding that physicians demonstrate sufficient loyalty to Health First, including only using Health First hospitals and referring only to other Health First physicians.

117.     Existence of the contractual and/or *de facto* exclusivity agreements with providers is further evidenced by MIMA's conduct after one insurer tried to exclude Health First's hospitals from its network.  In or around 2006, after Aetna Life Insurance Co. ("Aetna") determined that Health First's hospitals were considerably more expensive than other hospitals in and around Brevard County, Aetna decided to try and exclude Health First's hospitals from its network.

118.     After Aetna announced its intention to exclude Health First from its network, MIMA promptly terminated its relationship with Aetna, thus refusing to accept Aetna's paying patients because MIMA would have to see those patients at Wuesthoff-Melbourne.  But for the benefits it received from Health First (*i.e.*, sharing in Health First's monopoly profits), such a decision would be against MIMA's unilateral economic self-interest.  Yet MIMA refused to re-contract with Aetna until after Health First's hospitals re-contracted with Aetna.

119.     As a result of these contractual and/or *de facto* exclusivity agreements with providers, a substantial portion of the Relevant Market was foreclosed to Health First's actual or potential hospital competitors, including Wuesthoff-Melbourne.  Thus, the opportunity for other hospitals to enter or remain in the Relevant Market has been significantly limited.

120.     Specifically, Health First's conduct has foreclosed so large a percentage of the available market that Wuesthoff's continued operation was impaired.  In fact, Wuesthoff was

unable to effectively compete with Holmes RMC, despite at that time offering what many considered a superior product (*i.e.*, better facilities and a higher quality of medical care than Holmes RMC) at a lower price.  As a result, on or about July 27, 2010, financially distressed Wuesthoff announced it was being sold to Health Management Associates, Inc.

121.    Moreover, Health First's dominance and control over physicians in Southern Brevard County created a barrier to entry that no potential rival hospital has been able to overcome.  As such, no entrants have dared open a new hospital in this market to challenge Health First's dominance.

122.    This has allowed Health First to use its market power to break the competitive mechanism and deprive physicians of the ability to make a meaningful choice between hospitals.

123.    There are no procompetitive justifications for the exclusivity imposed upon physicians in the Relevant Market, as exclusivity is not necessary to assure supply, price stability, outlets, or quality.

124.    Health First requires any physician wanting to practice in Southern Brevard County to submit to its demands, including contractual and/or *de facto* exclusivity, as a precondition to participating in that geographic market.

### 2.    Refusing to Deal With Other Medicare Advantage Plans

125.    In addition to its Hospital Monopoly, Health First also has monopoly power in the market for Medicare Advantage plans in Southern Brevard County.

126.    Health First has approximately a 75% share in the Medicare Advantage market in Brevard County.  According to the Florida Office of Insurance Regulation, "Managed Care Quarterly Data Summary" as of June 30, 2010, of the 29,809 Medicare beneficiaries enrolled in Medicare managed care plans in Brevard County, HF Health Plans accounts for 21,988.

127.    Both Health First's hospitals and HF Physicians, however, do not accept any of Health First's competitors' Medicare Advantage plans.   This behavior is particularly anticompetitive considering Health First's Hospital Monopoly and the fact that HF Physicians is the largest multi-specialty group in Southern Brevard County.

128.    Thus, Health First's refusal to deal constitutes an unlawful attempt to use its monopoly power to distort and restrain competition in another market.   There is no valid business justification for Health First's physicians to refuse to accept its competitors' Medicare Advantage plans and, in fact, it is against each of those hospitals' and physicians' unilateral self-interest.

129.    OMNI was in large part responsible for convincing other Medicare Advantage plans, such as WellCare and Humana/CarePlus, to enter Southern Brevard County by actively courting them.   As one of the largest independent physician groups in Southern Brevard County at that time (*i.e.*, prior to being excluded from the market by Health First, as described below), OMNI was also a vital to the success of those competitive Medicare Advantage plans in that geographic area as HF Physicians and their co-conspirators refused to deal with them.

### 3.    Steering Patients to Health First's Hospitals

130.    Members enrolled in HF Health Plans are steered to Health First hospitals when they require acute care inpatient services.   Indeed, 85% of all patients (not just Health First Health Plan enrollees) admitted to hospitals by physicians participating in HF Health Plans are admitted to Health First hospitals.   This steerage allows the Health First hospitals to exploit and augment their market power.

131.    In contrast, health insurers that contract with both Health First's hospitals and Wuesthoff are able to substitute away from Health First's hospitals to a limited, but positive extent.   But these health insurers are at a competitive disadvantage vis-à-vis HF Health Plans because of the preferential pricing given to the HF Health Plans by Health First's hospitals.

The preferential pricing enjoyed by HF Health Plans does not allow the independent health plans to reach the appropriate economics of scale.  The failure to achieve economic scale by independent health plans in this market reduces the overall substitution of lower-priced Wuesthoff Hospitals for the more expensive Health First hospitals.

### 4.    Eliminating Independent Medical Executive Committees

132.    Health First's hospitals are among the highest-priced in the State, yet the quality of care received at those hospitals is poor.  This phenomenon, coupled with the fact that Health First has still managed to dominate hospital admissions (and healthcare services, generally) in Southern Brevard County, is direct evidence of Health First's market power.  Health First accomplished this dual feat, at least in part, by removing physicians from the MECs of its hospitals that dared voice concerns with quality of care, and replacing them with physicians willing to put Health First's profits ahead of their patients.

133.    MECs are critical as they are intended to be the advocates of patient interests, ensuring that quality of care has a voice to compete with the financial interests of the hospital.  But an MEC cannot exist in an environment where maintenance of a monopoly comes before quality of care.

134.    Doctors who advocated for patients and quality of care were systematically removed from the MECs of Health First's hospitals through lawsuits, slander, termination of hospital privileges, and/or removal from HF Health Plans' network.  These doctors were then replaced by physicians employed by, or otherwise loyal to, Health First and who were willing to assist Health First in maximizing revenue, jeopardizing patients, and maintaining Health First's Hospital Monopoly.  The result has been a loss of independent MECs and substantial degradation of care at Health First's hospitals, in particular Holmes RMC.

135.    In fact, a new Deputy Head of the Health First system has stated that, when the new administration arrived, they had no idea how extremely poor the quality of care level was at Health First and its hospitals.  In the opinion of that official, quality of care at Health First was very low.

136.    Thus, not surprisingly, Health First recently scored very poorly on the Leapfrog evaluation (a "C" rating) of patient safety.  This "C" rating was later confirmed by data from the Centers for Medicare & Medicaid Services' Hospital Compare website which showed that Holmes RMC scored 50 out of a possible 100 points, putting it in the bottom half of acute care hospitals in the State of Florida.

137.    Just one example of the poor quality of care that patients at Health First's hospitals receive is the death in 2010 of more than eight patients undergoing cardiac surgery. Several attending cardiovascular surgeons brought concerns to the attention of hospital administrators, board members, and members of the hospital's Medical Executive Committee regarding medical errors, patient safety, and problems with pre-operative, intra-operative, and post-operative cardiac care.  These concerns were documented in letters sent to Health First management that identified with specificity alleged problems in the hospital's cardiac surgery department that allegedly contributed to the unexplained and uninvestigated deaths of more than seven patients in a relatively short time frame.

138.    In the end, monopoly profits meant more to Health First than its patients, and no changes were made to how cardiac surgery and care was performed at Health First's hospitals. Moreover, the cardiac surgeons that asked the hospital to make changes were replaced and excluded from the Health First system.

139.   As a result of their successful efforts to prevent the development of an independent medical staff and to punish any physicians that fail to toe the line, Health First has been able to ensure that the quality of care provided to patients is far lower than it should be, particularly at Holmes RMC, the system's dominant hospital.

140.   For example, Dr. Grenevicki, the former Chairman of the Department of surgery, has been refused an opportunity to participate in Health First Health Plan, and had a baseless legal action brought against him, as well as Dr. Hynes, for supporting the suspension of trauma surgeons hired by Health First without adequate experience in surgery.  Similarly, Dr. Coican, the Chairman of Dentistry, was forced into a mandatory physician rehabilitation program for seconding a motion to suspend the unqualified trauma surgeons.

### D.   Health First Affirmatively Excludes Plaintiffs from the Market for Refusing to Submit to Its Anticompetitive Demands

141.   Those physicians, such as Plaintiffs, who refuse to follow along with Health First's monopoly agenda—including the exclusionary, predatory, and/or exploitative conduct described above—were openly retaliated against, terminated from Health First's network, and/or lost their medical privileges at Health First's hospitals.

142.   Plaintiffs come from diverse segments of the Southern Brevard County medical community, and yet each suffered, and continues to suffer, from some type of injury caused by the pervasive, all-consuming reach of Defendants' monopolistic empire.  Plaintiffs seek to recover for damages wrought by Defendants, while restoring competitive balance in the market that leads to better, more affordable healthcare.

### 1.   OMNI Healthcare and Drs. Deligdish and Seminer

143.   Unlike HF Physicians, MIMA, and other co-conspirators with contractual and/or *de facto* exclusivity agreements with Health First, OMNI and its physicians admit patients to

both Health First and non-Health First hospitals, depending on the medical needs and circumstances of their patients.

144.    OMNI first approached Health First in 1997 to participate in the HF Health Plans plan so that its physicians could provide care to HF Health Plans' members.  At that time, OMNI was told by Defendant Senne that only physicians employed by HF Physicians and MIMA would be permitted to participate in the HF Health Plans.

145.    Between 1997 and 1999, OMNI again approached Health First on multiple occasions seeking to participate in the HF Health Plans.  Each of those requests was also denied.

146.    In 2000, OMNI was finally permitted to participate in the HF Health Plans.  That participation, however, was limited to OMNI primary care physicians; OMNI physician specialists and ancillaries were not permitted to participate.  HF Physicians and MIMA were the only physician groups whose specialists were permitted to provide specialty care.  This ensured Health First members continued to be admitted exclusively to Health First's hospitals.

147.    In May 2002, OMNI specialty physicians were finally offered an agreement to provide specialty care to HF Health Plans' members, but at a significantly discounted rate compared to MIMA specialists.

148.    Not coincidentally, also in 2002, Wuesthoff Medical Center—Melbourne ("Wuesthoff-Melbourne") opened after Health First had lost its hard-fought battle to prevent it from opening.  Wuesthoff-Melbourne is smaller than Holmes RMC, but nonetheless has 115 private rooms and offers a wide range of services (including interventional cardiac care, full-service emergency department, surgery suites, family birth place, diagnostic and rehabilitation services) and ancillary services (including reference laboratory, homecare, nursing facility, assisted living facility, hospice, home medical equipment, wound care and hyperbaric center).

149.     Despite repeated requests from Health First, OMNI refused to agree to admit its patients exclusively to Health First's hospitals.  In response, Health First threatened to retaliate by recruiting physicians to compete with OMNI and to offer those physicians higher rates and compensation.  And, in fact, Health First made good on its threats, eventually hiring both additional primary care physicians and specialists. Health First further retaliated by, among other things, transferring OMNI's Health First patients to its own physicians, terminating a contractual program whereby OMNI provided unassigned call coverage at Health First's Palm Bay Hospital, and commissioning chart audits on OMNI's physicians.

150.     During this time period, Health First explicitly refused to increase OMNI's provider rates (which were lower than the rates for HF Physicians and MIMA providers) unless OMNI agreed to admit its patients exclusively to Health First's hospitals.

151.     In March 2004, Defendant Senne met with Plaintiff and OMNI physician Dr. Seminer and offered to allow OMNI to remain a participating member of HF Health Plans in exchange for an agreement by OMNI to admit its patients exclusively to Health First's hospitals.

152.     Ultimately, after its repeated attempts to coerce OMNI into admitting exclusively to Health First's hospitals, Health First refused to renew OMNI's contract with HF Health Plans. Instead, Health First demanded that OMNI's physicians contract individually with HF Health Plans as opposed to contracting as a group.

153.     OMNI again refused to admit exclusively to Health First's hospitals but did agree in good faith (albeit under duress) to "support" Health First's Palm Bay Hospital without agreeing to exclusively admit to Health First's hospitals.  A Letter of Intent to that effect was executed in January 2005, which also included a provision that Health First agreed to pay OMNI physicians no less than other providers within HF Health Plans' network.

154.    In 2007, OMNI learned that Health First was paying other physicians with whom they contracted (*i.e.*, those admitting exclusively or nearly exclusively to Health First's hospitals) higher rates than what OMNI's physicians were receiving.  When OMNI brought this to Health First's attention, Health First demanded that OMNI retroactively amend its provider agreement to eliminate the contractual provision agreeing to pay OMNI physicians no less than other providers within HF Health Plan's network, again threatening retaliation.

155.    Health First made good on its threats of retaliation, this time by cancelling OMNI's self-funded health insurance plan covering its 500+ employees and dependents, which had been contractually administered by HF Health Plans.  Health First further refused, contrary to Florida law, to provide OMNI with its claims experience file so that OMNI could obtain alternate health insurance for its employees and their dependents.

156.    Health First retaliated against OMNI for its refusal to admit exclusively to Health First's hospitals in other ways, including but not limited to:

a)  Terminating OMNI's pharmacy contract as a provider in Health First's Medicare Part D Plan, despite the fact that it met the plan's terms and conditions for participation;

b)  Fabricating a $1 million alleged overpayment for fees and services rendered over a two-year period by OMNI;

c)  Refusing to reimburse for digital mammograms provided by OMNI and requiring its patients to receive preauthorization for digital mammography on the false grounds that the technology was unproven, that is until several months later when Health First was able to purchase its own digital mammography equipment, after which it struck the requirement for preauthorization;

d)  Initiating a sham audit of OMNI and requesting more than 1,000 of OMNI's charts; and

e)  Failing to compensate OMNI physicians at the same rate that they compensated other physicians, and litigated this payment issue with OMNI through binding arbitration.

157.    Then in 2007, Health First's refused to re-credential OMNI's physicians and terminated OMNI's participation in HF Health Plans.  For several years after terminating OMNI, Health First actively encouraged OMNI's physicians to leave OMNI by promising the physicians

that, if they left OMNI and joined another physician group (*i.e.*, a group which admitted patients exclusively to Health First's hospitals) that they would be permitted to  participate in HF Health Plans.  In addition, physicians that left OMNI for other physician groups were only allowed to participate in Health First's health plans if they agreed not to refer any patients to OMNI.

158.    Thus, Health First not only refused to deal with OMNI (one of its most significant competitors in the physician services market), it refused to deal with other physicians who dealt with OMNI, its rival.  That same conduct also constituted an attempt by Health First to use its monopoly power in the Relevant Market to distort competition in the market for physician services in Southern Brevard County.

159.    Up until the time that MIMA was acquired by HFS, MIMA conspired with HFS to exclude and foreclose OMNI's participation in the physician's service market and the ancillary services market.  MIMA along with HFS did not refer OMNI any patients nor did they refer patients to OMNI's ancillary services.  Because of the conspiracy, MIMA engaged in an anticompetitive conduct that damaged competition.  The goal of the conspiracy was clear -- HFS was to maintain its monopoly or become a monopolist in those markets in which they did not have market power.

160.    As a result, OMNI eventually shrank from a group of approximately 70 providers to a group of approximately 20 providers.  OMNI was also forced to sell its pharmacy operation, close certain offices, and divest itself of ownership in an ambulatory surgery center (all product markets in which, again, Health First also competed).

161.    Periodically since Health First terminated OMNI's participation in HF Health Plans in 2007, OMNI has reapplied for inclusion in HF Health Plans' network.  As of the date of

this Complaint, OMNI has not been accepted in HF Health Plans' network despite its continued attempts to reapply.

162.     Drs. Deligdish and Seminer, as partners at OMNI, were both formerly contracted with Health First as participating providers.

163.     As described above, both Drs. Deligdish and Seminer (as partners at OMNI) were terminated from the HF Health Plans network as a result of their refusal to submit to Health First's anticompetitive scheme.   Dr. Deligdish also had his hospital privileges taken away at Holmes RMC in 2010.   As part of its retaliation, Health First has further tried to exclude OMNI and Drs. Deligdish and Seminer from the market by threatening to terminate other providers from the network if they referred patients to OMNI and/or Drs. Deligdish and Seminer.

164.     As a result of these efforts by Health First to exclude them from the market, OMNI and Drs. Deligdish and Seminer have lost significant income.

### 2.     S.O.A.R. and Brian Dowdell, MD

165.     Dr. Dowdell M.D., M.S. is licensed to practice medicine in the State of Florida, and is a member of the medical staff of Holmes RMC.

166.     In spring of 2006, Peter Weiss, Medical Director of HF Health Plans, demanded that Dr. Dowdell stop doing onsite x-rays and instead to do them at Health First's Palm Bay facility.   Dr. Dowdell refused because performing those x-rays on site was less expensive and more efficient than what Health First was proposing.

167.     Dr. Dowdell received a letter terminating him from the Health First provider network on November 3, 2006.   Since that time, Dr. Dowdell has repeatedly tried through both letters and in-person meetings to convince Health First to reinstate his participation in the HF Health Plans network.   All of these efforts have failed, including his last application on or about September 2, 2011.

168.    At one meeting in April 2008, Dr. Dowdell was further told that all doctors joining his group would similarly be terminated from the Health First network, and that any doctors that left his group would be reinstated.  Thus, Health First's intent—*i.e.*, excluding those physicians who refused to support its anticompetitive scheme—was made apparent.

169.    During one meeting, in which he was inquiring about being let back into the HF Health Plans network, Dr. Dowdell was told by Health First that if he joined a physician group that was more in-line with Health First's interests, he would be allowed back into the network.

170.    Like all physicians terminated from the HF Health Plans network, not only did fewer HF Health Plans members come to Dr. Dowdell, but he also stopped receiving any referrals from doctors employed by HF Physicians and/or MIMA.

171.    As a result of these efforts by Health First to exclude them from the market, Dr. Dowdell has lost significant income.

172.    In addition, Dr. Dowdell is the sole owner of S.O.A.R.  Many of S.O.A.R.'s physicians were also terminated from the HF Health Plans network and blacklisted by HF Physician and MIMA doctors as a result of their association with Dr. Dowdell.  Due to this exclusionary conduct, S.O.A.R. lost significant revenue and many of its physicians were ultimately lured away to other physician groups so that they could contract again with HF Health Plans.

### 3.      Hamilton Boone, PA

173.    C. Hamilton Boone, P.A., is a physician assistant licensed to practice in the State of Florida, and is a member of the medical staff of Holmes RMC.  He is a current or former member of the following associations: the American Academy of Physician Assistants, the Association of Family Practice Physician Assistants, the Florida Association of Physician Assistants, the Georgia Association of Physician Assistants, and North Carolina Association of

Physician Assistants, and the National Commission on Certification of Physician Assistants. Mr. Boone was punished because he objected to the poor quality of medical care provided to patients at Holmes RMC, and because he wanted Health First to compete aggressively and deliver competitive healthcare rather than engage in exclusionary conduct to the detriment of patients.

174. After Mr. Boone joined Dr. Hynes in voicing concerns over the quality of medical care provided at Holmes RMC, Health First decided that Mr. Boone was insufficiently supportive of its anticompetitive scheme and took affirmative steps to retaliate against him and exclude him from the market. Specifically, Mr. Boone complained to the Operating Room Committee about a preventable death in the O.R. The very next day, Mr. Boone started suffering harassment from Health First.

175. In fact, one HF Physician employee sent Mr. Boone a letter to that effect on or about March 12, 2010, informing him that he was effectively blacklisted by Health First. Moreover, Dr. Joe Gurri, a former MIMA physician now employed by HF Physicians, specifically instructed all MIMA surgeons not to utilize Mr. Boone's services. From that point on, all doctors employed by HF Physician and/or MIMA were instructed not to use Mr. Boone as a Physician Assistant. Health First has further prevented Mr. Boone from gaining access to surgery schedules so that he can seek consults with surgeons performing procedures at Holmes RMC, which is one of the primary sources for referrals for PAs who assist with surgeries.

176. As a result of these efforts by Health First to exclude them from the market, Mr. Boone has been unable to operate his business and has been damaged by the actions of the Defendants.

### 4. Richard Gayles, MD and Stan Golovac, MD

177. Drs. Gayles and Golovac are former HF Health Plans participants and partners in Florida Pain, a multi-service facility that specializes in the treatment of neck, back and cancer

pain with multiple locations in Brevard County.  In spring of 2009, they also opened Space Coast Surgery Center, an outpatient surgical and procedure facility.

178.    Originally, Space Coast Surgery Center was intended to be a joint venture with Health First.  Later, Health First expressed concerns that "Surgi-centers make less money than a hospital," and Drs. Gayles and Golovac opened the center on their own.  Afterwards, they were warned that Health First would view the opening of Space Coast Surgery Center as disloyal and as unwelcomed competition.

179.    Drs. Gayles and Golovac were terminated from the Health First provider network effective November 30, 2009, several months after opening Space Coast Surgery Center.  No official reason was provided for their termination.  Despite multiple attempts to get reinstated as participants in Health First's provider network, most recently in July 2012, all attempts have been rebuffed.

180.    Immediately following their termination from the Health First provider network, Drs. Gayls and Golovac stopped receiving referrals from HF and MIMA Physicians.  Today, no physician employed by HF Physicians (which now includes MIMA's physicians), and few if any physicians within Health First's provider network, refer patients to Drs. Gayles and Golovac.

181.    Moreover, the hospitalists at Holmes RMC (who, coincidentally, have recently all been terminated and replaced by hospitalists employed directly by Health First) refer all pain management cases exclusively to HF Physicians.  Not only do all of these cases go to providers within Health First's provider network, most if not all of them are referred to an HF Physician.

182.    Despite being excluded from Health First's provider network, Dr. Gayles still takes call at Cape Canaveral Hospital.  While on call, however, the hospital will not refer any HF Health Plans members to Dr. Gayles, and only a minimal number of other insured patients.

Instead, those referrals are all given to HF Physicians, even if that means that patients will have to wait a significant amount of time for the HF Physician to become available.  Dr. Gayles, on the other hand, is left with only uninsured, Medicaid, and other patients with low reimbursement rates.

183.    As a result of these efforts by Health First to exclude them from the market, Drs. Gayles' and Golovac's have lost significant income.

### 5.    Lance Grenevicki, MD

184.    Lance Grenevicki, D.D.S., M.D., FACS, is a medical doctor and a dentist licensed to practice medicine in the State of Florida and was previously the Chief of the Department of Surgery at Holmes RMC.  He was a member of the MEC of Holmes RMC.  He was also formerly the Vice President and President of the Medical Society of Brevard County.

185.    As Chairman of the Department of Surgery and a member of the MEC at Holmes RMC, Dr. Grenevicki supported the suspension of trauma surgeons hired by Health First when it became apparent that those surgeons lacked the requisite experience for the procedures they were performing, thus putting patients' safety at risk.  In retaliation, Health First brought a baseless legal action against Dr. Grenevicki and the other physicians involved.

186.    As a result, Dr. Grenevicki has also never been allowed to participate as a provider in the HF Health Plans network.  Although he has repeatedly tried to contract with Health First to become a participating provider, Health First has either denied the request outright or offered a contract under objectively unreasonable terms clearly designed to dissuade a meeting of the minds.

187.    Nonetheless, a large portion of Dr. Grenevicki's practice was previously composed of oral and maxillofacial trauma surgeries referred to him while serving as the on-call trauma surgeon at Holmes RMC, where all or nearly all trauma patients in Southern Brevard

County are diverted.  Historically, Holmes' trauma surgery needs were met this same way—*i.e.*, by contracting with surgeons to take call and referring incoming patients to those surgeons—until Health First terminated its contracts with non-HF Physicians and replaced them with Health First-employed surgeons.  For oral and maxillofacial surgeries in particular, Health First even referred its patients to a surgeon located well-outside the geographic area until it was able to hire its own oral and maxillofacial surgeon.

188.    Similarly, many of Dr. Grenevicki's referrals previously came from MIMA.  However, once HFS began to exclude Dr. Grenevicki, MIMA did as well and referrals from MIMA began to taper off.  Finally, when MIMA was acquired by Health First, he stopped receiving any referrals from MIMA physicians, who instead referred exclusively or nearly exclusively to Health First's surgeons.

189.    As a result of these efforts by Health First to exclude him from the market, Dr. Grenevicki has lost significant income.

### 6.    Aleksander Komar, MD

190.    Dr. Komar is board certified in surgery and surgical critical care by the American Board of Surgery.  After practicing with the University of Florida Jacksonville ("UFJ"), he was assigned to the university's Melbourne satellite in 2002.  At that time, UFJ was running Holmes RMC's Level II Trauma Center and Dr. Komar was assigned there as an attending surgeon.

191.    In September 2003, Dr. Komar resigned from the trauma service and joined an independent physician group, Medical Associates of Brevard.  One of the primary reasons for his resignation was the threats he received from the administration at Holmes RMC about dissolving the trauma program.  Nonetheless, Dr. Komar continued to support the trauma program at Holmes RMC through a part-time employment contract with UFJ.  Eventually, despite concerns

about quality of care voiced by the MEC, Health First and Holmes RMC terminated the trauma program contract with UFJ.

192.    After the UFJ contract was terminated, Health First offered Dr. Komar a provider contract, though at terms considerably inferior to those offered to HF Physicians.  In addition, Dr. Komar was also employed as a contractor at Health First's electronic intensive care unit ("eICU").

193.    During this period, Dr. Komar saw HF Health Plans patients and was repeatedly ordered to change the admission status of his patients.  On two separate occasions, after refusing to comply with Health First's demands regarding how to provide care for his patients, Dr. Komar was threatened by a director at HF Health Plans that he would be denied payment for his services and the patient would be made responsible for his bill if he did not concede to their demands.

194.    Health First has also refused payment for patients because Dr. Komar treated them at Wuesthoff-Melbourne.  In one instance, a patient required emergency surgery and, after denying Dr. Komar payment, he was reprimanded and told that he was supposed to transfer the patient in the middle of the night to Holmes RMC despite the fact that Holmes RMC had trouble even accommodating admitted patients.  In fact, at around the same time, Dr. Komar was forced to transfer two patients to Wuesthoff-Melbourne for emergency surgery when Holmes RMC could not accommodate them.

195.    In February 2009, after Health First determined that Dr. Komar was not going to support its anticompetitive scheme, Health First terminated his contract with the eICU.  In particular, after Dr. Komar signed a letter of support for Wuesthoff-Melbourne, he was threatened that if he did something like that again he would be terminated.  Despite these threats, Dr. Komar continued to advocate in favor of patient care and—after standing up at an MEC

meeting and criticizing Health First's Hospital Monopoly as detrimental to the provision of affordable, high-quality healthcare—he was terminated.  At that time, the Director of the eICU, Dr. James P. Schaffer, MD, informed Dr. Komar that he was not being terminated for performance reasons, but rather because someone "very high in the HF hierarchy" demanded it.  Dr. Schaffer further told Dr. Komar that his termination would put Dr. Schaffer "in a crunch" because there were already problems covering all of the eICU shifts.

196.    Although Health First has not terminated his provider contract, Dr. Komar has effectively been boycotted by Health First and, as a result, receives no referrals from HF Physicians and/or MIMA physicians despite being in the HF Health Plans network.  Furthermore, Health First actively diverts patients away from Dr. Komar by intentionally providing patients misinformation regarding Dr. Komar being out of town or otherwise unavailable.  Instead, patients are forced to see a surgeon employed by HF Physicians (*i.e.*, someone not only in the HF Health Plans network, but employed by Health First's physician group).

197.    As a result of these efforts by Health First to exclude him from the market, Dr. Komar has lost significant income.

### III.    The MIMA Acquisition

198.    In November 2012, Health First announced that it would be acquiring MIMA, then the largest physician group in Brevard County besides HF Physicians (the "MIMA Acquisition").  The MIMA Acquisition substantially added to Health First's power and dominance in the physicians' services market in Southern Brevard County.

199.    Large, desirable physician groups are better able to negotiate favorable rates with health insurers.  Thus, the MIMA Acquisition gave HF Physicians additional leverage in negotiating rates with other health insurers.

200.    For example, HF Physicians, including now the former-MIMA physicians, do not contract with competing Medicare Advantage plans.  Instead, they only accept Medicare Advantage Plans offered by HF Health Plans and HF Insurance.

201.    Additionally, controlling physicians (particularly primary care physicians) enables Health First to control patient referrals, as well as which treatments—such as ancillary services— which physicians elect to utilize.  The acquisition of MIMA augments this power and allows Health First to maintain its monopoly, and simply reduce the quality of care—effectively failing to pass on any cost benefits to its members.

202.    HF Physicians, including now the former-MIMA physicians, admit exclusively or nearly exclusively to Health First medical facilities as a contractual and/or *de facto* condition of their employment.

203.    Accordingly, the MIMA Acquisition enabled Health First to directly control the majority of admissions and specialty referrals in Southern Brevard, if not all of Brevard, County, thus restraining competition in both the markets for hospitals and physician services, and augmenting and maintaining Health First's overall market power.

204.    The MIMA Acquisition was investigated by the Office of the Florida Attorney General (the "Florida AG") and the Federal Trade Commission ("FTC").  During the course of the investigation, Health First falsely denied the existence of any actual and/or *de facto* exclusivity agreements and, relying on this misrepresentation, the Florida AG and FTC decided not to bring enforcement actions at that time.

205.    In its letter informing Health First that it was not bringing an enforcement action, a representative of the Florida AG stated, "[I]t is our understanding, based on our discussions with you, that Health First will continue to permit employed physicians, including former MIMA

46

physicians, to admit and/or refer patients to the hospital of their choosing, including non-Health First hospitals.  Additionally, it is our understanding that former MIMA physicians will not be required to sign exclusive agreements with HF Plans.  If either of these facts should change, or if you should acquire any additional physician practices in Florida, please notify me."

206.    In reality, as discussed herein, HF Physicians (including MIMA) rarely if ever refer patients to non-Health First hospitals as they are bound by actual and/or *de facto* exclusivity agreements that prevent them from doing so.  Indeed, even before the completion of the MIMA transaction, both MIMA and Health First physicians referred less than 1% of their patients to Wuesthoff (and these admissions represent the majority of all Health First's hospital admissions in Southern Brevard County).

207.    Additionally, immediately following the merger with Health First, the physicians formerly with MIMA began: (1) significantly increasing the prices for certain services (some as much as doubled); (2) terminating business relationships with other health plans and ancillary service providers; and (3) directing all ancillary services to Health First's own higher-priced providers.

208.    Therefore, the MIMA Acquisition has resulted in a substantial lessening of competition and reinforced/augmented Health First's market power in the Relevant Market and related Secondary Product Markets.

209.    Moreover, the MIMA Acquisition and the expansion of Health First's market power in the physician services market in Southern Brevard County is part of a larger effort to systematically terminate non-Health First physicians within Health First's provider networks and replace them with physicians employed directly by Health First.

210.    For example, within the past several years, Health First has systematically forced independent hospitalists out of its hospitals, either by terminating and/or refusing to extend their provider contracts or, in some instances, by terminating their hospital privileges without justification.  Afterwards, Health First replaces these hospitalists with physicians employed by Health First.

211.    These actions are not undertaken for valid business reasons such as lowering costs or ensuring quality of care, but rather they represent further efforts by Health First to maintain and enhance its super-monopoly.

## IV.    Health First's History, Pattern, and Practice of Anticompetitive Conduct

### A.    Tying Access to Its "Must Have" Hospital to Use of Its Other Hospitals

212.    Health First maintains the Hospital Monopoly it acquired, in part, by exploiting Holmes RMC's "must have" status and requiring managed care plans to include _all_ Health First hospitals in their network as a precondition to including Holmes RMC.  By forcing managed care plans to contract all of its hospitals together as a group, Health First can require managed care plans to pay its other hospitals supra-competitive prices as a condition for inclusion of its must-have hospital, Holmes RMC, in their network.  This requirement is only possible because, without the participation of Holmes RMC, managed care plans cannot successfully market their products in Southern Brevard County (or Brevard County, generally).

213.    As a result of this all-or-nothing requirement, Health First has effectively eliminated the ability of managed care plans to promote competition in Southern Brevard County through selective contracting.

214.    For example, before the merger of Holmes RMC and Cape Canaveral Hospital, managed care plans historically were able to contract selectively by choosing between, or threatening to choose between, Wuesthoff Medical Center-Rockledge ("Wuesthoff-Rockledge")

and Cape Canaveral Hospital in Cocoa Beach, for general acute care inpatient hospital services in Central Brevard County.  As a result of this competition, net hospital prices charged to managed care plans were lower in Central Brevard County, where there was inpatient hospital competition, than in Southern Brevard County where there was little, if any, general acute care inpatient hospital competition.

215.    However, the creation of Health First (and the affiliation of Holmes RMC and Cape Canaveral Hospital) enabled Defendants to restrict and eliminate competition on the merits for managed care contracts.

216.    As a result of the managed care plans' inability to selectively contract, hospital prices in Southern Brevard County are higher than anywhere else in central Florida.  In fact, according to representatives of some private health insurers, the fees charged by Health First's hospitals are among the highest, if not *the* highest, in the State.

B.    **Creating Additional Barriers to Entry: Limiting the Growth of Independent Physician Groups**

217.    Holmes RMC also took affirmative steps to limit the ability of independent physician groups to grow their practices.   On September 15, 1994, just before the formation of Health First, the Board of Directors of Holmes RMC authorized the creation and funding of its own medical services organization.   Four days later, on September 19, 1994, Holmes RMC's Medical Staff Planning Committee (one of the members of which was Defendant Means) voted to institute a moratorium on all new applications for hospital privileges by physician specialists.

218.    From 1994 through at least 2000, Holmes RMC enforced this policy whereby no new physician specialists were granted hospital privileges.  The moratorium was modified at a meeting on or about March 14, 1995 to, among other things, create an exception for "Hospital

based physicians" and permitting the Board of Directors of Holmes RMC to "reserve[] the option to override the [moratorium plan] to meet special needs that may arise."

219.   Once Health First acquired Holmes RMC, this policy was instituted at all Health First hospitals in Southern Brevard County.  Not surprisingly, exceptions to the moratorium and the exercise of the aforementioned option to "override" its terms were only applied when HF Physicians or MIMA were seeking to add new specialists.  Requests by independent physician groups, such as OMNI, to add specialists were routinely denied.

220.   As a result, Health First was able to grow its own physicians group and the groups (like MIMA) which had agreed to "play ball" with Health First, while preventing similar growth by independent physician groups that would otherwise have promoted competition and had a price disciplining effect in the Relevant Market and related Secondary Product Markets.

### C.   Predatory Investments: Viera Hospital

221.   Health First vehemently opposed the building of Wuesthoff-Melbourne, its only competitor in Southern Brevard County, by repeatedly arguing during the certificate of need ("CON") process that another hospital in the area was unnecessary.

222.   After being sued by Wuesthoff for antitrust violations in 1999, Health First settled with Wuesthoff in 2000 for $3.65 million and an agreement to stop opposing Wuesthoff's Melbourne hospital.

223.   Afterwards, despite taking the exact opposite position in opposing the building of Wuesthoff-Melbourne, Health First applied for and received permission to build another hospital, Viera Hospital, directly between Wuesthoff's two hospitals in Rockledge and Melbourne—*i.e.*, right between Central and Southern Brevard County.

224.   Given its geographic location, Viera Hospital reduced the income generated at Health First's other hospitals.  It would also, however, reduce income at Wuesthoff's hospitals.

In fact, Wuesthoff's most profitable hospital was impacted, ensuring that Wuesthoff had fewer resources to compete against Holmes RMC in Southern Brevard County. As one Health First executive openly acknowledged, the opening of Viera Hospital was specifically intended "to cut the head off the snake"—*i.e.*, to prevent Wuesthoff from effectively competing with Health First in Southern Brevard County.

225. The opening of Viera Hospital was a predatory investment specifically designed with the intent and purpose of injuring and restraining competition from Wuesthoff. The additional revenue derived from Viera Hospital was significantly outweighed by its cost. Therefore, despite being economically irrational in the short-term, Viera Hospital was built to preserve Health First's monopoly power and, thus, its long-term monopoly profits.

226. Health First's efforts to thwart competition from Wuesthoff in Southern Brevard County was successful in preventing Wuesthoff-Melbourne from thriving and expanding. In fact, in 2010, financially-distressed Wuesthoff was sold to Health Management Associates, Inc.

**D. Creating Additional Barriers to Entry: The Viera Company Restrictive Covenant**

227. After Health First reversed positions and built Viera Hospital, it then took affirmative steps to ensure that no other competitors would enter the immediate geographic area.

228. Viera Hospital was built upon an approximately 17,800 acre tract of land owned and controlled by The Viera Company, a wholly owned subsidiary of A. Duda & Sons, Inc. ("DUDA"). The town of Viera, in which Viera Hospital is located, is a master-planned town developed by DUDA and The Viera Company. In fact, the town's name of "Viera" itself was chosen by the Dudas, which means "faith" in the family's native Slovak language.

229. Health First and The Viera Company entered into an agreement whereby that 17,800 acre tract of land would be subject to a restrictive covenant preventing anyone from

opening a medical office, ambulatory surgery center, cancer center, fitness center, or diagnostic center ("including but not limited to - radiology, MRI, CT, PET, nuclear medicine, mammography, and ultrasound") without prior approval by Health First.  Additionally, potential lessees were specifically instructed that all tenants "are recommended to have privileges at Viera Hospital."

230.    Given the size and location of this 17,800 acre tract of land, this restrictive covenant effectively excluded Health First's hospital- and physician- competitors from a substantial portion of Southern Brevard County.

## V.    **The Individual Defendants**

231.    The actions taken to create a vertically integrated healthcare organization for the sole purpose of perpetuating Health First's Hospital Monopoly was no accident.  Those actions were intentionally put in place and implemented by Health First's board of directors.  Whether it was excluding physicians from the HF Health Plans or conspiring with MIMA to maintain and perpetuate their Hospital Monopoly, Health First's board of directors was involved and directed the anticompetitive conduct alleged herein.

232.    It is also significant that Health First's board of directors is not an effective voice of the community with the capacity to keep the monopolistic abuses of the organization in check. That is so because, unlike the board of a typical non-profit corporation, the members of Health First's board of directors are paid substantial sums of money, and are provided other benefits. Moreover, the boards of all the subsidiaries overlap with the board of the parent, so there effectively is only one centralized organization.  The terms of these board members tend to be long and self-perpetuating, thus permitting individual board members to benefit by hundreds of thousands of dollars while management is permitted to control the corporation without serious oversight.

### A.    Defendant Means

233.    Defendant Means is one of the co-founders of Health First.  He served as Chief Executive Officer and President of Health First, Inc. from 1995 to December 2011, and he also served as President and Chief Executive Officer of Holmes RMC and Palm Bay Hospital since 1989.  Defendant Means further served as a member of the board of HF Health Plans, and as a Director of Health First, Inc. until December 2011.

234.    In these positions, Defendant Means authorized, participated in, directed, approved, and/or ratified the unlawful acts described in this Complaint.  His role in the anticompetitive scheme can be inferred not only from the positions he held at Health First, but from various actions and statements he made in furtherance and/or support of the scheme.

235.    For example, Defendant Means reportedly instructed the CEO of Wuesthoff to "stay out of South [Brevard] County."  Subsequently, he reportedly told the physicians at a Medical Staff meeting at Holmes RMC, "If you sign letters of support for Wuesthoff, we will know who you are."

236.    These affirmative acts demonstrate that Defendant Means actively and knowingly engaged in a scheme designed to achieve anticompetitive ends—*i.e.*, to unlawfully maintain Health First's Hospital Monopoly and to attempt to monopolize several other healthcare-related markets—and exerted his influence so as to shape Health First's corporate intentions.

### B.    Defendant Senne

237.    Defendant Senne is the former President and Chief Executive Officer at Holmes RMC, as well as the founding President and Chief Executive Officer of HF Health Plans.  He was also the Executive Vice President and Chief Strategy Officer of Health First, Inc.

238.    In these positions, Defendant Senne authorized, participated in, directed, approved, and/or ratified the unlawful acts described in this Complaint.  His role in the

anticompetitive scheme can be inferred not only from the positions he held at Health First, but from various actions and statements he made in furtherance and/or support of the scheme.

239.   For example, when OMNI first approached Health First in 1997 in order to participate in the HF Health Plans plan, Defendant Senne told OMNI that only physicians employed by HF Physicians and MIMA would be permitted to participate in the HF Health Plans.  Later, Defendant Senne explicitly instructed OMNI that it could participate in the HF Health Plans' network if it agreed to admit its patients exclusively to Health First's hospitals.

240.   These affirmative acts demonstrate that Defendant Senne actively and knowingly engaged in a scheme designed to achieve anticompetitive ends—*i.e.*, to unlawfully maintain Health First's Hospital Monopoly and to attempt to monopolize several other healthcare-related markets—and exerted his influence so as to shape Health First's corporate intentions.

## ANTICOMPETITIVE EFFECTS

241.   Defendants acted with the purpose and effect of unreasonably restraining and injuring competition in the Relevant Market, as well as the related secondary product markets.

242.   But for the exclusionary conduct described herein: (a) Health First's market power in the Relevant Market and the related secondary product markets would be reduced; (b) there would be greater competition in Relevant Market and the related secondary product markets; (c) Health First would be unable to coerce providers into the exclusive dealing arrangements described above; (d) independent providers would not be subject to the same intimidation and retaliation techniques currently imposed upon them by Health First; and (e) prices in the Relevant Market would be lower and/or the quality of care would be higher, and prices would be lower and/or quality higher in the related secondary product markets.

243.    As a result, prices for acute care inpatient services and ancillary services are higher, and the quality of patient care (*i.e.*, quality of services) is lower, in Southern Brevard County than in most, if not all, of Florida.

## ANTITRUST IMPACT

244.    As a direct result of the anticompetitive course of conduct described herein, competition in the Relevant Market and in secondary markets was harmed, and Plaintiffs' ability to effectively compete in the related markets for physician services and ancillary services in Southern Brevard County was substantially limited.

245.    In furtherance of the anticompetitive course of conduct described herein, Health First terminated Plaintiffs' provider contracts and/or refused to renew them, thus barring them from providing medical services to Health First's members.  Health First further instructed its physicians not to refer any patients to them.

246.    Moreover, with respect to OMNI, Health First would only renew its provider contracts with former OMNI physicians on an individual basis and, even then, only if they agreed to admit their patients exclusively to Health First's hospitals/providers and *not* to OMNI or its providers.  As a result of Health First terminating OMNI's provider contract, as well as its affirmative efforts to lure OMNI's providers away from OMNI, OMNI lost the majority of its providers.  That forced conversion from independent to affiliated physician was accompanied by an increase in the prices charged by those physicians for physician and ancillary services.  Had those physicians remained independent, they would have imposed significant price discipline on Health First in the markets for physician services and ancillary services.

247.    Similarly, Health First's anticompetitive course of conduct described herein resulted in several physicians, including Dr. Deligdish, unjustifiably losing their medical privileges at Holmes RMC.

248.    Thus, it is clear that any provider wanting to practice in Southern Brevard County has been forced to comply with Health First's anticompetitive demands or practice in another geographic area.

249.    As a result of these occurrences above, Plaintiffs experienced loss of income due to the foreclosure of competition in the Relevant Market and related secondary product markets, and suffered harm to their business and property.

250.    These injuries were a direct and foreseeable result of Defendants' anticompetitive course of conduct, as described herein.

251.    Such actions, which have deprived Plaintiffs of the benefits of open competition, represent precisely the type of conduct the antitrust laws were designed to protect against.

252.    Health First not only competes in the Relevant Market, but also in the market for physician services and health insurance in Southern Brevard County.

253.    Patients typically rely on their physician's choice of hospital when utilizing acute care inpatient services.  Thus, physicians are also market participants in the Relevant Market.

### FIRST CLAIM FOR RELIEF

**Impermissible Merger In Restraint of Trade
In Violation of Section 7 of the Clayton Act
(Asserted Against All Defendants)**

254.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

255.    By acquiring MIMA, the largest independent physicians group in Southern Brevard County, Health First has further solidified its control over hospital admissions in the Relevant Market.  This control was sought for the anticompetitive purpose of reinforcing Health First's Hospital Monopoly by, *inter alia*, ensuring that all employed physicians refer exclusively to Health First's hospitals and physicians.

56

256.     Thus, the MIMA Acquisition constitutes a merger and acquisition which has the tendency to reduce, and in fact has reduced, competition in the Relevant Market and related secondary product markets (*i.e.*, those for physician services, private health insurance plans, and Medicare Advantage plans in Southern Brevard County).

257.     As a result, prices are higher (and will continue to climb) in the Relevant Market and there are fewer alternatives for health insurers doing business in Southern Brevard County, thereby causing injury to competition, consumers, and Plaintiffs.

258.     This reduction in competition has also substantially limited Plaintiffs' ability to effectively compete in the inter-related market for physician services in Southern Brevard County.    Plaintiffs have thus been injured in their business and property as a result of this reduction in competition.

259.     These injuries are of the type the federal antitrust laws were designed to prevent and flow from Defendants' unlawful conduct.

## SECOND CLAIM FOR RELIEF

**Monopolization**
**In Violation of Section 2 of the Sherman Act**
**(Asserted Against Defendant Health First, Inc.)**

260.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

261.     Health First has monopoly power in the Relevant Market—*i.e.*, general acute care inpatient hospital services in Southern Brevard County.    Direct evidence of Health First's monopoly power is demonstrated by Health First's ability to exclude competitors and raise prices to supra-competitive levels.    Indirect evidence of Health First's monopoly power includes, *inter alia*, its 70% market share in the Relevant Market.

262.    This monopoly in the Relevant Market was not lawfully obtained through superior business acumen; rather it was willfully acquired through a merger-to-monopoly.

263.    Health First has exercised, maintained, and exploited its monopoly power in the Relevant Market through the exclusionary and anticompetitive devices described above, including, *inter alia*:

a)      Contractual and/or *de facto* exclusive dealing arrangements requiring physicians to exclusively or nearly exclusively admit/refer all patients to Health First's hospitals and physicians;

b)      Intimidation and/or retaliation against physicians practicing in Southern Brevard County who Health First viewed as insufficiently loyal to Health First;

c)      Refusing to deal with Health First's competitors, without justification, and specifically to maintain and/or enhance Health First's monopoly;

d)      Eliminating physicians from its health plan and its hospitals who refused to put the hospital's profits ahead of patient care; and

e)      The MIMA acquisition, which not only enhanced Health First's market power in physician services, but assisted Health First in maintaining its monopoly in the Relevant Market by controlling which facilities its physicians utilize for medical services.

264.    As a result, prices are higher and there are fewer alternatives for participants in the Relevant Market and related healthcare markets, thereby causing injury to competition, consumers, and Plaintiffs.

265.    Health First's exercise and maintenance of monopoly power in the Relevant Market, including the exclusionary course of conduct designed towards that end, has also substantially limited Plaintiffs' ability to effectively compete in the inter-related market for physician services in Southern Brevard County.

266.    Plaintiffs have been injured in their business and property as a result of this reduction in competition.

267.    These injuries are of the type the federal antitrust laws were designed to prevent and flow from Defendants' unlawful conduct.

268.    Alternatively, in the absence of a finding of monopoly power in the Relevant Market, Health First acted with the specific intent of obtaining monopoly power and, because of those affirmative acts, poses a dangerous probability of achieving monopoly power in the market for general acute care inpatient hospital services in Southern Brevard County.

### THIRD CLAIM FOR RELIEF

**Attempted Monopolization
In Violation of Section 2 of the Sherman Act
(Asserted Against All Defendants)**

269.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

270.    Health First has acted with the specific intent of monopolizing the various Secondary Product Markets discussed herein—including the markets for physician services, private health insurance plans, Medicare Advantage plans, and ancillary services in Southern Brevard County.

271.    Health First has affirmatively sought such monopoly power in the Secondary Product Markets through the exclusionary and anticompetitive devices described above, including, *inter alia*:

a)    Contractual and/or *de facto* exclusive dealing arrangements requiring physicians to exclusively or nearly exclusively admit/refer all patients to Health First's hospitals and physicians;

b)    Intimidation and/or retaliation against physicians practicing in Southern Brevard County who Health First viewed as insufficiently loyal to Health First;

c)    Refusing to deal with Health First's competitors, without justification, and specifically to maintain and/or enhance Health First's monopoly;

d)   Eliminating physicians from its health plan and its hospitals who refused to put the hospital's profits ahead of patient care; and

e)   The MIMA acquisition, which not only enhanced Health First's market power in physician services, but assisted Health First in maintaining its monopoly in the Relevant Market by controlling which facilities its physicians utilize for medical services.

272.   As a result of this exclusionary conduct, there is a dangerous probability that Defendants have achieved or will achieve monopoly power in the Secondary Product Markets— *i.e.*, physician services, private health insurance, Medicare Advantage plans, and ancillary services—in Southern Brevard County.

273.   Moreover, as a result of Defendants' conduct: (i) Plaintiffs' ability to effectively compete in the physicians' services and ancillary services markets has been substantially limited; and (ii) prices are higher and alternatives fewer for participants in the Secondary Product Markets, thus resulting in injury to competition, consumers, and Plaintiffs.

274.   Plaintiffs have been injured in their business and property as a result of this reduction in competition.

275.   These injuries are of the type the federal antitrust laws were designed to prevent and flow from Defendants' unlawful conduct.

## FOURTH CLAIM FOR RELIEF

**Contract, Combination, or Conspiracy In Restraint of Trade
In Violation of Section 1 of the Sherman Act
(Asserted Against All Defendants)**

276.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

277.   Health First (through its wholly-owned subsidiaries, Holmes RMC and Palm Bay Hospital), competes in the Relevant Market; Plaintiffs, in turn, are primarily responsible for selecting where their patients are admitted for acute inpatient care services.   Similarly, Health

First (through its wholly-owned subsidiary, HF Physicians), MIMA, and Plaintiffs all compete in the physicians' services and ancillary services markets in Southern Brevard County.  Therefore, Health First and Plaintiffs are both market participants in the Relevant Market and in the related markets for physicians' services and ancillary services in Southern Brevard County.

278.    Defendants and certain co-conspirators (including MIMA, prior to its acquisition by Health First) entered into a continuing agreement, understanding, combination, and/or conspiracy to restraint trade and exclude competition by, *inter alia*, engaging in contractual and/or *de facto* exclusive dealing arrangements to admit patients exclusively to Health First hospitals.

279.    As a result, Defendants and their co-conspirators have foreclosed competition for general acute care inpatient hospital services in Southern Brevard County, thereby harming competition and causing prices to be higher, alternatives in that market to be fewer, and quality of care to be lower.  Along with competition, consumers and Plaintiffs have been harmed.

280.    Plaintiffs have thus suffered injured in their business and property as a result of this reduction in competition.

281.    These injuries are of the type the federal antitrust laws were designed to prevent and flow from Defendants' unlawful conduct.

### FIFTH CLAIM FOR RELIEF

**Conspiracy To Monopolize**
**In Violation of Section 2 of the Sherman Act**
**(Asserted Against All Defendants)**

282.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

283.    Defendants and certain co-conspirators (including MIMA, prior to its acquisition by Health First) have acted in concert to exercise and maintain Health First's monopoly power in Southern Brevard County in order to restrain trade and exclude competition.

284.    This conspiracy to monopolize was achieved through the exclusionary and anticompetitive conduct described above, including, *inter alia*, the contractual and/or *de facto* exclusive dealing arrangements to admit patients exclusively to Health First hospitals, as well as a concerted refusal to deal with (*i.e.*, refer patients to) those physicians that refused to take part in those exclusive dealing arrangements.

285.    As a result, Defendants and their co-conspirators have foreclosed competition in the Relevant Market and related Secondary Product Markets, thereby harming competition and causing prices to be higher, alternatives in that market to be fewer, and quality of medical care to be lower in Southern Brevard County.  Along with competition, consumers and Plaintiffs have been harmed.

286.    Plaintiffs have thus suffered injured in their business and property as a result of this reduction in competition.

287.    These injuries are of the type the federal antitrust laws were designed to prevent and flow from Defendants' unlawful conduct.

## SIXTH CLAIM FOR RELIEF

### Unfair Methods of Competition
### In Violation of Florida Deceptive and Unfair Trade Practices Act
### (Asserted Against All Defendants)

288.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

289.    This is an action for damages, for declaratory injunctive relief and for attorney's fees pursuant to § 501.203 Fla. Stat. et. Seq. §§ 501.204, 501.2105 and § 501.211 (2013).

290.     During all relevant times the defendants were engaged in trade or commerce with a thing of value and Plaintiffs were consumers as set forth in § 501.203, Fla. Stat. (2013).

291.     The acts engaged in by Defendants violate the Sherman Act, and therefore are violation of § 501.204 (2013).

292.     Moreover, the conduct described herein is deceptive or unfair in that it offends established public policy, is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers in violation of 501.204 Fla. Stat. (2013).

293.     Defendants Senne and Means participated directly in the deceptive or unfair conduct set forth herein as executives of the various defendants or possessed the authority to control said conduct.

294.     As a result of this deceptive and unfair conduct of the Defendants, Plaintiffs have suffered been damaged by their inability to properly run their businesses because of the acts and practices of the Defendants.

<u>**SEVENTH CLAIM FOR RELIEF**</u>

**Tortious Interference
In Violation of Florida State Law
(Asserted Against All Defendants)**

295.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

296.     Plaintiffs had an ongoing relationship with patients that were insured by HF Health Plans.

297.     Defendants, with knowledge of these business relationships, undertook affirmative acts with the explicit purpose and effect of interfering with such relationships, including, inter alia: terminating Plaintiffs' provider contracts; refusing to enter into new provider contracts; actively persuading patients to switch from Plaintiffs to alternative medical

providers; instructing physicians not to refer patients to Plaintiffs; and instructing physicians not to accept patients covered by health plans other than HF Health Plans which were referred by Plaintiffs.

298.    These affirmative acts were undertaken for the specific purpose of interfering with Plaintiffs' business relationships with its patients.  These actions were also unjustified as they were undertaken to injure Plaintiffs and further an unlawful, anticompetitive scheme as opposed to the legitimate acquisition of business.

299.    Furthermore, Plaintiff OMNI employed and/or partnered with dozens of physicians who served as medical providers, thus creating a business relationship between OMNI and those physicians.

300.    Defendants, with knowledge of these business relationships, undertook affirmative acts with the explicit purpose and effect of interfering with such relationships, including, inter alia: terminating OMNI's provider contract; refusing to enter into a new provider contract; making negative comments about OMNI and its business prospects; and coercing those physicians to leave OMNI in order to gain preferential pricing and access to HF Health Plan's members.

301.    In addition, the business relationships between OMNI and the aforementioned physicians were governed by a contract which contained a non-compete provision.  Defendants, with knowledge of the non-compete provision, hired these former OMNI physicians in question. But Defendants were not the passive beneficiaries of physicians looking for alternative employment, nor were they hired for a legitimate purpose such as expanding Defendants' business.  Instead, as described above, Defendants actively lured away these physicians with the specific intent, purpose, and effect of interfering with such relationships and damaging OMNI.

302.    As a result of the interferences described herein, Plaintiffs were damaged in the form of lost income and the diminished value of their businesses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demand a trial by jury on all matters so triable under law, and respectfully request that, based on the verdict of the jury, the Court enter a judgment against Defendants which:

a)    Adjudges and decrees that Defendants unlawfully violated Section 7 of the Clayton Act, and exercised and maintained monopoly power in the market for acute care inpatient hospital services in Southern Brevard County, or, in the alternative;

b)    Adjudges and decrees that Defendants have attempted to monopolize the market for acute care inpatient hospital services in Southern Brevard County;

c)    Adjudges and decrees that Defendants have engaged in an unlawful agreement in violation of Section 1 of the Sherman Act;

d)    Orders the divestiture of MIMA, HF Physicians, and HF Health Plans from Health First;

e)    Invalidates any arrangements between any of the Heath First entities and any physician and/or medical group conspiring with any of the Defendants, including but not limited to HF Physicians, to utilize Health First hospital facilities exclusively or nearly exclusively;

f)    Awards Plaintiffs threefold damages caused by Defendants' conduct, as required by statute;

g)    Awards Plaintiffs direct and consequential damages caused by Defendants' conduct, as required by state law;

h)     Awards Plaintiffs their reasonable attorney's fees and costs incurred in pursuing this action in accordance with the federal antitrust laws and state law; and

i)     Grants Plaintiffs such other and further relief as may be equitable and just under the circumstances.

Plaintiffs hereby reserve the right to assert a claim for punitive damages upon a proper proffer to the Court.

December 6, 2013                          Respectfully submitted,


                                         s/ Tucker H. Byrd
                                         Tucker H. Byrd (FL Bar 381632)
                                         Morgan & Morgan, P.A.
                                         20 North Orange Ave.
                                         Suite 1600
                                         Orlando, FL 32802-4979
                                         Telephone: (800) 896-3062
                                         Facsimile: (407) 418-2048
                                         tbyrd@forthepeople.com

                                         Manuel J. Dominguez (FL Bar 54798)
                                         Cohen Milstein Sellers & Toll PLLC
                                         2925 PGA Boulevard
                                         Suite 200
                                         Palm Beach Gardens, FL 33410
                                         Telephone:  (561) 833-6575
                                         Facsimile: (212) 838-7745
                                         jdominguez@cohenmilstein.com

                                         William G. Kopit
                                         Epstein Becker & Green
                                         1227 25th Street, NW
                                         Suite 700
                                         Washington, D.C. 20037-1156
                                         Telephone: (202) 861-1803
                                         Facsimile: (202) 861-3551
                                         wkpit@ebglaw.com

                                         Attorneys for Plaintiffs