## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| OMNI HEALTHCARE INC., INTERVENTIONAL SPINE INSTITUTE OF FLORIDA, CRAIG DELIGDISH, MD, C. HAMILTON BOONE, PA, BRIAN DOWDELL, MD, RICHARD GAYLES, MD, STAN GOLOVAC, MD, LANCE GRENEVICKI, MD, ALEKSANDER KOMAR, MD, SCOTT SEMINER, MD, INSTITUTE OF FACIAL SURGERY INC., THE PAIN INSTITUTE INC. d/b/a/ FLORIDA PAIN, and PHYSICIAN ASSISTANT SERVICES OF FLORIDA, L.L.C., | CASE NO. 6:13-CV-01509-RBD-DAB |
| | |
| Plaintiffs, | **THIRD AMENDED COMPLAINT** |
| vs. | |
| | **JURY TRIAL DEMANDED** |
| HEALTH FIRST, INC., HOLMES REGIONAL MEDICAL CENTER, INC., HEALTH FIRST PHYSICIANS INC., HEALTH FIRST HEALTH PLANS, INC., MICHAEL D. MEANS, and JERRY SENNE | **INJUNCTIVE RELIEF SOUGHT** |
| Defendants. | |

Plaintiffs bring this action for treble damages and injunctive relief under the antitrust laws of the United States and under Florida state law against defendants Health First, Inc. ("Health First Inc."), Holmes Regional Medical Center, Inc. ("Holmes RMC"), Health First Physicians Inc. (now doing business as Health First Medical Group; referred to herein as "HF Physicians"), Health First Health Plans, Inc. ("HF Health Plans"), Michael D. Means ("Defendant Means"), and Jerry Senne ("Defendant Senne") (collectively, "Health First" or "Defendants"), based upon personal knowledge as to facts pertaining to themselves, and upon information and belief as to all other matters, and hereby allege as follows:

### INTRODUCTION

1.      Health First has a monopoly in acute care inpatient hospital services in Southern Brevard County, Florida (the "Hospital Monopoly").  At its inception in 1995, Health First owned and operated the only two inpatient hospitals in that geographic area—Holmes RMC and Palm Bay Hospital, Inc. (formerly known as Palm Bay Community Hospital; referred to herein as "Palm Bay Hospital").  Competitor Wuesthoff Medical Center, Melbourne ("Wuesthoff-Melbourne") entered the market in 2002.

2.      Health First maintains and strengthens its Hospital Monopoly by, *inter alia*, intimidating physicians or otherwise obstructing their ability to practice medicine in Southern Brevard County if they do not "play ball" with Health First and refer their patients exclusively to Health First's hospitals and physician specialists.  These referrals are valuable as Health First can capture incremental margins associated with acute care inpatient hospital services (that might otherwise go to a rival hospital) and ancillary care such as x-rays and other diagnostic services (that might otherwise be performed at the facilities of an independent physician group).  The most efficient way to control a doctor's referral is to employ the doctor directly; the next best way is to use a stick.  Physicians who refuse to obey Health First's mandates have their provider contracts terminated by HF Health Plans, lose their medical privileges at Health First's hospitals, or are otherwise retaliated against so as to curtail their practice and significantly impair competition among physicians in Southern Brevard County.

3.      To perfect its control over the referral process, Health First recently acquired Melbourne Internal Medicine Associates ("MIMA"), the largest independent physicians group in the area.  The MIMA acquisition substantially lessened competition in the market for physician services in Southern Brevard County by placing more physicians under a single roof (*i.e.*, a horizontal effect) and by inducing affiliated physicians to charge insurers more than they

otherwise would as an independent physician (*i.e.*, a vertical effect).  This also augments Health First's Hospital Monopoly via the referral process and ensures that it can continue charging supra-competitive prices for acute care inpatient hospital services, while delivering healthcare at very low quality.

4.     Moreover, the MIMA acquisition permits Health First to control the referrals of MIMA's physicians relating to acute care inpatient hospital services and ancillary services (*i.e.*, auxiliary or supplemental services used to support diagnosis and treatment of a patient's condition; *see* ¶ 63, *infra*).  Allowing this merger to take further root and expand will significantly affect the ability of physicians to enter this market, and will significantly restrain competition in the market for physicians services and the market for acute care inpatient hospital services in Southern Brevard County, leading to higher prices for rival insurance companies and, ultimately, consumers.

5.     Health First is not just content with monopolizing the market for acute care inpatient hospital services; it wants to capitalize on its illegally-maintained dominant position by extending that power into adjacent markets.  In particular, Health First is leveraging its Hospital Monopoly into other healthcare-related markets—including those for ancillary services, physicians' services, commercial health insurance, and Medicare Advantage Plans.  In turn, Health First can leverage its market power in those markets to help maintain its Hospital Monopoly.  By leveraging its market power in each of these inter-related product markets, Health First damages competition in these markets and increases revenue by creating a vertically integrated, self-reinforcing, illegally maintained healthcare monopoly in Southern Brevard County.

6.     In addition to its Hospital Monopoly, Health First now owns and controls the largest multi-specialty physicians group and the largest private health insurance company in Southern Brevard County.  It is thus impossible to meaningfully participate in any healthcare-related market in Southern Brevard County without doing business with Health First and, more importantly, on Health First's terms.  Those terms are specifically designed with the purpose and effect of maintaining and/or enhancing Health First's market dominance and to further hinder economic competition in the healthcare-related markets in Southern Brevard County.

7.     Independent physician groups generally require certain inputs in their practice to compete effectively, namely: (1) access to patients enrolled in health plans; and (2) access to hospitals.  Health First controls both.  By threatening to deny physician groups access to these vital inputs, Health First could extract certain concessions, including *de facto* agreements by physicians to refer exclusively or nearly exclusively to Health First's hospitals and physician specialists, and to perform ancillary services at Health First's premises.  This requirement to refer on an exclusive basis foreclosed rival hospitals in Southern Brevard County from competing in acute care inpatient hospital services, as hospitals need access to physicians and their referrals to thrive.  The freedom for a physician to refer a patient to the best facility is an important aspect of providing quality healthcare; however Health First's penalty regime made it economically unwise for physicians to exercise this freedom.  Physician groups failing to abide by Health First's exclusivity requirement were impaired in their ability to compete in the market for physician services, as they were foreclosed from insured patients and Health First's facilities.  Their competitive impairment caused them to lose physicians to rival groups that abided by Health First's restrictions.

8.     As a result of the anticompetitive scheme described in this Complaint, Health First has unlawfully maintained its Hospital Monopoly while obtaining market power (or conditions under which there is a dangerous probability that it will obtain market power) in various interconnected, healthcare-related secondary markets.   Moreover, this conduct has injured Plaintiffs while, simultaneously, resulting in supra-competitive prices and lower quality of care for consumers.   Indeed, one of Health First's newest high-level executives has recently conceded that the quality of care provided to patients by Health First is so shockingly low that the new management team, which recently replaced the management team identified in this Complaint as individual defendants, may not be able to improve that level, even if they try.

9.     Defendants' conduct, as set forth herein, also constitutes unfair, deceptive, or unconscionable acts and practices.   Along with maintaining and increasing their monopoly power in violation of the Sherman Act (which is a *per se* violation of Florida's Deceptive and Unfair Trade Practices Act), Defendants' business practices were meant to destroy competition and damage not only the doctors and other participants in healthcare-related markets in Southern Brevard County, but the community and patients they serve as well.

10.     This case is being filed to reinstate competition on the merits for acute care inpatient hospital services, physician services, and health insurance in Southern Brevard County, Florida, and to recover injuries sustained by Plaintiffs both as a result of Health First's anticompetitive conduct and its unfair, deceptive, and/or unconscionable conduct.

## PARTIES

I.     **Plaintiffs**

A.     **Individual Plaintiffs**

11.     Plaintiff Craig Deligdish, M.D. is a board-certified hematologist, oncologist, and internal medicine practitioner practicing in Southern Brevard County, Florida.   Dr. Deligdish is

the President of OMNI Healthcare, Inc. ("OMNI").  He was Chairman of the subsection of Hematology and Medical Oncology, Chairman of the Neoplastic Disease Committee, Editor in Chief of Value-Based Cancer Care and a faculty member at the University of Texas Southwestern Medical School, Harvard Medical School, Associate Chief of Staff of Ambulatory Care at Dallas Veteran's Administration Medical Center, and Chief of the Medicine Section at the Dallas Veteran's Administration Medicine Center.

12.      Plaintiff Scott Seminer, M.D. is a physician licensed to practice medicine in the State of Florida.  He is board certified in internal medicine and gastroenterology.

13.      Plaintiff Brian Dowdell, M.D., M.S. is licensed to practice medicine in the State of Florida, and is a member of the medical staff of Holmes RMC.  Dr. Dowdell was formerly President of the Medical Society of Brevard County.  In addition, he is a member of the American Board of Physical Medicine and Rehabilitation, the American Academy of Pain Medicine, North American Spine Society, the Physiatric Association of Spine, Sports and Occupational Rehabilitation, and he is the owner of a clinic which provides pain management services.

14.      Plaintiff Richard Gayles, M.D. is an anesthesiologist licensed to practice medicine in the State of Florida.  He is board certified by the American Board of Anesthesiology, and is a Diplomat of the American Academy of Pain Management.  Dr. Gayles is also certified by the American Board of Pain Medicine, National Board of Medical Examiners, and by the American Heart Association in Basic and Advanced Cardiac Life Support.

15.      Plaintiff Stan Golovac, M.D. is an anesthesiologist licensed to practice medicine in the State of Florida.  He is board certified by the American Board of Anesthesiology, and certified by the American Board of Pain Medicine, by the National Board of Medical Examiners,

and by the American Heart Association in Basic and Advanced Cardiac Life Support.  He is also a Diplomat of the American Academy of Pain Management.

16.     Plaintiff Lance Grenevicki, D.D.S., M.D., FACS is a medical doctor and a dentist licensed to practice medicine in the State of Florida and was previously the Chief of the Department of Surgery at Holmes RMC.  He was a member of the MEC of Holmes RMC.  He was also the Vice President and President of the Medical Society of Brevard County.

17.     Plaintiff Aleksander Komar, M.D. is a board-certified general surgeon licensed to practice medicine in the State of Florida, and is a member of the medical staff of Holmes RMC.

18.     Plaintiff C. Hamilton Boone, P.A. is a physician assistant licensed to practice in the State of Florida, and is a member of the medical staff of Holmes RMC.  He is a current or former member of the following associations: the American Academy of Physician Assistants, the Association of Family Practice Physician Assistants, the Florida Association of Physician Assistants, the Georgia Association of Physician Assistants, the North Carolina Association of Physician Assistants, and the National Commission on Certification of Physician Assistants.

19.     Plaintiffs Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, Komar, and Boone are collectively referred to herein as the "Individual Plaintiffs."

**B.     Medical Practice Plaintiffs**

20.     Plaintiff OMNI is a multi-specialty group practice organized and existing under the laws of the State of Florida.  It was founded in 1994 as the Melbourne Medical Group, P.A. OMNI's physicians practice in Southern Brevard County and admit patients to both Health First's and Wuesthoff-Melbourne's medical facilities.  OMNI also offers ancillary services at its facilities including, *inter alia*, x-rays/radiology, outpatient surgery, nuclear medicine, audiology, sleep studies, and physical therapy.

21.     Plaintiff Interventional Spine Institute of Florida, doing business as Spine, Orthopedics and Rehabilitation ("S.O.A.R."), is a group practice founded in 2003 with its main office in Melbourne.  S.O.A.R. provides pain management services through the application of advanced interventional pain therapy.  Its physicians practice in Southern Brevard County.  S.O.A.R. also offers ancillary services at its facilities including, *inter alia*, x-rays/radiology, outpatient surgery suites, and physical therapy.

22.     Plaintiff Institute of Facial Surgery, Inc. ("Institute of Facial Surgery") is a practice founded in 2001 by Lance Grenevicki, D.D.S., M.D., FACS, with its main office in Melbourne. The Institute of Facial Surgery team is dedicated to the highest quality of care for dental implant surgery, corrective, cosmetic, and reconstructive jaw surgery and the specialty of oral & maxillofacial surgery.  Its physicians practice in Southern Brevard County.  Institute of Facial Surgery also offer ancillary services at its facilities including, *inter alia*, x-rays/radiology, electrocardiograms, oral microscopy, and laboratory/blood sugar analysis.

23.     Plaintiff The Pain Institute, Inc. d/b/a Florida Pain ("Florida Pain") is a group practice founded in 2005 with its offices in Melbourne, Merritt Island, and Jupiter.  The Pain Institute, Inc. d/b/a Florida Pain is a multi-service facility specializing in neck, back and cancer pain and offers pain management consultation and management services for acute and chronic pain.  Its physicians practice in Southern Brevard County.  In addition to physician services, Florida Pain also offers ancillary services at its facilities including, *inter alia*, laboratory (*e.g.*, drug testing), durable medical equipment (*e.g.*, orthotics), and outpatient surgery (through its in-house surgery suite and ambulatory surgery center).

24.     Plaintiff Physician Assistant Services of Florida, LLC ("PAS"), is a practice founded in 1999 with its main office in Melbourne.  PAS provides surgical physician assistants

as first assistants in multiple surgical specialties, saving the surgeon valuable time while reducing costs.

25.     Plaintiffs OMNI, S.O.A.R., Institute of Facial Surgery, Florida Pain, and PAS are collectively referred to herein as the "Medical Practice Plaintiffs."   Where appropriate, the Individual Plaintiffs and Medical Practice Plaintiffs are collectively referred to herein as "Plaintiffs."

## II.    **Defendants**

26.     Defendant Health First Inc. is a not-for-profit corporation organized and existing since 1995 under the laws of the State of Florida, with its principal place of business in Southern Brevard County.   Health First Inc. is the parent corporation of four affiliated hospitals located in Brevard County Florida: Holmes RMC, Cape Canaveral Hospital Inc. ("Cape Canaveral Hospital"), Palm Bay Hospital, and Viera Hospital, Inc. ("Viera Hospital").   Health First Inc. is also the parent corporation of HF Physicians and HF Health Plans.   Health First Inc. bills itself as "Central Florida's only fully integrated health system."

27.     Holmes RMC, a non-profit corporation organized and existing under the laws of the State of Florida, is a 514-bed acute care inpatient hospital located in Melbourne, Florida, which is in Southern Brevard County.   Holmes RMC is owned and controlled by Health First Inc.

28.     HF Health Plans is a for-profit corporation organized and existing under the laws of the State of Florida, with its principal place of business in Rockledge, Florida.   HF Health Plans opened in late-1995 and operates both health maintenance organization ("HMO") and point-of-service ("POS") health benefit plans; it is, when including Medicare Advantage plan enrollees, the largest health insurance company in terms of covered persons in Southern Brevard County.   HF Health Plans is owned and controlled by Health First Inc.

29.     HF Physicians is a for-profit corporation organized and existing under the laws of the State of Florida, with its principal place of business in Rockledge, Florida.  HF Physicians is the managing member of Health First Medical Group, LLC ("HF Medical") which, after the MIMA acquisition, is Brevard County's largest multi-specialty physicians group with approximately 250 physicians.  The physicians which comprise HF Physicians admit exclusively or almost exclusively to Health First hospitals, and refer exclusively or almost exclusively to other HF Physicians.  HF Physicians is owned and controlled by Health First Inc.

30.     Michael D. Means ("Defendant Means") is an individual residing in Marco Island, Florida.  Defendant Means, along with Defendant Senne, is a co-founder of Health First and formerly its President and Chief Executive Officer.

31.     Jerry Senne ("Defendant Senne") is an individual residing in Winter Park, Florida.  Defendant Senne is the former President and CEO of Holmes RMC.

32.     Defendants Means and Senne will be referred to herein as the "Individual Defendants."

33.     The term "Health First" is used herein to refer to all Health First-related entities, as well as the individual Defendants insofar as they were acting on behalf and for the benefit of Health First.  Where necessary, however, Defendants will be referred to individually.

## CO-CONSPIRATORS

34.     Various other physicians, individuals, firms, and corporations, not named as defendants herein, may have participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy.  Plaintiff reserves the right to name subsequently some or all of these persons as defendants.

35.     Whenever in this Complaint reference is made to any act, deed, or transaction of any business entity, the allegation means that the business entity engaged in the act, deed, or

transaction by or through its officers, directors, agents, employees, or representatives while actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

## JURISDICTION AND VENUE

36.     This action is brought pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 14 and 26). Plaintiff seeks statutory damages and injunctive relief from ongoing violations of the antitrust laws of the United States, specifically, Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 & 2), and Section 7 of the Clayton Act (15 U.S.C. §18).

37.     This Court has subject matter jurisdiction over the First, Second, Third, and Fourth Causes of Action pursuant to 28 U.S.C. § 1331 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26; it has supplemental jurisdiction over the Fifth and Sixth Causes of Action pursuant to 28 U.S.C. § 1367 since those claims form part of the same case or controversy and derive from a common nucleus of operative facts.

38.     This Court has personal jurisdiction over each Defendant, because each Defendant: resides in this District; transacted business in this District; and/or committed over acts in furtherance of the illegal scheme and conspiracy alleged herein in this District.

39.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants resided, transacted business, were found, or had agents in this District; most or all of the events giving rise to these claims occurred in this District; and/or a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

## INTERSTATE TRADE AND COMMERCE

40.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

41.     During the relevant period, a large percentage of the Defendants' revenues come from sources located outside of Florida, including the federal government (through the Medicare and Medicaid programs).

42.     The Defendants purchase a substantial portion of their medicine and supplies from sellers located outside of Florida.

43.     Many employers that have made payments to the Defendants (either directly or through health insurers) sell products or services in interstate commerce.

## MARKET DEFINITION

44.     Defining a relevant market is unnecessary where, as here, there is direct evidence of Health First's monopoly power—*i.e.*, its ability to exclude competitors, raise prices to supra-competitive levels, or restrict output.  Insofar as the Court requires a defined market for purposes of analyzing the claims made herein, for the reasons discussed below, the relevant market in this action is that for acute care inpatient hospital services in Southern Brevard County (the "Relevant Market").

45.     In addition to the Relevant Market, however, there are several healthcare-related markets ("Secondary Product Markets") which are also negatively impacted by Defendants' conduct and which assist Health First in unlawfully maintaining its monopoly in the Relevant Market.  Accordingly, these Secondary Product Markets are also discussed below.

**I.      Relevant Product Markets**

**A.      Primary Relevant Product Market—Acute Care Inpatient Hospital Services**

46.     The primary relevant product market involves acute care inpatient hospital services. There is extremely low cross elasticity of demand between acute care inpatient hospital services and other services, such as outpatient services.

47.     A small but significant price increase in the price of acute care inpatient hospital services will not cause patients to switch to outpatient services.  The choice of inpatient, as opposed to outpatient, services is largely determined by physicians, and is based on the medical needs of the patient, not on the relative cost of the services.

48.     Within the relevant geographic market of Southern Brevard County, Health First has more than a 70% market share of the acute care inpatient hospital services market as measured by patient admissions.

49.     Health First's market dominance and anticompetitive conduct in the market for acute care inpatient hospital services has required managed care plans to include all the Health First hospitals in their managed care contracts.

50.     Health First's prices for acute care inpatient hospital services are above competitive levels and, more specifically, are above the prices of its only competitor in Southern Brevard County, Wuesthoff-Melbourne.

51.     Barriers to entry exist in the acute-care inpatient hospital service market in Southern Brevard County making *de novo* entry difficult, costly, unlikely, and untimely. Building an acute care inpatient hospital is expensive and time-consuming.

52.     Other than Health First and Wuesthoff-Melbourne, no new firm has proposed building an acute care inpatient hospital in Southern Brevard County in at least ten (10) years. Health First built Viera Hospital in that time but, since Viera Hospital is owned by Health First, that hospital is only an additional Health First point of access, not a *de novo* entrant.

**B.    Secondary Relevant Product Markets**

53.    In addition to the primary relevant product market, there are several secondary product markets at issue in this action, including: (i) the market for physician services[1]; (ii) the market for ancillary services; (iii) the market for private health insurance plans; and (iv) the market for Medicare Advantage plans.

**i.    Physician Services**

54.    The physician services market comprises those services provided by an individual licensed under state law to practice medicine or osteopathy.

55.    There is low cross-elasticity of demand between physician services and other healthcare services rendered by non-physician providers.  A small but significant price increase in the price of physician services will not cause patients or managed care plans to switch to non-physician healthcare providers.

56.    Physicians are typically paid on a fee-for-service basis according to prices determined either by the Medicare Fee Schedule (for those patients covered by Medicare) or by provider contracts between the physician/medical practice and health insurance providers (for those patients covered by private health insurance).

57.    The same Medicare Fee Schedule is used for all physicians, regardless of specialty.  Similarly, health insurance providers traditionally contract with an entire medical practice, as opposed to separately contracting with each individual provider in a particular practice.

---

[1] In the alternative, Plaintiffs contend that there are individual product markets for the following medical specialties: general practice; surgery; anesthesiology; cardiology/ pulmonology; oncology; urology; internal medicine/gastroenterology; pediatrics; obstetrics/ gynecology; podiatry; pulmonology; orthopedics/physical medicine; otolaryngology/ENT; urgent care/emergency medicine, and neurology.

58.     While patients may have some limited financial responsibility (*e.g.*, a copay amount) associated with a doctor visit, physician services are typically paid for by health insurers and other third-party payors.  Moreover, a patient's utilization of a particular physician's services are generally guided by a single purchase decision—*i.e.*, where to receive treatment.   Once a patient has decided to check into a hospital or visit her primary care physician, many of her subsequent healthcare-related choices (*e.g.*, selecting a specialist) will flow from that original decision.

59.     In recent years, analysts have observed a trend towards consolidation in the physician services industry.  Larger medical practices have increased bargaining power vis-à-vis health insurers and are able to negotiate higher fee-for-service rates as compared to smaller medical practices.

60.     There are high barriers to entry in the physician services market, including *inter alia*, licensure, medical education, and training requirements.

61.     Plaintiffs each participate in the physician services market both as competitors and as suppliers, insofar as they are a source of referrals.

62.     Health First, through HF Physicians, participates in the physician services market both as competitors and as suppliers, insofar as they are a source of referrals.   Since its acquisition of MIMA, Health First (through its wholly owned and controlled subsidiary HF Physicians) has a dominant share of the physician services market in Southern Brevard County.

ii.      **Ancillary Services**

63.     The ancillary services market comprises those auxiliary or supplemental services provided by a licensed physician or medical practice to support diagnosis and treatment of a patient's condition.   These services include diagnostic services (*e.g.*, x-rays and laboratory testing), durable medical equipment and medical devices (*e.g.*, crutches and orthotics), therapies

(*e.g.*, radiation therapy and dialysis), and outpatient surgeries (*e.g.*, in-house surgery suites and ambulatory surgery centers).

64.     Ancillary services account for approximately 20% of total healthcare dollars spent and represent one of healthcare's fastest growing components.

65.     There is low cross-elasticity of demand between ancillary services and other types of services.  A small but significant price increase in the price of ancillary services will not cause patients or managed care plans to switch to other types of service providers.

66.     Ancillary services are purchased in conjunction with medical or hospital care. Most commonly, ancillary services are covered and paid for by the patient's insurance, not the patient.  Moreover, patients are often directed to a particular ancillary service provider by their doctors or health plan.  Indeed, patients' health plans (including Health First) typically will only reimburse for services performed by approved ancillary service providers.

67.     The prices for ancillary services are typically set by ancillary service agreements negotiated between physicians or their medical practices and Medicare or private health plans, depending on the patient's type of health insurance coverage.  Thus, price elasticity in the ancillary services market is not informed by patient choices in response to changes in relative prices.

68.     There are high barriers to entry in the ancillary services market, including state licensing requirements, extremely high initial and ongoing capital investment costs, and access to customers/patients, whom are typically controlled by pre-existing relationships between those customers/patients and their doctors and health plan providers.

69.     The Medical Practice Plaintiffs participate in the ancillary services as they provide these services at their facilities.   The particular ancillary services provided by each Medical Practice Plaintiff are discussed *infra*.

70.     Health First participates in the ancillary services market through various wholly owned and controlled subsidiaries, including, *inter alia*: Holmes RMC, Palm Bay Hospital, HF Physicians, Health First Outpatient Diagnostics LLC, Health First Physical Therapy Services LLC.   It also participates in this market through certain stand-alone facilities, including, *inter alia*: Health First Diagnostic Center, Health First Medical Rehabilitation, Health First Medical Equipment, Health First Home Care, and Hospice of Health First.   Through its ownership and control over these entities, Health First has a dominant share of the ancillary services market in Southern Brevard County.

### iii.     Private Health Insurance

71.     The private health insurance market comprises all health insurance coverage other than that provided by the government.

72.     Private health insurer providers compete with one another to attract enrollees. Three primary characteristics differentiate health plans from the perspectives of the enrollee: (1) size of provider network; (2) restrictions on patient choice; and (3) price of the insurance contract.   Enrollees typically prefer a large choice of providers, less restrictions, and lower prices.

73.     There is low cross-elasticity of demand between private health insurance and other ways to insure against the risk of incurring medical expenses.   A small but significant price increase in the price of private health insurance will not cause enrollees to switch to alternative forms of insurance.

74.     There are high barriers to entry in the private health insurance market, including state and federal licensing requirements, extremely high initial and ongoing capital investment costs, and access to enrollees.  In fact, a *de novo* entrant in the private health insurance market would have particular difficulty entering as it would have less negotiating clout with doctors and hospitals (thus causing them to pay higher prices for their services), while simultaneously needing to charge lower premiums to attract enrollees from incumbent firms in order to gain a foothold.

75.     According to some analysts, it is precisely these barriers to entry which have driven the trend toward consolidation in the health insurance markets as companies have found it easier to simply buy another company rather than enter a new geographic market.

76.     Plaintiffs participate in the private health insurance industry as suppliers of physician services.  This participation is generally dictated by provider contracts between the physician/practice and the health insurance provider.

77.     Health First, through its wholly owned and controlled subsidiary HF Health Plans, participates in the private health insurance industry as a competitor.  Through its ownership of HF Health Plans, Health First has a dominant share of the private health insurance market in Southern Brevard County.

### iv.     Medicare Advantage Plans

78.     The Medicare Advantage Plan market is a distinct sub-segment of the larger private health insurance market.  It comprises those enrollees who have opted to receive their Medicare benefits through private health plans instead of the federally administered traditional Medicare program.

79.     The Medicare Advantage market is a highly regulated industry.  The term itself comes from the Medicare Modernization Act of 2003; it was previously referred to as

"Medicare+Choice" by the Balanced Budget Act of 1997.  According to one recent study, 2014 spending on Medicare Advantage plans is expected to be $156 billion nationally with 15.7 million persons enrolled.

80.     There is low cross-elasticity of demand between Medicare Advantage plans and other types of health insurance plans.  A small but significant increase in the price of Medicare Advantage Plans would not be expected to cause consumers to switch to substitute products.

81.     The Medicare Advantage market has high barriers to entry similar to those in the private health insurance market, including state and federal licensing requirements, extremely high initial and ongoing capital investment costs, and access to enrollees.

82.     Health First, through its wholly owned and controlled subsidiary HF Health Plans, participates in the Medicare Care Advantage plans market as a competitor.  Through its ownership of HF Health Plans, Health First has a dominant share of the Medicare Advantage plans market in Southern Brevard County.

83.     Plaintiffs participate in the Medicare Advantage plans market as suppliers of physician services.  This participation is generally dictated by provider contracts between the physician/practice and the Medicare Advantage plan provider.

## II.     Relevant Geographic Market

84.     The relevant geographic market in this action is no larger than Southern Brevard County.  The hospital facilities located in that geographic market would have the economic power, if acting collectively, to increase prices above competitive levels.

85.     The outflow rate—*i.e.*, those Southern Brevard County residents who receive acute care inpatient hospital services at hospitals outside of Southern Brevard County—is low and has not varied significantly year-to-year, despite supra-competitive prices and less-than-competitive quality.  Similarly, the inflow rate—*i.e.*, those residents outside of Southern Brevard

County who receive acute care inpatient hospital services inside Southern Brevard County—is also low and has not varied significantly year-to-year despite changes in relative prices.

86.     The low outflow and inflow rates for the primary relevant product support a conclusion that acute care inpatient hospitals located outside of Southern Brevard County do not provide sufficient competitive discipline to those within Southern Brevard County to warrant their inclusion in the relevant geographic market.   There is extremely low cross-elasticity of demand between acute care inpatient hospitals located inside and outside of Southern Brevard County.

87.     Only physicians can admit patients to hospitals and there is little overlap between the physicians who admit to acute care inpatient hospitals located within Southern Brevard County, and those who admit to hospitals outside of Southern Brevard County.

88.     Acute care inpatient hospitals located within Southern Brevard County offer prices to managed care plans without regard to prices charged to those plans by non-affiliated acute care inpatient hospitals located outside Southern Brevard County.

89.     Acute care inpatient hospitals located outside Southern Brevard County offer prices to managed care plans without regard to prices charged to those plans by non-affiliated acute care inpatient hospitals located within Southern Brevard County.

90.     If all of the acute care inpatient hospitals located within Southern Brevard County were to raise prices at least 5%, they would not lose enough volume to make such a price increase unprofitable to those hospitals.

91.     There is also low cross elasticity of demand between acute care inpatient hospitals located in Southern Brevard County, and acute care inpatient hospital facilities located outside of Southern Brevard County.

92.     Similarly, there is relatively little physician overlap between the physicians who admit to acute care inpatient hospitals located within Southern Brevard County, and physicians who admit to acute care inpatient hospitals located outside of Southern Brevard County.

93.     Managed care plans cannot substitute acute care inpatient hospitals, or physicians, located outside Southern Brevard County for hospitals and physicians located within that area.

94.     Patients located within Southern Brevard County typically do not utilize acute care inpatient hospitals, or physicians, located outside Southern Brevard County for acute care inpatient hospital or physician services available within Southern Brevard County.

95.     Indeed, Defendants themselves have argued that South Brevard County is a separate geographic market for antitrust purposes.  This assertion was made in a 1995 Submission to the Federal Trade Commission ("FTC") in support of the then-proposed affiliation of Cape Canaveral Hospital and Holmes RMC.  In that submission, Health First argued that the combination of the two facilities would not reduce competition because the two hospitals were in different geographic markets.  Health First's argument to the FTC was successful and, as a consequence, the FTC elected not to challenge the transaction.  There has been no material difference between hospital usage patterns over time.

96.     The same relevant geographic market for the Relevant Market applies for each of the Secondary Product Markets.  Although one might expect some minor variation between products, this is due to the same reasons that caused Health First to conclude that Southern Brevard was its own relevant geographic market in analyzing acute care inpatient hospital services.

97.     As described by Holmes RMC in a Certificate of Need Application filed in April 2004, "Brevard County [is] divided into three natural market areas – North Brevard, Central

Brevard, and South Brevard." It further stated that these "three sub-regions . . . generally correspond to local trade areas." This is attributable, at least in part, to the unique geography, as well as the population dynamics, of Brevard County.

## FACTUAL ALLEGATIONS

III.  **Background: The Healthcare Industry, Health First, And Southern Brevard County**

A.  **The United States Healthcare Industry**

98.  In the United States as of 2010, about 84% of the population has some form of health insurance. Health insurance coverage is typically divided into two basic categories: public (which includes Medicare, Medicaid, and military health benefits) and private (which includes employer-sponsored, individual, and college-sponsored plans).

99.  According to the United States Census Bureau in 2010, of those persons with health insurance coverage, approximately 55% of Americans obtain it through an employer, 10% purchase it directly, 14.5% are enrolled in Medicare, 15.9% are enrolled in Medicaid, and 4.2% have military health insurance.

100.  Most persons with private insurance, approximately 90%, utilize some form of managed care plan that contracts with health care providers and medical facilities to provide healthcare for its members at reduced costs. Those contracts cover a wide range of healthcare-related products and services, including, *inter alia*, physician services, laboratory tests, non-physician provider servicers, inpatient and outpatient hospital services, and (sometimes) prescription drugs. Providers and facilities which have negotiated contracts with the managed care plan are commonly referred to as being "in-network."

101.  Some managed care plans are "fully insured" plans whereby the managed care organization accepts the insurance risk for healthcare-related expenditures. For other plans, the employer will accept the insurance risk itself, but will use the managed care plan to provide its

employees with access to the managed care plan's network of providers and facilities, as well as handle administration (*e.g.*, processing and paying claims).  Such plans are called "self-funded plans."

102.    The three most common types of managed care plans are Health Maintenance Organizations ("HMOs"), Preferred Provider Organizations ("PPOs"), and Point of Service ("POS") plans.  Typically, an HMO requires patients to select a primary care provider who coordinates most of the patients' care and the HMO only covers care provided by in-network providers and facilities.  In a PPO plan, patients do not choose a primary care physician but must still choose from the plan's network of contracted physicians.  POS plans are like a hybrid between an HMO and PPO plan.  In a POS plan, patients must select a primary care physician but may still see a physician out of network; however, they will pay more to see out-of-network physicians unless they were referred to that particular provider by their primary care physician.

103.    In addition, some managed care plans are permitted by the federal Medicare program to offer their services on a "risk basis" to Medicare beneficiaries as an alternative to the traditional Medicare program.  Such plans, called Medicare Advantage Plans, offer Medicare beneficiaries incentives in the form of benefits not available under the traditional Medicare plan in order to encourage participation.  Most Medicare Advantage Plans have an out-of-pocket maximum that, once reached, will pay 100% of Medicare-approved services for the remainder of the calendar year so long as the individuals utilize in-network providers.

104.    The core element underlying each of the plans discussed above is the managed care organization's network—*i.e.*, its ability to selectively contract with providers and facilities to obtain discounted pricing in exchange for access to the organizations' members.  Accordingly,

the importance of provider networks and selective contracting in the delivery of affordable healthcare coverage to consumers is widely recognized.

105.    If a medical provider or facility refuses to negotiate with a managed care plan, it runs the risk of losing patient volume to competing providers or facilities.  Thus, in a competitive market, selective contracting encourages medical providers and facilities to accept discounted contractual prices for the services they render in exchange for being a preferred provider in the managed care plan's network.  The result of this competitive pressure is the lowering of net prices to managed care plans and, ultimately, for their members.

106.    Studies suggest that patients are passive consumers of healthcare-related services. A patient's utilization of healthcare services are generally guided by a single purchase decision— *i.e.*, where to receive treatment.   Once a patient has decided to check into a hospital or visit her primary care physician, many of her subsequent choices (such as where to receive ancillary services or which specialist to see) will be guided by the hospital or primary care physician, as well as her health plan's network of approved physicians and ancillary service providers.

107.    Physicians are typically paid on a fee-for-service basis according to prices determined either by the Medicare Fee Schedule (for those patients covered by Medicare) or by provider contracts between the physician/medical practice and health insurance providers (for those patients covered by private health insurance).  Oftentimes, provider contracts are based on some formula which incorporates the values contained in the Medicare Fee Schedule.

108.    The same Medicare Fee Schedule is used for all physicians, regardless of specialty.  Similarly, health insurance providers traditionally contract with an entire medical practice, as opposed to separately contracting with each individual provider in a particular practice.

109.    In recent years, analysts have observed a trend towards consolidation in the physician services industry. Larger medical practices have increased bargaining power and, thus, are able to negotiate higher fee-for-service rates with health insurance providers as compared to smaller medical practices.

110.    While patients may have some limited financial responsibility (*e.g.*, a copay amount) associated with a doctor visit, physician services are typically paid for by the government, private health insurers, and other third-party payors.

111.    Accordingly, decisions regarding price and utilization of healthcare-related services are not typically made by or negotiated with patients.  These decisions are made for the patients by physicians, health plans, and the federal government.

**B.    The Formation of Health First**

112.    Health First was formed in 1995 by the joining of three hospitals: Holmes RMC and Palm Bay Hospital (which are located in Southern Brevard County), and Cape Canaveral Hospital (which is located in Central Brevard County).  This affiliation granted Health First an instant monopoly in Southern Brevard County as it owned and controlled the only two acute care inpatient hospitals in that geographic area.

113.    Soon afterwards, Health First vertically integrated into the physician services and health insurance markets.  In 1995, it formed its own physicians group, HF Physicians.  In 1996, Health First created HF Health Plans to offer HMO plans in Brevard County.

114.    Health First has long recognized its monopoly power and has publicly (and flippantly) acknowledged its existence.  For example, when the head of the Central Brevard Health Care Coalition urged Defendant Means, then President of Health First, to obtain an improved health information system he responded that he did not have to because "he was a monopolist."

115.    Holmes RMC (formerly known as Brevard Hospital) began in 1937, and is the largest hospital in Brevard County.  It is also the only hospital in Southern Brevard County with a Level II Trauma Center, Level II Neonatal Intensive Care Unit, and air ambulance (First Flight helicopter).

116.    Due to its size and unique offerings, Holmes RMC is considered what healthcare experts refer to as a "must-have" hospital.  In other words, any managed care plans which intend to market their products in Brevard County have little choice but to include Holmes RMC in their network.  Wuesthoff-Melbourne, Health First's only hospital competitor in Southern Brevard County, is currently too small to provide the same range of services that Holmes RMC provides and is only a limited competitor to Holmes RMC.

### C.    Health First Leverages its Market Power in Various Markets to Create a Vertically Integrated Healthcare Monopoly

117.    Health First openly bills itself as "Central Florida's only fully integrated healthcare system."  In this context, the term "fully integrated" means controlling the markets for acute care inpatient hospitals, physician services, ancillary services, private health insurance, and Medicare Advantage plans in Southern Brevard County.  This can best be described as a vertically-integrated or fully-integrated healthcare monopoly.

118.    To that end, Health First has leveraged its Hospital Monopoly to gain market power in other healthcare-related markets, including those for physicians' services, ancillary services, private health insurance, and Medicare Advantage plans.  At the same time, Health First also augments its Hospital Monopoly by leveraging its dominance in those same related markets.

119.    Once Health First secured its Hospital Monopoly through acquisition, it was able to leverage that monopoly power into an adjacent market, private health insurance.  It accomplishes this by exploiting Holmes RMC's "must have" status and requiring rival health

insurance plans to include *all* Health First hospitals in their network as a precondition to including Holmes RMC.  By forcing its private health insurance competitors to contract all of its hospitals together as a group, Health First can require them to pay its other hospitals supra-competitive prices as a condition for inclusion of its must-have hospital, Holmes RMC, in their network.  Health First can also price discriminate—*i.e.*, charge its affiliated health plan, HF Health Plans, less for acute care inpatient services than it charges rivals such as Blue Cross Blue Shield, Aetna, etc.  This effect is supported by the fact that, according to representatives of some private health insurers, the fees charged by Health First's hospitals in Southern Brevard County are among the highest, if not *the* highest, in the State of Florida.

120.   Next, after Health First had gained a dominant share in the private health insurance market, it can leverage that market power into the physician and ancillary services markets by denying rival providers access to the patients enrolled in Health First's health plans.  This, in turn, is done to induce physicians to either join Health First's physician group (bolstering Health First's market power in physician services) or refer their patients exclusively to Health First's hospitals and ancillary providers (bolstering Health First's market power in acute care inpatient hospital services and ancillary services).

121.   Once inside the Health First family, those physicians can charge rival health plans higher rates for both horizontal and vertical reasons: if those rates are not accepted, patients enrolled in rival insurance plans might switch to a Health First plan in order to keep their preferred physician; if those higher rates are accepted, Health First has successfully raised its insurance rivals' costs.  It's a win-win situation for Health First.

122.   Thus, by being "fully integrated," Health First's market power reinforces itself across each of the inter-related healthcare markets in which it participates.   This "fully

integrated" model was created with the specific intent to use its market power to exclude competition in the Relevant Market and other healthcare-related markets in which Health First competes (including the physician services, ancillary services, private health insurance, and Medicare Advantage markets).  As described throughout this Complaint, that model has achieved its intended effect—*i.e.*, Health First has successfully excluded or restrained its competitors, including Plaintiffs, and Health First has been able to charge supra-competitive prices while lowering the quality of care received at its facilities.

123.    Health First's use of its vertically or fully integrated healthcare monopoly severely hinders competition at all market levels, resulting in both higher prices and lower quality of care.  There is no valid business justification for Health First's actions, including the restrictions it imposes on independent physicians, as they were undertaken specifically to exclude competition and not to create cost savings or increase quality of care.

## IV.    **Defendants' Common Scheme**

124.    Since at least March 2004[2], Defendants and their co-conspirators have participated in a common scheme that has unfairly and unreasonably restrained competition in multiple healthcare-related markets in Southern Brevard County, while simultaneously harming Plaintiffs.  This common scheme is complex and involves multiple types of exclusionary conduct, each of which is addressed individually below.

125.    Even prior to acquiring MIMA (then the largest remaining independent physician group), Health First was able to induce MIMA's physicians into admitting exclusively or nearly exclusively to Health First hospitals.  This was accomplished by offering MIMA financial perks

---

[2] In March 2004, Defendant Senne invited Dr. Seminer and OMNI to join the conspiracy by offering to include OMNI in the Health Plan provider network if it agreed to admit its patients exclusively to Health First's hospitals.  [*See* ¶ 207, infra.]

and other preferential treatment in exchange for exclusivity.  By agreeing to receive these perks and preferential treatment, MIMA shared in the monopoly profits generated by Health First.

126.    One such perk was to grant MIMA an exclusive right to provide radiation therapy services to Health First's members, with Health First shutting down its competing radiation therapy department and selling its equipment to MIMA.  That radiation oncology program became the most profitable of all of MIMA's ancillary services.

127.    Another example of preferential treatment is when the federal government required MIMA to pay $12,000,000 for Medicare fraud relating to its oncology program, neither Health First nor its subsidiaries did anything to hold MIMA accountable for its over-utilization of those same services provided to HF Health Plans' patients.

128.    Health First also conspired with the physicians practicing at its hospitals to facilitate the election of MIMA physicians to positions on the hospitals' Medical Executive Committees ("MECs").  This not only rewarded MIMA for its participation in the conspiracy, but reinforced Health First's ability to influence medical decisions that could maximize revenue and ensure maintenance of its monopoly.

129.    In exchange for these and other benefits, MIMA providers referred less than 1% of their patients to rival Wuesthoff-Melbourne even prior to its acquisition by Health First. MIMA's reasons for not using Wuesthoff-Melbourne are pretextual.  They claimed that Wuesthoff-Melbourne was too far, but MIMA built a newer building closer to Wuesthoff-Melbourne than Holmes RMC, and admission patterns never changed.  They also claimed that physicians did not want to have to be on two staffs.  However, MIMA physicians were on the staffs of both Palm Bay and Holmes RMC, even though the distance between these hospitals is greater than the distance between Holmes RMC and Wuestoff-Melbourne, making it more

inconvenient being on the staff of those two Health First hospitals. Additionally, being on staff at two hospitals is not problematic for medical groups as they routinely split their staffing requirements so that physicians who staff one hospital primarily take all of the on call responsibilities at that particular hospital for their group.

130. Existence of the contractual and/or *de facto* exclusivity agreements with providers is further evidenced by MIMA's conduct after one insurer tried to exclude Health First's hospitals from its network. In or around 2006, after Aetna Life Insurance Co. ("Aetna") determined that Health First's hospitals were considerably more expensive than other hospitals in and around Brevard County, Aetna decided to try and exclude Health First's hospitals from its network.

131. After Aetna announced its intention to exclude Health First from its network, MIMA promptly terminated its relationship with Aetna, thus refusing to accept Aetna's paying patients because MIMA would have to see those patients at Wuesthoff-Melbourne. But for the benefits it received from Health First (*i.e.*, sharing in Health First's monopoly profits), such a decision would be against MIMA's unilateral economic self-interest. Yet MIMA refused to re-contract with Aetna until after Health First's hospitals re-contracted with Aetna.

132. In essence, by threatening to terminate physicians from its health plans, Health First has the power to control the market for physicians in Southern Brevard County. Failure by any physician to accede to the demands of Health First–*e.g.*, by refusing to exclusively admit patients to their facilities or refer to their physicians—resulted in termination from the health plan and, thus, exclusion from the largest source of patients in Southern Brevard County.

133. This power to exclude is demonstrated by the fact that physicians who participate in HF Health Plans only send 15% of their non-HF Health Plans patients (which they could send

anywhere) to Wuesthoff-Melbourne. In contrast, physicians who do not participate in HF Health Plans utilize Wuesthoff-Melbourne 45% of the time.

134. Thus, performing services at Health First hospitals, gaining access to patients enrolled in HF Health Plans, and obtaining referrals from Health First's hospitals and/or primary care providers is preconditioned on the understanding that physicians demonstrate sufficient loyalty to Health First, including only using Health First hospitals and referring only to other Health First physicians.

135. For these reasons, on information and belief, Plaintiffs believe that there are numerous unidentified co-conspirators beyond MIMA which have agreed to Health First's exclusive dealing arrangements.

A.    **Types of Exclusionary Conduct**

i.    **Health First Coerces Physicians Into Entering Exclusive Dealing Arrangements**

136. If a physician practicing in Southern Brevard County wants to be included in Health First's provider network, he or she must agree to refer all or nearly all patients to Health First's hospitals, ancillary providers, and physician specialists. Those that agree to Health First's terms have entered into *de facto* exclusive dealing arrangements with Health First.

137. These exclusive dealing arrangements enable Health First to strengthen its already dominant positions in the acute care inpatient hospital, ancillary, and physician services markets in Southern Brevard County.

138. The exclusive dealing arrangements were obtained through coercion, including the threat of being excluded from a significant portion of the physician services market in Southern Brevard County. They are indefinite in duration and physicians are not free to terminate them unless they wish to also be blacklisted.

31

139.    Health First and the doctors who have agreed to the exclusive dealing arrangements collectively control a dominant share of all patient admissions and referrals in Southern Brevard County—*i.e.*, where their patients receive medical treatment, where they receive ancillary services, and to which specialists they are referred.   Thus, these exclusive dealing arrangements have unreasonably deprived other physicians, ancillary service providers, and hospitals of a market for their goods and services.

140.    Not only are competing suppliers in those markets harmed by this conduct, but patients, health insurers, and third-party payors in those markets are similarly injured as they have been deprived of the benefits afforded by the ambit of free competition.   As a result, prices are higher, quality is lower, and consumer choice is lessened as new market entrants are prevented from entering those markets.

141.    There are no obvious pro-competitive effects which justify imposition of these exclusive dealing arrangements.   They are not necessary to assure supply or price stability, nor do they enable long-term planning on the basis of known costs.

### ii.    Health First Ties Access to its Health Plan Members to the Use of Its Medical Facilities, Ancillary Providers, and Physician Specialists

142.    Those physicians, like Plaintiffs, who refuse to be bound by Health First's exclusivity agreements are denied the opportunity to provide healthcare-related services to Health First's members or patients.   Accordingly, Health First has tied access to its health plan members to utilization of its hospital, ancillary, and physician services, thus restraining free competition in those markets in an appreciable and unreasonable manner.

143.    This type of exclusionary conduct, referred to as "tying," is particularly effective (*i.e.*, anticompetitive) since Health First, through its wholly owned and controlled subsidiary HF Health plans, covers more insured persons in Southern Brevard County than any other private

health insurance company.  But for its market power in private health insurance, Health First would not be able to coerce physicians into exclusively utilizing its hospitals, ancillary providers, and physician specialists.

144.    This conduct not only harms those physicians who are denied access to Health First's members, it also harms patients and Health First's competitors in those leveraged product markets.  As a result of these restraints on free competition, prices are higher, quality is lower, and consumer choice is lessened as new market entrants are prevented from entering those markets.

145.    There are no obvious pro-competitive effects which justify this conduct.

### iii.    Health First and Its Co-Conspirators Boycott and Refuse to Deal with Plaintiffs

146.    Those physicians who refuse to enter into exclusive dealing arrangements with Health First are not only denied access to Health First's members and patients, they are also blacklisted by all physicians who have agreed to the exclusive dealing arrangement (*i.e.*, Health First's co-conspirators).  Moreover, this blacklisting is not limited to patients covered by Health First insurance plans; it also extends to the conspiring physicians' patients who are covered by other insurance providers.  Such conduct constitutes a group boycott or concerted refusal to deal.

147.    Prior to the group boycott, Plaintiffs received referrals from MIMA, HF Physicians and inpatient referrals from physicians at Holmes RMC and Palm Bay Hospital. Afterwards, they received few if any referrals from these sources.

148.    HF Physicians is the largest multispecialty practice in Southern Brevard County. Together with MIMA and the other co-conspirators, these physicians have market power in the physician services market in Southern Brevard County.  Accordingly, those physicians who, like

Plaintiffs, are subjected to the group boycott are foreclosed from a substantial part of the physician services market.

149.    In addition to harming physicians, this group boycott negatively affects acute care inpatient hospitals and ancillary service providers.  Those physicians who agree to Health First's exclusive dealing arrangement are further prohibited from utilizing the acute care inpatient hospitals and ancillary services of Health First's competitors.

150.    Thus, the exclusive dealing arrangements have also resulted in a concerted refusal to deal with Wuesthoff-Melbourne, Health First's only acute care inpatient hospital competitor in Southern Brevard County, as well as a substantial percentage of ancillary service providers in Southern Brevard County.  This effect is compounded by the fact that patients often receive ancillary services at the facilities where they receive their medical treatment.

151.    But the group boycott and the concerted refusal to deal not only harms those physicians, ancillary service providers, and hospitals that are blacklisted; it also harms the patients, private health insurers, and third-party payors who are paying for services in those product markets in Southern Brevard County.  As a result of these restraints on free competition, prices are higher, quality is lower, and consumer choice is lessened as new market entrants are prevented from entering those markets.

152.    There are no pro-competitive justifications for imposition of this group boycott or concerted refusal to deal.  Instead, Defendants have engaged in the group boycott with the intent of maintaining or extending its market power in the acute care inpatient hospital, physician, and ancillary services markets in Southern Brevard County.

### iv.    Health First Actively Lures Physicians Away from Plaintiffs' Medical Practices and Limits Their Ability to Grow

153.    The Medical Practice Plaintiffs have been further injured by having their physicians actively lured away from their practices, and by creating conditions which artificially prevented them from achieving growth.

154.    After terminating the practice's provider contract, Health First would systematically approach physicians in those practices and inform them that they could regain access to Health First's patients and referrals *if* they left their practice and joined HF Physicians or an independent group more loyal to Health First (*i.e.*, one in which the physicians had agreed to enter into exclusivity arrangements).

155.    These conversations were often initiated by Defendants Mean and Senne, where they would further insist that the physicians' current practices were going to fail or be driven out of business.

156.    For example, S.O.A.R. lost four physicians after it was terminated from the Health First network.  Dr. Dowdell was specifically told by a HF Health Plans employee that the only way he and other S.O.A.R. physicians would be permitted back into the Health First network was if they joined a practice group that was "friendly" to Health First, such as MIMA.  Dr. Dowdell was further told that, if S.O.A.R. hired a new physician that was already in the Health First network, that physician would be removed from the network as soon as he or she joined S.O.A.R.

157.    Similarly, after OMNI lost its provider contract with Health First, it was told that Health First would only renew its provider contracts with former OMNI physicians on an individual basis and, even then, only if they left OMNI and agreed to admit their patients exclusively to Health First's hospitals/providers and *not* to OMNI or its providers.  Health first then went on a campaign to convince OMNI physicians to leave the practice and join "Health

First friendly" practices.   As a result of these efforts, OMNI shrank from a group of approximately seventy (70) providers to a group of approximately twenty (20) providers.  OMNI was also forced to sell its pharmacy operations, close certain offices, and divest itself of ownership in an ambulatory surgery center (all product markets in which Health First also competed).

158.   Because of Health First's anticompetitive scheme, many physicians left the Medical Practice Plaintiffs and joined other medical practices, including HF Physicians and MIMA.  The scheme also prevented the Medical Practice Plaintiffs from growing their business as it limited their access to insured patients.  This, in turn, resulted in loss of income to the Medical Practice Plaintiffs.

**v.   Health First Threatens to Revoke Hospital Privileges of the Doctors Who Refuse to Support its Scheme**

159.   Besides boycotting, Health First also can punish physicians who refuse to abide by its exclusive dealing arrangements by unjustifiably revoking their hospital privileges. Without hospital privileges, a physician cannot perform services at that facility.

160.   This threat is particularly powerful due to Health First's Hospital Monopoly in Southern Brevard County and, in particular, Holmes RMC's status as a "must have" hospital in that geographic area.   Thus, losing medical privileges at Holmes RMC severely limits a physician's ability to effectively compete in Southern Brevard County.

161.   In 2010, after OMNI already had its provider contract terminated by Health First, Holmes RMC—the hospital that had previously awarded Dr. Deligdish with an award for "Doctor With the Biggest Heart"—revoked Dr. Deligdish's hospital privileges without cause or justification.

162.   Dr. Deligdish's hospital privileges were revoked because he refused to agree to Health First's exclusive dealing arrangement and was too vocal in opposing Health First's anticompetitive scheme.

163.   As a result, Dr. Deligdish has been unable to effectively compete in the physician services market in Southern Brevard County and has lost significant income.

### vi.   Health First Has Leveraged its Market Power in Each of the Product Markets to Maintain and Strengthen its Stranglehold on All Healthcare in Southern Brevard County

164.   Health First, through its various wholly owned and controlled subsidiaries, has a dominant share in each of the relevant product markets at issue in this case:

- Through its ownership and control of Holmes RMC and Palm Bay Hospital, Health First has a dominant share of the acute care inpatient hospital services market in Southern Brevard County;

- Through its ownership and control of HF Physicians, Health First has a dominant share of the physician services market in Southern Brevard County;

- Through its ownership and control of HF Health Plans, Health First has a dominant share of both the private health insurance market (non-Medicare Advantage) and Medicare Advantage plan market in Southern Brevard County; and

- Through its ownership and control over Holmes RMC, Palm Bay Hospital, HF Physicians, Health First Outpatient Diagnostics LLC, Health First Physical Therapy Services LLC, as well as certain stand-alone facilities such as Health First Diagnostic Center, Health First Medical Rehabilitation, Health First Medical Equipment, Health First Home Care, and Hospice of Health First, Health First has a dominant share of the ancillary services market in Southern Brevard County.

165.   Through use of exclusive dealing arrangements, tying, group boycott/concerted refusals to deal, and other restraints on competition, Health First is able to leverage its market power in these various healthcare-related markets to maintain or extend its market power in adjacent markets.

166. For example, the exclusive dealing arrangements discussed *supra* are used to leverage Health First's market power in the private health insurance market to maintain or grow market share in the acute care inpatient hospital, physician, and ancillary service markets in Southern Brevard County.

167. Similarly, the group boycott discussed *supra* is used to leverage Health First's market power in physician services to maintain or grow market share in the acute care inpatient hospital, physician, and ancillary service markets in Southern Brevard County.

168. As a result, competition in the acute care inpatient hospital, physician, and ancillary service markets in Southern Brevard County has been unreasonably restrained and, therefore, prices in those markets are higher, quality is lower, and consumer choice is limited.

**B.      Each Defendant Had a Role in the Scheme**

      **i.      Health First Inc.**

169. Health First Inc. is the parent company of all of the other Health First-related entities. Health First and its various wholly owned subsidiaries have a complete unity of interest, and their actions are guided by one corporate consciousness.

170. Consistent therewith, Health First and its subsidiaries hold themselves out to the public as a single entity. In fact, Health First openly bills itself as "Central Florida's only fully integrated health system." Similarly, when negotiating rates/prices for hospital and physician services, Health First negotiates as a single economic entity, Health First Inc., as opposed to separately negotiating as Holmes RMC, Palm Bay Hospital, and HF Physicians.

171. Management at Health First Inc. exerts day-to-day control over all things "Health First." Not surprisingly, there is substantial overlap between the board of directors of the Health First parent entity and the boards of all its subsidiaries, further supporting the conclusion that there is but one centralized organization.

172.    The terms of these board members tend to be long and self-perpetuating, thus permitting individual board members to benefit by hundreds of thousands of dollars while management is permitted to control the corporation without serious oversight.

173.    The common scheme complained of herein was designed and implemented by Health First Inc.'s board of directors.  Each of the Health First-related entities is used merely as an agency or instrumentality of Health First Inc. in achieving its monopolistic agenda.

ii.    **Holmes RMC**

174.    Health First attempts to monopolize the acute care inpatient hospital services market in Southern Brevard County through its hospitals.  Health First's largest hospital in Southern Brevard County is Holmes RMC, which is considered a "must have" hospital with a dominant share in this geographic market.

175.    Moreover, Holmes RMC actively assists Health First in leveraging its Hospital Monopoly into other markets by, *inter alia*, refusing to make inpatient referrals to blacklisted physicians and, in some cases, revoking their hospital privileges.  Such actions establish Holmes RMC's role in the group boycott described *supra*.

176.    For example, a substantial portion of Dr. Dowdell's practice (as many as ten to fifteen patients a day) previously consisted of inpatient referrals from Holmes RMC.  As soon as Dr. Dowdell refused to participate in Health First's exclusive dealing arrangements, Dr. Dowdell stopped receiving such referrals.  This includes patients covered by insurance providers other than Health First.

177.    As yet another example, Holmes RMC revoked Dr. Deligdish's hospital privileges in 2010, without cause or justification, in response to Dr. Deligdish voicing his concerns over

Health First's exclusionary practices.   Holmes RMC had previously awarded Dr. Deligdish with an award for being the "Doctor With the Biggest Heart."

178.    As these examples demonstrate, Holmes RMC is not a passive, third-party beneficiary of its parent company's monopolistic practices.  Rather, Holmes RMC affirmatively participates in the common scheme described herein in order to further its shared goal with the other Health First entities—*i.e.*, monopolizing all healthcare-related markets in Southern Brevard County.

### iii.    HF Physicians

179.    Health First attempts to monopolize the physician services market in Southern Brevard County through its multispecialty physician practice, HF Physicians.  Following Health First's acquisition of MIMA, HF Physicians (now d/b/a Health First Medical Group) has a dominant share in the physician services market in Southern Brevard County.

180.    Furthermore, in order to effectuate Health First's group boycott, the physicians employed by HF Physicians (including those formerly associated with MIMA) were required to boycott those physicians who refused to enter into Health First's exclusive dealing arrangement by refusing to refer patients.

181.    As soon as Plaintiffs had their provider contracts terminated or were otherwise blacklisted by Health First, each of them stopped receiving referrals from the physicians employed by HF Physicians and MIMA.  This group boycott extended not only to patients covered by Health First plans, but also those covered by Health First's insurance company competitors (*e.g.*, Blue Cross Blue Shield, Aetna).

182.    For these reasons, HF Physicians played an integral part in Health First's anticompetitive scheme.

### iv.   HF Health Plans

183.   Health First attempts to monopolize the private health insurance market in Southern Brevard County through its wholly owned and controlled subsidiary, HF Health Plans. HF Health Plans has a dominant share in the private health insurance market in Southern Brevard County, and it covers more insured patients in that geographic area than any other private health insurance company.

184.   HF Health Plans plays a central role in the common scheme described herein.  It is HF Health Plans that refuses to deal with Plaintiffs since they rejected Health First's exclusive dealing arrangements.  Moreover, but for HF Health Plan's market power in private health insurance, Health First would not be able to coerce other physicians into exclusively utilizing its hospitals, ancillary providers, and physician specialists (the tied products).

185.   HF Health Plans' role is not limited to refusing to deal with Plaintiffs.  It is also actively involved in convincing physicians that they must refer all patients to Health First's medical facilities, ancillary service providers, and physician specialists.

186.   For example, it was Peter Weiss, Medical Director of HF Health Plans, who visited Dr. Dowdell's facilities and upon learning about the surgical procedures and x-rays that were being performed at his office, demanded Dr. Dowdell cease performing these procedures. Further, he instructed Dr. Dowdell that he could only perform these procedures at Health First's ancillary facilities.  When Dr. Dowdell refused (because performing those ancillary services on site was less expensive and more efficient), Dr. Dowdell received a letter from HF Health Plans terminating his provider contract and removing him from Health First's provider network.

187.   For these reasons, HF Health Plans is a primary participant in the common scheme devised by Health First.

### v. Michael Means

188.    Defendant Means is one of the co-founders of Health First.  He served as Chief Executive Officer and President of Health First Inc. from 1995 to December 2011, and he also served as President and Chief Executive Officer of Holmes RMC and Palm Bay Hospital since 1989.  Defendant Means further served as a member of the board of HF Health Plans, and as a Director of Health First Inc. until December 2011.

189.    In these positions, Defendant Means authorized, participated in, directed, approved, and/or ratified the unlawful acts described in this Complaint.  His role in the anticompetitive scheme can be inferred not only from the positions he held at Health First, but from various actions and statements he made in furtherance and/or support of the scheme.

190.    For example, Defendant Means reportedly instructed the CEO of Wuesthoff-Melbourne to "stay out of South [Brevard] County."  Subsequently, he reportedly told the physicians at a Medical Staff meeting at Holmes RMC, "If you sign letters of support for Wuesthoff, we will know who you are."

191.    These affirmative acts demonstrate that Defendant Means actively and knowingly engaged in a scheme designed to achieve anticompetitive ends—*i.e.*, to unlawfully maintain Health First's Hospital Monopoly and to attempt to monopolize several other healthcare-related markets—and exerted his influence so as to shape Health First's corporate intentions.

### vi. Jerry Senne

192.    Defendant Senne is the former President and Chief Executive Officer at Holmes RMC, as well as the founding President and Chief Executive Officer of HF Health Plans.  He was also the Executive Vice President and Chief Strategy Officer of Health First Inc.

193.   In these positions, Defendant Senne authorized, participated in, directed, approved, and/or ratified the unlawful acts described in this Complaint.  His role in the anticompetitive scheme can be inferred not only from the positions he held at Health First, but from various actions and statements he made in furtherance and/or support of the scheme.

194.   For example, when OMNI first approached Health First in 1997 in order to participate in the HF Health Plans plan, Defendant Senne told OMNI that only physicians employed by HF Physicians and MIMA would be permitted to participate in the HF Health Plans.  Later, Defendant Senne explicitly instructed OMNI that it could participate in the HF Health Plans' network if it agreed to admit its patients exclusively to Health First's hospitals.

195.   These affirmative acts demonstrate that Defendant Senne actively and knowingly engaged in a scheme designed to achieve anticompetitive ends—*i.e.*, to unlawfully maintain Health First's Hospital Monopoly and to attempt to monopolize several other healthcare-related markets—and exerted his influence so as to shape Health First's corporate intentions.

## C.   The Common Scheme Has Harmed Competition

196.   The common scheme described above not only harms those physicians, ancillary service providers, and hospitals that have been blacklisted, it also injures the patients, private health insurers, and third-party payors who are paying for services in those product markets in Southern Brevard County.

197.   As a result of the restraints on free competition imposed by Health First and its co-conspirators, prices are higher, quality is lower, and the number of suppliers is fewer.  New market entrants are prevented from entering the market, while existing competitors are kept from effectively competing in those product markets in Southern Brevard County.

198.   There are no pro-competitive justifications for these restraints sufficient to overcome their anticompetitive effects.  This is evidenced by the fact that prices are higher and

the quality of care lower in each of these product markets in Southern Brevard County when compared to surrounding areas.

### D. The Common Scheme Has Harmed Plaintiffs

#### i. OMNI Healthcare, Dr. Deligdish, and Dr. Seminer

199.    Unlike HF Physicians, MIMA, and other co-conspirators with contractual and/or *de facto* exclusivity agreements with Health First, OMNI and its physicians admit patients to both Health First and non-Health First hospitals, depending on the medical needs and circumstances of their patients.

200.    OMNI first approached Health First in 1997 to participate in the HF Health Plans plan so that its physicians could provide care to HF Health Plans' members.  At that time, OMNI was told by Defendant Senne that only physicians employed by HF Physicians and MIMA would be permitted to participate in the HF Health Plans.

201.    Between 1997 and 1999, OMNI again approached Health First on multiple occasions seeking to participate in the HF Health Plans.  Each of those requests was also denied.

202.    In 2000, OMNI was finally permitted to participate in the HF Health Plans.  That participation, however, was limited to OMNI primary care physicians; OMNI physician specialists and ancillaries were not permitted to participate.  HF Physicians and MIMA were the only physician groups whose specialists were permitted to provide specialty care.  This exclusivity cemented Health First's dominance in the supply of these services and ensured that Health First's patients continued to be admitted exclusively to Health First's hospitals.

203.    In May 2002, OMNI specialty physicians were finally offered an agreement to provide specialty care to HF Health Plans' members, but at a significantly discounted rate compared to MIMA specialists.

204.    Not coincidentally, also in 2002, Wuesthoff-Melbourne opened after Health First had lost its hard-fought battle to prevent it from opening.  Wuesthoff-Melbourne is smaller than Holmes RMC, but nonetheless has 115 private rooms and offers a wide range of services (including interventional cardiac care, full-service emergency department, surgery suites, family birth place, diagnostic and rehabilitation services) and ancillary services (including reference laboratory, homecare, nursing facility, assisted living facility, hospice, home medical equipment, wound care and hyperbaric center).

205.    Despite repeated requests from Health First, OMNI refused to agree to admit its patients exclusively to Health First's hospitals.  In response, Health First threatened to retaliate by recruiting physicians to compete with OMNI and to offer them higher rates and compensation.  Health First made good on its threats, eventually hiring both additional primary care physicians and specialists. Health First further retaliated by, among other things, transferring OMNI's Health First patients to its own physicians, terminating a contractual program whereby OMNI provided unassigned call coverage at Health First's Palm Bay Hospital, and commissioning chart audits on OMNI's physicians.

206.    During this time period, Health First explicitly refused to increase OMNI's provider rates (which were lower than the rates for HF Physicians and MIMA providers) unless OMNI agreed to admit its patients exclusively to Health First's hospitals.

207.    In March 2004, Defendant Senne met with Plaintiff and OMNI physician Dr. Seminer and offered to allow OMNI to remain a participating member of HF Health Plans in exchange for an agreement by OMNI to admit its patients exclusively to Health First's hospitals.

208.    Ultimately, after its repeated attempts to coerce OMNI into admitting exclusively to Health First's hospitals, Health First refused to renew OMNI's contract with HF Health Plans.

Instead, Health First demanded that OMNI's physicians contract individually with HF Health Plans as opposed to contracting as a group.

209.    OMNI again refused to admit exclusively to Health First's hospitals but did agree in good faith (albeit under duress) to "support" Health First's Palm Bay Hospital without agreeing to exclusively admit to Health First's hospitals.  A Letter of Intent to that effect was executed in January 2005, which also included a provision that Health First agreed to stop discriminating against OMNI and pay its physicians no less than other providers within HF Health Plans' network.

210.    In 2007, OMNI learned that Health First was paying other physicians with whom they contracted (*i.e.*, those admitting exclusively or nearly exclusively to Health First's hospitals) higher rates than what OMNI's physicians were receiving.  When OMNI brought this to Health First's attention, Health First demanded that OMNI retroactively amend its provider agreement to eliminate the contractual provision agreeing to pay OMNI physicians no less than other providers within HF Health Plan's network, again threatening retaliation.

211.    Health First made good on its threats of retaliation, this time by cancelling OMNI's self-funded health insurance plan covering its 500+ employees and dependents, which had been contractually administered by HF Health Plans.  Health First further refused, contrary to Florida law, to provide OMNI with its claims experience file so that OMNI could obtain alternate health insurance for its employees and their dependents.

212.    Health First retaliated against OMNI for its refusal to admit exclusively to Health First's hospitals in other ways, including but not limited to:

- Terminating OMNI's pharmacy contract as a provider in Health First's Medicare Part D Plan, despite the fact that it met the plan's terms and conditions for participation;

- Fabricating a $1 million alleged overpayment for fees and services rendered over a two-year period by OMNI;

- Refusing to reimburse for digital mammograms provided by OMNI and requiring its patients to receive preauthorization for digital mammography on the false grounds that the technology was unproven, that is until several months later when Health First was able to purchase its own digital mammography equipment, after which it struck the requirement for preauthorization;

- Initiating a sham audit of OMNI and requesting more than 1,000 of OMNI's charts; and

- Failing to compensate OMNI physicians at the same rate that they compensated other physicians, and litigated this payment issue with OMNI through binding arbitration.

213.    Then in 2007, Health First's refused to re-credential OMNI's physicians and terminated OMNI's participation in HF Health Plans.  For several years after terminating OMNI, Health First actively encouraged OMNI's physicians to leave OMNI by promising the physicians that, if they left OMNI and joined another physician group (i.e., a group which admitted patients exclusively to Health First's hospitals and referred exclusively to Health First's physician and ancillary service providers) that they would be permitted to participate in HF Health Plans.  In addition, physicians who left OMNI for other physician groups were only allowed to participate in Health First's health plans if they agreed not to refer any patients to OMNI.

214.    Thus, Health First not only refused to deal with OMNI (one of its most significant competitors in the physician services market), it refused to deal with those physicians who dealt with OMNI.  This conduct constitutes an attempt by Health First to use its market power in the private health insurance market to distort competition in the market for physician services in Southern Brevard County.

215.    Up until the time that MIMA was acquired by Health First, MIMA conspired with Health First to exclude and foreclose OMNI's participation in the physician and ancillary services markets.  MIMA along with Health First did not refer OMNI any patients nor did they

refer patients to OMNI's ancillary services.  Because of the conspiracy, MIMA engaged in an anticompetitive conduct that damaged competition.  The goal of the conspiracy was clear— Health First was to maintain its monopoly, or become a monopolist in those markets in which it did not have market power.

216.    As a result, OMNI eventually shrank from a group of approximately 70 providers to a group of approximately 20 providers.  OMNI was also forced to sell its pharmacy operation, close certain offices, and divest itself of ownership in an ambulatory surgery center (all product markets in which, again, Health First also competed).

217.    Periodically since Health First terminated OMNI's participation in HF Health Plans in 2007, OMNI has reapplied for inclusion in HF Health Plans' network.  As of the date of this Complaint, OMNI has not been accepted in HF Health Plans' network despite its continued attempts to reapply.

218.    Drs. Deligdish and Seminer, as partners at OMNI, were both formerly contracted with Health First as participating providers.

219.    As described above, both Drs. Deligdish and Seminer (as partners at OMNI) were terminated from the HF Health Plans network as a result of their refusal to submit to Health First's anticompetitive scheme.  Dr. Deligdish also had his hospital privileges taken away at Holmes RMC in 2010.  As part of its retaliation, Health First has further tried to exclude OMNI and Drs. Deligdish and Seminer from the market by threatening to terminate other providers from the network if they referred patients to OMNI and/or Drs. Deligdish and Seminer.

220.    As a result of these efforts by Health First to exclude them from the market, OMNI and Drs. Deligdish and Seminer have lost significant income and OMNI's growth has been restrained.

### ii.    S.O.A.R. and Dr. Dowdell

221.    Dr. Dowdell M.D., M.S. is licensed to practice medicine in the State of Florida, and is a member of the medical staff of Holmes RMC.

222.    In spring of 2006, Peter Weiss, Medical Director of HF Health Plans, demanded that Dr. Dowdell stop doing onsite outpatient surgeries, and instead to do them at Health First's Palm Bay facility.   Dr. Dowdell refused because performing those services on site was less expensive and more efficient than what Health First was proposing.

223.    Dr. Dowdell received a letter terminating him from the Health First provider network on November 3, 2006.  Since that time, Dr. Dowdell has repeatedly tried through both letters and in-person meetings to convince Health First to reinstate his participation in the HF Health Plans network.  All of these efforts have failed, including his last application on or about September 2, 2011.

224.    At one meeting in April 2008, Dr. Dowdell was further told that all doctors joining his group would similarly be terminated from the Health First network, and that any doctors who left his group would be reinstated.  Thus, Health First's intent—*i.e.*, excluding those physicians who refused to support its anticompetitive scheme—was made apparent.

225.    During one meeting, in which he was inquiring about being allowed back into the HF Health Plans network, Dr. Dowdell was told by Health First that if he joined a physician group that was more in-line with Health First's interests, such as MIMA, he would be allowed back into the network.

226.    Like all physicians terminated from the HF Health Plans network, not only did fewer HF Health Plans members come to Dr. Dowdell, but he also stopped receiving any referrals from doctors employed by HF Physicians and/or MIMA.  S.O.A.R. previously received

as many as fifty (50) referrals a week from MIMA physicians.  After it was blacklisted, this number dropped to nearly zero (0).  This blacklisting not only involves ensuring that Dr. Dowdell and S.O.A.R. receive no referrals from other physicians and practice groups, it also includes misrepresentations by Health First employees to patients stating that Dr. Dowdell and S.O.A.R. are no longer on staff at Health First's hospitals.

227.    Similarly, S.O.A.R. previously received ten (10) to fifteen (15) inpatient referrals a day from Holmes RMC.  After it was blacklisted, this number also dropped to nearly zero (0).

228.    As a result of these efforts by Health First to exclude them from the market, Dr. Dowdell has lost significant income.

229.    In addition, Dr. Dowdell is the sole owner of S.O.A.R.  Many of S.O.A.R.'s physicians were also terminated from the HF Health Plans network and blacklisted by HF Physicians and their co-conspirators, including MIMA, as a result of their association with S.O.A.R.  Due to this exclusionary conduct, S.O.A.R. lost significant revenue and its growth was restrained.  Moreover, several of its physicians were ultimately lured away to other physician groups so that they could contract again with HF Health Plans.

### iii.    Florida Pain, Dr. Gayles, and Dr. Golovac

230.    Drs. Gayles and Golovac are former HF Health Plans participants and partners in Florida Pain, a multi-service facility that specializes in the treatment of neck, back and cancer pain with multiple locations in Brevard County.  In spring of 2009, they also opened Space Coast Surgery Center, an outpatient surgical and procedure facility.

231.    Originally, Space Coast Surgery Center was intended to be a joint venture with Health First.  Later, Health First expressed concerns that "Surgi-centers make less money than a hospital," and backed out of the joint venture.  Ultimately, Drs. Gayles and Golovac decided to

open the center on their own.  Afterwards, they were warned that Health First would view the opening of Space Coast Surgery Center as disloyal and as unwelcomed competition.

232.    Florida Pain was terminated from the Health First provider network effective November 30, 2009, several months after opening Space Coast Surgery Center.  No official reason was provided for their termination.  Despite multiple attempts to get reinstated as participants in Health First's provider network, most recently in July 2012, all attempts have been rebuffed.

233.    At the time its provider contract was terminated, approximately twenty-five percent (25%) of Florida Pain's patients were Health First members.  Today, that figure is essentially zero percent (0%).

234.    Immediately following their termination from the Health First provider network, Drs. Gayles and Golovac also stopped receiving referrals from HF Physicians and MIMA.  Today, no physician employed by HF Physicians (which now includes MIMA's physicians), and few if any physicians within Health First's provider network, refer patients to Drs. Gayles and Golovac on a regular basis.

235.    Moreover, the hospitalists at Holmes RMC (who, coincidentally, have recently all been terminated and replaced by hospitalists employed directly by Health First) refer all pain management cases exclusively to HF Physicians.  Not only do all of these cases go to providers within Health First's provider network, most if not all of them are referred to a HF Physician.

236.    Despite being excluded from Health First's provider network, Dr. Gayles continued taking call at Cape Canaveral Hospital for some period of time after Florida Pain's contract was terminated.  While on call, however, the hospital would not refer any HF Health Plans members to Dr. Gayles, and only a minimal number of other insured patients.  Instead,

those referrals were all given to HF Physicians, even if that meant that patients would have to wait a significant amount of time for the HF Physician to become available.  Dr. Gayles, on the other hand, was left with only uninsured, Medicaid, and other patients with low reimbursement rates.  Because of this, Dr. Gayles has since stopped taking call at Cape Canaveral Hospital.

237.    As a result of these efforts by Health First to exclude them from the market, Drs. Gayles and Golovac have lost significant income.

238.    In addition, Drs. Gayles and Golovac are co-owners in Florida Pain.  Many of Florida Pain's physicians were also terminated from the HF Health Plans network and blacklisted by HF Physicians and their co-conspirators, including MIMA.  Due to this exclusionary conduct, Florida Pain lost significant revenue and its growth has been restrained.

### iv.    Institute of Facial Surgery and Dr. Grenevicki

239.    Lance Grenevicki, D.D.S., M.D., FACS is a medical doctor and a dentist licensed to practice medicine in the State of Florida and was previously the Chief of the Department of Surgery at Holmes RMC.  He was a member of the MEC of Holmes RMC.  He was also formerly the Vice President and President of the Medical Society of Brevard County.

240.    As Chairman of the Department of Surgery and a member of the MEC at Holmes RMC, Dr. Grenevicki supported the suspension of trauma surgeons hired by Health First when it became apparent that those surgeons lacked the requisite experience for the procedures they were performing, thus putting patients' safety at risk.  In retaliation, Health First brought a baseless legal action against Dr. Grenevicki and the other physicians involved.  On May 5, 2014, Judge Moxley of the Eighteenth Judicial Circuit of Florida ruled in Dr. Grenevicki's favor, and awarded him costs and attorney fees as the prevailing party.

241.    Dr. Grenevicki has never been allowed to participate as a provider in the HF Health Plans network.  Although he has repeatedly tried to contract with Health First to become a participating provider, Health First has either denied the request outright or offered a contract under objectively unreasonable terms clearly designed to dissuade a meeting of the minds.

242.    Nonetheless, a large portion of Dr. Grenevicki's practice was previously composed of oral and maxillofacial trauma surgeries referred to him while serving as the on-call trauma surgeon at Holmes RMC, where all or nearly all trauma patients in Southern Brevard County are diverted.  Historically, Holmes RMC's trauma surgery needs were met this same way—*i.e.*, by contracting with surgeons to take call and referring incoming patients to those surgeons—until Health First terminated its contracts with non-HF Physicians and replaced them with Health First-employed surgeons.  For oral and maxillofacial surgeries in particular, Health First even referred its patients to a surgeon located well-outside the geographic area until it was able to hire its own oral and maxillofacial surgeon.  Until he was blacklisted, Dr. Grenevicki received three (3) to eight (8) inpatient referrals a day from Health First and its subsidiaries.

243.    Similarly, many of Dr. Grenevicki's referrals previously came from MIMA.  However, once Health First began to exclude Dr. Grenevicki, MIMA did as well and referrals from MIMA began to taper off.  Finally, when MIMA was acquired by Health First, he stopped receiving any referrals from MIMA physicians, who instead referred exclusively or nearly exclusively to Health First's surgeons.

244.    As a result of these efforts by Health First to exclude him from the market, Dr. Grenevicki has lost significant income.

245.    In addition, Dr. Grenevicki is an owner in the Institute of Facial Surgery.  Many of the Institute of Facial Surgery's physicians were also terminated from the HF Health Plans'

network and blacklisted by HF Physicians and its co-conspirators, including MIMA.  As a result of Health First's exclusionary conduct, the Institute of Facial Surgery had to reduce its staff by almost twenty-five percent (25%).  Thus, the Institute of Facial Surgery lost significant revenue and its growth was restrained.

**v.    Dr. Komar**

246.    Dr. Komar is board certified in surgery and surgical critical care by the American Board of Surgery.  After practicing with the University of Florida Jacksonville ("UFJ"), he was assigned to the university's Melbourne satellite in 2002.  At that time, UFJ was running Holmes RMC's Level II Trauma Center and Dr. Komar was assigned there as an attending surgeon.

247.    In September 2003, Dr. Komar resigned from the trauma service and joined an independent physician group, Medical Associates of Brevard.  One of the primary reasons for his resignation was the threats he received from the administration at Holmes RMC about dissolving the trauma program.  Nonetheless, Dr. Komar continued to support the trauma program at Holmes RMC through a part-time employment contract with UFJ.  Eventually, despite concerns about quality of care voiced by the MEC, Health First and Holmes RMC terminated the trauma program contract with UFJ.

248.    After the UFJ contract was terminated, Health First offered Dr. Komar a provider contract, though at terms considerably inferior to those offered to HF Physicians.  In addition, Dr. Komar was also employed as a contractor at Health First's electronic intensive care unit ("eICU").

249.    During this period, Dr. Komar saw HF Health Plans' patients and was repeatedly ordered to change the admission status of his patients.  On two separate occasions, after refusing to comply with Health First's demands regarding how to provide care for his patients, Dr. Komar

was threatened by a director at HF Health Plans that he would be denied payment for his services and the patient would be made responsible for his bill if he did not concede to their demands.

250.    Health First has also refused payment for patients because Dr. Komar treated them at Wuesthoff-Melbourne.  In one instance, a patient required emergency surgery and, after denying Dr. Komar payment, he was reprimanded and told that he was supposed to transfer the patient in the middle of the night to Holmes RMC despite the fact that Holmes RMC had trouble even accommodating admitted patients.  In fact, at around the same time, Dr. Komar was forced to transfer two patients to Wuesthoff-Melbourne for emergency surgery when Holmes RMC could not accommodate them.

251.    In February 2009, after Health First determined that Dr. Komar was not going to support its anticompetitive scheme, Health First terminated his contract with the eICU.  In particular, after Dr. Komar signed a letter of support for Wuesthoff-Melbourne, he was threatened that if he did something like that again he would be terminated.  Despite these threats, Dr. Komar continued to advocate in favor of patient care and—after standing up at an MEC meeting and criticizing Health First's anticompetitive practices as detrimental to the provision of affordable, high-quality healthcare—he was terminated.  At that time, the Director of the eICU, Dr. James P. Schaffer, MD, informed Dr. Komar that he was not being terminated for performance reasons, but rather because someone "very high in the HF hierarchy" demanded it. Dr. Schaffer further told Dr. Komar that his termination would put Dr. Schaffer "in a crunch" because there were already problems covering all of the eICU shifts.

252.    While some patients come directly to surgeons that are in their health insurance provider's network, most are referred to a surgeon by another physician.  Although Health First has not terminated his provider contract, Dr. Komar has effectively been boycotted by Health

First and, as a result, receives no referrals from HF Physicians and/or MIMA physicians despite being in the HF Health Plans network. Furthermore, Health First actively diverts patients away from Dr. Komar by intentionally providing patients misinformation regarding Dr. Komar being out of town or otherwise unavailable. Instead, patients are forced to see a surgeon employed by HF Physicians (*i.e.*, someone not only in the HF Health Plans network, but employed by Health First's physician group).

253. As a result of these efforts by Health First to exclude him from the market, Dr. Komar has lost significant income.

### vi. PAS and Mr. Boone

254. C. Hamilton Boone, P.A., is a physician assistant licensed to practice in the State of Florida, and is a member of the medical staff of Holmes RMC. He is a current or former member of the following associations: the American Academy of Physician Assistants, the Association of Family Practice Physician Assistants, the Florida Association of Physician Assistants, the Georgia Association of Physician Assistants, the North Carolina Association of Physician Assistants, and the National Commission on Certification of Physician Assistants.

255. Mr. Boone was punished because he objected to the poor quality of medical care provided to patients at Holmes RMC, and because he wanted Health First to compete aggressively and deliver competitive healthcare rather than engage in exclusionary conduct to the detriment of patients.

256. After Mr. Boone joined Dr. Hynes in voicing concerns over the quality of medical care provided at Holmes RMC, Health First decided that Mr. Boone was insufficiently supportive of its anticompetitive scheme and took affirmative steps to retaliate against him and exclude him from the market. Specifically, Mr. Boone complained to the Operating Room

Committee about a preventable death in the O.R.  The very next day, Mr. Boone started suffering harassment from Health First.

257.    In fact, one HF Physician employee sent Mr. Boone a letter to that effect on or about March 12, 2010, informing him that he was effectively blacklisted by Health First. Moreover, Dr. Joe Gurri, a former MIMA physician now employed by HF Physicians, specifically instructed all MIMA surgeons not to utilize Mr. Boone's services.  From that point on, all doctors employed by HF Physician and/or MIMA were instructed not to use Mr. Boone as a Physician Assistant.  Health First has further prevented Mr. Boone from gaining access to surgery schedules so that he can seek consults with surgeons performing procedures at Holmes RMC, which is one of the primary sources for referrals for PAs who assist with surgeries.

258.    Prior to Mr. Boone's being blacklisted by Health First, PAS employed six (6) physician assistants.  Today, as a result of his and PAS' foreclosure from the market, Mr. Boone is the only physician assistant that remains at PAS.  Moreover, the number of cases Mr. Boone has assisted on has dropped to less than half of his pre-blacklisting total.

259.    As a result of these efforts by Health First to exclude them from the market, Mr. Boone and his practice, PAS, have lost significant income.

## V.    The MIMA Acquisition

260.    In November 2012, Health First announced that it would be acquiring MIMA, then the second largest physician group in Brevard County behind HF Physicians (the "MIMA Acquisition").    The MIMA Acquisition substantially added to Health First's power and dominance in the physicians' services market in Southern Brevard County.

261.    Large, desirable physician groups are better able to negotiate favorable rates with health insurers.    Thus, the MIMA Acquisition gave HF Physicians additional leverage in negotiating rates with HF Health Plans' rivals—*i.e.*, other private health insurers.    Moreover,

affiliated physician groups can drive a harder bargain with rival health plans than independent physician groups. If a the rival health plan declines the rate hike, there is a chance that some members will switch to HF Health Plans to follow their preferred physicians; if the rival health plan accept the rate hike, Health First has successfully raised the costs of HF Health Plans' competitors. This externality is not available to independent physician groups and, thus, leads to higher prices by the vertically integrated entity.

262. In fact, shortly after the MIMA Acquisition, Health First approached other private health insurers doing business in Southern Brevard County and demanded to renegotiate their contracts, seeking higher rates for hospital and physician services. By charging these private health insurers higher rates, Health First was able to increase the costs of its competitors in the market for private health insurance in Southern Brevard County.

263. After the MIMA Acquisition, former MIMA physicians stopped accepting Medicare Advantage plans offered by Health First's competitors, thereby reducing their own revenues. Instead, they now only accept Medicare Advantage plans offered by Health First. The vertical affiliation induced these doctors to incur losses that only make economic sense in light of the fact that these losses would be more than recouped by Health First's other subsidiary, HF Health Plans. Therefore, patients who wished to maintain relationships with their physicians were forced to switch to Health First's Medicare Advantage plans.

264. Additionally, by controlling physicians, Health First controls patient referrals, as well as the treatments and ancillary services those physicians elect to utilize. The MIMA Acquisition augments Health First's power to control physicians. This control enables Health First to maintain and strengthen its monopoly and reduce the quality of care—effectively failing to pass on any cost benefits to its members.

265.    HF Physicians, including now the former-MIMA physicians, admit exclusively or nearly exclusively to Health First medical facilities as a contractual and/or *de facto* condition of their employment.  Thus, it is easier for Health First to monitor and police that the former-MIMA physicians abide by the terms of the exclusive dealing arrangements.

266.    Accordingly, the MIMA Acquisition has perfected Health First's control over the majority of admissions and specialty referrals in Southern Brevard County, thus restraining competition in the markets for hospitals, physician services, ancillary services, and Medicare Advantage plans, and augmenting and maintaining Health First's overall market power.

267.    The MIMA Acquisition was investigated by the Office of the Florida Attorney General (the "Florida AG") and the Federal Trade Commission ("FTC").  During the course of the investigation, Health First falsely denied the existence of any actual and/or *de facto* exclusivity agreements and, relying on this misrepresentation, the Florida AG and FTC decided not to bring enforcement actions at that time.

268.    In its letter informing Health First that it was not bringing an enforcement action, a representative of the Florida AG stated, "[I]t is our understanding, based on our discussions with you, that Health First will continue to permit employed physicians, including former MIMA physicians, to admit and/or refer patients to the hospital of their choosing, including non-Health First hospitals.  Additionally, it is our understanding that former MIMA physicians will not be required to sign exclusive agreements with HF Plans.  If either of these facts should change, or if you should acquire any additional physician practices in Florida, please notify me."

269.    In reality, as discussed herein, HF Physicians (including MIMA) rarely if ever refer patients to non-Health First hospitals as they are bound by actual and/or *de facto* exclusivity agreements that prevent them from doing so.  Indeed, even before the completion of the MIMA

transaction, both MIMA and Health First physicians referred less than 1% of their patients to Wuesthoff-Melbourne.

270.    Additionally, immediately following the merger with Health First, the physicians formerly with MIMA began: (1) significantly increasing the prices for certain services to rival health insurance plans (some as much as doubled); (2) terminating business relationships with other health plans and ancillary service providers; and (3) directing all ancillary services to Health First's own higher-priced providers.

271.    Therefore, the MIMA Acquisition resulted in a substantial lessening of competition and reinforced/augmented Health First's market power in the Relevant Market and related Secondary Product Markets.

272.    Moreover, the MIMA Acquisition and the expansion of Health First's market power in the physician services market in Southern Brevard County is part of a larger effort to systematically terminate non-Health First physicians within Health First's provider networks and replace them with physicians employed directly by Health First.

273.    For example, within the past several years, Health First has systematically forced independent hospitalists out of its hospitals, either by terminating and/or refusing to extend their provider contracts or, in some instances, by terminating their hospital privileges without justification.  Afterwards, Health First replaces these hospitalists with physicians employed by Health First.  Since hospitalists are responsible for making inpatient referrals for patients admitted at a hospital, this allows Health First to ensure that all referrals are being made to physicians employed by Health First.

274. These actions are not undertaken for valid business reasons such as lowering costs or ensuring quality of care, but rather they represent further efforts by Health First to maintain and enhance its super-monopoly.

## ANTICOMPETITIVE EFFECTS

275. Defendants acted with the purpose and effect of unreasonably restraining and injuring competition in the Relevant Market, as well as the related Secondary Product Markets.

276. But for the exclusionary conduct described herein: (1) Health First's market power in the Relevant Market and the Secondary Product Markets would be reduced; (2) there would be increased competition in the Relevant Market and the Secondary Product Markets; (3) Health First would be unable to coerce providers into the exclusive dealing arrangements described above; (4) independent providers would not be subject to the same intimidation and retaliation techniques currently imposed upon them by Health First; and (5) prices would be lower or the quality of care would be higher in the Relevant Market and Secondary Product Markets.

277. As a result, prices are higher and the quality of patient care (*i.e.*, quality of services) lower in these product markets in Southern Brevard County than in most, if not all, of Florida.

## ANTITRUST IMPACT

278. As a direct result of the anticompetitive course of conduct described herein, competition in the Relevant Market and in the Secondary Product Markets was unreasonably restrained, and OMNI HealthCare Inc., Interventional Spine Institute of Florida, Craig Deligdish, MD, Brian Dowdell, MD, Richard Gayles, MD, Stan Golovac, MD, Lance Grenevicki, MD, Aleksander Komar, MD, Scott Seminer, MD, Institute of Facial Surgery, Inc., and The Pain Institutes Inc. (collectively, the "Antitrust Plaintiffs") have been substantially limited in their

ability to effectively compete in the related markets for physician services and ancillary services in Southern Brevard County.

279.    In furtherance of the common scheme described herein, Health First (through its wholly owned and controlled subsidiary, HF Health Plans) terminated or otherwise refused to enter into provider contracts with the Antitrust Plaintiffs, thus barring them from providing medical services to Health First's members.  Health First further instructed its physicians and co-conspirators not to refer any patients to Antitrust Plaintiffs, including those patients insured by other private health insurers.

280.    These actions were particularly harmful to Antitrust Plaintiffs as Health First controls the health plan with the greatest number of covered persons and the physicians group with the greatest number of physicians in Southern Brevard County.

281.    Moreover, as part of this common scheme Defendants actively lured physicians away from the Antitrust Plaintiffs' medical practices, and prevented those practices from achieving the level of growth they would have achieved absent Defendants' anticompetitive conduct.

282.    Additionally, the common scheme described herein resulted in some physicians, including Dr. Deligdish, unjustifiably losing their medical privileges at Holmes RMC.

283.    Thus, any provider wanting to effectively practice in Southern Brevard County has been forced to comply with Health First's anticompetitive demands or practice in another geographic area.

284.    Antitrust Plaintiffs have experienced loss of income due to the foreclosure of competition in the Relevant Market and related Secondary Product Markets, and suffered harm to their business and property.

285.    These injuries were a direct and foreseeable result of Defendants' anticompetitive course of conduct, as described herein.   Further, these actions have deprived Plaintiffs of the benefits of open competition, and represent precisely the type of conduct the antitrust laws were designed to protect against.

286.    Health First, directly or through its wholly owned and controlled subsidiaries, participates in the Relevant Market and each of the Secondary Product Markets (*i.e.*, physician services, ancillary services, private health insurance, and Medicare Advantage plan markets in Southern Brevard County) either as a competitor or supplier or both.

287.    Each of the Antitrust Plaintiffs participates in the Relevant Market as suppliers, insofar as they decide where their patients receive medical treatment.

288.    Each of the Antitrust Plaintiffs participates in the physician services market in Southern Brevard County as competitors and suppliers, insofar as they offer physician services and make referrals to other physicians.

289.    Except for Drs. Grenevicki and Komar, each of the Antitrust Plaintiffs, either individually or through their medical practices, competes in the ancillary services market in Southern Brevard County as competitors and suppliers, insofar as they offer ancillary services or refer their patients to other ancillary service providers.

290.    Each of the Antitrust Plaintiffs, either individually or through their medical practices, competes in the private health insurance and Medicare Advantage markets in Southern Brevard County as suppliers, insofar as they offer their services to be included in the health insurance provider's managed care network in order to provide healthcare to the health insurer's enrollees.

## FIRST CLAIM FOR RELIEF

**Impermissible Merger In Restraint of Trade
In Violation of Section 7 of the Clayton Act**

**(Asserted by Antitrust Plaintiffs Against Defendants Health First Inc. and HF Physicians)**

291.    Health First Inc. acquired MIMA in November 2012, and subsequently merged MIMA's assets and physicians with HF Physicians.

292.    By acquiring MIMA, the largest independent physicians group in Southern Brevard County, Health First has further solidified its control over hospital admissions, physician referrals, and choice of ancillary service providers in Southern Brevard County.  (*See* ¶¶ 260 - 274, *supra*.)

293.    This control was sought for the anticompetitive purpose of reinforcing Health First's market power in the acute care inpatient hospital, physician, and ancillary service markets in Southern Brevard County by, *inter alia*, enabling it to police the conspiracy and ensure that all employed physicians refer exclusively to Health First's hospitals, physicians, and ancillary service providers.

294.    It further enabled Health First to maintain and strengthen its market power in the private health insurance and Medicare Advantage markets in Southern Brevard County.  The MIMA Acquisition afforded Health First greater bargaining leverage (owing to both horizontal and vertical effects), thus allowing it to negotiate higher rates for its acute care inpatient hospital and physician services, and raising the costs of its rivals in the private health insurance market.  Following the acquisition, former MIMA physicians no longer accepted Medicare Advantage plans other than those offered by Health First, a clear profit sacrifice.  As a result, the patients of those former MIMA physicians who wanted to keep their doctor had to switch to Health First's Medicare Advantage plan.

295.    Thus, the MIMA Acquisition constitutes a merger and acquisition which has the tendency to reduce, and in fact has reduced, competition in the Relevant Market and related Secondary Product Markets (*i.e.*, those for physician services, ancillary services, private health insurance plans, and Medicare Advantage plans in Southern Brevard County).

296.    As a result, prices are higher (and will continue to climb) in the Relevant Market and Secondary Product Markets, and there are fewer alternatives for health insurers doing business in Southern Brevard County, thereby causing injury to competition, consumers, and the Antitrust Plaintiffs.  (*See* ¶¶ 275 - 277, *supra*.)

297.    As discussed in paragraphs 278 - 290, *supra*, this reduction in competition has also substantially limited Antitrust Plaintiffs' ability to effectively compete in the inter-related markets for physician and ancillary services in Southern Brevard County.  Plaintiffs have thus been injured in their business and property as a result of this reduction in competition.  These injuries are of the type the federal antitrust laws were designed to prevent and flow directly from the exclusionary practices which makes Defendants' conduct unlawful.

298.    OMNI, S.O.A.R., Institute of Facial Surgery, and Florida Pain were and will continue to be harmed by the MIMA Acquisition as it has perfected Health First's control over physician and ancillary service referrals in Southern Brevard County, thus maintaining and enhancing Health First's ability to exclude these practices and their providers from those markets.  As a result, these entities have lost significant income and have suffered harm to their business and property.

299.    Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevick, and Komar were and will continue to be harmed by the MIMA Acquisition as it has perfected Health First's control over physician referrals in Southern Brevard County, thus maintaining and enhancing

Health First's ability to subject them to a group boycott or concerted refusal to deal.  As a result, these doctors have lost significant income and have suffered harm to their business and property.

## SECOND CLAIM FOR RELIEF

**Monopolization of the Acute Care Inpatient Hospital Services Market
In Violation of Section 2 of the Sherman Act**

**(Asserted by Antitrust Plaintiffs Against Defendants Health First Inc. and Holmes RMC)**

300.    Holmes RMC is a wholly owned subsidiary of Health First Inc.  Health First exerts substantial control over the day-to-day operations of its subsidiaries, using them as agencies or instrumentalities of the parent company.  In fact, when Health First negotiates with private health insurers regarding hospital rates at Holmes RMC, it does so as "Health First Inc." and not Holmes RMC.

301.    Health First, through its ownership and control of Holmes RMC and Palm Bay Hospital, has monopoly power in the Relevant Market—*i.e.*, acute care inpatient hospital services in Southern Brevard County.  (*See* ¶¶ 112 - 116, *supra.*)

302.    Direct evidence of Health First's monopoly power is demonstrated by Health First's ability to exclude rival providers of inpatient hospital services and raise prices to private health insurers and other third-party payors to supra-competitive levels.  Indirect evidence of Health First's monopoly power includes, *inter alia*, its 70% market share in the Relevant Market.

303.    Alternatively, in the absence of a finding of monopoly power in the Relevant Market, Health First has attempted to monopolize this market by acting with the specific intent of obtaining monopoly power and, because of the affirmative acts described *supra*, poses a dangerous probability of achieving monopoly power in the market for acute care inpatient hospital services in Southern Brevard County.

304.   Health First's monopoly in the Relevant Market was not lawfully obtained through superior business acumen; rather it was willfully acquired through a merger-to-monopoly.

305.   Health First has exercised, maintained, and exploited its monopoly power in the Relevant Market through the exclusionary and anticompetitive devices described above, including, *inter alia*, exclusive dealing arrangements (*see* ¶¶ 136 - 141, *supra*); tying (*see* ¶¶ 142 - 145, *supra*); group boycott/concerted refusal to deal (*see* ¶¶ 146 - 152, *supra*); and monopoly leveraging (*see* ¶¶ 164 - 168, *supra*).

306.   As a result, prices are higher and there are fewer alternatives for participants in the Relevant Market, thereby causing injury to competition, consumers, and the Antitrust Plaintiffs. (*See* ¶¶275 - 277, *supra*.)

307.   The Antitrust Plaintiffs participate in the Relevant Market as suppliers, insofar as they are primarily responsible for deciding where their patients receive medical treatment.  (*See* ¶ 287, *supra*.)

308.   Health First's exercise and maintenance of monopoly power in the Relevant Market, including the exclusionary course of conduct designed towards that end, has substantially limited the Antitrust Plaintiffs' ability to effectively compete in the inter-related markets for physician and ancillary services in Southern Brevard County.  (*See* ¶¶ 199 - 253 *supra*)

309.   Antitrust Plaintiffs have been injured in their business and property as a result of Defendants' anticompetitive scheme.  These injuries are of the type the federal antitrust laws were designed to prevent and flow directly from the exclusionary practices which makes Defendants' conduct unlawful.  (*See* ¶¶ 278 - 290, *supra*.)

310.   OMNI is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's members/patients; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, OMNI has lost significant income and has suffered harm to its business and property.

311.   S.O.A.R. is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, S.O.A.R. has lost significant income and has suffered harm to its business and property.

312.   Institute of Facial Surgery is harmed by the various exclusionary practices described herein because: (a) it has been denied access to the Health First network for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped

receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, Institute of Facial Surgery has lost significant income and has suffered harm to its business and property.

313.   Florida Pain is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, Florida Pain has lost significant income and has suffered harm to its business and property.

314.   Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, and Komar are harmed by the various exclusionary practices described herein because they have been: (a) denied access to Health First's members; and (b) blacklisted by Health First and, thus, receive no patient referrals, regardless of the patient's insurance provider, from HF Physicians or its co-conspirators.  In addition, Dr. Deligdish has had his hospital privileges revoked from Holmes RMC in retaliation for voicing concerns over Health First's anticompetitive practices.  As a result, these doctors have lost significant income and have suffered harm to their business and property.

## THIRD CLAIM FOR RELIEF

**Attempted Monopolization of the Physician Services Market
In Violation of Section 2 of the Sherman Act**

**(Asserted by Antitrust Plaintiffs Against Defendants Health First Inc. and HF Physicians)**

315.    HF Physicians is a wholly owned subsidiary of Health First Inc.  Health First exerts substantial control over the day-to-day operations of its subsidiaries, using them as agencies or instrumentalities of the parent company.  In fact, when Health First negotiates with private health insurers regarding rates for hospital and physician services performed by its subsidiaries, it does so as a single entity "Health First Inc."

316.    Health First, through its ownership and control of HF Physicians, has a dominant share in the physician services market in Southern Brevard County.  (*See* ¶¶ 183 - 187, *supra.*)

317.    Health First has attempted to monopolize this market by acting with the specific intent of obtaining monopoly power and, because of the affirmative acts described *supra*, poses a dangerous probability of achieving monopoly power in the market for physician services in Southern Brevard County.

318.    Health First has enhanced and abused its market power in the physician services market in Southern Brevard County through the exclusionary and anticompetitive devices described above, including, *inter alia*, exclusive dealing arrangements (*see* ¶¶ 136 - 141, *supra*); tying (*see* ¶¶ 142 - 145, *supra*); group boycott/concerted refusal to deal (*see* ¶¶ 146 - 152, *supra*); and monopoly leveraging (*see* ¶¶ 164 - 168, *supra*).

319.    As a result, prices are higher and there are fewer alternatives for participants in the physician services market in Southern Brevard County, thereby causing injury to competition, consumers, and the Antitrust Plaintiffs.  (*See* ¶¶ 275 - 277, *supra.*)

320.    The Antitrust Plaintiffs participate in the physician services market in Southern Brevard County as both competitors and suppliers, insofar as they offer physician services and refer patients to other physicians.  (*See* ¶ 61, *supra*.)

321.    Health First's exercise and maintenance of market power in the physician services market in Southern Brevard County, including the exclusionary course of conduct designed towards that end, has substantially limited the Antitrust Plaintiffs' ability to effectively compete in the inter-related markets for physician and ancillary services in Southern Brevard County. (*See* ¶¶ 199 - 253, *supra*)

322.    Antitrust Plaintiffs have been injured in their business and property as a result of Defendants' anticompetitive scheme.  These injuries are of the type the federal antitrust laws were designed to prevent and flow directly from the exclusionary practices which makes Defendants' conduct unlawful.  (*See* ¶¶ 278 - 290, *supra*.)

323.    OMNI is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, OMNI has lost significant income and has suffered harm to its business and property.

324.    S.O.A.R. is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing

arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, S.O.A.R. has lost significant income and has suffered harm to its business and property.

325.    Institute of Facial Surgery is harmed by the various exclusionary practices described herein because: (a) it has been denied access to the Health First network for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, Institute of Facial Surgery has lost significant income and has suffered harm to its business and property.

326.    Florida Pain is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in

Southern Brevard County. As a result, Florida Pain has lost significant income and has suffered harm to its business and property.

327.     Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, and Komar are harmed by the various exclusionary practices described herein because they have been: (a) denied access to Health First's members; and (b) blacklisted by Health First and, thus, receive no patient referrals, regardless of the patient's insurance provider, from HF Physicians or its co-conspirators. In addition, Dr. Deligdish had his hospital privileges at Holmes RMC revoked by, or at the direction of, Health First in retaliation for voicing concerns over Health First's anticompetitive practices. As a result, these doctors lost significant income and have suffered harm to their business and property.

### FOURTH CLAIM FOR RELIEF

**Attempted Monopolization of the Ancillary Services Market
In Violation of Section 2 of the Sherman Act**

**(Asserted by Antitrust Plaintiffs Against
Defendants Health First Inc., Holmes RMC, and HF Physicians)**

328.     Holmes RMC and HF Physicians are wholly owned subsidiaries of Health First Inc. Health First exerts substantial control over the day-to-day operations of its subsidiaries, using them as agencies or instrumentalities of the parent company. In fact, when Health First negotiates with private health insurers regarding rates for hospital and physician services performed by Holmes RMC and HF Physicians, it does so as a single entity "Health First Inc."

329.     Health First participates in the ancillary services market through various wholly owned and controlled subsidiaries, including, *inter alia*: Holmes RMC, Palm Bay Hospital, HF Physicians, Health First Outpatient Diagnostics LLC, Health First Physical Therapy Services LLC. It also participates in this market through certain stand-alone Health First facilities, including, *inter alia*: Health First Diagnostic Center, Health First Medical Rehabilitation, Health

First Medical Equipment, Health First Home Care, and Hospice of Health First.  Through its ownership and control of these entities, Health First has a dominant share of the ancillary services market in Southern Brevard County.  (*See* ¶ 270, *supra.*)

330.    Health First has attempted to monopolize this market by acting with the specific intent of obtaining monopoly power and, because of the affirmative acts described *supra*, poses a dangerous probability of achieving monopoly power in the market for ancillary services in Southern Brevard County.

331.    Health First has enhanced and abused its market power in the ancillary services market in Southern Brevard County through the exclusionary and anticompetitive devices described above, including, *inter alia*, exclusive dealing arrangements (*see* ¶¶ 136 - 141, *supra*); tying (*see* ¶¶ 142 - 145, *supra*); group boycott/concerted refusal to deal (*see* ¶¶ 146 - 152, *supra*); and monopoly leveraging (*see* ¶¶ 164 - 168, *supra*).

332.    As a result, prices are higher and there are fewer alternatives for participants in the ancillary services market in Southern Brevard County, thereby causing injury to competition, consumers, and the Antitrust Plaintiffs.  (*See* ¶¶ 275 - 277, *supra.*)

333.    The Antitrust Plaintiffs participate in the ancillary services market in Southern Brevard County as both competitors and suppliers, insofar as they are offer ancillary services and refer patients to other physicians/practices who offer ancillary services.  (*See* ¶ 69, *supra*.)

334.    Health First's exercise and maintenance of market power in the ancillary services market in Southern Brevard County, including the exclusionary course of conduct designed towards that end, has substantially limited the Antitrust Plaintiffs' ability to effectively compete in the inter-related markets for physician and ancillary services in Southern Brevard County. (*See* ¶¶ 199 - 253, *supra*)

335.   Antitrust Plaintiffs have been injured in their business and property as a result of Defendants' anticompetitive scheme.   These injuries are of the type the federal antitrust laws were designed to prevent and flow directly from the exclusionary practices which makes Defendants' conduct unlawful.  (*See* ¶¶ 278 - 290, *supra*.)

336.   OMNI is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, OMNI has lost significant income and has suffered harm to its business and property.

337.   S.O.A.R. is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, S.O.A.R. has lost significant income and has suffered harm to its business and property.

338.   Institute of Facial Surgery is harmed by the various exclusionary practices described herein because: (a) it has been denied access to the Health First network for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, Institute of Facial Surgery has lost significant income and has suffered harm to its business and property.

339.   Florida Pain is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, Florida Pain has lost significant income and has suffered harm to its business and property.

340.   Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, and Komar are harmed by the various exclusionary practices described herein because they have been: (a) denied access to Health First's members; and (b) blacklisted by Health First and, thus, receive no patient referrals, regardless of the patient's insurance provider, from HF Physicians or its co-conspirators.  In addition, Dr. Deligdish had his hospital privileges at Holmes RMC revoked by,

or at the direction of, Health First in retaliation for voicing concerns over Health First's anticompetitive practices.  As a result, these doctors lost significant income and have suffered harm to their business and property.

### FIFTH CLAIM FOR RELIEF

**Attempted Monopolization of the Private Health Insurance Market
In Violation of Section 2 of the Sherman Act**

**(Asserted by Antitrust Plaintiffs Against
Defendants Health First Inc. and HF Health Plans)**

341.    HF Health Plans is a wholly owned subsidiary of Health First Inc.  Health First exerts substantial control over the day-to-day operations of its subsidiaries, using them as agencies or instrumentalities of the parent company.  In fact, Health First holds itself out as "Central Florida's only fully integrated health system."

342.    Health First, through its ownership and control of HF Health Plans, has a dominant share in the private health insurance market in Southern Brevard County.  (*See* ¶ 77, *supra.*)

343.    Health First has attempted to monopolize this market by acting with the specific intent of obtaining monopoly power and, because of the affirmative acts described *supra*, poses a dangerous probability of achieving monopoly power in the market for physician services in Southern Brevard County.

344.    Health First has enhanced and abused its market power in the physician services market in Southern Brevard County through the exclusionary and anticompetitive devices described above, including, *inter alia*, exclusive dealing arrangements (*see* ¶¶ 136 - 141, *supra*); tying (*see* ¶¶ 142 - 145, *supra*); group boycott/concerted refusal to deal (*see* ¶¶ 146 - 152, *supra*); and monopoly leveraging (*see* ¶¶ 164 - 168, *supra*).

345.    As a result, prices are higher and there are fewer alternatives for participants in the physician services market in Southern Brevard County, thereby causing injury to competition, consumers, and the Antitrust Plaintiffs.  (*See* ¶¶ 275 - 277, *supra*.)

346.    The Antitrust Plaintiffs participate in the private health insurance market in Southern Brevard County as suppliers, insofar as they contract with private health insurers to offer services as part of their provider networks.  Furthermore, private health insurers pay the Antitrust Plaintiffs for services rendered to their enrollees.  (*See* ¶ 76, *supra*.)

347.    Health First's exercise and maintenance of market power in the private health insurance market in Southern Brevard County, including the exclusionary course of conduct designed towards that end, has substantially limited the Antitrust Plaintiffs' ability to effectively compete in the inter-related markets for physician and ancillary services in Southern Brevard County.  (*See* ¶¶ 199 - 253, *supra*)

348.    Antitrust Plaintiffs have been injured in their business and property as a result of Defendants' anticompetitive scheme.  These injuries are of the type the federal antitrust laws were designed to prevent and flow directly from the exclusionary practices which makes Defendants' conduct unlawful.  (*See* ¶¶ 278 - 290, *supra*.)

349.    OMNI is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and

the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, OMNI has lost significant income and has suffered harm to its business and property.

350. S.O.A.R. is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, S.O.A.R. has lost significant income and has suffered harm to its business and property.

351. Institute of Facial Surgery is harmed by the various exclusionary practices described herein because: (a) it has been denied access to the Health First network for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, Institute of Facial Surgery has lost significant income and has suffered harm to its business and property.

352. Florida Pain is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to

the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, Florida Pain has lost significant income and has suffered harm to its business and property.

353.    Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, and Komar are harmed by the various exclusionary practices described herein because they have been: (a) denied access to Health First's members; and (b) blacklisted by Health First and, thus, receive no patient referrals, regardless of the patient's insurance provider, from HF Physicians or its co-conspirators.  In addition, Dr. Deligdish had his hospital privileges at Holmes RMC revoked by, or at the direction of, Health First in retaliation for voicing concerns over Health First's anticompetitive practices.  As a result, these doctors lost significant income and have suffered harm to their business and property.

## SIXTH CLAIM FOR RELIEF

### Attempted Monopolization of the Medicare Advantage Market
### In Violation of Section 2 of the Sherman Act

### (Asserted by Antitrust Plaintiffs Against
### Defendants Health First Inc. and HF Health Plans)

354.    HF Health Plans is a wholly owned subsidiary of Health First Inc.  Health First exerts substantial control over the day-to-day operations of its subsidiaries, using them as agencies or instrumentalities of the parent company.  In fact, Health First holds itself out as "Central Florida's only fully integrated health system."

355.    Health First, through its ownership and control of HF Physicians, has a dominant share in the Medicare Advantage market in Southern Brevard County.  (*See* ¶ 82, *supra*.)

356.    Health First has attempted to monopolize this market by acting with the specific intent of obtaining monopoly power and, because of the affirmative acts described *supra*, poses a dangerous probability of achieving monopoly power in the Medicare Advantage market in Southern Brevard County.

357.    Health First has enhanced and abused its market power in the Medicare Advantage market in Southern Brevard County through the exclusionary and anticompetitive devices described above, including, *inter alia*, exclusive dealing arrangements (*see* ¶¶ 136 - 141, *supra*); tying (*see* ¶¶ 142 - 145, *supra*); group boycott/concerted refusal to deal (*see* ¶¶ 146 - 152, *supra*); and monopoly leveraging (*see* ¶¶ 164 - 168, *supra*).

358.    As a result, prices are higher and there are fewer alternatives for participants in the Medicare Advantage market in Southern Brevard County, thereby causing injury to competition, consumers, and the Antitrust Plaintiffs.  The injury from this monopoly is felt by buyers in the form of higher premiums, and suppliers in the form of reduced payments for services.  (*See* ¶¶ 275 - 277, *supra*.)

359.    The Antitrust Plaintiffs participate in the Medicare Advantage market in Southern Brevard County as suppliers, insofar as they contract with private health insurers to offer services as part of their provider networks.  Furthermore, insurers offering Medicare Advantage plans pay the Antitrust Plaintiffs for services rendered to their Medicare Advantage enrollees.  (*See* ¶ 83, *supra*.)

360.    Health First's exercise and maintenance of market power in the Medicare Advantage market in Southern Brevard County, including the exclusionary course of conduct designed towards that end, has substantially limited the Antitrust Plaintiffs' ability to effectively

compete in the inter-related markets for physician and ancillary services in Southern Brevard County.  (*See* ¶¶ 199 - 253, *supra*)

361.   Antitrust Plaintiffs have been injured in their business and property as a result of Defendants' anticompetitive scheme.   These injuries are of the type the federal antitrust laws were designed to prevent and flow directly from the exclusionary practices which makes Defendants' conduct unlawful.  (*See* ¶¶ 278 - 290, *supra*.)

362.   OMNI is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, OMNI has lost significant income and has suffered harm to its business and property.

363.   S.O.A.R. is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and

the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, S.O.A.R. has lost significant income and has suffered harm to its business and property.

364. Institute of Facial Surgery is harmed by the various exclusionary practices described herein because: (a) it has been denied access to the Health First network for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, Institute of Facial Surgery has lost significant income and has suffered harm to its business and property.

365. Florida Pain is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, Florida Pain has lost significant income and has suffered harm to its business and property.

366. Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, and Komar are harmed by the various exclusionary practices described herein because they have been: (a) denied access to Health First's members; and (b) blacklisted by Health First and, thus, receive no

patient referrals, regardless of the patient's insurance provider, from HF Physicians or its co-conspirators.  In addition, Dr. Deligdish had his hospital privileges at Holmes RMC revoked by, or at the direction of, Health First in retaliation for voicing concerns over Health First's anticompetitive practices.  As a result, these doctors lost significant income and have suffered harm to their business and property.

### SEVENTH CLAIM FOR RELIEF

**Contract, Combination, or Conspiracy In Restraint of Trade
In Violation of Section 1 of the Sherman Act**

**(Asserted by Antitrust Plaintiffs Against All Defendants)**

367.    Defendants have participated in a common scheme designed to leverage Health First's market power in the Relevant Market and Secondary Product Markets and, ultimately, create a vertically-integrated healthcare monopoly in Southern Brevard County.  This common scheme constitutes a continuing agreement, understanding, combination, and/or conspiracy to restrain trade and exclude competition those markets.  (*See* ¶¶ 124 - 168, *supra*.)

368.    All of those physicians and medical practices which agreed to Health First's exclusive dealing arrangements, including MIMA and its physicians prior to the acquisition by Health First, are co-conspirators of the Defendants.

369.    The common scheme involves multiple forms of exclusionary conduct, including, *inter alia*, exclusive dealing arrangements, tying, and group boycott/concerted refusal to deal. Each of these forms of conduct individually constitutes an unreasonable restraint of trade:

- The exclusive dealing arrangements violate the Sherman Act under the rule of reason as it forecloses competition in a substantial share of the Relevant Market and Secondary Product Markets so as to adversely affect competition (*see* ¶¶ 136 - 141, *supra*);

- The tying arrangement is a *per se* violation of the Sherman Act as it involves distinct services (*i.e.*, private health insurance and hospital, physician, and ancillary services), Health First has market power in the tying product (*i.e.*,

private health insurance), and the amount of commerce in the tied markets (hospital, physician, and ancillary services) is not insubstantial (*see* ¶¶ 142 - 145, *supra*); and

- The group boycott/concerted refusal to deal is a *per se* violation of the Sherman Act § 1 as it involves a horizontal agreement amongst direct competitors (*see* ¶¶ 146 - 152, *supra*).

370.    As discussed *supra*, each of the Defendants actively participated in, and gained a competitive advantage from, this anticompetitive course of conduct:

- Health First Inc., through its officers and board of directors, designed and implemented the common scheme described herein.  It exerts day-to-day control over all things "Health First," and uses its subsidiaries as merely agents or instrumentalities to achieve its anticompetitive ends (*see* ¶¶ 169 - 173, *supra*);

- Holmes RMC actively assists Health First in leveraging its monopoly power in the Relevant Market to maintain and enhance its market power in adjacent markets by, *inter alia*, refusing to make inpatient referrals to blacklisted physicians and, in some cases, revoking their hospital privileges (*see* ¶¶ 174 - 178, *supra*);

- HF Physicians actively assists Health First in leveraging its market power in the physician services market in Southern Brevard County to maintain and enhance its market power in adjacent markets by, *inter alia*, boycotting physicians who have refused to enter into exclusive dealing arrangements with Health First (*see* ¶¶ 179 - 182, *supra*);

- HF Health Plans actively assists Health First in leveraging its market power in the private health insurance and Medicare Advantage markets in Southern Brevard County to maintain and enhance its market power in adjacent markets by, *inter alia*, refusing to deal with those physicians/practices that have refused to enter into exclusive dealing arrangements with Health First (*see* ¶¶ 183 - 187, *supra*); and

- Michael Means and Jerry Senne, as members of the Health First board of directors, designed and implemented the common scheme.  They also directly participated in the common scheme by, *inter alia*, inviting physicians to enter exclusive dealing arrangements Health First and convincing physicians to leave those practices which refused to join the conspiracy (*see* ¶¶ 188 - 195, *supra*).

371.    As a result of the common scheme, prices are higher and there are fewer alternatives for participants in the Relevant Market and Secondary Product Markets, thereby causing injury to competition, consumers, and Plaintiffs.  (*See* ¶¶ 275 - 277, *supra*.)

372.    Defendants and Antitrust Plaintiffs participate in each of these markets in Southern Brevard County.  (*See* ¶¶ 61, 69, 76, 83, and 287, *supra*.)

373.    The exclusionary course of conduct underlying the common scheme has substantially limited the Antitrust Plaintiffs' ability to effectively compete in the inter-related markets for physician and ancillary services in Southern Brevard County.  (*See* ¶¶ 199 - 253, *supra*)

374.    Antitrust Plaintiffs have been injured in their business and property as a result of Defendants' anticompetitive scheme.  These injuries are of the type the federal antitrust laws were designed to prevent and flow directly from the exclusionary practices which makes Defendants' conduct unlawful.  (*See* ¶¶ 278 - 290, *supra*.)

375.    OMNI is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, OMNI has lost significant income and has suffered harm to its business and property.

376.    S.O.A.R. is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal;

(c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, S.O.A.R. has lost significant income and has suffered harm to its business and property.

377.    Institute of Facial Surgery is harmed by the various exclusionary practices described herein because: (a) it has been denied access to the Health First network for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, Institute of Facial Surgery has lost significant income and has suffered harm to its business and property.

378.    Florida Pain is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, Florida Pain has lost significant income and has suffered harm to its business and property.

379.    Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, and Komar are harmed by the various exclusionary practices described herein because they have been: (a) denied access to Health First's members; and (b) blacklisted by Health First and, thus, receive no patient referrals, regardless of the patient's insurance provider, from HF Physicians or its co-conspirators.   In addition, Dr. Deligdish had his hospital privileges at Holmes RMC revoked by, or at the direction of, Health First in retaliation for voicing concerns over Health First's anticompetitive practices.   As a result, these doctors lost significant income and have suffered harm to their business and property.

## EIGHTH CLAIM FOR RELIEF

**Conspiracy to Monopolize the Relevant Market and Secondary Product Markets
In Violation of Section 2 of the Sherman Act**

**(Asserted by Antitrust Plaintiffs Against All Defendants)**

380.    Defendants have participated in a common scheme designed to leverage Health First's market power in the Relevant Market and Secondary Product Markets and, ultimately, create a vertically-integrated healthcare monopoly in Southern Brevard County.   This constitutes concerted action deliberately aimed at achieving or maintaining a monopoly in the Relevant Market, as well as each of the Secondary Product Markets.

381.    The common scheme involves multiple forms of exclusionary conduct, including, *inter alia*, exclusive dealing arrangements (*see* ¶¶ 136 - 141, *supra*); tying (*see* ¶¶ 142 - 145, *supra*); group boycott/concerted refusal to deal (*see* ¶¶ 146 - 152, *supra*); and monopoly leveraging (*see* ¶¶ 164 - 168, *supra*).

382.    All of those physicians and medical practices which agreed to Health First's exclusive dealing arrangements, including MIMA and its physicians prior to the acquisition by Health First, are co-conspirators of the Defendants.

383.    As discussed *supra*, each of the Defendants actively participated in, and gained a competitive advantage from, this anticompetitive course of conduct:

- Health First Inc., through its officers and board of directors, designed and implemented the common scheme described herein.  It exerts day-to-day control over all things "Health First," and uses its subsidiaries as merely agents or instrumentalities to achieve its anticompetitive ends (*see* ¶¶ 169 - 173, *supra*);

- Holmes RMC actively assists Health First in leveraging its monopoly power in the Relevant Market to maintain and enhance its market power in adjacent markets by, *inter alia*, refusing to make inpatient referrals to blacklisted physicians and, in some cases, revoking their hospital privileges (*see* ¶¶ 174 - 178, *supra*);

- HF Physicians actively assists Health First in leveraging its market power in the physician services market in Southern Brevard County to maintain and enhance its market power in adjacent markets by, *inter alia*, boycotting physicians who have refused to enter into exclusive dealing arrangements with Health First (*see* ¶¶ 179 - 182, *supra*);

- HF Health Plans actively assists Health First in leveraging its market power in the private health insurance and Medicare Advantage markets in Southern Brevard County to maintain and enhance its market power in adjacent markets by, *inter alia*, refusing to deal with those physicians/practices that have refused to enter into exclusive dealing arrangements with Health First (*see* ¶¶ 183 - 187, *supra*); and

- Michael Means and Jerry Senne, as members of the Health First board of directors, designed and implemented the common scheme.  They also directly participated in the common scheme by, *inter alia*, inviting physicians to enter exclusive dealing arrangements Health First and convincing physicians to leave those practices which refused to join the conspiracy (*see* ¶¶ 188 - 195, *supra*).

384.    Defendants' participation in the common scheme constitutes overt acts in furtherance of the conspiracy.

385.    As a result of the common scheme, prices are higher and there are fewer alternatives for participants in the Relevant Market and Secondary Product Markets, thereby causing injury to competition, consumers, and the Antitrust Plaintiffs.  Defendants and Antitrust Plaintiffs participate in each of these markets in Southern Brevard County.  (*See* ¶¶ 275 - 277, *supra*.)

386.    The exclusionary course of conduct underlying the common scheme has substantially limited the Antitrust Plaintiffs' ability to effectively compete in the inter-related markets for physician and ancillary services in Southern Brevard County.  (*See* ¶¶199 - 253, *supra*)

387.    Antitrust Plaintiffs have been injured in their business and property as a result of Defendants' anticompetitive scheme.  These injuries are of the type the federal antitrust laws were designed to prevent and flow directly from the exclusionary practices which makes Defendants' conduct unlawful.  (*See* ¶¶ 278 - 290, *supra*.)

388.    OMNI is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, OMNI has lost significant income and has suffered harm to its business and property.

389.    S.O.A.R. is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the

exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, S.O.A.R. has lost significant income and has suffered harm to its business and property.

390.   Institute of Facial Surgery is harmed by the various exclusionary practices described herein because: (a) it has been denied access to the Health First network for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, Institute of Facial Surgery has lost significant income and has suffered harm to its business and property.

391.   Florida Pain is harmed by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, Florida Pain has lost significant income and has suffered harm to its business and property.

392.   Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, and Komar are harmed by the various exclusionary practices described herein because they have been: (a)

denied access to Health First's members; and (b) blacklisted by Health First and, thus, receive no patient referrals, regardless of the patient's insurance provider, from HF Physicians or its co-conspirators.  In addition, Dr. Deligdish had his hospital privileges at Holmes RMC revoked by, or at the direction of, Health First in retaliation for voicing concerns over Health First's anticompetitive practices.  As a result, these doctors lost significant income and have suffered harm to their business and property.

### NINTH CLAIM FOR RELIEF

**Unfair Methods of Competition
In Violation of Florida Deceptive and Unfair Trade Practices Act**

**(Asserted by All Plaintiffs Against All Defendants)**

393.    This is an action for damages, for declaratory injunctive relief and for attorney's fees pursuant to § 501.203 Fla. Stat. *et seq.* §§ 501.204, 501.2105 and § 501.211 (2013).

394.    During all relevant times, the Defendants were engaged in trade or commerce with a thing of value and Plaintiffs were consumers as set forth in § 501.203, Fla. Stat. (2013).

395.    The acts engaged in by Defendants violate the Sherman Act, and therefore are violations of § 501.204 (2013).  (*See* ¶¶ 291 - 392, *supra*.)

396.    Moreover, the conduct described herein is deceptive or unfair in that it offends established public policy, is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers in violation of  § 501.204 Fla. Stat. (2013).

397.    As discussed *supra*, each of the Defendants actively participated in this unfair and anticompetitive course of conduct by means of a conspiracy:

- Health First Inc., through its officers and board of directors, designed and implemented the common scheme described herein.  It exerts day-to-day control over all things "Health First," and uses its subsidiaries as merely agents or instrumentalities to achieve its anticompetitive ends (*see* ¶¶ 169 - 173, *supra*);

- Holmes RMC actively assists Health First in leveraging its monopoly power in the Relevant Market to maintain and enhance its market power in adjacent markets by, *inter alia*, refusing to make inpatient referrals to blacklisted physicians and, in some cases, revoking their hospital privileges (*see* ¶¶ 174 - 178, *supra*);

- HF Physicians actively assists Health First in leveraging its market power in the physician services market in Southern Brevard County to maintain and enhance its market power in adjacent markets by, *inter alia*, boycotting physicians who have refused to enter into exclusive dealing arrangements with Health First (*see* ¶¶ 179 - 182, *supra*);

- HF Health Plans actively assists Health First in leveraging its market power in the private health insurance and Medicare Advantage markets in Southern Brevard County to maintain and enhance its market power in adjacent markets by, *inter alia*, refusing to deal with those physicians/practices that have refused to enter into exclusive dealing arrangements with Health First (*see* ¶¶ 183 - 187, *supra*); and

- Michael Means and Jerry Senne, as members of the Health First board of directors, designed and implemented the common scheme. They also directly participated in the common scheme by, *inter alia*, inviting physicians to enter exclusive dealing arrangements Health First and convincing physicians to leave those practices which refused to join the conspiracy (*see* ¶¶ 188 - 195, *supra*).

398. As a result of Defendants' unfair, unconscionable, or anticompetitive conduct stemming from this conspiracy, Plaintiffs have each been aggrieved. (*See* ¶¶ 199 - 253, *supra*.)

399. OMNI is aggrieved by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County. As a result, OMNI has lost significant income and has suffered harm to its business and property.

400.    S.O.A.R. is aggrieved by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; (d) Health First has actively lured physicians away from its practice; and (e) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, S.O.A.R. has lost significant income and has suffered harm to its business and property.

401.    Institute of Facial Surgery is aggrieved by the various exclusionary practices described herein because: (a) it has been denied access to the Health First network for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, Institute of Facial Surgery has lost significant income and has suffered harm to its business and property.

402.    Florida Pain is aggrieved by the various exclusionary practices described herein because: (a) it had its provider contract terminated for refusing to agree to the exclusive dealing arrangements, thus denying it access to Health First's enrollees; (b) the physicians who agreed to the exclusive dealing arrangements have subjected it to group boycott/concerted refusal to deal; (c) since being blacklisted by Health First, it has stopped receiving inpatient referrals from

Holmes RMC; and (d) the exclusionary practices have prevented it from growing its business due to a lack of referrals and the inability to access a substantial segment of insured persons in Southern Brevard County.  As a result, Florida Pain has lost significant income and has suffered harm to its business and property.

403.    Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, and Komar are harmed by the various exclusionary practices described herein because they have been: (a) denied access to Health First's members; and (b) blacklisted by Health First and, thus, receive no patient referrals, regardless of the patient's insurance provider, from HF Physicians or its co-conspirators.  In addition, Dr. Deligdish had his hospital privileges at Holmes RMC revoked by, or at the direction of, Health First in retaliation for voicing concerns over Health First's anticompetitive practices.  As a result, these doctors lost significant income and have suffered harm to their business and property.

404.    Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, and Komar have been aggrieved by the various exclusionary practices described herein because they have been: (a) denied access to Health First's members; and (b) blacklisted by Health First and, thus, receive no patient referrals, regardless of the patient's insurance provider, from HF Physicians or its co-conspirators.  In addition, Dr. Deligdish had his hospital privileges at Holmes RMC revoked by, or at the direction of, Health First in retaliation for voicing concerns over Health First's anticompetitive practices.  As a result, these doctors lost significant income and have suffered harm to their business and property.

405.    Mr. Boone and PAS have been aggrieved as they were blacklisted by Health First, which instructed physicians not to utilize their services.  As a result, Mr. Boone and Physician Assistant Services have lost significant income in the form of lost sales, lost business

opportunities, and lost reputation and, accordingly, have suffered harm to their respective businesses and property.

<strong><u>TENTH CLAIM FOR RELIEF</u></strong>

<strong>Tortious Interference<br>In Violation of Florida State Law</strong>

<strong>(Asserted by All Plaintiffs Against All Defendants)</strong>

406.   The common scheme described herein (*see* ¶¶ 124 to 168, *supra*) tortiously interfered with three different types of business relationships: (1) all Plaintiffs except for Dr. Grenevicki, Mr. Boone, Institute of Facial Surgery, and PAS had an ongoing, preexisting relationship with certain patients insured by HF Health Plans; (2) all Plaintiffs had an ongoing, preexisting relationship with those doctors that previously referred patients or, in the case of Mr. Boone and PAS, otherwise utilized their services; and (3) the Medical Practice Plaintiffs, except for Florida Pain, each had ongoing, preexisting relationships with certain physicians who were lured away by Health First to join other practices.

407.   Each of these relationships afforded Plaintiffs existing or prospective legal rights, including the reasonable expectation of continued business vis-à-vis the ongoing patient-provider relationship, provider-to-provider referral relationship, or employment relationship.

408.   Defendants, with knowledge of these business relationships, undertook affirmative acts with the explicit purpose and effect of furthering the alleged conspiracy and interfering with such relationships.  (*See* ¶¶ 169 - 195, *supra*.)

409.   OMNI's business relationships with its patients, the physicians who previously referred it patients, and its own physicians were interfered with when Defendants' common scheme resulted in: (a) the termination of OMNI's provider contracts; (b) the blacklisting of its

physicians; (c) the persuading of OMNI's patients to switch to alternative medical providers; and (d) the active luring away of OMNI's providers to other medical practices.

410.   S.O.A.R.'s business relationships with its patients, the physicians who previously referred it patients, and its own physicians were interfered with when Defendants' common scheme resulted in: (a) the termination of S.O.A.R.'s provider contracts; (b) the blacklisting of its physicians; (c) the persuading of S.O.A.R.'s patients to switch to alternative medical providers; and (d) the active luring away of S.O.A.R.'s providers to other medical practices.

411.   Institute of Facial Surgery's business relationships with the physicians who previously referred it patients were interfered with when Defendants' common scheme resulted in the blacklisting of its physicians.

412.   Florida Pain's business relationships with its patients, the physicians who previously referred it patients, and its own physicians were interfered with when Defendants' common scheme resulted in: (a) the termination of Florida Pain's provider contracts; (b) the blacklisting of its physicians; and (c) the persuading of Florida Pain's patients to switch to alternative medical providers.

413.   Dr. Deligdish's business relationships with his patients and the physicians who previously referred him patients were interfered with when Defendants' common scheme resulted in: (a) the termination of OMNI's provider contracts; (b) the blacklisting of OMNI and Dr. Deligdish; and (c) the persuading of Dr. Deligdish's patients to switch to alternative medical providers.

414.   Dr. Seminer's business relationships with his patients and the physicians who previously referred him patients were interfered with when Defendants' common scheme resulted in: (a) the termination of OMNI's provider contracts; (b) the blacklisting of OMNI and

Dr. Seminer; and (c) the persuading of Dr. Seminer's patients to switch to alternative medical providers.

415.   Dr. Dowdell's business relationships with his patients and the physicians who previously referred him patients were interfered with when Defendants' common scheme resulted in: (a) the termination of S.O.A.R.'s provider contracts; (b) the blacklisting of S.O.A.R. and Dr. Dowdell; and (c) the persuading of Dr. Dowdell's patients to switch to alternative medical providers.

416.   Dr. Gayles' business relationships with his patients and the physicians who previously referred him patients were interfered with when Defendants' common scheme resulted in: (a) the termination of the Florida Pain's provider contracts; (b) the blacklisting of Florida Pain and Dr. Gayles; and (c) the persuading of Dr. Gayles' patients to switch to alternative medical providers.

417.   Dr. Golovac's business relationships with his patients and the physicians who previously referred him patients were interfered with when Defendants' common scheme resulted in: (a) the termination of the Florida Pain's provider contracts; (b) the blacklisting of Florida Pain and Dr. Golovac; and (c) the persuading of Dr. Golovac's patients to switch to alternative medical providers.

418.   Dr. Grenevicki's business relationships with the physicians who previously referred him patients were interfered with when Defendants' common scheme resulted in the blacklisting of the Institute of Facial Surgery and Dr. Grenevicki.

419.   Dr. Komar's business relationships with his patients and the physicians who previously referred him patients were interfered with when Defendants' common scheme

resulted in: (a) his blacklisting; and (b) the persuading of his patients to switch to alternative medical providers.

420.   Mr. Boone and PAS's business relationships with the doctors who previously utilized their services were interfered with when Defendants' common scheme resulted in their being blacklisted by Health First.

421.   These affirmative acts were undertaken for the specific purpose of interfering with Plaintiffs' business relationships with its patients.  These actions were also unjustified as they were undertaken to injure Plaintiffs and further an unlawful, anticompetitive scheme as opposed to the legitimate acquisition of business.  (*See* ¶¶ 291 - 392, *supra*.)

422.   As a result of the interferences described herein, Plaintiffs were damaged in the form of lost income and, in the case of the Medical Practice Plaintiffs, the diminished value of their businesses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demand a trial by jury on all matters so triable under law, and respectfully request that, based on the verdict of the jury, the Court enter a judgment against Defendants which:

a)   Adjudges and decrees that Defendants unlawfully violated Section 7 of the Clayton Act, and exercised and maintained monopoly power in the market for acute care inpatient hospital services in Southern Brevard County, or, in the alternative;

b)   Adjudges and decrees that Defendants have attempted to monopolize the market for acute care inpatient hospital services in Southern Brevard County;

c)   Adjudges and decrees that Defendants have engaged in an unlawful agreement in violation of Section 1 of the Sherman Act;

d)      Orders the divestiture of MIMA, HF Physicians, and HF Health Plans from Health First;

e)      Invalidates any arrangements between any of the Heath First entities and any physician and/or medical group conspiring with any of the Defendants, including but not limited to HF Physicians, to utilize Health First hospital facilities exclusively or nearly exclusively;

f)      Awards Plaintiffs threefold damages caused by Defendants' conduct, as required by statute;

g)      Awards Plaintiffs their reasonable attorney's fees and costs incurred in pursuing this action in accordance with the federal antitrust laws; and

h)      Grants Plaintiffs such other and further relief as may be equitable and just under the circumstances.

Plaintiffs hereby reserve the right to assert a claim for punitive damages upon a proper proffer to the Court.

May 22, 2014                                   Respectfully submitted,


                                              /s/ Manuel J. Dominguez
                                              Manuel J. Dominguez (FL Bar 54798)
                                              Cohen Milstein Sellers & Toll PLLC
                                              2925 PGA Boulevard
                                              Suite 200
                                              Palm Beach Gardens, FL 33410
                                              Telephone:  (561) 833-6575
                                              Facsimile: (212) 838-7745
                                              jdominguez@cohenmilstein.com

                                              Tucker H. Byrd (FL Bar 381632)
                                              Morgan & Morgan, P.A.
                                              20 North Orange Ave.
                                              Suite 1600
                                              Orlando, FL 32802-4979
                                              Telephone: (800) 896-3062
                                              Facsimile: (407) 418-2048
                                              tbyrd@forthepeople.com

                                              William G. Kopit
                                              Epstein Becker & Green
                                              1227 25th Street, NW
                                              Suite 700
                                              Washington, D.C. 20037-1156
                                              Telephone: (202) 861-1803
                                              Facsimile: (202) 861-3551
                                              wkpit@ebglaw.com

                                              *Attorneys for Plaintiffs*