**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

OMNI HEALTHCARE INC.; INTERVENTIONAL
SPINE INSTITUTE OF FLORIDA; CRAIG
DELIGDISH, MD; C. HAMILTON BOONE, PA;
BRIAN DOWDELL, MD; RICHARD GAYLES, MD;
STAN GOLOVAC, MD; LANCE GRENEVICKI, MD;
ALEKSANDER KOMAR, MD; SCOTT SEMINER,
MD; INSTITUTE OF FACIAL SURGERY INC.; THE
PAIN INSTITUTE INC. d/b/a/ FLORIDA PAIN; and
PHYSICIAN ASSISTANT SERVICES OF FLORIDA,
L.L.C.,

          Plaintiffs,

vs.

HEALTH FIRST, INC.; HOLMES REGIONAL
MEDICAL CENTER, INC.; HEALTH FIRST
PHYSICIANS INC.; HEALTH FIRST HEALTH
PLANS, INC.; MICHAEL D. MEANS, and JERRY
SENNE,

          Defendants.

_____/

**Case No.:
6:13cv1509-RBD-DAB**

**DEFENDANTS' JOINT MOTION TO DISMISS THIRD AMENDED COMPLAINT OR,
IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT
AND INCORPORATED MEMORANDUM OF LAW**

HOLLAND & KNIGHT LLP
315 S. Calhoun Street, Suite 600
Tallahassee, FL 32301

June 5, 2014

Defendants, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(e) and Local Rule 3.01, hereby move to dismiss all claims asserted by Plaintiffs in their Third Amended Complaint [Doc 57] or, in the alternative, for a more definite statement.  In support, Defendants state as follows:

**PRELIMINARY STATEMENT AND LEGAL STANDARDS**

Rule 8(a), Fed. R. Civ. P. requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  In filing their expanded 101-page, 422-paragraph Third Amended Complaint ("Complaint"), Plaintiffs ignored Rule 8 and this Court's admonitions about the previous complaints.[1]  The Complaint also does not contain enough facts, as opposed to conclusory allegations, to state a claim for relief that is plausible on its face.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In the alternative, Defendants move for a more definite statement.  Among other reasons stated more fully herein, Plaintiffs define "Health First" as all defendants, (Compl. ¶ 33), and then inconsistently use the term "Health First" in counts in which only certain defendants are included.  (Compl. ¶¶ 2, 5, 48-52, 118-119.)  As a result, Defendants are uncertain which particular defendants are alleged to have engaged in particular conduct.

**ARGUMENT**

I.   **THE COMPLAINT FAILS TO STATE A CLAIM FOR WHICH RELIEF MAY BE GRANTED**

A.   **The Claims Brought by Hamilton Boone and PAS are not cognizable in Federal Court, and therefore, they should be severed and dismissed.**

Subject matter jurisdiction is conferred on federal courts either through federal question jurisdiction pursuant to 28 U.S.C. § 1331 or through diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Federal courts can exercise supplemental jurisdiction over state-law claims *only* when

---

[1] Plaintiffs' Second Amended Complaint was 65 pages and 302 paragraphs long.

they arise out of the same case or controversy as the claim that supplies federal court jurisdiction. 28 U.S.C. § 1367. Here, Hamilton Boone and Physician Assistant Services ("PAS") assert *only* state law claims against the Defendants for alleged violations of FDUTPA (Count 9) and tortious interference (Count 10). While Boone and PAS originally made antitrust claims against the Defendants, those claims were dismissed with leave to amend and were not raised in this latest iteration. Neither of these remaining claims arises under the Constitution or laws of the United States, and diversity of citizenship is not asserted and does not exist. When a Plaintiff amends his Complaint and fails to include a claim giving rise to federal subject matter jurisdiction, the district court should dismiss the remaining claims for lack of subject matter jurisdiction. *See Pintando v. Miami-Dade Housing Agency*, 501 F. 3d 1241, 1243-44 (11th Cir. 2007) ("When Pintando amended his complaint and failed to include a Title VII claim or any other federal claim, the basis for the district court's subject-matter jurisdiction ceased to exist, and the district should have dismissed Pintando's state claims without prejudice."). Because Mr. Boone and PAS have not made any claims cognizable in federal court, their state-law claims should be dismissed for lack of subject matter jurisdiction.[2]

**B.    For Multiple Reasons, the Plaintiffs Lack Standing to Seek Relief Under the Antitrust Laws and Therefore, Those Claims Should be Dismissed.**

The issue of standing is frequently resolved through a motion to dismiss. The requirement is properly assessed before the expense and burden of antitrust discovery goes forward. *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449-450 (6th Cir 2007) (en banc).[3]   In this Circuit, determination of antitrust standing involves a two-pronged inquiry. *Todorov, M.D. v.*

---

[2] Plaintiffs' Third Amended Complaint  fails to allege any jurisdictional basis for counts  7 to 10 . (Compl. ¶ 37.)
[3] *See also Verizon Communic'ns, Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398, 416 (Stevens, J., concurring) ("In complex cases it is usually wise to begin by deciding whether the plaintiff has standing to maintain the action."); *Alternatives Research & Dev. Found. v. Glickman*, 101 F. Supp. 2d 7, 10 (D.D.C. 2000) ("As a threshold matter . . . the plaintiffs must show that they have standing to bring suit in order to survive defendants' motion to dismiss."); *Med. Savings Ins. Co. v. HCA, Inc.*, 2005 WL 1528666 at *7-8 (M.D. Fla. 2005), *aff'd*, 2006 WL 1746934 (11th Cir. 2006) (dismissing antitrust claims for lack of standing).

*DCH Healthcare Auth.*, 921 F. 2d 1438, 1449 (11th Cir. 1991).[4] "First, a court should determine whether the plaintiff suffered 'antitrust injury'; second, the court should determine whether the plaintiff is an efficient enforcer of the antitrust laws, which requires some analysis of the directness or remoteness of the plaintiff's injury. This two-pronged approach was endorsed by the Supreme Court when it stated that '[a] showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4, because a party may have suffered antitrust injury but may not be a proper plaintiff under § 4 for other reasons.'" *Id.* In the Eleventh Circuit, "[b]asically, a plaintiff must show that it is a customer or competitor in the relevant antitrust market." *Florida Seed Co., Inc. v. Monsanto Co.*, 105 F. 3d 1372, 1374 (11th Cir. 1997) (citing *Assoc. Gen. Contractors*, 459 U.S. at 539); *see also Nat'l Independent Theater Exh. v. Buena Vista Distrib. Co.*, 748 F. 2d 602, 608 (11th Cir. 1984), *cert. denied sub nom.*, *Patterson v. Buena Vista Distrib. Co.*, 474 U.S. 1013 (1985). This requirement is designed to ensure that a particular antitrust plaintiff is an "efficient enforcer" of the antitrust laws. Furthermore, each Plaintiff must identify a competitive harm sufficient to confer standing on it to sue under each count before it should be allowed to proceed in this case.[5]

Ignoring the "customer or competitor" test in this Circuit, Plaintiffs allege that they "participate" in several of the product markets that they have defined for themselves — inpatient hospital services, private health care insurance and Medicare Advantage plans as "suppliers of physician services."[6] (Compl. ¶¶ 76, 83, 287 and 290.) But suppliers generally do not have

---

[4] The Plaintiffs will likely cite to Ninth Circuit law rather than Eleventh Circuit law, the Court should reject that attempt to ignore the law of the Eleventh Circuit.

[5] "But 'standing is not dispensed in gross,' *Lewis v. Casey,* 518 U.S. 343, 358 n.6 (1996), and each plaintiff must demonstrate that it has suffered injury in order to establish standing." *Oxbow Carbon & Minerals LLC v. Union Pacific R. Co.,* 926 F. Supp. 2d 36, 43 (D.D.C. 2013).

[6] Plaintiffs will rely on *Blue Shield of Virginia v. McCready,* 457 U.S. 465 (1982), to argue that there is no "customer or competitor" requirement for antitrust standing, but ignore the fact that Ms. McCready was a customer of both Blue Cross and the psychiatrists with whom Blue Cross allegedly conspired.

3

standing to sue for antitrust violations in the markets in which they supply goods or services as any possible injury is too remote. [7]

But even if any of the Plaintiffs can articulate injury-in-fact as a supplier in each such market, they still have not explained how they are an "efficient enforcer" in each such market. For example, the Complaint repeatedly alleges that Wuesthoff Hospital was the "target" of Defendants' alleged conduct to monopolize the market for inpatient hospital services. (Compl. ¶¶ 129-135 and 150.) But Wuesthoff has already sued Defendants, and that matter has been resolved. Defendants will address these standing issues count-by-count.

> **1.    Count 1 — Plaintiffs Lack Standing to Sue Under Section 7 of the Clayton Act to Challenge the MIMA Acquisition.**

The Plaintiffs challenge Health First's acquisition of MIMA, a multi-specialty physicians group, under Section 7 of the Clayton Act. (Compl. ¶¶ 291-299.) The Complaint alleges, without explanation, that this acquisition will reduce competition in the hospital services market and in each of the alleged secondary markets. (Compl. at ¶ 295-297.) But irrespective of what relevant product market is considered, these Plaintiffs lack antitrust standing.

None of these Plaintiffs "participate" in the hospital services market as either competitors or customers. Thus, Plaintiffs feel the impact of this physician group merger on the hospital services market only indirectly as "suppliers" of physician services to hospitals. They contend that hospital prices will rise due to this merger, but they do not explain how this hurts Plaintiffs. Health First's acquisition of MIMA, irrespective of how it impacts the hospital market, has no cognizable impact on these Plaintiffs. Moreover, because Plaintiffs allege that Defendants and MIMA were already conspiring not to admit patients to the Wuesthoff hospitals, their merger

---

[7] *SAS of Puerto Rico, Inc. v. Puerto Rico Telephone Co.*, 48 F.3d 39, 43-45 (1st Cir. 1995); *Serfecz v. Jewel Food Stores*, 67 F. 3d 591, 597-598 (7th Cir. 1995); *Serpa Corp. v. McWane, Inc.*, 199 F. 3d 6 (1st Cir. 1999); *Norris v. Hearst Trust*, 500 F. 3d 454, 466 (5th Cir. 2007); *B & H Medical, L.L.C. v. ABP Admin., Inc.*, 526 F. 3d 257, 265-266(6th Cir. 2008); *Yong Ki Hong v. KBS America, Inc.*, 951 F. Supp. 2d 402, 413 (E.D.N.Y. 2013).

will not have any new impact on admissions to competing hospitals.  The same analysis applies with respect to the private insurance and Medicare Advantage markets.  (Compl. ¶¶ 294 and 296.)  Plaintiffs allege that they are merely suppliers to those markets as well and therefore any reduction in competition in those markets impacts Plaintiffs, if at all, only indirectly.  Far from harming Plaintiffs, a reduced availability of physicians and higher prices to insurers should actually benefit Plaintiffs.

Plaintiffs allege that as competitors in the markets for physician services and ancillary services they will be harmed by the merger because it will give Health First greater ability to "police the conspiracy" (Compl. ¶ 293) and because it "perfected Health First's control over physician and ancillary service referrals in Southern Brevard County, thus maintaining and enhancing Health First's ability to exclude these practices and their providers from those markets." (Compl. ¶¶ 298-299.)  But a merger is not rendered unlawful merely because the merging parties allegedly conspired before the merger.  The Clayton Act is concerned with whether an acquisition or merger *itself* may cause antitrust injury.  *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 115–17 (1986).  And if it is true, as Plaintiffs allege, that Defendants and MIMA conspired not to make referrals to Plaintiffs, the merger itself will not lead to increase in that alleged harm.  Additionally, the fact that the merger may result in enhanced competition in markets for physician and ancillary services is not "antitrust injury" so as to confer standing on Plaintiffs. *See Cargill, Inc.*, 479 U.S. at 121-124; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977).

Current competitors of the merging parties have standing to sue to challenge a merger only under the most narrow circumstances. *Cargill, Inc.*, 479 U.S. at 116, 122; *Phototron Corp. v. Eastman Kodak Co.*, 842 F. 2d 95, 100 (5th Cir. 1988); *Sterling Merchandising, Inc. v. Nestle,*

*S.A.*, 656 F. 3d 112, 121-124.(1st Cir. 2011).[8] As the Seventh Circuit has noted:

> Whenever the plaintiff and consumers have divergent rather than congruent interests, there is a potential problem in finding "antitrust injury." If, as in *Brunswick* itself, the plaintiff and the defendant are competitors, the plaintiff gains from higher prices and loses from lower prices—just the opposite of the consumers' interest. When the plaintiff is a poor champion of consumers, a court must be especially careful not to grant relief that may undercut the proper functions of antitrust.

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F. 2d 1325, 1334 (7th Cir.1986).

Plaintiffs do not allege that the MIMA acquisition will likely lead to predatory pricing or other unlawful conduct that will result in their exclusion from the marketplace. Thus, Plaintiffs fail to meet the "injury-in-fact" much less the antitrust injury standards set by the Supreme Court for allowing a competitor to challenge a merger. .

### 2. Count 2 — Plaintiffs Lack Standing to Sue for Monopolization of the General In-Patient Acute Care Hospital Services Market.

The Plaintiffs' Second Claim for Relief is for the alleged monopolization of the hospital services market in Southern Brevard County. It is brought only against Defendants Health First, Inc. and HRMC. Again, both prongs of the test for antitrust standing are absent here. First, Plaintiffs have not alleged any antitrust injury. The Plaintiffs do not allege that they compete in the hospital services market, or that they have been excluded from the hospital market (as might a potential competitor hospital). Plaintiffs do not allege that they purchase hospital services, or that they are paying more for these services (as might a managed care company that pays for hospital services). Instead, they allege that they "participate" in the hospital services market as a supplier by "deciding where their patients receive medical treatment." (Compl. ¶ 307.) As for injury, Plaintiffs allege only that "prices are higher and there are fewer alternatives for

---

[8] As indicated in the leading antitrust treatise, current competitors of merging parties will rarely have antitrust standing; it exists only in the rarest circumstances — below-cost pricing and market exclusion — which are not alleged or plausible here, but *potential* competitors can do so when the merger will exclude them from the relevant market. Areeda & Hovencamp, *Antitrust Law*, ¶ 356(a) (citing *Bon–Ton Stores v. May Department Stores Co.*, 881 F. Supp. 860 (W.D.N.Y. 1994)).

participants in the Relevant Market," (Compl. ¶ 306) and that "Health First's exercise and maintenance of monopoly power in the Relevant Market, including the exclusionary course of conduct designed towards that end, has substantially limited the Antitrust Plaintiffs' ability to effectively compete in the inter-related markets for physician and ancillary services in Southern Brevard County." (Compl. ¶ 308.)  These are purely conclusory allegations.

"The antitrust injury concept . . . requires the private antitrust plaintiff to show that his own injury coincides with the public detriment tending to result from the alleged violation." *Austin v. Blue Cross & Blue Shield of Alabama*, 903 F. 2d 1385, 1389-90 (11th Cir. 1990).  A monopoly in the market for hospital services does not harm Plaintiffs as "suppliers" who "decide where their patients receive medical treatment" at all, much less in the same way as it might consumers or insurers who allegedly pay higher prices for hospital services; or competing hospitals who might be driven from the market.  Plaintiffs' loss of patient referrals for physician or ancillary services as a result of alleged "punishment" by Health First in an effort to monopolize a market for hospital services is not "antitrust injury" in the relevant market as there is no allegation that those patients were denied access to physician or ancillary services.

For those reasons, Plaintiffs also do not satisfy the requirements of an "efficient enforcer" as to this claim.  The factors to consider include: (1) the directness or indirectness of the asserted injury; (2) whether there exists an identifiable class of persons motivated to vindicate the public interest in antitrust enforcement; (3) the nature of the damages; (4) the importance of avoiding duplicate recoveries; and (5) whether the plaintiff can enforce an antitrust judgment." *Todorov*, 921 F. 2d at 1450.

Applying those tests here, even if there were valid claims for monopolization against Health First, such claims logically should be pursued by entities that participate as customers or competitors in the relevant market, such as health insurers that purchase hospital services, or

Wuesthoff, which the Complaint acknowledges, is HRMC's only competitor in the market for hospital services in Southern Brevard County. Thus, there are other current and potential plaintiffs who would be a "more appropriate class of persons to vindicate the public interest in maintaining prices and services at competitive levels." *Pierson v. Orlando Reg'l Healthcare Sys., Inc.,* 619 F. Supp. 2d 1260, 1277 (M.D. Fla. 2009).

The Plaintiffs themselves assert that the purported purpose of the alleged unlawful conduct by Health First was to keep the Wuesthoff-Melbourne hospital from being a viable competitor to the Health First hospitals in Southern Brevard County, not to monopolize any of the markets in which Plaintiffs participate.[9]  (Compl. at ¶¶ 129-135 and 150.)  As such, Plaintiffs' alleged injuries were, at best, indirect. This lawsuit fits squarely within the type of lawsuits brought by aggrieved physicians against hospitals that courts in this circuit have routinely rejected for lack of antitrust standing. *See, e.g., Todorov v. DCH Healthcare Auth.,* 921 F. 2d 1438, 1454 (11th Cir. 1991); *Feldman v. Palmetto General Hosp., Inc.,* 980 F. Supp. 467, 469 (S.D. Fla. 1997); *Pierson v. Orlando Reg'l Healthcare Sys., Inc.,* 619 F. Supp. 2d 1260, 1277 (M.D. Fla. 2009); *Levine v. Cent. Fla. Med. Affiliates, Inc.,* 864 F. Supp. 1175, 1183-85 (M.D. Fla. 1994).

---

[9] Significantly, not only was Wuesthoff-Melbourne the direct target of the alleged monopolization, and therefore an efficient enforcer of the antitrust laws, it actually brought its own lawsuit against Health First. Wuesthoff sued Health First in this Court in 2005; an Amended Complaint was filed and then later dismissed in 2006. *See Wuesthoff Health Systems, Inc. v. Health First, Inc., et al.,* No. 6:05cv1454-orl-22JGG (M.D. Fla.). That case was subsequently re-filed in state court in Brevard County in 2007 and settled in 2012. *See Wuesthoff Health System, Inc., v. Health First, Inc, Holmes Regional Medical Center, Inc., Cape Canaveral Hospital, Inc., Health First Physicians, Inc., and Health First Health Plans, Inc,* Case No. 05-2007-CA-19391 (18th Jud. Cir. Brevard County, Fla.). A separate antitrust suit filed by a local spinal surgeon Dr. Richard Hynes, challenging Health First's purported monopolization of the hospital services and insurance markets remains pending in state court in Brevard County. *Hynes v. Health First, Inc.,* Case No. 05-CA-2007-19182 (18th Jud. Cir. Brevard County, Fla.) The existence of these other lawsuit underscores the fact that these Plaintiffs are not efficient enforcers to be alleging monopolization of the hospital services market. The conduct alleged was directed at Wuesthoff-Melbourne, not at Plaintiffs. And there is a significant danger of duplicative proceedings and multiple recoveries. Certainly, the divestiture sought by the Complaint here (and by Dr. Hynes' complaint) can only be ordered once. The Court can take judicial notice, even on a motion to dismiss under Rule 12(b)(6), of the judicial records of this and the state courts of Florida. *See, e.g., Henson v. CSC Credit Servs.,* 29 F. 3d 280, 284 (7th Cir. 1994); *Pringle v. Ga. Regional Hosp.,* No. 1:09–CV–0147–TCB, 2009 WL 3094847, at *2 (N.D. Ga. 2009) ("[T]he court may take judicial notice of public records, including court records, without converting the motion to dismiss to a summary judgment motion.") (citing *Bryant v. Avado Brands, Inc.,* 187 F. 3d 1271, 1280 (11th Cir. 1999)).

Plaintiffs at all times had access to a competing hospital in the market, Wuesthoff-Melbourne.  Plaintiffs do not allege that there were any services that were unavailable at Wuesthoff-Melbourne and only available at HRMC.  (Compl. ¶204.)  Nor do any of the Plaintiffs, except Dr. Deligdish, allege that they were denied access to HRMC so as to impair their ability to practice.  Even Dr. Deligdish admits that he continues to practice in Southern Brevard County, showing that he has not been driven from the market and has no standing. (Compl. ¶ 11); *Pierson,* 619 F. Supp. 2d at 1277; *Untracht v. Fikri,* 454 F. Supp. 2d 289, 308-309 (W.D.Pa.,2006).

### 3.  Counts 3 and 4 — Plaintiffs Lack Standing to Sue for Attempted Monopolization of the Markets for Physician Services and Ancillary Services.

These counts are brought against Health First, Inc and HF Physicians (Count 3) and Health First, Inc., HRMC, and HF Physicians (Count 4).  Even as to the physician services and ancillary services markets in which Plaintiffs claim to compete, they cannot claim to have suffered any antitrust injury.  Plaintiffs allege that, "prices are higher and there are fewer alternatives for participants" in each of these markets as a result of Defendants' conduct. (Compl. ¶¶ 319 and 332.)  But this does not allege any injury to Plaintiffs.  Plaintiffs would actually be the beneficiaries of those higher prices in these two markets in which they do compete.  That is to say, the Plaintiffs would benefit from Defendants' higher prices because they could either keep their prices the same or lower than Health First's prices, in which case they would theoretically receive more business; or they could raise their prices and keep the same amount of business as before, but obtain higher profits.

This fact further underscores why Plaintiffs lack standing.  First, they suffer no antitrust injury from any alleged attempt to monopolize.  Second, they are not efficient enforcers of the antitrust laws because their interests are not aligned with keeping prices low and increasing

competition. There are other potential plaintiffs, such as consumers and insurers, who would be more appropriate enforcers because they would be the ones who might pay any higher prices for such services. For these reasons, Plaintiffs' Counts 3 and 4 must be dismissed for lack of standing.

> **4.     Counts 5 and 6 — Plaintiffs Lack Standing to Sue for Attempted Monopolization of the Private Insurance and Medicare Advantage Markets.**

These two Counts are brought against Defendants Health First, Inc. and HFHP for attempted monopolization of the markets for private health insurance plans and Medicare Advantage plans. Here again, Plaintiffs have ignored the antitrust standing requirements in this Circuit. Plaintiffs do not allege that they are either customers or competitors in these two insurance markets, rather they claim only to be "suppliers, insofar as they contract with private health insurers to offer services as part of their provider networks." (Compl. ¶¶ 346 and 359.) Nor do Plaintiffs allege a cognizable injury-in-fact, much less a direct antitrust injury, such as paying higher prices for insurance, paying higher input costs or facing a reduced supply from the alleged anticompetitive acts affecting these markets. Plaintiffs do not even allege an injury related in any way to the health care insurance market. Instead, Plaintiffs' claimed injury and basis for standing to sue for attempted monopolization of these insurance markets is that Health First's conduct "has substantially limited the Antitrust Plaintiffs' ability to effectively compete in the inter-related markets for physician and ancillary services in Southern Brevard County." (Compl. ¶¶ 347 and 360.) This theory of standing amounts to a double "carom-shot" injury, because, not only do the Plaintiffs not claim to have suffered direct injury in either of the two insurance markets, their alleged injury is claimed in two wholly unrelated markets for other services. Indeed, Plaintiffs have also sued and sought damages for the alleged attempted

monopolization of the markets for physician services and ancillary services, (Counts 3 and 4) so Counts 5 and 6 would appear to be, at best, duplicative.

Plaintiffs have not articulated a plausible theory of any antitrust injury and they make no effort to explain why they fill the role of efficient enforcers. Therefore, Plaintiffs lack standing and these Counts should be dismissed.

> 5.    **Counts 7 and 8 — Plaintiffs Lack Standing to Sue for Alleged Conspiracy to Restrain Trade and Conspiracy to Monopolize.**

These counts are brought against all Defendants for conspiring to restrain trade in and conspiring to monopolize the hospital services market and each of the secondary product markets by conduct "to leverage Health First's market power in the Relevant Market and Secondary Product Markets and, ultimately, create a vertically-integrated healthcare monopoly in Southern Brevard County." (Compl. ¶¶ 367 and 380.) In both counts Plaintiffs allege that, "As a result of the common scheme, prices are higher and there are fewer alternatives for participants in the Relevant Market and Secondary Product Markets, thereby causing injury to competition, consumers, and the Antitrust Plaintiffs." (Compl. ¶¶ 367 and 380.) The conduct in which Defendants allegedly engaged as part of both conspiracy counts is the same. (Compl. ¶¶ 369, 370 and 383.)

As stated above, Plaintiffs are neither customers nor competitors in the hospital market, or in the private insurance or Medicare Advantage markets and therefore lack antitrust standing to sue for any antitrust violations in those markets. In addition, Plaintiffs have not alleged facts to support a claim that they have suffered any antitrust injury from any conspiracy to restrain trade or to monopolize in any of the Relevant of Secondary Product markets. The alleged injury, higher prices and fewer alternatives in those markets, are not injuries to Plaintiffs. For example, the alleged conspiracy between Health First and MIMA (and other un-named physicians) not to admit patients to Wuesthoff-Melbourne does not cause any injury to Plaintiffs and they lack

standing to challenge any such conspiracy. Even the alleged conspiracy between Defendants and MIMA to boycott Plaintiffs does not cause any injury to consumers and therefore is not "antitrust injury." Patients are still able to seek treatment from Plaintiffs. Additionally, for the same reasons discussed above, Plaintiffs are not efficient enforcers of such claims.

Plaintiffs should not be permitted to side-step the antitrust standing requirements. If Plaintiffs are not customers or competitors in any of the markets affected by the alleged conspiracy, they lack the threshold standing to sue for a conspiracy to restrain trade in or to monopolize those markets and their claims should be dismissed. As explained in the discussion of the *Brunswick* and *Cargill* decisions above, a competitor does not suffer an antitrust injury from higher prices in the market in which it competes.

### 6.    The Individual Plaintiffs Lack Standing to Sue in Addition to their Corporate Practices.

Individual shareholders and employees lack standing to enforce competition laws because they have not suffered the requisite direct injury.[10] *Union De Transports Aeiens v. Beckman*, 485 U.S. 934 (1988); *Air Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 528 (1991); *Nat'l Indep. Theater Exhibitors, Inc. v. Buena Vista Distrib. Co.*, 748 F. 2d 602, 608 (11th Cir. 1984) ("neither an officer nor an employee of a corporation has standing to bring an action in his own right for an antitrust violation causing injury to the corporation and its business"), *cert. denied*, 471 U.S. 1056 (1985); *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F. 2d 705 (11th Cir. 1984); *Southwest Suburban Board of Realtors, Inc. v. Beverly Area Planning Ass'n, et al.*, 830 F. 2d 1374, 1378 (7th Cir. 1987) (denying standing to sue under the antitrust laws for individual real estate brokers whose brokerages were also plaintiffs seeking

---

[10] In this action, the individual Plaintiffs and their corporate practices have sued the Defendants. Plaintiff Dr. Komar is the only individual Plaintiff whose corporate practice is not also a Plaintiff. Dr. Komar practices in a group, but that group has not joined this lawsuit. His lack of standing to bring individual antitrust claims will be the subject of a separate motion for summary judgment.

damages); *see also Vinci v. Mgmt., Inc.*, 80 F. 3d 1372, 1375 (9th Cir. 1996) ("A shareholder of a corporation injured by antitrust violations has no standing to sue in his or her own name . . ." and "this rule applies even if the injured shareholder is the sole shareholder.").   Thus, even if the individual Plaintiffs who are the shareholder(s) and/or employees of those corporate entities suffered some injury resulting from the alleged antitrust violations in the Complaint in the form of reduced salary, lost benefits, or other loss in value of their ownership interest in the corporation due to the corporation's reduction in business, those injuries are merely derivative of the injury suffered by their corporations.   For these reasons, the antitrust claims of all of the individual Plaintiffs, other than Dr. Komar, must be dismissed with prejudice.

### 7.   Dr. Grenevicki and Dr. Komar Lack Standing to Sue for Attempted Monopolization of the Ancillary Services Market.

Count 4 for attempted monopolization of the market for "ancillary services" is brought on behalf of the "Antitrust Plaintiffs."   However, in paragraph 289, Plaintiffs admit that Dr. Grenevicki and Dr. Komar do not compete in the market for "ancillary services."   (Compl. ¶ 289.)   But, in paragraphs 338 and 340, using boilerplate language, these two plaintiffs claim to have been harmed by the attempt to monopolize the ancillary services market.   Because no other valid basis for standing to assert this claim is alleged, those two Plaintiffs' claims in Count 4 should be dismissed.

### C.   Counts 3 - 6 should be Dismissed Because Plaintiffs have Failed to Define the Relevant Geographic Market for each "Secondary Product Market," and Count IV Improperly Lumps Disparate Products and Services into a Single Market.

Claims under Section 2 of the Sherman Act "require harm to competition that must occur within a 'relevant', that is, a distinct market, *with a specific set of geographical boundaries* and a narrow delineation of the products at issue." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F. 3d 1065, 1074 (11th Cir. 2004) (emphasis added); *Am. Key Corp. v. Cole*

*Nat. Corp.*, 762 F. 2d 1569, 1579 (11th Cir. 1985) ("Proof of the relevant product and geographic market is absolutely essential to appellants' Section 2 claims."). A relevant geographic market is the geographic area "in which the seller operates and to which purchasers can practicably turn for supplies." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).

In the instant case, Plaintiffs have made superficial changes to their previous complaint by dividing what was a single count for attempted monopolization of all of the secondary product markets into four separate counts (Counts 3-6) for attempted monopolization of each secondary product market. These superficial changes do not cure the fact that the latest Complaint still fails to allege any facts to support the relevant geographic market for any of the secondary markets.

The Complaint contains no information about the relevant geographic markets for the secondary products other than the purely conclusory allegation that the market is "Southern Brevard County." (Compare Compl. ¶¶ 84-94 with ¶¶ 96, 316, 330, 343, and 355.) For example, the physician and medical practice Plaintiffs provide specialized medical services (pain management, hematology, oncology, gastroenterology, oral maxillofacial surgery, and general surgery). However, there are no factual allegations as to why the geographic market for these specialized physician services is limited just to Southern Brevard County. In other words, why areas outside Southern Brevard County are not areas "to which purchasers can practicably turn for supplies." Antitrust courts have consistently recognized that patients may be willing to travel longer distances to see a specialist than they otherwise would for primary care. *See, e.g., Sidibe v. Sutter Health*, No. C 12–04854 LB 3:12–cv–04854, 2013 WL 5956315 at *6 (N.D. Cal. Nov. 7, 2013) ("The Linked Geographic Market is particularly relevant with regard to Specialty Providers Services because enrollees are willing to travel farther for specialized services . . . ."). In fact, Plaintiffs appear to concede this point as well. (Compl. ¶ 242) ("Health First even

referred its patients to a surgeon located well-outside the geographic area until it was able to hire its own oral and maxillofacial surgeon."). Likewise, the Complaint contains no factual allegations regarding why the market for ancillary services, private health insurance, or the Medicare Advantage Market is no larger than Southern Brevard County because purchasers could not practicably turn to areas outside Southern Brevard County to buy those products or services.

This failure to allege any facts to plausibly support the defined relevant geographic market for each of the secondary product markets requires dismissal of the claims in Counts 3 to 6. *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F. 3d 1327, 1336 (11th Cir. 2010) (stating that although the relevant geographic market is typically a question of fact, "antitrust plaintiffs still must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets.").

In addition, Count 4 must be dismissed because Plaintiffs have improperly lumped numerous disparate services into a single product market. Plaintiffs allege that the "ancillary services" market includes a variety of "auxiliary or supplemental services" provided by a licensed physician or medical practice to support diagnostic or treatment. (Compl. ¶ 63.) Such is not a product, but instead a collection of unrelated products. This is confirmed by the Plaintiffs' allegation that these services include (1) diagnostic services, (2) durable medical equipment, (3) therapies, and (4) outpatient surgeries. (Compl. ¶ 63.) Plaintiffs then list examples of each of these services, but leave Defendants guessing as to what else may be contained in the amorphous "ancillary services" market.[11] These various services cannot be part of a single product market definition because they are not acceptable substitutes for each other.

---

[11] The amorphous and unrelated nature of the various products and services that are included in the "ancillary services" product market is underscored by the allegation that ten different Health First entities compete in this ancillary services market, only two of which are defendants. (Compl. ¶ 329.)

A relevant market is defined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe v. United States,* 370 U.S. 294, 325 (1962); *United States v. EI DuPont de Nemours & Co.*, 351 U.S. 377 (1956). The Complaint says nothing about whether patients or managed care plans can switch between the various ancillary services in response to a price increase in any other ancillary service. For example, no one would suggest that an x-ray can be substituted for a blood test or that physical therapy or durable medical equipment can be substituted for hospice services. Thus, these disparate services cannot be part of the same relevant product market. Furthermore, the relevant geographic markets for each ancillary product may not be the same. For example, consumers may be able to shop for durable medical equipment in a larger market than they would be willing to travel to have a blood test or an x-ray. For this additional reason, Count 4 must be dismissed.

> **D.**     **Counts 7 And 8 Fail to Allege an Agreement or Facts Supporting a Plausible Inference of an Agreement with Competing Physicians to Boycott Plaintiffs.**

Plaintiffs' claims for conspiracy in Counts 7 and 8 are based on the "common scheme" allegations of paragraphs 124-168. Much of what is alleged in those paragraphs is actually unilateral conduct which is not unlawful. *Pac. Bell Tel. Co. v. Linkline Comm'ns, Inc.*, 555 U.S. 438, 449 (2009). Furthermore, Defendants are legally incapable of conspiring among themselves. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984). Therefore, Plaintiffs must allege facts supporting the existence of an agreement with one or more competitors to restrain trade. The closest Plaintiffs come to such an allegation is the following:

> 146. Those physicians who refuse to enter into exclusive dealing arrangements with Health First are not only denied access to Health First's members and patients, they are also blacklisted by all physicians who have agreed to the exclusive dealing arrangement (*i.e.*, Health First's co-conspirators). Moreover, this blacklisting is not limited to patients covered by Health First insurance plans; it also extends to the conspiring physicians' patients who are covered by other insurance providers. Such conduct constitutes a group boycott or concerted refusal to deal.

> 147. Prior to the group boycott, Plaintiffs received referrals from MIMA, HF Physicians and inpatient referrals from physicians at Holmes RMC and Palm Bay Hospital. Afterwards, they received few if any referrals from these sources.

(Compl. ¶¶ 146-147.)

Those paragraphs do not allege an agreement, nor do they allege any facts from which an agreement may be plausibly inferred. At most, those paragraphs allege purely parallel conduct. There are no facts alleged that would make an inference of conspiracy more plausible than independent action; namely some "further circumstance pointing toward a meeting of the minds." *Twombly*, 550 U.S. at 556-557. Simply put, the Complaint does not plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For this reason, courts have required far more factual content to support a plausible inference of a claim sufficient to survive dismissal. *Twombly*, 550 U.S. at 564; *Kendall v. Visa U.S.A., Inc.*, 518 F. 3d 1042, 1049 (9th Cir. 2008) (citing *Twombly*, 550 U.S. at 554–55, n.5); *Black v. JP Morgan Chase & Co.*, 2011 WL 4102802 (W.D. Pa. 2011); *America Channel, LLC v. Time Warner Cable, Inc.*, 2007 WL 1892227 (D. Minn., 2007).[12]

The Eleventh Circuit has made clear that in a case brought under Section 1 of the Sherman Act, "we must determine whether the complaint, in asserting a conspiracy or agreement in restraint of trade[,] contains 'allegations plausibly suggesting (not merely consistent with) [a conspiracy or] agreement'[,] that is, whether the complaint 'possess[es] enough heft to show that the pleader is entitled to relief.'" *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F. 3d 1327, 1332-33 (11th Cir. 2010). Here, the allegations of any conspiracy in Counts 7 and 8 directed at the

---

[12] Plaintiffs will likely cite to *In re Pool Products Distribution Market Antitrust Litigation*, 2013 WL 6670020 (E.D. La. 2013), but in that case the Plaintiffs alleged a number of facts that made the inference of conspiracy plausible. There, the manufacturer defendants took parallel actions against their independent self interest in raising freight minimums; had a motive to conspire to raise prices to Pool's competitors; had an opportunity to conspire; and had an e-mail that appeared to state that an agreement had been reached to raise freight minimums. Plaintiffs here have alleged no such additional facts making a inference of an agreement to boycott Plaintiffs more likely than independent business behavior.

Plaintiffs are confined exclusively to parallel conduct — *i.e.*, a cessation of referrals to these Plaintiffs. Such allegations are insufficient under *Twombly*.

**E.     Count 9 Should be Dismissed Because the Defendants have Failed to sufficiently allege either a traditional or *per se* violation of FDUTPA.**[13]

FDUTPA proscribes "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1) (2011).  There are two types of FDUTPA violations: a "traditional" violation and a "*per se*" violation.  *Blair v. Wachovia Mortg. Corp.*, No. 5:11-cv-566-Oc-37TBS, 2012 WL 868878, at *2-3 (M.D. Fla. Mar. 14, 2012).  In order to prevail on a claim for a traditional FDUTPA violation, plaintiffs must establish (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Id.* at *3.  By contrast, a *per se* violation of FDUTPA stems from the violation of "any law, statute, rule, regulation or ordinance which proscribes unfair methods of competition or unfair, deceptive or unconscionable acts or practices." *Id.* (citation omitted).

While it is not clear, Plaintiffs appear to allege a traditional and a *per se* violation of FDUTPA, both of which should be dismissed.  Plaintiffs' FDUTPA claim focuses on the "common scheme" allegations, which are merely a regurgitation of Plaintiffs' antitrust claims. (Compl. ¶ 397.)  Plaintiffs also claim that "[t]he acts engaged in by Defendants violate the Sherman Act, and therefore are violations of [FDUTPA]." (Compl. ¶ 395.)  As discussed herein, Plaintiffs' claims under the Sherman Act should be dismissed.  Accordingly, Plaintiffs have not been *aggrieved* by any unfair or deceptive act, and their FDUTPA claims — whether phrased as *per se* or traditional violations — should similarly be dismissed. *See* § 501.211(1), Fla. Stat. ("anyone *aggrieved* by a violation on this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is

---

[13] FDUTPA does not apply to any person or activity regulated by the Office of Insurance Regulation.  Fla. Stat. § 501.212(4)(a).  For this reason, HF Heath Plans, an insurance company regulated by the Office of Insurance Regulation (Compl. ¶ 28), is exempt from FDUTPA, and the FDUTPA claim against it should be dismissed.

violating, or is otherwise likely to violate this part." (emphasis added)); *Macias v. HBC of Fla., Inc.*, 694 So. 2d 88, 90 (Fla. 3d DCA 1997), Plaintiffs do not allege that they suffered *actual damages*, but instead claim only consequential damages, which are not recoverable under FDUTPA.  Fla. Stat. § 501.211(2) ("In any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages . . . ."); (Compl. ¶¶ 399 – 405).  Florida law has defined actual damages as follows:

> Generally, the measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties.  [citations omitted]  A notable exception to the rule may exist when the product is rendered valueless as a result of the defect-then the purchase price is the appropriate measure of actual damages.

*Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. 3d DCA 1984); *Dorestin v. Hollywood Imports, Inc.*, 45 So. 3d 819, 827-828 (Fla. 4th DCA 2010).  These are not the type of damages that Plaintiffs seek here.  Plaintiffs' claims are all for consequential damages such as "lost significant income."  *See* Compl. ¶¶ 399-405.[14]  These are not "actual damages" as defined in the FDUTPA.

Finally, the claims against HFHP in Count 9 should be dismissed because the FDUPTA provides an exemption for "[a]ny person or activity regulated under laws administered by . . . [t]he Office of Insurance Regulation of the Financial Services Commission."  § 501.212(4)(a), Fla. Stat.  The applicability of the provisions depends on the activity which is the subject of the lawsuit, and whether that activity is subject to the regulatory authority of the Office of Insurance Regulation.  *W.S. Badcock Corp. v. Myers*, 696 So. 2d 776, 782–83 (Fla. 1st DCA 1996).  In this instance, the activity of contracting with providers approved under an insurance health plan or a health maintenance organization is regulated extensively by the Office of Insurance Regulation.  Fla. Stat. §§ 627.64731, 627.6474, 627.6699(6), 641.2017, 641.315.  All of HFHP's conduct is

---

[14] Plaintiffs also make a claim for treble damages, which are not available under the FDUTPA.  Fla. Stat. § 501.211(2).

fully regulated by Florida's Department of Insurance and therefore exempt from FDUTPA.  *See, e.g.*, *Int'l Brokerage & Surplus Lines, Inc. v. Liberty Mut. Ins. Co.*, No. 8:06-cv-104-T-30MSS, 2007 WL 220172 at *9 (M.D. Fla. Jan. 26, 2007) (dismissing FDUTPA claims brought against entity regulated by the Office of Insurance Regulation).

For those reasons, Count 9 should be dismissed as against all Defendants and they should be awarded attorneys fees and costs under FDUTPA pursuant to §501.2105, Fla. Stat.  *Moritz v. Hoyt Enters., Inc.*, 604 So. 2d 807, 809-10 (Fla. 1992).

**F.     Count 10 Fails to Identify the Specific Conduct by Each Defendant, and further demonstrates that any Interference was Justified.**

When tortious interference by multiple Defendants is alleged, the Plaintiff must identify the specific conduct by each Defendant that is alleged to be tortious.  *Cf. Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, 619 F. Supp. 2d 1260, 1273 (M.D. Fla. 2009) "'[b]y lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, [the plaintiff's] complaint failed to satisfy this minimum standard.'" (internal citations omitted)), *aff'd*, 451 F. App'x 862 (11th Cir. 2012); *Synergy Real Estate of SW Florida, Inc. v. Premier Prop. Mgmt. of SW Florida, LLC*, 2:11-CV-707-FTM-29, 2013 WL 5596795 (M.D. Fla. Oct. 11, 2013) ("[P]laintiffs failed to comply with Fed.R.Civ.P. 8 by indiscriminately lumping defendants together and the Court advised plaintiffs to clearly and concisely state the circumstances, occurrences and events which support each of their claims.").

The Plaintiffs in this case indiscriminately lump all Defendants together and, in a conclusory fashion, state that the "Defendants" undertook "affirmative acts" that interfered with the Plaintiffs' relationships with their patients.  (Compl. ¶ 408.)  Plaintiffs fail to identify which Defendants undertook what acts that interfered with what business relationships.  Not one single Defendant is discussed specifically, and Defendants are left guessing as to what conduct by what Defendant is alleged to be tortious.  Moreover, the Complaint actually suggests that any

"interference" was justified.  Under Florida law, "[a]n interested third-party accused of tortious interference is essentially 'interfering' with its own interest . . . *[t]his is not interference; it is freedom of contract.*"  *Palm Beach Cnty. Health Care Dist. v. Prof'l Med. Educ., Inc.*, 13 So. 3d 1090, 1095 (Fla. 4th DCA 2009) (emphasis added); *see Morris Commc'ns Corp v. PGA Tour, Inc.*, 235 F. Supp. 2d 1269, 1287 (M.D. Fla. 2002), *aff'd* 364 F. 3d 1288 (11th Cir. 2004)  Here, Plaintiffs claim that "Defendants" interfered with three different types of relationships: (1) Plaintiffs' physician-patient relationships, (2) Plaintiffs' relationships with those doctors that previously referred patients to Plaintiffs, and (3) Plaintiffs relationships with other physicians who were lured away by Health First.  (Compl. ¶ 406.)  While these allegations do not specify which Defendants did what, each of the Defendants are interested parties in these relationships.[15] For example, HF Heath Plans is likely many of the patients' primary payer for covered medical services.  For this reason, the conduct alleged cannot constitute *unjustified* interference.

**G.      All Claims against Defendants Means and Senne Should be Dismissed.**

Plaintiffs indiscriminately combine Senne with Means who together become the "Individual Defendants" and then both Senne and Means are combined with all of the other Defendants, to become "Health First" or "Defendants," thus obscuring the lack of specific allegations as to Senne's or Means' role in any alleged unlawful conduct.  (Compl. ¶¶ 32-33.) Senne and Means are Defendants only in Counts 7-10 which are the three counts alleging conspiracies and the claim for tortious interference.  However, the allegations against Senne and Means in those counts and in paragraphs 124-168 (the "Common Scheme") that are within the

---

[15]  Moreover, the Defendants' alleged interference with the Plaintiffs' physician-patient relationships is not actionable because, under Florida law, when a contract is terminable at will, there can be no claim for tortious interference.  *See Bluesky Greenland Envtl Solutions, LLC v. 21st Century Planet Fund, LLC*, Case No. 12-81234-CIV, 2013 WL 6247442, at *8 (S.D. Fla. Dec. 4, 2013) ("The general rule is that an action for tortious interference will not lie where a party tortiously interferes with a contract terminable at will.").

statute of limitations are purely conclusory, namely that they, "authorized, participated in, directed, approved, and or ratified" *all* of the "unlawful acts" described in the Complaint.

There is no allegation that Senne or Means made any agreement or participated in a conspiracy with MIMA to boycott Plaintiffs. As with the other Defendants, all that is alleged is parallel conduct by Health First and MIMA - they each declined to make patient referrals to Plaintiffs. No facts are alleged that would plausibly support an inference of such an agreement.

Count 9, an alleged violation of FDUTPA, fails against Senne and Means for the same reasons as the antitrust claims upon which Count 9 is based and because no other specific unfair or deceptive conduct by Senne and Means is alleged. As stated in *SIG, Inc. v. AT & T Digital Life, Inc.*, "to satisfy Rule 8's pleading standards, Plaintiffs' FDUTPA allegations must 'specify [Defendants'] individual actions and how they constitute a violation of FDUTPA.'" No. 12–62080–CIV, 2013 WL 5005730, at *13 (S.D. Fla. Sept. 12, 2013). Also, Plaintiffs' damages claims for lost income do not constitute "actual damages" under § 501.211(2), Florida Statutes. Finally, because Means and Senne no longer work for any of the Defendants, no meaningful injunctive relief is available against them.

As to Count 10, no specific conduct of Senne or Means is alleged that constitutes tortious interference; they are simply folded into the term "Defendants" without any specific allegations that relate to either of them. Moreover, the Complaint does not state a claim for tortious interference against Senne or Means because a corporate officer is not liable for tortious interference unless he acted outside the scope of his employment or against the best interests of his corporation. *See Rudnick v. Sears, Roebuck & Co.*, 358 F. Supp. 2d 1201, 1206–07 (S.D. Fla. 2005); *Sloan v. Sax,* 505 So. 2d 526, 528 (Fla. 3d DCA 1987). There is no such allegation here.

## II.    IN THE ALTERNATIVE TO DISMISSAL, DEFENDANTS REQUEST A MORE DEFINITE STATEMENT

A more definite statement is appropriate when a pleading "is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e).  The motion will be granted "when the pleading is 'so vague or ambiguous that the opposing party cannot respond, even with a simple denial, in good faith or without prejudice to himself.'"  *Campbell v. Miller*, 836 F. Supp. 827, 832 (M.D. Fla. 1993).  As the court stated in *Shoemaker v. Phillips & Cohen Associates, Ltd.*:

> Although motions for a more definite statement may be disfavored, a 'pleading must be sufficiently intelligible for the district court to be able to make out one or more potentially viable legal theories on which the claimant might proceed; in other words the pleading must be sufficient to survive a Rule 12(b)(6) motion to dismiss.' 5C Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1376 (3d ed.2004).  Further, "[i]f details are necessary in order to make a vague complaint intelligible, the fact that the details also are subject to the discovery process should not preclude their production under Rule 12(e).' *Id.*

No. 3:08-cv-682-J-25HTS, 2008 WL 4426641, at *1 (M.D. Fla. Sept. 25, 2008).

Here, the Complaint is unintelligible for numerous reasons.  First, Plaintiffs define "Health First" as "all Health First-related entities, as well as the individual Defendants insofar as they were acting on behalf and for the benefit of Health First." (Compl. ¶ 33.)  However, Plaintiffs then go on to refer to "Health First" in counts in which all Defendants are not named.  For example, only Defendants Health First, Inc. and Health First Physicians, Inc. are named in Count 1, but the allegations repeatedly refer to "Health First" a term which has been defined to include all defendants.  (Compl. Count I, compare ¶ 291 which refers to "Health First, Inc," with other paragraphs that refer to "Health First", ¶¶ 292, 293, 294, and 299).  Counts 2 through 6 suffer from the same defect.  (Compl. ¶¶ 300- 305, 308, 310-318, 321, 323-331, 334, 336-344, 347, 349-357, 360, and 362-366.)  In fact, in several allegations, Plaintiffs use both of the terms "Health First, Inc." and "Health First" in the same paragraph, thereby indicating an intent to

differentiate the two terms and underscoring the confusing nature of the allegations.  (Compl. ¶ 315) ("HF Physicians is a wholly owned subsidiary of Health First Inc.  Health First exerts substantial control over the day-to-day operations of its subsidiaries, using them as agencies or instrumentalities of the parent company."); *see also* Compl. ¶¶ 328, 341 and 354.

Additionally, while Count 5 alleges that Health First Inc. and HF Health Plans attempted to monopolize the market for *private health insurance*, the allegations of paragraphs 343-345, which are included in that claim, refer to the market for *physician services*, a market that is the subject of Count 3.  Similarly, Count 6 alleges that Health First, Inc. and HF Health Plans attempted to monopolize the Medicare Advantage market, but the allegations allege illegal conduct on the part of HF Physicians as well.  *See* Compl. ¶ 355.

Count 10 uses the term "Defendants" throughout, a term which is defined to mean all Defendants.  In fact, no defendant is separately identified as having engaged in any tortious conduct.  Count 10 says that it is based on the allegations of the "Common Scheme" described in paragraphs 124-168.  (Compl. ¶ 406.)  However, Count 10 is a claim for tortious interference — it is not a conspiracy claim — so Plaintiffs must identify the conduct by each separate Defendant and may not rely on concepts of joint and several liability.  *Osheroff v. Rauch Weaver Millsaps & Co.*, 882 So. 2d 503, 506 (Fla. 4th DCA 2004).

Defendants should not be required to guess or speculate as to which entities are being sued by who and for what conduct in what counts.  These vague, confusing and contradictory allegations create such an ambiguity that Defendants cannot possibly respond to these allegations without prejudicing themselves.[16]

---

[16] Defendants have attempted to respond to the allegations in the Third Amended Complaint by filing this motion to dismiss in addition to this request for a more definite statement, but only in an abundance of caution so as to not waive their right to challenge the sufficiency of the Third Amended Complaint. Fed. R. Civ. P. 12(g)(2) ("Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion.").

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Third Amended Complaint in its entirety with prejudice and award Defendants their prevailing-party attorney's fees under FDUTPA pursuant to § 501.2105, Fla. Stat. or, in the alternative, grant Defendants' motion for more definite statement

Respectfully submitted this 5th day of June, 2014.

**HOLLAND & KNIGHT LLP**

/s/ Jerome W. Hoffman
Jerome W. Hoffman
jerome.hoffman@hklaw.com
Florida Bar No.: 0258830
Dominic C. MacKenzie
donny.mackenzie@hklaw.com
Florida Bar No.: 705690
Mia McKown
mia.mckown@hklaw.com
Florida Bar No.: 897140
Kevin W. Cox
kevin.cox@hklaw.com
Florida Bar No.: 0034020
315 South Calhoun Street, Suite 600
Tallahassee, Florida 32302
Tel:    850-224-7000
Fax:    850-224-8832

*Trial Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this the 5th day of June, 2014, a true and correct copy of the foregoing has been electronically filed with the Court via CM/ECF, which will send a notice of electronic filing to counsel for Plaintiffs, Tucker H. Byrd, Morgan & Morgan, P.A., 20 North Orange Ave., Suite 1600, Orlando, FL 32802-4979 [tbyrd@forhtepeople.com]; Manuel J. Dominguez, Cohen Milstein Sellers & Toll PLLC, 2925 PGA Boulevard, Suite 200, Palm Beach Gardens, FL 33410 [jdominguez@cohenmilstein.com]; William G. Kopit, Epstein, Becker & Green, 1227 25th Street, NW, Suite 700, Washington, D.C. 20037-1156 [wkopit@ebglaw.com]; Matthew W. Ruan, Cohen, Milstein, Sellers & Troll, PLLC, 88 Pine Street, 14th Floor, New York, New York 10005 [mruan@cohenmilstein.com].

/s/ Jerome W. Hoffman
Attorney

#30318937_v3

26