**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

OMNI HEALTHCARE, INC.;
INTERVENTIONAL SPINE INSTITUTE
OF FLORIDA; CRAIG DELIGDISH;
C. HAMILTON BOONE; BRIAN
DOWELL; RICHARD GAYLES; STAN
GOLOVAC; LANCE GRENEVICKI;
ALEKSANDER KOMAR; SCOTT
SEMINER; INSTITUTE OF FACIAL
SURGERY, INC.; THE PAIN
INSTITUTE, INC.; and PHYSICIAN
ASSISTANT SERVICES OF
FLORIDA, LLC,

                    Plaintiffs,

v.                                                              Case No. 6:13-cv-1509-Orl-37DAB

HEALTH FIRST, INC.; HOLMES
REGIONAL MEDICAL CENTER, INC.;
HEALTH FIRST PHYSICIANS, INC.;
HEALTH FIRST HEALTH PLANS, INC.;
MICHAEL D. MEANS; and JERRY
SENNE,

                    Defendants.
_____

## ORDER

This cause is before the Court on the following:

1.    Defendants' Joint Motion to Dismiss Third Amended Complaint or, in the

      Alternative, for a More Definite Statement and Incorporated Memorandum

      of Law (Doc. 58), filed June 5, 2014; and

2.    Plaintiffs' Response in Opposition to Defendants' Joint Motion to Dismiss

      Third Amended Complaint or, in the Alternative, for a More Definite

      Statement (Doc. 64), filed June 23, 2014.

Upon consideration, the Court finds that the motion is due to be denied.

## BACKGROUND[1]

Condensing the Plaintiffs' 101 page Third Amended Complaint to a pithy synopsis has overwhelmed the Court's capacity to compress. Thus, dear reader, my apologies for the length of what follows.

This antitrust action involves an alleged attempt to create "a vertically integrated, self-reinforcing, illegally maintained healthcare monopoly in Southern Brevard County." (Doc. 57, ¶ 5.) Plaintiffs are several of Southern Brevard County's physicians and physicians practice groups (*id.* ¶¶ 11–17, 19–23) as well as a physician assistant ("PA") and his PA practice (*id.* ¶¶ 18, 24). Defendants are Health First, Inc. ("Health First"), a "fully integrated" healthcare corporation, along with three of its wholly owned subsidiaries: Holmes Regional Medical Center, Inc. ("Holmes RMC"), a hospital; Health First Health Plans, Inc. ("HF Health Plans"), a private healthcare insurer; and Health First Physicians, Inc. ("HF Physicians"), a physicians practice group. (*Id.* ¶¶ 26–29.) Michael D. Means and Jerry Senne, Health First's founders and former executives, are also Defendants. (*Id.* ¶¶ 30–32.)

According to Plaintiffs, for years Defendants have been engaged in an anticompetitive scheme to monopolize Southern Brevard County's interrelated healthcare markets. (*See id.* ¶¶ 1–10, 112–35.) The scheme has been largely successful.

---

[1] The following factual recitation summarizes the allegations of the Third Amended Complaint. (Doc. 57.) Solely for the purpose of ruling on Defendants' motion to dismiss (Doc. 58), the Court accepts Plaintiffs' allegations as true and construes all reasonable inferences in their favor. *See, e.g.*, *Strickland v. Alexander*, 772 F.3d 876, 882 (11th Cir. 2014).

Health First and its subsidiaries have already gained or nearly gained market power[2] in all of this action's relevant markets: acute-care inpatient hospital services, physician services, ancillary services, private healthcare insurance, and Medicare Advantage Plans. (*Id.* ¶¶ 46–83.) Defendants are now allegedly using that market power to coerce independent physicians into joining Health First's subsidiaries or entering into exclusive referral arrangements designed to perfect Health First's control over all relevant markets. (*Id.* ¶¶ 136–68.) Plaintiffs claim to have refused to acquiesce to Defendants' coercion, prompting Defendants and their coconspirators to retaliate with exclusionary tactics designed to drive Plaintiffs out of practice.  (*Id.* ¶¶ 199–259.)

### I.    Market Dynamics

Defendants' alleged anticompetitive scheme is complex, requiring concerted action from multiple participants in multiple markets, but it is primarily designed to ensure that Southern Brevard County's patients choose Health First's hospitals and physicians for healthcare treatment. (*See id.* ¶¶ 2, 124.) Health First's subsidiaries stand to profit from providing and insuring that treatment, and maximizing their patient volume maximizes their potential profits. (*See id.* ¶ 2.)

Unlike competitors in typical markets, Health First's hospital and physician subsidiaries cannot attract patients simply by lowering the price or increasing the quality of their treatment services. Price changes are ineffective because most patients have

---

[2] "Market power is the power to force a purchaser to do something that he would not do in a competitive market. It has been defined as the ability of a single seller to raise price and restrict output. The existence of such power ordinarily is inferred from the seller's possession of a predominant share of the market." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 464 (1992) (citations and internal quotation marks omitted).

healthcare insurance that limits their financial responsibility for treatment to a fixed copayment. (*See id.* ¶¶ 58, 98, 103, 110–11.) Quality changes are ineffective because most patients are "passive consumers" who make only one purchase decision when they need treatment: whether to consult a primary care physician or proceed directly to a hospital. (*See id.* ¶¶ 58, 106.) After that, if their treating physician refers them to a different facility or physician for further treatment, patients ordinarily pursue the referred treatment as long as it is covered by their insurance. (*See id.*) Accordingly, physician referrals—which are not necessarily related to treatment quality—control the course and scope of most patients' healthcare treatment. Defendants therefore need to influence physicians in order to influence patients' treatment decisions. (*See id.* ¶¶ 2, 111, 139.)

To influence physicians, Defendants exploit the dynamics of the managed-care-plan system. Managed care plans are the type of healthcare insurance to which most patients subscribe. (*See id.* ¶ 100.) In a managed care plan, subscribers pay premiums to an insurer in order to gain access to its provider network—that is, the network of physicians and hospitals that have contracted to treat subscribers in exchange for pre-negotiated reimbursement payments. (*See id.* ¶¶ 100, 104.) Reimbursement rates vary from provider to provider based on their relative bargaining power. (*See id.* ¶¶ 59, 74, 107.) Because insurers pay the reimbursements for in-network treatment, subscribers have a strong financial incentive to seek treatment only from in-network providers. (*See id.* ¶¶ 58, 102–04, 110.)

The dynamics of the managed-care-plan system create well-defined needs and incentives for participating hospitals, physicians, healthcare insurers, and patients. Hospitals and physicians generate revenue primarily through treatment reimbursements,

so they need access to insured patients in order to operate sustainably. (*See id.* ¶¶ 7–8, 56, 67, 104, 107.) Access to insured patients requires inclusion in insurers' provider networks and referrals from other hospitals and physicians.[3] (*See id.* ¶¶ 56, 104–07.) Healthcare insurers generate revenue primarily through subscriber premiums, so they need subscribers in order to operate sustainably. (*See id.* ¶¶ 72, 74, 358.) Attracting subscribers requires a comprehensive provider network, and vice versa. (*See id.* ¶¶ 72, 116.) Patients are the system's ultimate consumers; they need only a comprehensive provider network. (*See id.*) In terms of incentives, hospitals and physicians have financial incentives to treat the most possible patients and to demand the highest possible reimbursements (*see id.* ¶¶ 104–05); healthcare insurers have financial incentives to maintain the broadest possible subscriber base, pay the lowest possible reimbursements, and demand the highest possible premiums (*see id.* ¶ 74); and patients have a financial incentive to pay the lowest possible premiums for comprehensive coverage (*see id.* ¶ 72).

By exploiting those needs and incentives, Defendants have been able to leverage a monopoly on certain acute-care inpatient hospital services into market power in Southern Brevard County's private healthcare insurance market. (*See id.* ¶¶ 112–19.) In turn, that market power permits Defendants to coerce Southern Brevard County's independent physicians into either joining Health First's physicians practice group or referring their patients exclusively to Health First's hospitals and physicians; either way, the coercion expands Health First's control over all of the markets in which it participates, including the physician and ancillary service markets. (*See id.* ¶¶ 120–21, 136–68.) The

---

[3] Depending on their specialty and resources, some physicians additionally need access to hospital facilities, which requires hospitals to grant physicians "hospital privileges." (*See* Doc. 57, ¶¶ 7, 159–63.)

details of Defendants' self-reinforcing, market-by-market expansion are as follows.

## II.   Health First's Expansion

In 1995, Health First monopolized Southern Brevard County's "acute-care inpatient hospital services" market by acquiring all of the market's competing hospitals. (*See id.* ¶ 112.) Since then, at least one new competitor has emerged,[4] but Health First's flagship hospital, Holmes RMC, remains the area's only facility capable of providing "Level II" trauma and neonatal-intensive care. (*Id.* ¶¶ 115–16.) Holmes RMC is also the only hospital in the area with air-ambulance capabilities. (*Id.* ¶ 115) Patients consider those services to be essential to comprehensive healthcare coverage, so Southern Brevard County's insurers have little choice but to include Holmes RMC in their provider networks. (*See id.* ¶¶ 49, 116.)

Health First is aware of Holmes RMC's "must-have" status and leverages it to gain market power in Southern Brevard County's private healthcare insurance market.[5] (*Id.* ¶¶ 116, 119.) To do so, Health First uses a tying arrangement: it refuses to permit

---

[4] Wuesthoff Medical Center, Melbourne ("Wuesthoff") is Holmes RMC's primary competitor. (*See* Doc. 57, ¶¶ 1, 50–52, 116.) Wuesthoff entered the acute-care inpatient hospital market in 2002. (*Id.* ¶ 1.)

[5] The private healthcare insurance market encompasses the Medicare Advantage Plan market, which "comprises those enrollees who have opted to receive their Medicare benefits through private health plans instead of the federally administered traditional Medicare program." (Doc. 57, ¶ 78.) Health First competes in both the private healthcare insurance market and the Medicare Advantage Plan market through HF Health Plans. (*See id.* ¶¶ 77, 82.)

"A relevant product market can exist as a distinct subset of a larger product market." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1337 (11th Cir. 2010). Here, Plaintiffs make little, if any, distinction between the pertinent dynamics of the private healthcare insurance market and the Medicare Advantage Plan market, nor do they distinguish between HF Health Plans' expansions into each. (*See id.* ¶¶ 117–23.) Accordingly, for purposes of this Order, the Court considers HF Health Plans' expansion into each to have occurred simultaneously and by the same means.

independent healthcare insurers to include Holmes RMC in their provider networks unless they also include Health First's less-desirable hospitals at supra-competitive reimbursement rates.[6] (*See id.* ¶ 119.) Simultaneously, Health First price discriminates in favor of its wholly owned healthcare insurer, HF Health Plans, by granting it access to all Health First facilities at lower reimbursement rates than those charged under the tying arrangement. (*Id.*) As a result of the tying arrangement and price discrimination, HF Health Plans has lower reimbursement expenses than its competitors, permitting it to charge subscribers lower premiums while still offering a comprehensive provider network. Over time, HF Health Plans has used that advantage to attract a "dominant share" of Southern Brevard County's private healthcare-insurance subscribers. (*See id.* ¶¶ 119–20.)

Health First uses HF Health Plans' dominance in the private healthcare insurance market to influence Southern Brevard County's physicians. (*See id.* ¶¶ 120, 132.) As addressed above, physicians need access to insured patients in order to operate sustainably. (*See id.* ¶ 7.) By excluding physicians from its provider network, HF Health Plans can foreclose their access to a "dominant share" of Southern Brevard County's insured patients. (*See id.* ¶¶ 7, 119–20, 132.) Health First uses that threat to coerce independent physicians into either joining HF Physicians—Health First's

---

[6] "A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak*, 504 U.S. at 461–62 (citation and internal quotation marks omitted). "A tying arrangement violates § 1 of the Sherman Act if the seller has market power and the tying arrangement affects a substantial volume of commerce in the tied product market." *Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1296 n.4 (11th Cir. 2010).

multi-specialty physicians practice group[7]—or referring their patients exclusively to Health First's physicians and healthcare facilities.  (*See id.* ¶¶ 120, 132, 134.)

Regardless of whether they join HF Physicians or enter into exclusive referral arrangements, when independent physicians acquiesce to Health First's coercion, Health First expands its control over all of the markets in which it participates. (*See id.* ¶¶ 137, 151.) Specifically, HF Physicians competes with independent physicians in the physician and ancillary service markets, so when independent physicians join it, HF Physicians loses competitors and grows in size. (*See id.* ¶ 120.) As HF Physicians grows, so too does Health First's influence in the physician and ancillary service markets. (*See id.*) Further, HF Physicians refers patients exclusively to Health First's hospitals, and it price discriminates[8] in favor of HF Health Plans. (*See id.* ¶¶ 121, 185.) Those practices respectively increase Health First's control over the acute-care inpatient hospital service and private healthcare insurance markets, and as HF Physicians grows, the effects of those practices intensify. Similarly, when physicians enter into exclusive referral arrangements, Health First's hospitals and HF Physicians benefit directly from an influx of patients, increasing their market share, and HF Health Plans benefits indirectly from the correspondingly intensified effects of the tying arrangements and price discrimination from which it draws its competitive advantage in the private healthcare insurance market.[9]

---

[7] HF Physicians competes in both the physician services and ancillary services markets. (Doc. 57, ¶¶ 62, 70.)

[8] Like Health First's hospitals, HF Physicians demands higher reimbursement rates from independent insurers than it does from HF Health Plans. (Doc. 57, ¶ 121.) In response, insurers either accept the higher rates, driving up their expenses, or they refuse to contract with HF Physicians, shrinking their provider networks. (*See id.*) Either way, HF Health Plans becomes more attractive to subscribers by comparison. (*See id.*)

[9] For example, if one of HF Health Plans' competitors, such as Aetna (*see* Doc. 57, ¶ 130), includes in its provider network Health First's hospital and physician subsidiaries

(*See id.* ¶¶ 119–21, 184–85.) Thus, regardless of their choice, coercing physicians into joining HF Physicians or entering into exclusive referral arrangements increases Health First's power across all relevant markets.

Ultimately then, by "fully integrating" subsidiaries into each of Southern Brevard County's relevant healthcare markets and establishing, *inter alia*, tying, exclusive-dealing, and price-discrimination arrangements which permit those subsidiaries to augment each other's market power, Defendants have implemented a monopolization scheme that is self-reinforcing.[10] (*See id.* ¶¶ 5, 122–23, 142–44.)

### III.   MIMA Acquisition

In 2012, Health First acquired Melbourne Internal Medicine Associates ("MIMA"). (*Id.* ¶¶ 3–4, 260–74.) At the time, MIMA was the largest physicians practice group in Southern Brevard County other than HF Physicians. (*Id.* ¶ 3.) Prior to the acquisition, MIMA was allegedly one of Defendants' coconspirators, participating in their exclusive referral arrangements and group boycotts. (*See id.* ¶¶ 125–31.) After the acquisition,

---

as well as independent hospitals and physicians, then the more often the competitor's subscribers receive treatment from Health First's subsidiaries, the more often it pays reimbursement rates that have been inflated by Health First's tying arrangements and price discrimination. (*See id.* ¶¶ 119–21.) Health First's exclusive referral arrangements ensure that Health First's hospital and physician subsidiaries treat competing insurers' subscribers as often as possible, maximizing HF Health Plans' competitive advantage in the private healthcare insurance market by maximizing its competitors' reimbursement expenses. (*See id.*) As more physicians enter into exclusive referral arrangements, more patients are referred to Health First's hospital and physician subsidiaries, which correspondingly increases competing insurers' reimbursement expenses.

[10] In other words, Health First can theoretically leverage the physician-driven increase in its control over the acute-care inpatient hospitals services market into increased power in the private health insurance market, which, in turn, gives Health First greater influence over physicians, who, in turn, can use their referrals to expand Health First's control over all of the relevant markets, including the acute-care-hospital services market, and so on, until Health First's monopolization of Southern Brevard County's interrelated healthcare markets is complete. (*See* Doc. 57, ¶¶ 5, 122, 128, 293.)

HF Physicians absorbed MIMA's physicians entirely. (*See id.* ¶ 62.) Plaintiffs claim that the MIMA acquisition cemented Health First's control over Southern Brevard County's physician services market and augmented its control over the other relevant markets. (*See id.* ¶¶ 3, 62, 148, 179, 271.)

## IV.    Exclusionary Conduct

Most physicians and physicians practice groups join HF Physicians or enter into exclusive referral arrangement with Health First, but some refuse. Defendants employ a number of exclusionary tactics designed to drive those who refuse out of Southern Brevard County's healthcare markets.

Some of the exclusionary tactics are unilateral.[11] For example, when physicians refuse to comply with Health First's anticompetitive scheme, HF Health Plans excludes them from its provider network (*see id.* ¶¶ 142–43, 146), HF Physicians stops referring patients to them (*see id.* ¶ 148), and Health First's hospitals revoke their hospital privileges (*see id.* ¶¶ 159–63). Moreover, while Health First is applying those exclusionary tactics to noncompliant physicians practice groups, its representatives—who, in the past, have included Defendants Means and Senne—"systematically" approach the practice groups' individual physicians and attempt to lure them away by offering to reinstate their referral, hospital, and provider-network privileges if they agree to leave the noncompliant practice group and join one that Health First deems "friendly." (*See id.* ¶¶ 153–58.)

Other exclusionary tactics require concerted action from coconspirators. For

---

[11] For antitrust purposes, "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984).

example, those independent physicians who do enter into exclusive referral arrangements with Health First must boycott those physicians who do not.[12] (*See id.* ¶¶ 136–39, 146–52, 213–14, 219, 224–25.) The group boycott ensures that noncompliant physicians lose access not only to HF Health Plans' subscribers, but also to competing insurers' subscribers who would have been referred to the noncompliant physicians but for their treating physicians' participation in an exclusive referral arrangement. (*See id.* ¶¶ 146, 181.)

As a result of Defendants' and their coconspirators' exclusionary tactics, physicians and practice groups that refuse to comply with Defendants' anticompetitive scheme lose access to most of the patients and facilities that they need in order to operate, significantly reducing their ability to compete in the physician and ancillary services markets for reasons unrelated to the cost or quality of their services. (*See id.* ¶ 2.) Even compliant physicians lose their freedom of referral. (*See id.* ¶¶ 7, 136, 146.) The attendant breakdown of competitive conditions in Southern Brevard County's healthcare markets has caused treatment quality to become "shockingly low" despite its persistently increasing price. (*See id.* ¶ 8; *see also id.* ¶¶ 50, 196–98 (discussing the anticompetitive scheme's competitive harm to physicians, ancillary service providers, hospitals, patients, and healthcare insurers).)

## V.   Instant action

Two sets of Plaintiffs bring the instant action. The first and larger set is comprised

---

[12] Notably, not all of the physicians groups that have participated in the group boycotts were conscripted into doing so. For example, prior to its acquisition, MIMA entered into an exclusive referral arrangement with Health First in exchange for certain "financial perks," such as debt forgiveness and the exclusive right to provide radiation oncology services at Health First's facilities. (*See id.* ¶¶ 125–27.)

of several independent physicians and their affiliated practice groups. (*Id.* ¶¶ 11–17, 19–23.) They claim to have refused to join HF Physicians or enter into exclusive referral arrangements, triggering Defendants' exclusionary tactics. (*See id.* ¶¶ 199–253.) As a result, the physician and physicians practice Plaintiffs aver that they have sustained substantial financial losses[13] and their abilities to compete in the physician and ancillary service markets have diminished. (*See id.* ¶¶ 7–8, 220, 228–29, 237–38, 244–45, 253.)

C. Hamilton Boone and his PA practice, Physician Assistant Services of Florida, LLC ("PASF"), make up the second set of Plaintiffs. They claim to have been "blacklisted" by Health First's subsidiaries and MIMA for "voicing concerns" about whether Health First's exclusionary conduct was contributing to the area's increasingly poor treatment quality. (*See id.* ¶¶ 254–59.) Boone and PASF allege that they lost "significant income" as a result of the blacklisting. (*Id.* ¶ 259.)

The Third Amended Complaint contains ten counts. In the first eight, the physician and physicians practice group Plaintiffs assert antitrust[14] claims: in Count I, they challenge the MIMA acquisition under § 7 of the Clayton Act (*id.* ¶¶ 291–99); in Counts II–VI, respectively, they assert claims under §§ 4 and 16 of the Clayton Act for the monopolization or attempted monopolization of the acute-care inpatient hospital services

---

[13] For example, Plaintiff Omni Healthcare, Inc. alleges that it lost patient volume, as well as fifty of its seventy physicians, forcing it to sell its pharmacy practice, close several offices, and divest its ownership in an ambulatory surgery center. (*See* Doc. 57, ¶ 216.)

[14] The Clayton Act, 15 U.S.C. §§ 12–27, creates a private right of action for violations of "the antitrust laws," which include the Sherman Act, 15 U.S.C. §§ 1–7. Section 4 of the Clayton Act authorizes treble damages for sustained business or property injuries. *See* 15 U.S.C. § 15(a). Section 16 authorizes injunctive relief for threatened business or property injuries. *Id.* § 26. Section 7 authorizes challenges to impermissible mergers and acquisitions. *Id.* § 18. Plaintiffs bring suit under all three sections. (Doc. 57, ¶ 36.)

market, the physician services market, the ancillary services market, the private healthcare insurance market, and the Medicare Advantage Plans market, all in violation of § 2 of the Sherman Act (*id.* ¶¶ 300–66); and in Counts VII and VIII, they assert claims under §§ 4 and 16 of the Clayton Act for conspiracies to restrain trade in and to monopolize all relevant markets in violation of §§ 1 and 2 of the Sherman Act (*id.* ¶¶ 367–92). In the last two counts, all Plaintiffs assert Florida state-law claims: in Count IX, they assert Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claims (*id.* ¶¶ 393–405 (citing Fla. Stat. § 501.204)), and in Count X, they assert tortious interference claims (*id.* ¶¶ 406–422).

Defendants move to dismiss the Third Amended Complaint in its entirety. (Doc. 58.) Plaintiffs oppose. (Doc. 64.) The matter is ripe for the Court's adjudication.

## STANDARDS

Federal Rule of Civil Procedure 8(a)(2) requires a claimant to plead "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint does not need detailed factual allegations; however, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (alterations and internal quotation marks omitted). When a complaint is challenged under Rule 12(b)(6), a court accepts as true all well-pleaded factual allegations and disregards unsupported conclusions of law. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678.

**DISCUSSION**

Defendants move to dismiss Plaintiffs' Third Amended Complaint entirely. (*See* Doc. 58.) In support, they argue that: (1) the Clayton Act claims should be dismissed because Plaintiffs lack antitrust standing, they inadequately defined the relevant markets, and they failed to allege a plausible conspiracy; (2) the FDUTPA claims should be dismissed because Plaintiffs failed to allege deceptive or unfair conduct; (3) the tortious interference claim should be dismissed because Plaintiffs lumped Defendants together into a single count without delineating their separate tortious acts; (4) Defendants Means and Senne should be dismissed from this action because they cannot be held individually liable for Health First and its subsidiaries' conduct; and (5) Plaintiffs C. Hamilton Boone and PASF should be dismissed from this action because the Court lacks supplemental jurisdiction over their claims. (*See id.*) The Court will address each argument in turn.

 **I.**  **Clayton Act Claims**[15]

   **A.**  **Antitrust Standing**

Defendants first move to dismiss all of Plaintiffs' Clayton Act claims for lack of antitrust standing. Antitrust standing "involves more than the 'case or controversy' requirement that drives constitutional standing." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991). It requires "an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws. Antitrust standing is best understood in a general sense as a search for the proper plaintiff to enforce the antitrust laws." *Id.* (citations omitted).

---

[15] For purposes of this section, the term "Plaintiffs" does not include C. Hamilton Boone or PASF, as they do not join in the Clayton Act claims.

The U.S. Court of Appeals for the Eleventh Circuit employs a two-pronged test to determine whether a plaintiff has antitrust standing. *Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010). "[F]irst, the plaintiff must have alleged an antitrust injury." *Id.* An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). In other words, because the antitrust laws were enacted for the protection of competition, an antitrust injury must "result from interference with the freedom to compete," *Johnson v. Univ. Health Servs., Inc.*, 161 F.3d 1334, 1338 (11th Cir. 1998), and its remedy must further the public "goal of increased competition," *Todorov*, 921 F.2d at 1450. "The antitrust injury requirement ensures that the plaintiff, although motivated by private interests, is seeking to vindicate the *type of injury* to the public that the antitrust laws were designed to prevent." *Palmyra*, 604 F.3d at 1299 (emphasis added). "[S]econd, the plaintiff must be an efficient enforcer of the antitrust laws." *Id.* There is no "bright-line rule" for determining whether a plaintiff is an efficient enforcer; instead, courts must weigh several factors, including:

> the directness or indirectness of the injury, the remoteness of the injury, whether other potential plaintiffs [are] better suited to vindicate the harm, whether the damages [are] highly speculative, the extent to which the apportionment of damages [would be] highly complex and would risk duplicative recoveries, and whether the plaintiff would be able to efficiently and effectively enforce the judgment.

*Id.* Those factors are nonexclusive, "often intertwined," and "no single factor will necessarily predominate over the others." *Id.* The "efficient enforcer" requirement ensures that the "*particular plaintiff* will efficiently vindicate the goals of the antitrust laws." *Todorov*, 921 F.2d at 1452 (emphasis added).

Defendants contend that Plaintiffs lack antitrust standing to assert any of their Clayton Act claims. (Doc. 58, pp. 3–14.) According to Defendants, Plaintiffs cannot claim antitrust injury from attempts to monopolize or restrain trade in the relevant markets because the resulting injury to the consuming public—increased treatment prices and decreased treatment quality—would be borne by insurers and patients, not physicians. (*See id.* at 10–11.) Additionally, Defendants argue that the Eleventh Circuit's efficient-enforcer standard has an intrinsic "customer or competitor" requirement that forecloses Plaintiffs from bringing suit for antitrust violations that impact the markets for acute-care inpatient hospital services, private healthcare insurance, and Medicare Advantage Plans, as Plaintiffs are neither customers nor competitors in those markets. (*See id.* at 3–5, 7–14.) The Court disagrees with both arguments.

First, Plaintiffs have adequately alleged antitrust injury. Defendants' argument to the contrary incorrectly presumes that antitrust plaintiffs must suffer the *same* injury as the consuming public; the two injuries can differ as long as they "*coincide.*" *See Todorov*, 921 F.2d at 1450 (emphasis added) (citation and internal quotation marks omitted). Here, while Plaintiffs maintain that Defendants' anticompetitive scheme injures the consuming public by subjecting it to increased treatment prices and decreased treatment quality, Plaintiffs themselves claim a more discrete injury: financial harm from Defendants' efforts to exclude them from the physician and ancillary service markets. (*See, e.g.*, Doc. 57, ¶¶ 8 (clarifying that Defendants' alleged scheme "injured Plaintiffs while, *simultaneously*, resulting in supra-competitive prices and lower quality of care for consumers") (emphasis added), 275–90 (distinguishing between the anticompetitive scheme's "effects" on consumers and its "impact" on Plaintiffs).) The two injuries are distinct, but both flow from

"interference with the freedom to compete" and thus both are remediable under the Clayton Act. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 482–83 (1982) ("[W]hile an increase in price resulting from a dampening of competitive market forces is assuredly one type of injury for which § 4 potentially offers redress, that is not the only form of injury remediable under § 4.") (citation omitted); *see also Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 466 F.3d 961, 967–68 (11th Cir. 2006) (reaffirming that "exclusion from the relevant market" is a type of harm that antitrust laws were designed to prevent, as it inflicts financial harm on excluded plaintiffs while decreasing competition it the relevant market). Moreover, the remedy that Plaintiffs request would "further the public goal of increased competition." *Todorov*, 921 F.2d at 1450. In addition to monetary relief, Plaintiffs seek an injunction dissolving Defendants' exclusive referral arrangements and divesting MIMA from Health First. (*See* Doc. 57, ¶ 10; *see also id.* at 99–100 (wherefore clause).) When antitrust plaintiffs seek dissolution of an anticompetitive scheme rather than inclusion in it, their interests coincide with those of the consuming public. *Compare Palmrya*, 604 F.3d at 1303 (finding antitrust injury where a hospital sought dissolution of a competitor's exclusivity arrangements, as dissolution would increase competition in the competitor's targeted healthcare markets), *with Todorov*, 921 F.2d at 1453–55 (refusing to find antitrust injury where a radiologist sought inclusion in a radiology department so that he could share in supra-competitive profits that the department secured through a tying arrangement). In short, Plaintiffs have suffered a competitive injury, the remedy for which would increase competition in the relevant markets; that is all that is required for antitrust injury. *See Todorov*, 921 F.2d at 1450.

Second, Plaintiffs are efficient enforcers of the antitrust laws in all of the relevant

markets. As a threshold matter, there is no "customer or competitor" requirement to being an efficient enforcer. The language upon which Defendants rely for that proposition comes from *Florida Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997). There, the Eleventh Circuit recited the "target area" test—an outdated articulation of the efficient enforcer requirement[16]—and then concluded that, "*[b]asically*, a plaintiff must show that it is a customer or competitor in the relevant market." *See id.* (emphasis added). Taken in context, that "customer or competitor" language is simply imprecise shorthand for an outdated articulation of the efficient enforcer standard; it is not a strict requirement.

To the contrary, the Clayton Act "does not confine its protection to consumers, or to purchasers, or to sellers. . . . The Act is comprehensive in terms of its coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *McCready*, 457 U.S. at 472 (citation and internal quotation marks omitted). More particularly, "[t]he availability of the § 4 remedy to some person who claims its benefit is not a question of the specific intent of the conspirators. [It] cannot reasonably

---

[16] The "target area" test required that "an antitrust plaintiff both prove that he is within that sector of the economy endangered by a breakdown of competitive conditions in a particular industry and that he is the target against which anticompetitive activity is directed." *Fla. Seed*, 105 F.3d at 1374 (citation and internal quotation marks omitted). Prior to *Florida Seed*, the U.S. Supreme Court expressly rejected the "target area" test for fear that its label might "lead to contradictory and inconsistent results." *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 536 n.33 (1983). The Court instead recommended applying the balancing factors recited above. *See id.* Despite that rejection, the Eleventh Circuit continued to use the "target area" test for a number of years, reasoning that the results it produced were not "materially different" from those produced by the U.S. Supreme Court's balancing factors. *See, e.g.*, *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1495–97 (11th Cir. 1985). Over time though, the Eleventh Circuit has distanced itself from the "target area" test, *see Todorov*, 921 F.2d at 1451 n.19 (declining to apply the "target area" test in light of the U.S. Supreme Court's rejection), and it now applies the U.S. Supreme Court's balancing factors exclusively, *see, e.g.*, *Palmyra*, 604 F.3d at 1299 (applying the balancing factors without reference to the "target area" test).

18

be restricted to those competitors whom the conspirators hoped to eliminate from the market." *Id.* at 479. So long as the efficient-enforcer factors weigh in their favor, plaintiffs who are necessary to and harmed by an anticompetitive scheme to manipulate a market have antitrust standing under § 4 of the Clayton Act regardless of whether they participate in that market directly.[17] *See id.* at 479, 482–84.

Here, the efficient-enforcer factors favor Plaintiffs. Plaintiffs' injuries are direct; as addressed above, Plaintiffs refused to cede their referral control—an integral aspect of Defendants' alleged anticompetitive scheme[18]—and Defendants responded with

---

[17] In spite of the U.S. Supreme Court's express and repeated refusal to "engraft artificial limitations on the § 4 remedy," Defendants maintain that *McCready* supports the "customer or competitor" requirement because the plaintiff in *McCready* was a customer of the broad "psychotherapy services" market. (*See* Doc. 58, p. 4 n.6.) *McCready* involved a scheme by an insurer and a group of psychiatrists to exclude psychologists from the psychotherapy market by refusing to reimburse insured patients for psychotherapy services administered by psychologists. *See* 457 U.S. at 468–71. The Court held that a patient who was denied reimbursements for the psychologists' services had antitrust standing despite the fact that the psychologists, and not her, were the scheme's primary target. *See id.* at 483–85.

With the following example, the Court clarified that the plaintiff's antitrust standing did not hinge on her participation as a customer in the psychotherapy services market:

> If a group of psychiatrists conspired to boycott a bank until the bank ceased making loans to psychologists, the bank would no doubt be able to recover the injuries suffered as a consequence of the psychiatrists' actions. And plainly, in evaluating the reasonableness under the antitrust laws of the psychiatrists' conduct, we would be concerned with its effects not only on the business of banking, but also on the business of the psychologists against whom that secondary boycott was directed.

*Id.* at 484. Here, like the *McCready* banker, Plaintiffs are neither customers nor competitors in the markets for acute-care inpatient hospitals services, private healthcare insurance, or Medicare Advantage Plans, but Plaintiffs' role in Defendants' scheme to monopolize those markets supports their antitrust standing to challenge the scheme.

[18] Indeed, without referral control, Health First's market power never becomes "self-reinforcing" and its expansion goes only so far as Holmes RMC's "must have" status will take it, meaning that the expansion likely ends in the private healthcare insurance market. (*See* Doc. 57, ¶¶ 183–84.)

exclusionary tactics that caused Plaintiffs to sustain financial losses. Those losses are discrete, quantifiable, non-duplicative,[19] and unlikely to require complex apportionment.[20] Further, Plaintiffs' injuries are financially motivating and congruent with the consuming public's interest in dissolving Defendants' alleged tying and exclusive dealing arrangements. There is no indication that Plaintiffs and their counsel would be unable to enforce a favorable judgment. Thus, as most or all of the efficient-enforcer factors weigh in their favor, Plaintiffs are well suited to "efficiently vindicate the goals of the antitrust laws." *Todorov*, 921 F.2d at 1452.

Defendants raise two additional arguments against Plaintiffs' antitrust standing, both of which can be quickly resolved. Defendants argue that Plaintiffs lack antitrust standing to challenge the MIMA acquisition because Plaintiffs are competitors of MIMA and HF Physicians, and competitors "rarely" have antitrust standing to challenge an acquisition under § 7 of the Clayton Act. (*See* Doc. 58, p. 7 n.8.) However, acquisitions that may result in "exclusion from the relevant market" provide the rare circumstances

---

[19] Defendants specifically argue that Plaintiffs' request for an injunction divesting MIMA from Health First suggests that they are not efficient enforcers, as another group of physicians have requested the same relief in a pending state court action, and the "divestiture can only be ordered once." (Doc. 58, p. 9 n.9.) While the Court agrees that this action poses some risk of duplicative *injunctive* relief, "courts are less concerned about whether the plaintiff is an efficient enforcer of the antitrust laws when the remedy is equitable because the dangers of mismanaging the antitrust laws are less pervasive in this setting." *Todorov*, 921 F.2d at 1452. After all, "the fact is that one injunction is as effective as 100, and, concomitantly, that 100 injunctions are no more effective than one." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986) (citation and internal quotation marks omitted). The risk of duplicative orders of divestiture is therefore not enough to find that Plaintiffs are inefficient enforcers in this case. In any event, the Court expects the parties to keep it apprised of relevant developments in related proceedings, which mitigates the risk of duplicative rulings.

[20] For the most part, Plaintiffs claim to have lost income and assets—such as surgery centers they were forced to sell—as a result of the boycott-induced decrease in patient volume. (*See* Doc. 57, ¶¶ 212, 216, 220, 226–29, 233–38, 242–45, 251–53.)

under which a competitor can have § 7 antitrust standing. *See Gulf States*, 466 F.3d at 966–68. Plaintiffs allege that the MIMA acquisition perfects Defendants' control over the physician services market and augments their control over the remaining markets, which Defendants use to exclude noncompliant physicians from Southern Brevard County. (*See* Doc. 57, ¶¶ 260–74.) Under the circumstances, those allegations suffice to give Plaintiffs § 7 antitrust standing.

Additionally, Defendants argue that the individual physician Plaintiffs' injuries are entirely derivative of those suffered by their corporate practices and thus they lack antitrust standing to sue in addition to their practices. (*See* Doc. 58, pp. 13–14 (citing *Nat'l Indep. Theater Exhibitors, Inc. v. Buena Vista Distrib. Co.*, 748 F.2d 602, 608 (11th Cir. 1984) (holding that an individual officer and shareholder of a corporation lacked antitrust standing to bring suit for "an antitrust violation causing injury to the corporation and its business" because he had not demonstrated that any anticompetitive "behavior was directed against him individually")).) This second argument overlooks several individual injuries that the physician Plaintiffs allege, including having their hospital privileges revoked at Health First's subsidiaries and being individually boycotted until they join a compliant practice group. (*See* Doc. 57, ¶¶ 219, 225, 236, 242.) Those alleged injuries are separate from the injuries allegedly sustained by the corporate practice groups (*see id.* ¶¶ 220, 229, 238, 245), and they support the physician Plaintiffs' individual antitrust standing. *See Todorov*, 921 F.2d at 1441 n.1 (holding that denial of hospital privileges raises an issue of individual antitrust standing); *cf. Radovich v. Nat'l Football League*, 352 U.S. 445, 453–54 (1957) (permitting a professional football player, who the National Football League individually boycotted as part of an effort to "destroy" the

All-America Conference, to bring suit under § 4 of the Clayton Act). Accordingly, the Court rejects Defendants' two remaining antitrust standing arguments.

In sum then, Plaintiffs have antitrust standing to raise all of their Clayton Act claims. Plaintiffs suffered antitrust injury because they were necessary to and competitively harmed by a purposefully anticompetitive scheme to monopolize all of the relevant, interrelated markets in this action. Plaintiffs are efficient enforcers because their injuries are direct, discrete, and unlikely to require complex apportionment, and there is no indication that Plaintiffs would not be capable of efficiently and effectively enforcing a judgment in their favor. No more is required for antitrust standing.

### B.   Market Definitions

Defendants next move to dismiss Counts III–VI of the Third Amended Complaint— which respectively allege attempted monopolization of the markets for physician services, ancillary services, private healthcare insurance, and Medicare Advantage Plans—for failure to adequately define the relevant markets. (*See* Doc. 58, pp. 14–17.) Market definition is a necessary component to attempted monopolization claims because the scope and contours of the relevant markets influence whether the defendant poses a dangerous probability of monopolizing them.[21] *See U.S. Anchor Mfg., Inc. v. Rule*

---

[21] Specifically, "to establish a violation of § 2 [of the Sherman Act] for attempted monopolization, a plaintiff must show (1) an intent to bring about a monopoly and (2) a dangerous probability of success." *Gulf States*, 721 F.3d at 1285. "A dangerous probability of success arises when the defendant comes close to achieving monopoly power in the relevant market." *Id.* "Monopoly power is the power to raise prices to supra-competitive levels or . . . the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market." *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 994 (11th Cir. 1993) (citations and internal quotation marks omitted). "The principal measure of actual monopoly power is market share, and the primary measure of the probability of acquiring monopoly power is the defendant's proximity to acquiring a monopoly share of the

*Indus., Inc.*, 7 F.3d 986, 993 (11th Cir. 1993).

Defining a relevant market "involves identifying producers that provide customers of a defendant firm (or firms) with alternative sources for the defendant's product or services." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1337 (11th Cir. 2010) (citation and internal quotation marks omitted). Markets definitions have "both product and geographic dimensions."[22] *Gulf States*, 721 F.3d at 1285. The product dimension provides "a narrow delineation of the products [or services] at issue," and the geographic dimension confines the market to "a specific set of geographic boundaries." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1074 (11th Cir. 2004). A market's product and geographic dimensions are questions of fact that often require discovery to precisely articulate and need not be pled with specificity; to survive a motion to dismiss, antitrust plaintiffs need only "present enough information in their complaint to plausibly suggest [those dimensions'] contours." *Jacobs*, 626 F.3d at 1336.

In this case, Defendants argue that the product dimension of the ancillary service market is inadequately defined, as are the geographic dimensions of all markets except for the acute-care inpatient hospital services market. (*See* Doc. 58, pp. 14–17.) The Court disagrees.

Plaintiffs adequately define the product dimension of the ancillary services market. According to Plaintiffs,

> [t]he ancillary service market comprises those auxiliary or supplemental

---

market." *Id.* at 999. Thus, "[a] plaintiff can show [a] dangerous probability of success only if it can properly define the relevant market." *Gulf States*, 721 F.3d at 1285.

[22] The "product" dimension of a relevant market can be made of up products, services, or both.

> services provided by a licensed physician or medical practice to support diagnosis and treatment of a patients' condition. These services include diagnostic services (*e.g.*, x-rays and laboratory testing), durable medical equipment and medical services (*e.g.*, crutches and orthotics), therapies (*e.g.*, radiation therapy and dialysis), and outpatient surgeries (*e.g.*, in-house surgery suites and ambulatory surgery centers).

(Doc. 57, ¶ 63.) Defendants argue that the "various services" encompassed within that definition "cannot be part of a single product market definition because they are not acceptable substitutes for each other." (Doc. 58, p. 16.) Indeed, the products or services that make up a market typically must have "high cross-elasticity of demand[23] or reasonable substitutability," *Jacobs*, 626 F.3d at 1337, and Plaintiffs concede that, as defined, most ancillary services are not substitutes (*see* Doc. 64, pp. 14–15). Instead, Plaintiffs argue, albeit in different terms, that the ancillary services market is a plausible "cluster market." (*See id.*) The Court agrees with Plaintiffs.

Cluster markets are comprised of products or services which are not substitutes but should nevertheless be "clustered" or "lumped" together into a single market to reflect "commercial realities." *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966) ("We see no barrier to combining in a single market a number of different products or services

---

[23] Cross-elasticity of demand "measures the change in the quantity demanded by consumers of one product relative to the change in price of another." *Jacobs*, 626 F.3d at 1337 n.13.

> A high cross-elasticity of demand (that is, consumers demanding proportionately greater quantities of Product X in response to a relatively minor price increase in Product Y) indicates that the two products are close substitutes for each other—that is, consumers derive comparable utility from equivalent consumption of either one. For purposes of the relevant product market analysis, a high cross-elasticity of demand indicates that the two products in question are reasonably interchangeable substitutes for each other and hence are part of the same market.

*Id.*

where that combination reflects commercial realities."). The U.S. Supreme Court addressed the use of cluster markets in *Grinnel Corp.*, where it affirmed a district court's decision to treat several remotely monitored alarm services, such as burglar alarms and fire alarms, as part of a single market despite those services' non-interchangeability. *See id.* at 571–72. According to the Court, the alarm services were linked by a single use—the protection of property through a central monitoring station—as well as three commercial realities: (1) the competing monitoring companies "recognize[d] that to compete effectively, they must offer all or nearly all types of service"; (2) the "different forms of accredited central station service [were] provided from a single office"; and (3) "customers utilize[d] different services in combination." *See id.* at 571–73. Based on those links, the Court held that it was appropriate to cluster those services into a single relevant market for antitrust purposes. *See id.* at 573; *see also United States v. Phila. Nat'l Bank*, 374 U.S. 321, 356 (1963) (determining that "the cluster of products (various kinds of credit) and services (such as checking accounts and trust administration) denoted by the term 'commercial banking' . . . composes a distinct [product market]").

Like the cluster market in *Grinnel*, Plaintiffs allege that the disparate services encompassed within the ancillary service market are linked by a common use—diagnostic and treatment support administered by a licensed physician or healthcare practice (*see* Doc. 57, ¶ 63)—as well as several commercial realities: (1) high barriers to entry, including licensure requirements and "extremely high initial and ongoing capital investment costs," limit the number of competitors in the market (*see id.* ¶ 68); (2) competitors offer multiple services in combination (*see id.* ¶¶ 20–24); and (3) patients passively consume those services "in conjunction with medical or hospital care," with the

costs covered by insurers and the "particular ancillary service provider [selected] by their doctors or health plan" (*see id.* ¶¶ 66–67). Based on those allegations, the Court finds that the services encompassed within the ancillary service market could plausibly be shielded from competitive forces in such a way that clustering them in the same relevant market is appropriate for antitrust purposes.[24] Plaintiffs have therefore adequately alleged the product dimension of the ancillary service market.

The geographic dimensions of the markets for physician services, ancillary services, private healthcare insurance, and Medicare Advantage Plans are likewise adequately defined. Plaintiffs allege that the geographic dimensions of all of this action's relevant markets are the same: Southern Brevard County—that is, the southernmost third of Brevard County. (*See id.* ¶¶ 84, 96–97.) According to Plaintiffs, Brevard County's geography and population dynamics have made Southern Brevard County a distinct trade area, and inflow and outflow rates suggest that local patients rarely seek healthcare treatment from providers located outside of that trade area, even when local treatment quality falls below competitive levels. (*See id.* ¶¶ 84–97.)

Defendants do not contest that Southern Brevard County is an appropriate geographic boundary for the acute-care inpatient hospital services market; however, they

---

[24] Notably, courts routinely use cluster markets in the healthcare antitrust context. *See, e.g.*, *ProMedica Health Sys., Inc. v. F.T.C.*, 749 F.3d 559, 564–68 (6th Cir. 2014) (discussing the contours of markets for non-interchangeable inpatient hospital services that all parties "agree[d] should be clustered" because of the impracticality inherent in analyzing the competitive effects of the merger at issue on "hundreds if not thousands of markets for individual procedures"); *Weiss v. York Hosp.*, 745 F.2d 786, 826–27 (3d Cir. 1984) (affirming a jury's determination that "inpatient health care services" was an appropriate cluster market because "[t]he jury could have concluded . . . that a consumer of hospital services makes one 'purchase decision'—where to be hospitalized—and that further decisions concerning his treatment are relatively insulated from competitive effect").

argue that Plaintiffs have not plausibly explained why the boundaries of the remaining markets would be the same as the acute-care inpatient hospital services market. (*See* Doc. 58, pp. 14–16.) The Court disagrees. Plaintiffs emphasize in their Third Amended Complaint that, while "one might expect some minor variations" between the geographic dimensions of the different relevant markets, Southern Brevard County's "unique geography" and population dynamics make those dimensions coincide in this case. (*See* Doc. 57, ¶¶ 96–97.) Although sparse, those allegations are sufficiently plausible to survive a motion to dismiss, especially considering that "Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases." *Spanish Broad. Sys.*, 376 F.3d at 1070; *see also Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001) (collecting cases for the proposition that courts should "hesitate to grant motions to dismiss" for failure to plead a relevant market). Moreover, Plaintiffs' geographic allegations provide Defendants with notice and concrete boundaries for discovery purposes.

Accordingly, Defendants' motion to dismiss Plaintiffs' attempted monopolization claims for failure to adequately define the relevant markets is due to be denied.

### C.   Conspiracy

Defendants additionally move to dismiss Counts VII and VIII of the Third Amended Complaint—which claim conspiracies to restrain trade in and to monopolize the relevant markets (*see* Doc. 57, ¶¶ 367–92)—for failure to allege a plausible conspiracy. (*See* Doc. 58, pp. 16–19.) According to Defendants, the group boycott allegations that underlie Plaintiffs' conspiracy claims demonstrate only "parallel conduct" between the Health First's subsidiaries and the independent physicians who stopped referring patients

to Plaintiffs; there are no "further circumstances pointing toward a meeting of the minds" that would support a conspiracy claim. (*See id.* at 18 (quoting *Twombly*, 550 U.S. at 557).)

Plaintiffs' group-boycott allegations include the following: Over multiple encounters, representatives from Health First, including Defendants Senne and Means, expressly informed Plaintiffs that inclusion in HF Health Plans' provider network was conditioned upon exclusively referring patients to Health First's subsidiaries. (*See* Doc. 57, ¶¶ 154–57, 194, 207.) The representatives further emphasized that physicians who were included in HF Health Plans' provider network were "*not*" to refer patients to excluded practice groups or their members. (*See id.* ¶¶ 157, 213–14.) Members of excluded practice groups would be admitted into HF Health Plans' provider network and would be eligible for referrals from Health First's subsidiaries only if they left the excluded group and joined one that was more "friendly" or "loyal" to Health First—that is, "one in which the physicians had entered into exclusivity arrangements." (*See id.* ¶¶ 154, 156, 224–25.) Health First's representatives specifically named MIMA as an example of an independent but "friendly" practice group. (*See id.* ¶¶ 146, 156, 225.) When Plaintiffs refused to enter into exclusive referral arrangements, HF Health Plans excluded them from its provider network and, shortly thereafter, MIMA and other independent in-network providers stopped referring patients to them. (*See id.* ¶¶147, 215, 226, 234, 243, 252.)

Plaintiffs insist (*see* Doc. 64, pp. 7–9), and the Court agrees, that their meetings with Health First's representatives, coupled with their subsequent exclusion from HF Health Plans' provider network and "blacklisting" by its in-network providers (*see* Doc. 57, ¶ 138), plainly provide "context that raises a suggestion of a preceding

agreement" to boycott physicians who refuse to enter into exclusive referral arrangements with Health First. *Twombly*, 550 U.S. at 557. That context provides enough "heft" to plausibly allege a conspiracy and not merely parallel action. *See id.* Defendants' motion to dismiss for failure to plausibly allege a conspiracy is therefore due to be denied.

## II.  State Law Claims

### A.  FDUTPA

Plaintiffs' FDUTPA claims incorporate the allegations from their antitrust claims and assert, *inter alia*, that violations of the latter constitute *per se* violations of the former. (*See* Doc. 57, ¶¶ 9, 393–95.) Defendants do not dispute that point, but they contend that, because the antitrust claims should be dismissed based on the arguments addressed above, so too should the FDUTPA claims. (*See* Doc. 58, p. 19.) The Court's rejection of Defendants' antitrust arguments therefore compels its rejection of their FDUTPA argument.[25]

Alternatively, Defendants argue that the FDUTPA claims should be dismissed as to Defendant HF Health Plans because it is exempt from suit under § 501.212(4)(a), Florida Statutes. (*See id.* at 20–21.) Section 501.212(4)(a) provides that FDUPTA "does not apply to . . . [a]ny person or activity regulated under laws administered by . . . The Office of Insurance Regulation of the Financial Services Commission." The applicability of that exemption turns on "the activity which is the subject of the lawsuit, and whether

---

[25] Defendants additionally argue that Plaintiffs will not be entitled to damages under FDUTPA because they will not be able to demonstrate "actual damages" under the statute. (*See* Doc. 58, pp. 19–20.) Regardless of its validity, that argument is not grounds for dismissal; Plaintiffs have requested declaratory and injunctive relief in addition to monetary damages. (*See* Doc. 57, ¶ 393.) The Court declines at the pleading stage to pass on which damages, if any, Plaintiffs will ultimately be entitled.

that activity is subject to the regulatory authority of the Office of Insurance Regulation."

*State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.*, 427 F. App'x 714, 723

(11th Cir. 2011), *rev'd on other grounds sub nom. State Farm Mut. Auto. Ins. Co. v.*

*Williams*, 563 F. App'x 665 (11th Cir. 2014). Defendants argue that, from HF Health Plans'

perspective, the activity at issue in this suit is "contracting with providers approved under

an insurance plan or a health maintenance organization," and as some aspects of that

activity are regulated by the Office of Insurance Regulation, HF Health Plans is exempt

from suit. (*See* Doc. 58, pp. 20–21 (citing Fla. Stat. §§ 627.64731, 627.6474, 627.6699(6),

641.2017, 641.315)).)

Defendants' characterization of the activity at issue in this suit is too narrow.

Broadly, Plaintiffs accuse HF Health Plans of playing a role in an attempt to create a

"vertically integrated, self-reinforcing, illegally maintained healthcare monopoly in

Southern Brevard County." (Doc. 57, ¶ 5.) More narrowly, Plaintiffs accuse

HF Health Plans of exploiting Health First's anticompetitive practices to gain a dominant

subscriber base and then excluding or threatening to exclude physicians from its provider

network if they refused to join HF Physicians or enter into exclusive dealing arrangements

with Health First's subsidiaries. (*See id.* ¶¶ 183–87.) None of the statutes to which

Defendants cite indicate that the Office of Insurance Regulation would regulate that

activity.[26] Accordingly, HF Health Plans does not fall within the § 501.212(4)(a)

---

[26] The sole possible exception may be § 627.6474(1), which prohibits insurers from
requiring a "contracted healthcare practitioner . . . to accept the terms of other health care
practitioner contracts with the insurer . . . as a condition of continuation or renewal of the
contract." That provision would arguably apply to conditioning an in-network provider's
contract renewal on the provider's agreement to enter into the exclusive dealing
arrangements that other in-network providers have already agreed to, if those
agreements are explicit. That provision, however, would plainly not apply to physicians

exemption, and Defendants' alternative motion is due to be denied.

## B. Tortious Interference

Defendants move to dismiss Plaintiffs' tortious interference claim for "indiscriminately" lumping multiple Defendants into a single count without delineating their separate and allegedly tortious conduct, which Defendants argue violates Rule 8. (*See* Doc. 58, p. 21–22.) Alternatively, they argue that any alleged interference with the physician Plaintiffs' relationships with their patients could not have been tortious because those relationships are terminable at will, and "an action for tortious interference will not lie where a party tortuously interferes with a contract that is terminable at will." (*See id.* at 22 n.15 (quoting *Bluesky Greenland Envtl. Solutions, LLC v. 21st Century Planet Fund, LLC*, 985 F. Supp. 2d 1356, 1367 (S.D. Fla. 2013)).)

First, Plaintiffs' tortious interference claims incorporate and rely on their "Common Scheme" allegations, which set out Defendants' alleged expansionary and exclusionary tactics (*see* Doc. 57, ¶¶ 124–68, 406), as well as their "Each Defendant Had a Role in the Scheme" allegations, which delineate, one by one, each Defendant's role in the "Common Scheme" (*see id.* ¶¶ 169–95, 408). Based on those incorporated allegations, the Court finds that Plaintiffs' use of the group term "Defendants" throughout the tortious interference count does not amount to impermissible lumping under Rule 8. As to their

---

like Dr. Grenevicki, a Plaintiff who "has never been allowed to participate as a provider in the HF Health Plans network," (*see* Doc. 57, ¶ 241), and thus even the most generous reading of § 627.6474(1) does not require dismissal of HF Health Plans. Moreover, that provision does not capture the coercive and collusive aspects of HF Health Plans' alleged activities. The remaining statutory provisions to which Defendants cite are inapposite, and some even suggest that those provisions were not intended to govern the activities at issue. *See, e.g.,* Fla. Stat. § 641.315(7) (stating that, when an insurer terminates a providers' contract, the notice of the reasons for that termination cannot be used as substantive evidence in any civil action).

second argument, Defendants omit the Florida law caveat that unjustified interference with a terminable-at-will relationship *is* tortious *unless* the interfering party has a "competition privilege." *See Bluesky*, 985 F. Supp. 2d at 1367; *see also Rudnick v. Sears, Roebuck & Co.*, 358 F. Supp. 2d 1201, 1205-06 (S.D. Fla. 2005) (collecting Florida cases for the proposition that interference with an at-will business relationship can be tortious). Defendants make no effort to demonstrate a "competition privilege" that is evident on the face of the Third Amended Complaint, and thus their second argument is rejected.[27] Accordingly, Defendants' motion to dismiss Plaintiffs' tortious interference claim is due to be denied.

### III.   Defendants Senne and Means

Plaintiffs name Senne and Means as Defendants in four counts: the two antitrust conspiracy counts, the FDUPTA count, and the tortious interference count. (Doc. 57, ¶¶ 367–422.) Defendants move to dismiss Senne and Means as Defendants in all of those claims. (Doc. 58, pp. 22–23.) According to Defendants, Plaintiffs have not made any allegations that would support individual liability for the claimed antitrust violations, the lack of individual liability for the antitrust claims precludes individual liability for the related FDUPTA claims, and Plaintiffs have not "state[d] a claim for tortious interference against Senne or Means because a corporate officer is not liable for tortious interference unless he acted outside of the scope of his employment or against the best interests of his corporation." (*See id.* at 23.)

---

[27] Defendants briefly raise a third argument against the tortious interference claim—that they are "interested parties" in Plaintiffs' relationships with their patients, competitors, and colleague—but they do not clarify why they would be interested parties in those relationships or how that interest should effect the Court's analysis. The Court therefore rejects Defendants' third argument as unsupported.

Regarding the antitrust claims, Plaintiffs have adequately alleged Defendants Senne and Means' active participation in the anticompetitive scheme, not merely by using their executive positions at Health First and its subsidiaries to authorize and approve the scheme, but also by personally attempting to coerce physicians and practice groups into exclusive referral arrangements or, alternatively, to persuade members of excluded practice groups to join a co-conspiring practice. (*See* Doc. 57, ¶¶ 114, 155, 157, 188–95, 207.) Those allegations suffice for individual antitrust liability. *See United States v. Wise*, 370 U.S. 405, 416 (1962) ("[A] corporate officer is subject to prosecution under § 1 of the Sherman Act whenever he knowingly participates in effecting the illegal contract, combination, or conspiracy—be he one who authorizes, orders, or helps perpetrate the crime—regardless of whether he is acting in a representative capacity."). As Plaintiffs' individual antitrust allegations are adequate, so too are their corresponding individual FDUTPA allegations.

As to the tortious interference claims, Defendants argue based on *Rudnick*, 358 F. Supp. 2d at 1206–07, and *Sloan v. Sax*, 505 So. 2d 526, 528 (Fla. 3d DCA 1987), that "a corporate officer is not liable for tortious interference unless he acted outside of the scope of his employment or against the best interests of his corporation." (Doc. 58, p. 23.) That argument overextends *Rudnick* and *Sax*, which hold only that a corporate agent is not, for tortious interference purposes, considered a third party to a contract between the corporation and a plaintiff unless that agent interferes with the contract for reasons that are harmful to the corporation. *See Rudnick*, 358 F. Supp. 2d at 1206; *Sax*, 505 So. 2d at 527–28. The doctrine addressed in *Rudnick* and *Sax* typically applies "in the context of a managerial or supervisory employee terminating a plaintiff's

employment," in which case a tortious interference claim "will usually not lie against the terminating employee because he/she is considered a party to the employment relationship." *Rudnick*, 358 F. Supp. 2d at 1206. By contrast, the doctrine does not apply here, where Senne and Means are accused of, *inter alia*, interfering with relationships between independent physician practice groups and their employees—relationships in which Health First, Senne, and Means were in no way parties. Defendants' tortious interference argument is therefore rejected, and their motion to dismiss Senne and Means from this action is due to be denied.

## IV.   Plaintiffs Boone and PASF

Finally, Defendants move to dismiss the claims of Plaintiffs C. Hamilton Boone and PASF for lack of supplemental jurisdiction. (*See* Doc. 58, pp. 2–3.) In Plaintiffs' Second Amended Complaint, Boone and PASF joined the remaining Plaintiffs in their antitrust claims, which presented a federal question. (*See* Doc. 21, ¶¶ 19, 22, 254–87.) After the Court dismissed the Second Amended Complaint without prejudice (*see* Doc. 54), Plaintiffs filed the now-operative Third Amended Complaint, in which Boone and PASF join only in the state-law FDUPTA and tortious interference claims (*see* Doc. 57, ¶¶ 393–422). Relying on *Pintando v. Miami-Dade Housing Agency*, 501 F.3d 1241, 1243–44 (11th Cir. 2007), Defendants contend that the Court lacks supplemental jurisdiction over Boone and PASF because they no longer assert any federal claims from which to anchor their supplemental state-law claims.[28] (*See* Doc. 58, pp. 2–3.)

*Pintando* is inapposite to this action. In *Pintando*, a *single* plaintiff initially brought

---

[28] Plaintiffs do not assert that the Court has diversity jurisdiction over this action. (*See* Doc. 57, ¶ 37.)

a Title VII claim, over which the district court had federal question jurisdiction pursuant to 28 U.S.C. § 1331, as well as several state-law claims, over which the court had supplemental jurisdiction pursuant to 28 U.S.C. § 1367. *See* 501 F.3d at 1242. After the litigation had progressed for a time, the plaintiff voluntarily amended his complaint under Rule 15(a) to drop the Title VII claim, leaving only his state-law claims at issue. *See id.* On review, the Eleventh Circuit held that the plaintiff's voluntary dismissal of the Title VII claim divested the district court of any independent basis for federal jurisdiction, and thus the district court was required to dismiss the remaining state-law claims for lack of supplemental jurisdiction. *See id.* at 1243–44.

Boone and PASF's claims differ from Mr. Pintando's in two important respects. First, they did not *voluntarily* dismiss their antitrust claims under Rule 15(a); the Court dismissed them under Rule 12(b)(6). (*See* Doc. 54.) Under the latter circumstances, district courts have discretion to continue to exercise supplemental jurisdiction under 28 U.S.C. § 1367.[29] *See Bayshore Ford Trucks Sales, Inc. v. Ford Motor Co.*, 299 F. App'x 943, 944 (11th Cir. 2008) (holding that the *Pintando* mandatory-dismissal rationale does not apply when a plaintiff's federal claims are involuntarily dismissed under Rule 12(b)(6)). Second, and more importantly, unlike *Pintando*, other Plaintiffs remain in this action with active federal claims. If at least one named plaintiff can independently invoke a district court's federal jurisdiction and the remaining plaintiffs' presence in the action does not destroy that jurisdiction, then the court may exercise supplemental

---

[29] The Court recognizes that its dismissal without prejudice left Boone and PASF the option to refile their antitrust claims, but in the absence of authority distinguishing dismissals with prejudice from those without, the Court declines to afford that distinction controlling weight.

jurisdiction over related claims from the remaining plaintiffs. *See Exxon Mobil Corp. v. Allapattah Servs. Inc.*, 545 U.S. 546, 566–67 (2005) (holding that a district court sitting in diversity could exercise supplemental jurisdiction over plaintiffs whose claims concededly could not meet the amount in controversy requirement because at least one plaintiff's claim could); *see also Lindsay v. Gov't Emp. Ins. Co.*, 448 F.3d 416, 423 (D.C. Cir. 2006) (holding that *Allapattah* permits courts with federal question jurisdiction over at least one plaintiff to exercise supplemental jurisdiction over plaintiffs who cannot present a federal question but can assert related state-law claims). Plaintiffs Boone and PASF allege that they were unlawfully "blacklisted" by Health First's facilities, HF Physicians, and MIMA for drawing attention to the declining quality of treatment that Defendants' anticompetitive scheme was causing. (*See* Doc. 57, ¶¶ 254–59.) The Court finds that those allegations share a common enough nucleus of operative fact with this action's remaining federal claims for it to be appropriate to exercise supplemental jurisdiction over them despite Boone and PASF's lack of independent federal claims.

### V.    More Definite Statement

As an alternative to dismissal, Defendants move pursuant to Rule 12(e) for a more definite statement. (*See* Doc. 58, pp. 24–25.) More definite statements are appropriate only where a pleading is "so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e).

The 101-page, 422-paragraph tome filed as the Third Amended Complaint, while perhaps not a model of clarity, sets out in great detail the factual basis for Plaintiffs' allegations (*see* Doc. 57, ¶¶ 1–10, 44–168, 260–90), the parties involved (*see id.* ¶¶ 11–33), the Defendants' separate roles in the alleged scheme (*see id.* ¶¶ 169–98), the

Plaintiffs' individual harms (*see id.* ¶¶ 199–259), and the facts, parties, and law pertinent to each claim (*see id.* ¶¶ 291–422). Those allegations more than suffice to notify Defendants of Plaintiffs' claims and permit them to file a responsive pleading. Ordering a more definite statement would only serve to prolong the already protracted pleading process in this action, likely resulting in even more pages and paragraphs. Defendants' motion for a more definite statement is therefore due to be denied.

### CONCLUSION[30]

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendants' Joint Motion to Dismiss Third Amended Complaint or, in the Alternative, for a More Definite Statement and Incorporated Memorandum of Law (Doc. 58) is **DENIED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on January 21, 2015.

ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record

---

[30] Any remaining arguments raised in Defendants' motion to dismiss but not expressly addressed in this Order are rejected.