# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

OMNI HEALTHCARE INC., et al.,

              Plaintiffs,

vs.                              **Case No.: 6:13cv1509-RBD-DAB**

HEALTH FIRST, INC., et al.,

              Defendants.

_____/

## JOINT PROPOSED JURY INSTRUCTIONS

| INDEX | | | |
|---|---|---|---|
| No. | Title | Source(s) | Objection/Basis |
| 1 | Basic Instructions – Introduction | 11th Cir. Pattern 3.1 | |
| 2 | Duty to Follow Instructions – Corporate Party Involved | 11th Cir. Pattern 3.2.2 | |
| 3 | Consideration of Direct and Circumstantial Evidence; Argument of Counsel; Comments by the Court | 11th Cir. Pattern 3.3 | |
| 4 | Credibility of Witnesses | 11th Cir. Pattern 3.4 | |
| 5 | Impeachment of Witnesses Because of Inconsistent Statements | 11th Cir. Pattern 3.5.1 | |
| 6 | Expert Witness – When Expert Fees Represent a Significant Portion of the Witness's Income | 11th Cir. Pattern 3.6.2 | |
| 7 | Responsibility for Proof – Plaintiff's Claims – Preponderance of the Evidence | 11th Cir. Pattern 3.7.1 | |
| 8 | Multiple Claims; Multiple Plaintiffs/Defendants | 7th Cir. Pattern 1.25 | Objections noted |
| 9 | Responsibility for Proof – Affirmative Defense – | 11th Cir. Pattern 3.7.2 | Objections noted |

|    | | | |
|----|---|---|---|
|    | Preponderance of the Evidence | | |
| 10 | Summary of Claims | | Objections noted |
| 11 | Purpose of Antitrust Laws | Adapted from Jury Instructions, *Masimo Corp. v. Tyco Health Care Grp.*, Case No. CV 02-4770 MRP (AJWx) (C.D. Cal. March 2005), *available at* http://apps.americanbar.org/antitrust/at-committees/at-trial/pdf/jury-instructions/jj-masimo.pdf; ; Eleventh Circuit Civil Pattern Jury Instruction 3.1 and 3.2, Antitrust Sherman Act Instructions (2011). | Objections noted |
| 12 | General Instruction on Relevant Markets | | Objections noted |
| 13 | Section 7 of the Clayton Act – Impermissible Merger | 3A Federal Jury Practice and Instructions – Civil § 150:131 – 135. | Objections noted |
| 14 | Section 2 of the Sherman Act – Monopolization | Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at C-2, C-4, C-6, C-7, C-13 to C-A-13, 19, C-26 to C-30, C-39 (2005 ed.). | Objections noted |
| 15 | Section 2 of the Sherman Act – Attempt to Monopolize | Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at A-13, C-6, C-7, C-13 to C-15, C-84 to C-85, C-88, C-90 to C-91, C-95 to C-96 (2005 ed.). | Objections noted |
| 16 | Transitional Instruction and Conspiracy | *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771-77 (1984*); Lockheed Martin Corp. v. Boeing Co.*, 390 F. Supp. 2d 1073, 1082-83 (M.D. Fla. 2005); *Microsoft Corp. v. Big Boy Distribution LLC*, 589 F. Supp. 2d 1308, 1323 (S.D. Fla. 2008) (applying Florida law); *Rivers v. Dillards Dept. Store*, 698 So. 2d 1328, 1333 (Fla. 1st DCA 1997); *Cedar Hills Props. Corp. v. E. Fed. Corp.*, 575 So. 2d 673, 676 (Fla. 1st DCA 1991). | Objections noted |
| 17 | Conspiracy Threshold | *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771-77 (1984*); Microsoft Corp. v. Big Boy Distribution LLC*, 589 F. Supp. 2d 1308, 1323 (S.D. Fla. 2008) (applying Florida law); *Rivers v. Dillards Dept. Store*, 698 So. 2d 1328, 1333 (Fla. 1st DCA 1997); *Cedar Hills Props. Corp. v. E. Fed. Corp.*, 575 So. 2d 673, 676 (Fla. 1st DCA 1991). | Objections noted |
| 18 | Acts by Corporate Agents | Kevin F. O'Malley, Jay E. Grenig, Hon. William C. Lee, FED-JI § 150:2, 3A Fed. Jury Prac. & Instr. § 150:2 (6th | |

| | | | |
|---|---|---|---|
| | | ed.) (Westlaw database updated Aug. 2015). | |
| 19 | Conspiracy Generally | *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771-77 (1984*); Lockheed Martin Corp. v. Boeing Co.*, 390 F. Supp. 2d 1073, 1082-83 (M.D. Fla. 2005); Kevin F. O'Malley, Jay E. Grenig, Hon. William C. Lee, FED-JI § 150:2, 3A Fed. Jury Prac. & Instr. § 150:20 (6th ed.) (Westlaw database updated Aug. 2015) (from Eleventh Circuit sample jury instruction) (modified). | |
| 20 | Section 1 of the Sherman Act – Contract, Combination, or Conspiracy in Restraint of Trade | Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at A-3, B-2 to B-4, B-10 to B-, B-50 to B-51 (2005 ed.). | Objections noted |
| 21 | Group Boycott - Elements of a Unlawful Horizontal Concerted Refusal to Deal | Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at B-50 to B-51 (2005 ed.). | Objections noted |
| 22 | Section 2 of the Sherman Act - Conspiracy to Monopolize the Relevant Market and Secondary Markets | Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at A-13, C-6, C-7, C-13 to C-14, C-15, C-100 to C-101, C-103 to C-104, C-105 to C-107 (2005 ed.); Eleventh Circuit Criminal Pattern Jury Instructions 13.1 (2010 ed.; Feb. 2016 revisions). | Objections noted |
| 23 | Conspiracy – Circumstantial Evidence | *Matsushita Elec. Indus. Co., Ltd., Zenith Radio Corp.*, 475 U.S. 574, 588, 597 n.21 (1986); *City of Tuscaloosa v. Harcros Chem., Inc.*, 158 F.3d 548, 570 (11th Cir. 1998); *Seagood Trading Corp. v. Jerrico*, Inc., 924 F.2d 1555, 1573-74 (11th Cir. 1991); *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 822 F. Supp. 2d 1201, 1209 (N.D. Ala. 2011). | Objections noted |
| 24 | Conspiracy – Economic Feasibility | *Matsushita Elec. Indus. Co., Ltd., Zenith Radio Corp.*, 475 U.S. 574, 587, 596-97 (1986); *City of Tuscaloosa v. Harcros Chem., Inc.*, 158 F.3d 548, 568 n. 21. | Objections noted |
| 25 | Transitional Instructions as to Defendants Means and Senne (Counts 7 and 8) | *United States v. Wise*, 370 U.S. 405, 416 (1962); *Omni Healthcare v. Health First*, 2015 WL 275806, at *15 (M.D. Fla. Jan. 22, 2015); *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841, 852 (N.D. Cal. 1979). | |

| 25 | Instructions as to Defendants Means and Senne (Count 7) | *United States v. Wise,* 370 U.S. 405, 416 (1962); *Omni Healthcare v. Health First,* 2015 WL 275806, at *15 (M.D. Fla. Jan. 22, 2015); *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.,* 467 F. Supp. 841, 852 (N.D. Cal. 1979) | Objection noted |
|---|---|---|---|
| 26 | Instructions as to Defendants Means and Senne (Count 8) | *United States v. Wise,* 370 U.S. 405, 416 (1962); *Omni Healthcare v. Health First,* 2015 WL 275806, at *15 (M.D. Fla. Jan. 22, 2015); *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.,* 467 F. Supp. 841, 852 (N.D. Cal. 1979) | |
| 27 | Transitional Instruction | Adapted from Jury Instructions, *Masimo Corp. v. Tyco Health Care Grp.,* Case No. CV 02-4770 MRP (AJWx) (C.D. Cal. March 2005), *available at* http://apps.americanbar.org/antitrust/at-committees/at-trial/pdf/jury-instructions/ji-masimo.pdf. | |
| 28 | Injury and Causation | Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at F-2 to F-5, F-7 (2005 ed.). | |
| 29 | Damages | Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at F-11, F-, F-15 to F-16, F-19 to F-20, F-27 to F-28, F-, F-47 to F-48, F-49 (2005 ed.); *Mendenhall v. Fleming Co.,* 504 F.2d 879, 881 (5th Cir. 1974); *Fla. Seed Co. v. Monsanto Co.,* 915 F. Supp. 1167, 1176 (M.D. Ala. 1995), *aff'd,* 105 F.3d 1372 (11th Cir. 1997); *see Associated Gen. Contractors of Cal., Inc. v. Cal. Stat. Council of Carpenters,* 459 U.S. 519, 533, n.25 (1983) | |
| 30 | Instructions as to Conspiracy Under Florida Law | *Microsoft Corp. v. Big Boy Distribution LLC,* 589 F. Supp. 2d 1308, 1323 (S.D. Fla. 2008) (applying Florida law); *Rivers v. Dillards Dept. Store,* 698 So. 2d 1328, 1333 (Fla. 1st DCA 1997); *Cedar Hills Props. Corp. v. E. Fed. Corp.,* 575 So. 2d 673, 676 (Fla. 1st DCA 1991).* | Objections noted |
| 31 | Conspiracy – Circumstantial Evidence (Florida law) | *Raimi v. Furlong,* 702 So. 2d 1273, 1284 (Fla. 1st DCA 1995) (citing *Diamond v. Rosenfeld,* 511 So. 2d 1031, 1034 (Fla. 4th DCA 1987), *rev. denied,* 520 So. 2d 586 (Fla. 1988)); Regions Bank v. Kaplan, CASE NO. 8:12-CV-1837-T-17MAP, 2016 WL 1592742, *4 (M.D. Fla. Apr. 19, 2016) (applying Florida law, citing *Raimi*); | |

| | | *see also Cohen v. Arvin*, 878 So. 2d 403 (Fla. 4th DCA 2004) (inference stacking is impermissible; original inference must be established to exclusion of all other reasonable inferences before another inference may be constructed from the first); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC*, No. 13-CIV-80371, 2015 WL 3905018, *23 (S.D. Fla. June 25, 2015) (applying Florida law, citing *Cohen*)). | |
|---|---|---|---|
| 32 | FDUTPA | Adapted from Jury Instructions, ECF No. 62 at 9-11, *Eugene v. 3DON & Partner Estate Grp., LLC*, Case No. 07-80439-CIV-HURLEY/HOPKINS (S.D. Fla. July 30, 2008); *Tippens v. Round Island Plantation L.L.C.*, 2009 U.S. Dist. LEXIS 66224, *41 (S.D. Fla. 2009); *Hetrick v. Ideal Image Dev. Corp.*, 2010 U.S. App. LEXIS 7831, at *18-19 (11th Cir. Apr. 15, 2010). | Objections noted |
| 33 | Tortious Interference with Advantageous Business Relationship | Adapted from Florida Standard Jury Instructions 408.2, 408.4, and 408.6. | Objections noted |
| 34 | Transitional Instructions as to Defendants Means and Senne (Counts 9 and 10) | *United States v. Wise,* 370 U.S. 405, 416 (1962); *Omni Healthcare v. Health First*, 2015 WL 275806, at *15 (M.D. Fla. Jan. 22, 2015); *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841, 852 (N.D. Cal. 1979) | Objections noted |
| 35 | Instructions as to Defendants Means and Senne (Count 9) | *United States v. Wise,* 370 U.S. 405, 416 (1962); *Omni Healthcare v. Health First*, 2015 WL 275806, at *15 (M.D. Fla. Jan. 22, 2015); *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841, 852 (N.D. Cal. 1979) | Objections noted |
| 36 | Instructions as to Defendants Means and Senne (Count 10) | *United States v. Wise,* 370 U.S. 405, 416 (1962); *Omni Healthcare v. Health First*, 2015 WL 275806, at *15 (M.D. Fla. Jan. 22, 2015); *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841, 852 (N.D. Cal. 1979) | Objections noted |
| 37 | Affirmative Defense – Statute of Limitations | Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at G-2 (2005 ed.). | |
| 38 | Affirmative Defense – Equitable Estoppel | *State v. Harris*, 881 So. 2d 1079, 1984 (Fla. 2004); Marc A. Wites, *Florida Causes of Action*, § 18:120.1 (2012). *See also State ex. rel. Watson v. Gray*, 48 So. 2d 84, 87 (Fla. 1950) (The | |

| | | | |
|---|---|---|---|
| | | doctrine of estoppel is applicable in all cases where by word, act, or conduct one party willfully causes another party to believe the existence of a certain state of things and thereby induces the other party to act on that belief in a manner that results in injury.); *Pelican Island Prop. Owners Ass'n, Inc., v. Murphy*, 554 So. 2d 1179, 1181 (Fla. 2d DCA 1989) (Estoppel based on silence can exist where the parties do not have equal knowledge of the facts or the same means of ascertaining that knowledge.); *Rinker Materials Corp. v. Palmer First Nat'l Bank & Trust Co. of Sarasota*, 361 So. 2d 156, 159 (Fla. 1978) (generally, need proof of fraud, misrepresentation or affirmative deception); *Rubman v. Honig*, 817 So. 2d 1001, 1002 (4th DCA 2002). (Silence when there is a duty to speak should estop assertion of a right that otherwise may have existed.). | |
| 39 | Affirmative Defense – Waiver | *Jonas v. City of West Palm Bch.*, 79 So. 438 (Fla. 1918); *Cullum v. Packo*, 947 So. 2d 533, 537 (Fla. 1st DCA 2006); Marc A. Wites, *Florida Causes of Action*, § 18:220.1 (2012). *See Am. Somax Ventures v. Touma*, 547 So. 2d 1266, 1268 (Fla. 4th DCA 1989) (when waiver is implied, the conduct must make out a clear case); Marc A. Wites, *Florida Causes of Action*, § 18:220.5, n.1 (2012). | |
| 40 | Duty to Deliberate When Only the Plaintiff Claims Damages | Eleventh Circuit Civil Pattern Jury Instruction 3.8.1. | |
| 41 | Election of Foreperson; Explanation of Verdict Forms | Eleventh Circuit Civil Pattern Jury Instruction 3.9. | |

**JURY INSTRUCTION 1** – Basic Instructions – Introduction

Members of the jury:

It's my duty to instruct you on the rules of law that you must use in deciding this case.

When I have finished, you will go to the jury room and begin your discussions, sometimes called deliberations.

**Source:** Eleventh Circuit Civil Pattern Jury Instruction 3.1.

**JURY INSTRUCTION 2** – Duty to Follow Instructions – Corporate Party Involved

Your decision must be based only on the evidence presented here.  You must not be influenced in any way by either sympathy for or prejudice against anyone.

You must follow the law as I explain it—even if you do not agree with the law—and you must follow all of my instructions as a whole.  You must not single out or disregard any of the instructions on the law.

The fact that a corporation is involved as a party must not affect your decision in any way.  A corporation and all other persons stand equal before the law and must be dealt with as equals in a court of justice.  When a corporation is involved, of course, it may act only through people as its employees; and, in general, a corporation is responsible under the law for the acts and statements of its employees that are made within the scope of their duties as employees of the company.

**Source:** Eleventh Circuit Civil Pattern Jury Instruction 3.2.2.

**JURY INSTRUCTION 3** – Consideration of Direct and Circumstantial Evidence; Argument of Counsel; Comments by the Court

You must consider only the evidence that I have admitted in the case. Evidence includes the testimony of witnesses and the exhibits admitted.  But, anything the lawyers say is not evidence and isn't binding on you.

You shouldn't assume from anything I've said that I have any opinion about any factual issue in this case.  Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision about the facts.

Your own recollection and interpretation of the evidence is what matters.

In considering the evidence you may use reasoning and common sense to make deductions and reach conclusions.  You shouldn't be concerned about whether the evidence is direct or circumstantial.

"Direct evidence" is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness.

"Circumstantial evidence" is proof of a chain of facts and circumstances that tend to prove or disprove a fact.  There's no legal difference in the weight you may give to either direct or circumstantial evidence.

**Source:** Eleventh Circuit Civil Pattern Jury Instruction 3.3.

**JURY INSTRUCTION 4** – Credibility of Witnesses

When I say you must consider all the evidence, I don't mean that you must accept all the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part. The number of witnesses testifying concerning a particular point doesn't necessarily matter.

To decide whether you believe any witness I suggest that you ask yourself a few questions:

- Did the witness impress you as one who was telling the truth?

- Did the witness have any particular reason not to tell the truth?

- Did the witness have a personal interest in the outcome of the case?

- Did the witness seem to have a good memory?

- Did the witness have the opportunity and ability to accurately observe the things he or she testified about?

- Did the witness appear to understand the question clearly and answer them directly?

- Did the witness's testimony differ from other testimony or other evidence?

**Source:** Eleventh Circuit Civil Pattern Jury Instruction 3.4.

**JURY INSTRUCTION 5 –** Impeachment of Witnesses Because of Inconsistent Statements

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact.  And ask whether there was evidence that at some other time a witness said or did something, or didn't say or do something, that was different from the testimony the witness gave during the trial.

But keep in mind that a simple mistake doesn't mean a witness wasn't telling the truth as he or she remembers it.  People naturally tend to forget some things or remember them inaccurately.  So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception.  The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

**Source:** Eleventh Circuit Civil Pattern Jury Instruction 3.5.1.

**JURY INSTRUCTION 6** – Expert Witness – When Expert Fees Represent a Significant Portion of the Witness's Income

When scientific, technical or other specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about the matter.

But that doesn't mean you must accept the witness's opinion.  As with any other witness's testimony, you must decide for yourself whether to rely upon the opinion.

When a witness is being paid for reviewing and testifying concerning the evidence, you may consider the possibility of bias and should view with caution the testimony of such witness where court testimony is given with regularity and represents a significant portion of the witness's income.

**Source:** Eleventh Circuit Civil Pattern Jury Instruction 3.6.2.

**JURY INSTRUCTION 7 –** Responsibility for Proof – Plaintiffs' Claims – Preponderance of the Evidence

In this case it is the responsibility of the Plaintiffs to prove every essential part of their claims by a "preponderance of the evidence."   This is sometimes called the "burden of proof" or the "burden of persuasion."

A "preponderance of the evidence" simply means an amount of evidence that is enough to persuade you that the Plaintiff's claim is more likely true than not true.

If the proof fails to establish any essential part of a claim or contention by a preponderance of the evidence, you should find against the Plaintiff making that claim.

When more than one claim is involved, as is the case here, you should consider each claim separately.

In deciding whether any fact has been proved by a preponderance of the evidence, you may consider the testimony of all of the witnesses, regardless of who may have called them, and all of the exhibits received in evidence, regardless of who may have produced them.

If the proof fails to establish any essential part of the Plaintiff's claim by a preponderance of the evidence, you should find for the Defendant or Defendants as to that claim.

**Source:** Eleventh Circuit Civil Pattern Jury Instruction 3.7.1.

**DEFENDANTS' JURY INSTRUCTION 8 –** Multiple Claims; Multiple Plaintiffs/Defendants

You must give separate consideration to each claim and each party in this case. Although there are six Defendants, it does not follow that if one is liable, any of the others is also liable. Likewise, although there are 13 Plaintiffs, it does not follow that if one is successful, the others are, too.

In considering a claim against a Defendant, you must not consider evidence admitted only against other Defendants or only as to other claims.

**Source:** Seventh Circuit Pattern Jury Instruction 1.25.


**PLAINTIFFS' POSITION:**

**This instruction should be eliminated. It is not an Eleventh Circuit instruction and does not accurately state the law. Most of the conduct in this case is relevant to multiple claims, and agency principles permit the jury to find a Health First entity vicariously liable for the violations of another Health First entity. *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 622 F. Supp. 2d 890, 899 (N.D. Cal. 2009); *Transamerica Leasing, Inc. v. La Republica de Venezuela,* 200 F.3d 843, 849 (D.C.Cir.2000); Restatement (Third) of Agency, § 1.01.**

**DEFENDANTS' POSITION:**

**This is a complex case with 13 Plaintiffs and 6 defendants with 9 claims. The jury needs to be instructed on how to handle the complexity of matching evidence from each Plaintiff to each Defendant on each claim. It is inappropriate to allow the jury to believe that they can look at the Plaintiffs as a single group and the Defendants as a single entity for all purposes.**

**JURY INSTRUCTION 9** – Responsibility for Proof – Affirmative Defense – Preponderance of the Evidence

In this case, the Defendants assert the statute of limitations as an affirmative defenses, which is addressed in the instructions below.  Defendants also assert the affirmative defenses of waiver and estoppel with respect to their state law claims. Even if the Plaintiffs prove a claim by a preponderance of the evidence, the Defendants can prevail in this case on applicable claims if they prove this affirmative defense by a preponderance of the evidence.

When more than one affirmative defense is involved, as is the case here, you should consider each one separately.

I caution you that the Defendants do not have to disprove the Plaintiffs' claims, but if the Defendants raise an affirmative defense, the only way they can prevail on that specific defense is if they prove that defense by a preponderance of the evidence.

**Source:** Eleventh Circuit Civil Pattern Jury Instruction 3.7.2.

**DEFENDANTS' JURY INSTRUCTION 10** – Summary of Claims

This case involves nine different claims.

The first seven claims are antitrust claims brought by the following Plaintiffs: OMNI, SOAR, Drs. Craig Deligdish, Brian Dowdell, Richard Gayles, Stan Golovac, Lance Grenevicki, Aleksander Komar, Scott Seminer, the Institute of Facial Surgery, and Florida Pain.   So the next seven claims I describe are brought by these 11 Plaintiffs. The alleged relevant geographic market for all these claims is Southern Brevard County.

First, these Plaintiffs claim that Health First, Inc., and Health First Physicians violated Section 7 of the Clayton Act through an impermissible acquisition of  with MIMA.

Second, these Plaintiffs claim that Health First, Inc. and Holmes Regional Medical Center violated Section 2 of the Sherman Act through monopolization of the inpatient acute care hospital services market.

Third, these Plaintiffs claim that Health First, Inc. and Health First Physicians violated Section 2 of the Sherman Act by attempting to monopolize the physician services market.

Fourth, these Plaintiffs claim that Health First, Inc., Holmes Regional Medical Center, and Health First Physicians violated Section 2 of the Sherman Act by attempting to monopolize the ancillary services market.

Fifth, these Plaintiffs claim that Health First, Inc. and Health First Health Plans violated Section 2 of the Sherman Act by attempting to monopolize the Medicare Advantage insurance market.

As to claims Counts 1 through 4 and 6, I instruct you that Mr. Means and Mr. Senne are not defendants in them, so you may not render a verdict one way or the other as to Mr. Means or Mr. Senne on these five claims or counts.

Sixth, these Plaintiffs claim that all the Defendants, including Mr. Means and Mr. Senne, violated Section 1 of the Sherman Act by participating in a conspiracy in restraint of trade with an independent group of physicians, MIMA, prior to the acquisition of the assets of MIMA.

Seventh, these Plaintiffs claim that all the Defendants, including Mr. Means and Mr. Senne, violated Section 2 of the Sherman Act by conspiring with MIMA to monopolize one or more of the following markets: acute care inpatient hospital services, physician services, ancillary services, or Medicare Advantage plans.

There are two other claims at issue.  These are brought by the Plaintiffs I listed earlier, as well as Plaintiffs Hamilton Boone and Physician Assistant Services, LLC.

All Plaintiffs claim that all Defendants, including Mr. Means and Mr. Senne, violated Florida's Deceptive and Unfair Trade Practices Act by conspiring with MIMA to engage in all of the conduct alleged above.

All Plaintiffs claim that all Defendants, including Mr. Means and Mr. Senne, conspired with MIMA to tortiously interfere with Plaintiffs' business relationships.

Defendants deny these claims.


**PLAINTIFFS' JURY INSTRUCTION 10** – Summary of Claims

This case involves nine different claims.

The first seven claims are antitrust claims brought by the following Plaintiffs: OMNI, SOAR, Drs. Craig Deligdish, Brian Dowdell, Richard Gayles, Stan Golovac, Lance Grenevicki, Aleksander Komar, Scott Seminer, the Institute of Facial Surgery, and Florida Pain.  So the next seven claims I describe are brought by these 11 Plaintiffs. The alleged relevant geographic market for all these claims is Southern Brevard County.

First, these Plaintiffs claim that Health First, Inc., and Health First Physicians violated Section 7 of the Clayton Act through an impermissible acquisition of MIMA.

Second, these Plaintiffs claim that Health First, Inc. and Holmes Regional Medical Center violated Section 2 of the Sherman Act through monopolization of the inpatient acute care hospital services market.

Third, these Plaintiffs claim that Health First, Inc. and Health First Physicians violated Section 2 of the Sherman Act by attempting to monopolize the physician services market.

Fourth, these Plaintiffs claim that Health First, Inc., Holmes Regional Medical Center, and Health First Physicians violated Section 2 of the Sherman Act by attempting to monopolize the ancillary services market.

Fifth, these Plaintiffs claim that Health First, Inc. and Health First Health Plans violated Section 2 of the Sherman Act by attempting to monopolize the Medicare Advantage insurance market.

As to claims Counts 1 through 4 and 6, I instruct you that Mr. Means and Mr. Senne are not defendants in them, so you may not render a verdict one way or the other as to Mr. Means or Mr. Senne on these five claims or counts.

Sixth, these Plaintiffs claim that all the Defendants, including Mr. Means and Mr. Senne, violated Section 1 of the Sherman Act by participating in a conspiracy in restraint of trade with an independent group of physicians, MIMA, prior to the acquisition of the assets of MIMA. Plaintiffs also allege that Defendants' requirement that participating providers refer only to other in-network providers constitutes an unreasonable restraint of trade.

Seventh, these Plaintiffs claim that all the Defendants, including Mr. Means and Mr. Senne, violated Section 2 of the Sherman Act by conspiring to monopolize one or more of the following markets: acute care inpatient hospital services, physician services, ancillary services, or Medicare Advantage plans.

There are two other claims at issue.  These are brought by the Plaintiffs I listed earlier, as well as Plaintiffs Hamilton Boone and Physician Assistant Services, LLC.

All Plaintiffs claim that all Defendants, including Mr. Means and Mr. Senne, violated Florida's Deceptive and Unfair Trade Practices Act through all of the conduct alleged above.

All Plaintiffs claim that all Defendants, including Mr. Means and Mr. Senne, tortiously interfered with Plaintiffs' business relationships.

Defendants deny these claims.

**PLAINTIFFS' POSITION:**

**This instruction clarifies that Plaintiffs' state law claims are in no way limited to a conspiracy with MIMA, as Defendants insist. Plaintiffs' state-law counts in the Third Amended Complaint specifically allege numerous instances of unilateral conduct and incorporate numerous additional instances of unilateral conduct as violating state law, including ALL OF PLAINTIFFS' ANTITRUST COUNTS.  Doc. 57 at ¶¶397–422. Do Defendants seriously contend that Plaintiffs should not be permitted to prove their claims by way of conduct that was specifically enumerated and incorporated in their state law counts? This is an astonishing position to say the least.**

**Defendants themselves have waived their eleventh-hour position in any event by failing to raise this argument previously and by instead arguing in their summary judgment papers based on non-conspiracy conduct. *See, e.g.*, Doc. 204 at 27–28 (arguing that termination of contracts was justified and therefore not tortious interference). This instruction also clarifies that Plaintiffs challenge Defendants' in-network referral requirement as an agreement in restraint of trade.**

**The in-network referral conspiracy was clearly alleged in the complaint and articulated by the Court in its order denying the motions to dismiss, as discussed in Plaintiffs' trial brief. Whether such requirements are commonplace does not determine whether they are lawful. The cases cited by Defendants do not stand for the proposition that in-network referral requirements are lawful. In *Levine*, the court held that the restraint could not be condemned under the rule of reason where the plaintiff offered no evidence of either actual or potential anticompetitive effects, or of market power. 72 F.3d 1538, 1551 (11th Cir. 1996). Each of those considerations is in sharp contrast to the facts of this case. *Retina Associates*, also cited by Defendants, involved allegations that sought to expand the meaning of a group boycott to encompass a joint venture. 105 F.3d at 1379. Joint ventures are evaluated under the rule of reason. *Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 596 F. Supp. 1231, 1252 (S.D. Fla. 1984), *aff'd*, 779 F.2d 592 (11th Cir. 1986). Moreover, the Plaintiff in *Retina Associates* had specifically declined an offer to participate in the joint venture. 105 F.3d at 1379. Defendants here do not contend that the MIMA conspiracy was part of any joint venture or ancillary to any procompetitive purpose.**

**DEFENDANTS' POSITION:**

Plaintiffs' 11th-hour attempts to portray routine, in-network referral policies as somehow violative of the antitrust laws should not be permitted.  This theory was not pled and has no place in the jury instructions or in the verdict form.

Plaintiffs' "in-network conspiracy" theory is that doctors cannot agree with Health First to refer patients with Health First insurance to other doctors or hospitals that also accept Health First insurance.  The Eleventh Circuit has rejected the claim that this common arrangement between health insurance plans and participating doctors is an unlawful conspiracy under Section 1 of the Sherman Act.  *See Levine v. Central Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1549-53 (11th Cir. 1996) (affirming summary judgment on Section 1 claim challenging agreement between health insurer Healthchoice and doctors who accepted Healthchoice's insurance plan to refer Healthchoice patients to other doctors who accepted Healthchoice insurance); *see also Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc*., 105 F.3d 1376, 1381-1383 (1997).  As in *Levine*, Plaintiffs here offer no evidence of any anticompetitive effects or of market power in the physician services market, the ancillary services market, the private insurance market, or the Medicare Advantage market.

Finally, the Third Amended Complaint clearly pleads that the state law claims are conspiracy-based. *See* Third Amended Complaint ("TAC"), D.E. 57, ¶¶ 406, 408-420 (tortious interference allegations based on conspiracy or "Defendants' common scheme"); *id.* ¶¶ 380-381, 383-386 ("common scheme" allegations re: FDUTPA).  Plaintiffs' opposition to Defendants' motion to dismiss confirmed that their state law claims were based solely on allegations of a conspiracy.  Plaintiffs Opposition to Defendants' Motion to Dismiss, D.E. 64 at 15 ("Plaintiffs' tortious interference claims rest on the Defendants' conspiracy.  Under Florida law, conspiracy for tortious interference requires a combination of two or more person, having a common purpose, seeking to accomplish the underlying tort of interference."); *id.* at 14 (regarding FDUTPA:  "The same business practices that Plaintiffs allege violate the federal antitrust laws—*e.g.*, excluding doctors and physician assistants for refusing to support Defendants' anticompetitive scheme—can also be characterized as "unfair").

**DEFENDANTS' JURY INSTRUCTION 11 –** Purpose of the Antitrust Laws

The purpose of the antitrust laws is to preserve free and unfettered competition in the marketplace. The antitrust laws rest on the core belief that competition produces the highest quality of goods and services at the lowest prices, and the greatest material progress for the greatest number of people. But the law does not guarantee success to those who enter into business because it also recognizes that in the natural operation of our economic system, some competitors are going to lose business, or even go out of business, while others gain and prosper.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at A-2 (2005 ed.); Eleventh Circuit Civil Pattern Jury Instruction 3.1 and 3.2, Antitrust Sherman Act Instructions (2011).

**PLAINTIFF'S JURY INSTRUCTION 11 –** Purpose of the Antitrust Laws

The purpose of the Antitrust laws is to preserve free and unfettered competition in the marketplace. The antitrust laws rest on the core belief that competition produces the highest quality of goods and services at the lowest prices, and the greatest material progress for the greatest number of people.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at A-2 (2005 ed.).

**PLAINTIFFS' POSITION:**

**This instruction eliminates the last sentence of Defendants' instruction, which is their own self-serving addition to the ABA model instruction. While what they have added may be true, it does not reflect the PURPOSE of the antitrust laws, which is what the instruction is about. The former 11th Circuit instruction cited by Defendants is no longer part of the 11th Circuit Pattern Jury Instructions. Moreover, the cases cited by Defendants discuss the competitive process, which is the focus of Plaintiffs' proposed instruction.**

**DEFENDANTS' POSITION:**

**The final sentence proposed by Defendants is verbatim from the most recent 11th Circuit Pattern Jury Instructions provided for the Sherman Act in 2011. (The current 11th Circuit Pattern Jury Instructions, from 2013, do not include Sherman Act instructions.)  The purpose of the antitrust laws is to protect competition, not individual competitors.  *Brown Shoe Co. v. United***

*States*, 370 U.S. 294, 320 (1962); *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws … were enacted for 'the protection of competition not competitors.') (citing *Brown Shoe*). Accordingly, the instruction proposed by Defendants here is consistent with both Supreme Court and Eleventh Circuit law regarding the purpose of the antitrust laws.  *E.g.*, *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288 (11th Cir. 2004) ("In order for a practice to be exclusionary, it must harm the competitive *process* and thereby harm consumers.  Harm to one or more *competitors* will not suffice for a § 2 violation") (emphasis in original); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065 (11th Cir. 2004) ("In alleging the anticompetitive effect of the defendant's conduct, an antitrust plaintiff must show harm to competition rather than to competitors.  That is, the 'anticompetitive effects' are measured by their impact on the market rather than by their impact on competitors."); *Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 145 F.3d 1258 (11th Cir. 1998) ("A plaintiff who alleges unfair competition must prove injury to *competition* in order to sustain a federal antitrust claim.  In other words, as courts have repeatedly stated, the antitrust laws are intended to protect competition, not competitors.") (emphasis in original).

**DEFENDANTS' JURY INSTRUCTION 12.** General Instruction on Relevant Markets.

One of the terms about which you will hear the lawyers and witnesses talk about is "relevant market" The antitrust laws are directed toward the preservation of competition, and the definition of relevant markets is helpful in measuring competition and evaluating the effects of conduct on competition within the confines of an economically meaningful market.   Determination of the relevant product market is a necessary predicate to determination of several of Plaintiffs' claims in this case:

(1) whether the acquisition of the assets of MIMA by Health First Physicians, Inc., in 2013 violated Section 7 of the Clayton Act;
(2) whether Health First, Inc.,. and Holmes Regional Medical Center, Inc. monopolized the market for inpatient acute care hospital services in Southern Brevard County;
(3) whether the Defendants (other than Mr. Senne and Mr., Means) attempted to monopolize the markets for physician services, ancillary services and Medicare Managed insurance in Southern Brevard County.

I will separately instruct you on the elements of each of those claims later.

But, at the outset, it is necessary for you to determine the products or services that are involved in each claim and the geographic area of effective competition for each product or service.

Relevant Product Market

Generally, a relevant product or service market is defined to encompass all products or services that compete with or are reasonable substitutes for the product or service directly affected by the challenged conduct.  For instance, if a merger involves two producers of aluminum foil, it may be appropriate to define the relevant product market to include not only aluminum foil, but also plastic wrap if consumers would use plastic wrap as a reasonable substitute for aluminum foil.

The definition of the relevant product market, however, is ultimately a practical exercise, and there is no absolute prohibition to defining a product or service market to include non-substitutes if the product or service market definition reflects commercial realities. A product or service market that includes non-substitutes is sometimes referred to as a "cluster market."  Cluster markets are

comprised of products or services which are not substitutes, but should nevertheless be "clustered" together into a single market to reflect commercial realities, such as a preference to purchase services together.  For instance, businesses may prefer for reasons of convenience or efficiency to have a single financial institution provide all of their commercial banking services, like lending, checking, and payroll processing.  Those services may not compete with one another or may not represent reasonable substitutes for one another. Factors you may consider in determining whether the product or service market defined by Plaintiffs reflects commercial realities include whether the services are complementary in nature and preferences of purchasers to receive the services from a common source.

Plaintiffs contend that the relevant product markets in this case are several cluster markets consisting of: (a) inpatient acute care hospital services" and separately, "physician services" in Count 1; (b) "inpatient acute care hospital services" in Count 2; (c) "physician services" in Count 3; and (d) "ancillary services" in Count 4. Plaintiffs also allege a market for "Medicare Advantage insurance" in Count 6 that is not a "cluster market."

Defendants deny that the market for physician services is an appropriate product market because a doctor in one type of medical specialty may not be an acceptable substitute for a doctor in another medical specialty.  For example, Defendants point out that a cardiologist may not be a good substitute for a brain surgeon.  They also argue that many physicians do not practice as part of a multi-specialty group.  Defendants also deny that ancillary services is an appropriate market because those services (like durable medical equipment, home health services, pharmacy services, clinical lab services, rehab services and fitness centers) are not substitutes for each other, and are frequently purchased from separate providers.  Defendants also deny that Medicare Advantage insurance is a separate market because consumers can, and often do, annually switch from Medicare Advantage to traditional Medicare coverage.

Relevant Geographic Market

After you have determined the relevant product market, you must next determine the relevant geographic market.

The relevant geographic market is the area in which the defendant faces competition from other firms that compete in the relevant product market, and to which buyers or sellers can reasonably turn for purchases or sales. For example,

the relevant geographic market for ice cream sold at retail is the area in which a buyer of ice cream would reasonably turn for substitutes if, for instance, one brand of ice cream has been priced substantially above competitive levels. Evidence might show that consumers generally will not drive more than 10 minutes for an alternative supply of that brand of ice cream. In that case, it may be appropriate to define a geographic market encompassing only the area that could be reached in a 10-minute drive.

The Plaintiffs contend that the relevant geographic market is Southern Brevard County. The Defendants contend that this geographic market definition is too narrow for some of the relevant products and should include a larger area for some of those services to include other parts of Brevard County or in some cases parts of nearby counties. The Plaintiffs have the burden of proving the relevant geographic market by a preponderance of the evidence.

In determining whether the Plaintiffs have met their burden and demonstrated that their proposed relevant geographic market definition is more likely proper than not, you may consider several factors, including:

- the geographic area in which the Defendants and Plaintiffs draw patients and where patients are located;
- the geographic area to which patients could turn for alternative or substitute services; and
- whether governmental licensing requirements have the effect of limiting competition in certain areas.

**PLAINTIFFS' JURY INSTRUCTION 12.** General Instruction on Relevant Markets.

One of the terms about which you will hear the lawyers and witnesses talk about is "relevant market." The antitrust laws are directed toward the preservation of competition, and the definition of relevant markets is helpful in measuring competition and evaluating the effects of conduct on competition within the confines of an economically meaningful market.  Determination of the relevant product market is a necessary predicate to determination of several of Plaintiffs' claims in this case:

(1) whether the acquisition of the assets of MIMA by Health First Physicians, Inc., in 2013 violated Section 7 of the Clayton Act;

25

(2) whether Health First, Inc. and Holmes Regional Medical Center, Inc. monopolized the market for inpatient acute care hospital services in Southern Brevard County;

(3) whether the Defendants (other than Mr. Senne and Mr., Means) attempted to monopolize the markets for physician services, ancillary services and Medicare Managed insurance in Southern Brevard County.

I will separately instruct you on the elements of each of those claims later.

But, at the outset, it is necessary for you to determine the products or services that are involved in each claim and the geographic area of effective competition for each product or service.

Relevant Product Market

Generally, a relevant product or service market is defined to encompass all products or services that compete with or are reasonable substitutes for the product or service directly affected by the challenged conduct. For instance, if a merger involves two producers of aluminum foil, it may be appropriate to define the relevant product market to include not only aluminum foil, but also plastic wrap if consumers would use plastic wrap as a reasonable substitute for aluminum foil.

The definition of the relevant product market, however, is ultimately a practical exercise, and there is no obstacle to defining a product or service market to include non-substitutes if the product or service market definition reflects commercial realities. A product or service market that includes non-substitutes is sometimes referred to as a "cluster market." Cluster markets are comprised of products or services which are not substitutes, but should nevertheless be "clustered" together into a single market to reflect commercial realities, such as a preference to purchase services together. For instance, businesses may prefer for reasons of convenience or efficiency to have a single financial institution provide all of their commercial banking services, like lending, checking, and payroll processing. Those services may not compete with one another or may not represent reasonable substitutes for one another. Factors you may consider in determining whether the product or service market defined by Plaintiffs reflects commercial realities include whether the services are complementary in nature; preferences of purchasers to receive the services from a common source; and whether the products or services are affected economically in similar ways by market forces or the challenged conduct.

Plaintiffs contend that the relevant product markets in this case are several cluster markets consisting of: (a) inpatient acute care hospital services" and separately, "physician services" in Count 1; (b) "inpatient acute care hospital services" in Count 2; (c) "physician services" in Count 3; and (d) "ancillary services" in Count 4. Plaintiffs also allege a market for "Medicare Advantage insurance" in Count 6 that is not a "cluster market."

Defendants deny that the market for physician services is an appropriate product market because a doctor in one type of medical specialty may not be an acceptable substitute for a doctor in another medical specialty.  For example, Defendants point out that a cardiologist may not be a good substitute for a brain surgeon. They also argue that many physicians do not practice as part of a multi-specialty group. Defendants also deny that ancillary services is an appropriate market because those services (like durable medical equipment, home health services, pharmacy services, clinical lab services, rehab services and fitness centers) are not substitutes for each other, and are frequently purchased from separate providers.  Defendants also deny that Medicare Advantage insurance is a separate market because consumers can, and often do, annually switch from Medicare Advantage to traditional Medicare coverage.

Relevant Geographic Market

After you have determined the relevant product market, you must next determine the relevant geographic market.

The relevant geographic market is the area in which the defendant faces competition from other firms that compete in the relevant product market, and to which buyers or sellers can reasonably turn for purchases or sales. For example, the relevant geographic market for ice cream sold at retail is the area in which a buyer of ice cream would reasonably turn for substitutes if, for instance, one brand of ice cream has been priced substantially above competitive levels. Evidence might show that consumers generally will not drive more than 10 minutes for an alternative supply of that brand of ice cream. In that case, it may be appropriate to define a geographic market encompassing only the area that could be reached in a 10-minute drive.

The Plaintiffs contend that the relevant geographic market is Southern Brevard County. The Defendants contend that this geographic market definition is too narrow for some of the relevant products and should include a larger area for some of those services to include other parts of Brevard County or in some cases

parts of nearby counties. The Plaintiffs have the burden of proving the relevant geographic market by a preponderance of the evidence.

In determining whether the Plaintiffs have met their burden and demonstrated that their proposed relevant geographic market definition is more likely proper than not, you may consider several factors, including:

- the geographic area in which the Defendants and Plaintiffs draw patients and where patients are located;
- the geographic area to which patients could turn for alternative or substitute services;
- whether governmental licensing and regulatory requirements have the effect of limiting competition in certain areas;
- the testimony of participants in the market as to what they consider to be the geographic area in which they could obtain substitutes for the services in question; and
- the Defendants' own statements and documents regarding the geographic in which they compete with respect to the services in question.

**PLAINTIFFS' POSITION:**

**This instruction adds to the factors for determining a cluster market "whether the products or services are affected economically in similar ways by market forces or the challenged conduct," which is supported by *U.S. v. American Tel. and Tel Co.*, 524 F.Supp. 1336, 1376 (D.D.C. 1981) (approving cluster market in part because anticompetitive conduct affected whole range of products similarly). This does not amount, as Defendants argue, to defining the market based on the challenged conduct. Rather, the conduct must generate similar economic effects across the proposed market in order for this factor to support the proposed market definition. This instruction also adds factors that the jury may consider in evaluating Plaintiffs' proposed geographic market. These factors are supported by common sense, ABA model antitrust instruction C-14, and *Chicago Bridge & Iron Co. N.V. v. F.T.C.*, 534 F.3d 410, 421 (5th Cir. 2008) ("CB&I's and PDM's *own documents* confirmed that they focused almost exclusively on each other in assessing competition and paid little or no attention to other companies.") (emphasis added).**

**DEFENDANTS' POSITION:**

**In their first sentence under the heading "Relevant Product Market," Plaintiffs seek to instruct the jury that the relevant market is defined as "products or services that compete with or are reasonable substitutes for the product or service directly affected by the challenged conduct." This is incorrect. The relevant product market cannot be defined based on "the challenged conduct," as Plaintiffs contend.** *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.***, 124 F.3d 430, 438-39 (3d Cir. 1997).**

**JURY INSTRUCTION 13**– Section 7 of the Clayton Act – Impermissible Merger

(**Count 1**)

In Count 1, Plaintiffs OMNI, SOAR, Drs. Craig Deligdish, Brian Dowdell, Richard Gayles, Stan Golovac, Lance Grenevicki, Aleksander Komar, Scott Seminer, the Institute of Facial Surgery, and the Pain Institute claim that Defendants Health First, Inc. and Health First Physicians violated Section 7 of the Clayton Act through the acquisition of the assets of MIMA.

**Plaintiffs' Proposed Intervening Instruction – Statute Defining the Claim**

Section 7 of the Clayton Act provides as follows:

[N]o person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

**PLAINTIFFS' POSITION:**

**Providing the text of the statute will assist the jury in understanding the law and is the approach used in 3A Fed. Jury Prac. & Instr. (*see, e.g.*, § 150:120).**

**DEFENDANTS' POSITION:**

**Reading the text of the statute is unnecessary as it is redundant with the instructions, will not likely be understood by the jury, and adds text to already very long instructions.**

There are three elements involved in determining whether Defendants Health First, Inc. and Health First Physicians, Inc. violated Section 7 of the Clayton Act:

**First**, determination of the relevant line or lines of commerce—the relevant product market;

**Second,** determination of the relevant section of the country—the relevant geographic market; and

**Third,** determination of the likely anticompetitive effects of the acquisition of the assets of MIMA in the relevant product and geographic markets.

**Source:** 3A Federal Jury Practice and Instructions – Civil § 150:131.

## Element 1: Relevant Product Market

The Plaintiffs contend that the acquisition of the assets of MIMA by Health First Physicians, Inc. violated Section 7 of the Clayton Act by substantially lessening competition or tending to create a monopoly in two separate product markets, the market for inpatient acute care hospital services and, separately, the market for physician services. Defendants deny that "physician services" is a relevant product market and that the acquisition of the assets of MIMA had any anticompetitive effect on either the market for inpatient acute care hospital services or the market for any physician service. I have previously instructed you as to the determination of relevant product markets.

## Element 2: Relevant Geographic Market Section of the Country

In this case, Plaintiffs contend that the relevant geographic market for the inpatient hospital acute care market and the physician services market is Southern Brevard County. Defendants contend that the relevant geographic markets may be different for each type of hospital or physician service, some markets being larger than Southern Brevard County.

**Source:** 3A Federal Jury Practice and Instructions – Civil § 150:133.

## Defendants' Element 3: Effect of Acquisition

Having determined the relevant market, you must decide whether the effect of the acquisition of the assets of MIMA by Defendants may be substantially to lessen competition or may tend to create a monopoly in that relevant market.

The determination of this question will establish whether or not this acquisition was a violation of Section 7 of the Clayton Act. This determination must be made in light of several factors: (1) the primary index of legality is the

31

market share of the acquired and acquiring companies and (2) the extent of concentration in the industry.  An acquisition that produces a firm controlling an undue percentage of the relevant market and resulting in a significant increase in concentration is presumptively unlawful, unless Defendants can overcome this presumption by other evidence to establish the vigor of competition or affirmative justifications in support of the acquisition.

Section 7 of the Clayton Act may be violated by either showing a reasonable probability of substantial lessening of competition in the future or by showing a substantial lessening of competition that has already occurred.

As I shall instruct you later, it is each Plaintiff's burden to establish that whatever injury that Plaintiff claims to have suffered is the direct and proximate result of such violation of law, if any, that you may find—namely, that the Plaintiff was injured by the actual or by the probable lessening of competition or tendency toward creation of a monopoly.

**Source:** 3A Federal Jury Practice and Instructions – Civil § 150:134.

## Plaintiffs' Element 3: Effect of Acquisition

Having determined the relevant market, you must decide whether the effect of the acquisition of the assets of MIMA by defendants may be substantially to lessen competition or may tend to create a monopoly in that relevant market.

The determination of this question will establish whether or not this acquisition was a violation of Section 7 of the Clayton Act.  This determination must be made in light of the degree to which the acquisition may increase barriers to entry into the market or reduce competition by (1) preventing competitors or potential competitors from accessing a sufficient volume of patients to compete effectively; or (2) preventing competing physicians from  participating in a substantial portion of the market; or (3) preventing actual or potential competitors from participating in a substantial portion of the market if they are not vertically integrated.
A violation of Section 7 of the Clayton Act may be shown either by demonstrating a reasonable probability of substantial lessening of competition in the future or by showing a substantial lessening of competition that has already occurred.

As I shall instruct you later, it is each Plaintiff's burden to establish that whatever injury that Plaintiff claims to have suffered is the direct and proximate

result of such violation of law, if any, that you may find—namely, that the Plaintiff was injured by the actual or by the probable lessening of competition or tendency toward creation of a monopoly.

**Source:** 3A Federal Jury Practice and Instructions – Civil § 150:134.

## PLAINTIFFS' POSITION:

**This instruction replaces the factors Defendants list as the primary indices of the competitive effects of a merger (which are those associated with a horizontal merger) with the factors courts recognize as relevant to evaluation of a vertical merger. These factors are supported by *Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 673 (S.D.N.Y. 2002); *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, No. 97 CIV. 5499 (DNE), 2000 WL 264295, at \*25 (S.D.N.Y. Mar. 9, 2000); *Brown Shoe Co. v. United States*, 370 U.S. 294, 328-333 (1962); and *Fruehauf Corp. v. F.T.C.*, 603 F.2d 345, 352 (2d Cir.1979). To the extent Defendants argue vertical merger challenges are not recognized by the Eleventh Circuit, "[a]ll mergers are within the reach of s 7, and all must be tested by the same standard, whether they are classified as horizontal, vertical, conglomerate." *F.T.C. v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967). "The Supreme Court in analyzing vertical mergers has looked to the extent of foreclosure and its relation to the structure of the market. In *Standard Oil Co. of California v. United States* . . . and *F.T.C. v. Motion Picture Advertising Serv. Co.*, . . . the Court held that the standard of legality is determined by the degree of market foreclosure." *Columbia Broad. Sys., Inc. v. F.T.C.*, 414 F.2d 974, 980 (7th Cir. 1969). The fact that a vertical merger instruction has not been given in the Eleventh Circuit does not entitle Defendants to disregard the law of vertical mergers in drafting an instruction.**

## DEFENDANTS' POSITION:

**The cases cited above are not precedent in the 11th Circuit and there is no support for the requested instruction on a "vertical merger" in the 11th Circuit.  More importantly, the facts do not support a "vertical merger" since the assets of MIMA were acquired by another physician group, Health First Physicians, Inc., not a hospital or health plan.**

*Mere Acquisition Not a Violation*

The mere acquisition by one corporation of the assets of another, even though it results in some lessening of competition, is not forbidden.  The Clayton Act prohibits only such acquisition as in reasonable likelihood will result in a substantial lessening of competition in the relevant market.

**Source:** 3A Federal Jury Practice and Instructions – Civil § 150:135.

**JURY INSTRUCTION 14** – Section 2 of the Sherman Act – Monopolization

**(Count 2)**

In the next count, Plaintiffs OMNI, SOAR, Drs. Craig Deligdish, Brian Dowdell, Richard Gayles, Stan Golovac, Lance Grenevicki, Aleksander Komar, Scott Seminer, the Institute of Facial Surgery, and the Pain Institute claim that they were each injured by Health First, Inc. and Holmes Regional Medical Center's unlawful monopolization of the market for inpatient hospital services in Southern Brevard County.

### Plaintiffs' Proposed Intervening Instructions:

### Statute Defining the Claim

Section 2 of the Sherman Act makes it unlawful to "monopolize . . . any part of the trade or commerce among the several States."

**PLAINTIFFS' POSITION:**

**Again, providing the text of the statute will help the jury understand the law and is the approach of certain model instructions.**

**DEFENDANTS' POSITION**

**Reading the text of the statute is unnecessary as it is redundant with the instructions, will not likely be understood by the jury, and adds text to already very long instructions.**

To prevail on this claim, each Plaintiff must prove, even if by common proof, each of the following elements by a preponderance of the evidence with respect to Defendants Health First, Inc. and Holmes Regional Medical Center, Inc.:

**First**, that the alleged relevant market, inpatient acute care hospital services in Southern Brevard County, is a valid antitrust market;

**Second**, that the Defendants possessed monopoly power in that market;

**Third**, that the Defendants "willfully" acquired or maintained monopoly power in that market by engaging in anticompetitive conduct;

and

**Fourth,** that the Plaintiff was injured in its business or property because of the Defendants' anticompetitive conduct.

If you find that a given Plaintiff has failed to prove each and every one of these elements, then you must find for the Defendant and against that Plaintiff on that Plaintiff's claim.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at C-2 (2005 ed.).

## Element 1: Relevant Market

In order to prevail on their monopolization claims, each of the Plaintiffs must prove the existence of a relevant product or service market and relevant geographic markets, even if by common proof. I have already provided you with the instructions on how to determine such relevant markets in Jury Instruction Nos. __ through __.

In this claim, Plaintiffs contend that the relevant market is the market for acute inpatient hospital services in Southern Brevard County.   By contrast, the Defendants assert the market contains both inpatient and outpatient services.

## Element 2: Monopoly Power

If you find that the Plaintiff has proven a relevant market, then you should determine whether Defendants have monopoly power in that market.

## PLAINTIFFS' *Monopoly Power Defined*

Monopoly power is the power to control prices or exclude competition in a relevant antitrust market. More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time or exclude competitors from the market. Monopoly power may be shown either indirectly, by reference to market share and structural features of the market, or directly, for example through evidence of quality below competitive levels,

prices above competitive levels, or the exclusion of competitors from the market. However, monopoly power, in and of itself, is not unlawful. Rather, the Defendants must have acquired or maintained their monopoly power by engaging in anticompetitive conduct. Anticompetitive conduct is conduct, other than competition on the merits, that has the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market.

**DEFENDANTS'** *Existence of Monopoly Power*

Plaintiffs allege that Defendants Health First and Holmes Regional Medical Center have monopoly power. If the evidence establishes that either of these two defendants have the power to control prices or to exclude competition in the relevant market, then you may conclude that the Defendants have monopoly power in that relevant market.

### DEFENDANTS' *Market Share*

The first factor that you should consider is each Defendant's market share.

A market share above 50 percent may in some cases be sufficient to support an inference that a Defendant has monopoly power, but in considering whether that Defendant has monopoly power it is also important to consider other aspects of the relevant market, such as market share trends, the existence of barriers to entry, the entry and exit by other companies, and the number and size of competitors.  Along with each Defendant's market share, these factors should inform you as to whether the Defendant has monopoly power.  The likelihood that a company has monopoly power is stronger the higher that company's share is above 50 percent.

### PLAINTIFFS' *Market Share*

The first factor that you should consider is each Defendant's market share.

A market share above 50 percent may in some cases be sufficient to support an inference that a Defendant has monopoly power, but in considering whether that Defendant has monopoly power it is also important to consider other aspects of the relevant market, such as market share trends, the existence of barriers to entry, the entry and exit by other companies, and the number and size of competitors.  Along with each Defendant's market share, these factors should inform you as to whether the Defendant has monopoly power.  The likelihood that a company has monopoly power is stronger the higher that company's share is above 50 percent.

A market share below 50 percent is ordinarily not sufficient to support a conclusion that the Defendant has monopoly power. However, if you find that the other evidence demonstrates that the Defendant does, in fact, have monopoly power despite having a market share below 50 percent, you may conclude that the Defendant has monopoly power.

## PLAINTIFFS' POSITION

**This instruction adds back in the final sentence in the ABA model instruction, which Defendants deleted from their own previous draft of this instruction. The portion removed by Defendants is supported by many decisions. *See, e.g., Yoder Bros. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1367 n.19 (5th Cir. 1976) (citing *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203 (5th Cir. 1969)); *Valley Liquors, Inc. v. Renfield Importers*, 822, F.2d 656, 667 (7th Cir. 1987); *Hayden Publ'g Co. v. Cox Broad Corp.*, 730 F.2d 64, 69 n.7 (2d Cir. 1984); *Broadway Delivery Corp. v. United Parcel Serv.*, 651 F.2d 122, 130 (2d. Cir. 1981). *Bailey v. Allgas*, cited by Defendants was a Robinson–Patman Act case, not a monopolization case.**

## DEFENDANTS' POSITION:

**The cases cited by Plaintiffs are not controlling law in the 11th Circuit.  In this Circuit, "[a] market share at or less than 50% is inadequate as a matter of law to constitute monopoly power."  *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1250 (11th Cir. 2002) (citing *Yoder Bros., Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1368 (5th Cir. 1976) and *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1000 (11th Cir. 1993)).**

### *Market Share Trends*

The trend in the Defendant's market share is something you may consider. An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

### *Barriers to Entry*

You may also consider whether there are barriers to entry into the relevant market.  Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way.  Barriers to entry might include state licensing or regulatory requirements, significant capital costs associated with entering the market, and the reputation of companies already participating in the market.

Evidence of low or no entry barriers may be evidence that the Defendant does not have monopoly power, regardless of the Defendant's market share, because new competitors could enter easily if defendant attempted to raise prices for a substantial period of time.  By contrast, evidence of high barriers to entry along with high market share may support an inference that the Defendant has monopoly power.

### Entry and Exit by Other Companies

The history of entry and exit in the relevant market may be helpful to consider.  Entry of new competitors or expansion of existing competitors may be evidence that the defendant lacks monopoly power.  On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that the Defendant has monopoly power.

### Number and Size of Competitors

You may consider whether the Defendants' competitors are capable of effectively competing.  In other words, you should consider whether the financial strength, market shares, and number of competitors act as a check on the Defendants' ability to price its products.  If the Defendants' competitors are vigorous or have large or increasing market shares, this may be evidence that the Defendant lacks monopoly power.  On the other hand, if you determine that the Defendant's competitors are weak or have small or declining market shares, this may support an inference that the Defendant has monopoly power.

If you find that the Defendant has monopoly power in the relevant market, then you must consider the remaining elements of this claim.  If you find that the Defendant does not have monopoly power, then you must find for the Defendant and against the Plaintiff on this claim.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at C-4, C-16 to C-19 (2005 ed.).

## Element 3: Willful Acquisition or Maintenance of Monopoly Power and Anticompetitive Conduct

The next element each Plaintiff must prove is that the Defendant willfully acquired or maintained monopoly power through anticompetitive acts or practices. Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market.   Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition.   In addition, you should distinguish the acquisition or maintenance of monopoly power through anticompetitive acts from the acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, which is not unlawful.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws.  A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws.  A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine.  This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In determining whether a Defendant's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

For example, suppose there are five firms that make printers for home computers and that these printers comprised a relevant product market. Suppose also that Firm A developed a more efficient manufacturing process that allowed it to sell profitably at a lower price than its competitors. If Firm A grew its market share and achieved monopoly power by selling profitably at a lower price, it would not be unlawful for Firm A to achieve monopoly power in this way. Developing

more efficient processes and developing the ability to sell profitably at lower prices is competition on the merits and benefits consumers, and it therefore is not anticompetitive conduct even if it has a negative effect on competitors. Similarly, in the same example, suppose Firm B developed and patented a revolutionary new printer and consumers so preferred Firm B's printer that Firm B achieved monopoly power. It would not be unlawful for Firm B to achieve monopoly power in this way. Firm B "built a better mousetrap," which is competition on the merits and benefits consumers, and it therefore is not anticompetitive conduct.

By contrast, in the same example, suppose not only that Firm C makes printers, but also that Firm C possesses a monopoly in the market for computers and that there are barriers to entry in the computer market such that no other firm will be able to enter that market. Suppose also that Firm C altered its computers in such a way that only Firm C's printers would work with its computers, and that the alteration does not improve the design of Firm C's computers or provide any benefits to competition or consumers—the only effect of the alteration is to exclude competing printer makers from the marketplace. If Firm C thereby prevented its printer competitors from competing and achieved monopoly power, it would be unlawful for Firm C to achieve monopoly power in the printer market in this way.

If you find that the Plaintiff has proven by a preponderance of the evidence that the Defendant willfully acquired or maintained monopoly power through anticompetitive acts, then you must consider whether the Plaintiff has proved the remaining elements of this claim.  If, however, you find that the Plaintiff did not prove this element by a preponderance of the evidence, then you must find for the Defendant and against the Plaintiff on this claim.

### PLAINTIFFS' Monopolization -- Business Justification

If you find that the Plaintiffs have shown that, more likely than not, the Defendants' conduct was anticompetitive, then you must consider whether the Defendants' conduct also had a legitimate, procompetitive business justification. To be legitimate, the justification must not be pretextual. In other words, if you find that the business justification offered by the Defendants was not the true reason for their conduct but rather that the Defendants were motived primarily by anticompetitive intent, then you should disregard that justification as pretextual.

Any business justification must be a form of competition on the merits because it involves, for example, conduct that increased efficiency or

benefitted competition. A procompetitive business purpose is one that benefits competition such as by promoting efficiency or quality or offering a better product or service. If you find that the Defendants presented evidence of a business justification, the Plaintiffs may rebut that showing by demonstrating that the justification the Defendants offer was not the true reason for their conduct or that the justification does not on balance have procompetitive benefits.

If you determine that the Defendants had a business justification for their conduct, you must determine whether the anticompetitive effect of the Defendants' conduct outweighed the procompetitive benefits of that conduct. When you evaluate this balance, you may consider whether less restrictive means were available to the Defendants to accomplish the alleged procompetitive benefit of its conduct, and whether those other means would have been less harmful to competition. If the anticompetitive effect of the Defendants' conduct outweighs the procompetitive benefit, the proffered business justification for the conduct in question is not a defense to the Plaintiffs' monopolization claims. If, on the other hand, the procompetitive benefit of the Defendants' conduct outweighs the anticompetitive harm of that conduct, then you must find for the Defendants on the monopolization claim.

### PLAINTIFFS' POSITION

**Plaintiffs agree that both Plaintiffs' "Business Justification" instruction and the Defendants' "Unilateral Refusal to Deal" instruction should be given if the first two paragraphs of Defendants' instruction ("As stated before . . . deal with them.") are deleted. These paragraphs are Defendants' additions to the ABA model instructions and do not correctly state the law or Plaintiffs' positions. Otherwise, Plaintiffs' "Business Justification" instruction should replace Defendants' Unilateral Refusal to Deal instruction below. Plaintiffs' "Business Justification" instruction is the jury instruction used in *Hynix Semiconductor, Inc. v. Rambus, Inc., 2008 WL 1907912* (N.D. Cal. Mar. 26, 2008). This instruction more closely fits the law and allegations applicable in this case. Health First's instruction below fails to match the law to the facts because:**

1) **it incorrectly presumes that Plaintiffs predicate their monopolization claims only on refusals to deal, which Plaintiffs have made clear in their summary judgment briefing and at the summary judgment hearing is incorrect, and**

**2) it makes no mention of the law on pretextual business justifications, which is one of the core issues the jury will have to decide.**

**DEFENDANTS' POSITION:**

**Both the Plaintiffs' "Business Justification" instruction and the Defendants' "Unilateral Refusal to Deal" instruction should be given.  Inclusion of Defendants' "Unilateral Refusal to Deal" instruction does not imply that it is Plaintiffs' sole claim, and Plaintiffs' cannot claim that their claim is not predicated, at least in part, on Health First's refusal to deal; as such, a "Unilateral Refusal to Deal" instruction is warranted.**

**DEFENDANTS' Unilateral Refusal to Deal**

As stated before, one of the elements the Plaintiffs must prove is that the Defendants engaged in anticompetitive conduct.  Plaintiffs claim that this element may be satisfied in this case because some of them claim that the Defendants unlawfully refused to deal with them.

Ordinarily, a company may deal or refuse to deal with whomever it pleases, as long as it acts independently.  Even a company with monopoly power in a relevant market has no general duty to cooperate with its business rivals and ordinarily may refuse to deal with them.

Plaintiffs contend that Defendants Health First, Health First Physicians, Inc. and Health First Health Plans have refused to deal with them in certain ways.  Each of those Defendants has introduced evidence that its refusal to deal with some of the Plaintiffs was based on what they say were legitimate business purposes.  A refusal to deal that is designed to protect or further the legitimate business purposes of the Defendant does not violate the antitrust laws, even if that refusal injures competitors.  In general the desire to maintain monopoly power or to block entry of competitors is not a legitimate business purpose.  A legitimate business purpose is one that benefits the actor regardless of any harmful effect on competitors, such as a purpose to promote efficiency or quality, offer a better product or service, or increase short-run profits.  Thus, only a refusal to deal that harms the Defendant's independent interests and makes sense only to obtain or maintain monopoly power is not based on legitimate purposes.  A refusal to deal that is based in part on legitimate business reasons, even if it is also motivated by the desire to harm competitors, does not violate the antitrust laws.  It is up to you to determine

whether each Defendant's refusal to deal was motivated by legitimate business purposes or whether it was designed solely to obtain or maintain monopoly power.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at C-39 (2005 ed.).

**JURY INSTRUCTION 15**– Section 2 of the Sherman Act – Attempt to Monopolize

(**Counts 3, 4, & 6**)

Plaintiffs OMNI, SOAR, Craig Deligdish, Brian Dowdell, Richard Gayles, Stan Golovac, Lance Grenevicki, Aleksander Komar, Scott Seminer, the Institute of Facial Surgery, and the Pain Institute have brought three separate claims for attempted monopolization of various markets.

First, these Plaintiffs claim that Health First, Inc. and Health First Physicians violated Section 2 of the Sherman Act by attempting to monopolize the physician services market.

Second, these Plaintiffs claim that Health First, Inc., Holmes Regional Medical Center, and Health First Physicians violated Section 2 of the Sherman Act by attempting to monopolize the ancillary services market.

Third, these Plaintiffs claim that Health First, Inc. and Health First Health Plans violated Section 2 of the Sherman Act by attempting to monopolize the Medicare Advantage Market.

**Plaintiffs' Proposed Intervening Instruction: Statute Defining the Claim**

Section 2 of the Sherman Act makes it unlawful to "attempt to monopolize . . . any part of the trade or commerce among the several States."

**PLAINTIFFS' POSITION**

**Again, providing the text of the statute will help the jury understand the law and is the approach of certain model instructions.**

**DEFENDANTS' POSITION:**

**Reading the text of the statute is unnecessary as it is redundant with the instructions, will not likely be understood by the jury, and adds text to already very long instructions.**

To prevail on each claim of attempted monopolization, the Plaintiffs must prove, each of the following elements by a preponderance of the evidence:

**First**, that the Defendants engaged in anticompetitive conduct;

**Second**, that the Defendants had a specific intent to achieve monopoly power in the relevant market;

**Third**, that there was a dangerous probability that the Defendants would achieve their goal of monopoly power in the relevant market;

and

**Fourth**, that the Plaintiff was injured in its business or property by the Defendants' anticompetitive conduct.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for the Defendant on that claim and against the Plaintiff on that Plaintiff's claim of attempted monopolization. If you find that the evidence is sufficient to prove all five elements as to a particular Defendant, then you must find for the Plaintiff and against the Defendant on that Plaintiff's claim of attempted monopolization.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at C-84 to C-85 (2005 ed.).

## Element 1: Anticompetitive Conduct

It is not sufficient for the Plaintiffs to prove that the Defendants intended to monopolize the relevant market. The Plaintiffs must also show that the Defendants engaged in anticompetitive conduct, coupled with an intent to monopolize and a dangerous probability that the Defendants would succeed.

You have previously received an instruction regarding what constitutes anticompetitive conduct. The same anticompetitive conduct that is required to support a monopolization claim is also required to establish a claim of attempted monopolization. Refer to Element 3 of Count 2 for these instructions.

### PLAINTIFFS' Refusal to Deal and Leveraging

Additionally, Plaintiffs claim that the element of anticompetitive conduct is satisfied in this case by the Defendants' use of anticompetitive conduct in combination with its monopoly power in the hospital market to obtain or maintain monopoly power in the physician services, ancillary services, and Medicare Advantage markets. For instance, Plaintiffs claim that Health First hospitals refuse to contract with competing Medicare Advantage plans in order to diminish the ability of Health First's competitors in the Medicare Advantage market to compete and that this harms Plaintiffs by restricting their access to insured patients since competing Medicare Advantage plans all insure far fewer individuals. Similarly, Plaintiffs allege that Health First used its monopoly power in the hospital market to steer referrals away from Plaintiffs and to Health First providers instead, in an effort to monopolize both the physician and ancillary services markets.

A firm that operates in different markets does not automatically violate the antitrust laws whenever it obtains a competitive advantage because of the cat that it operates in those different markets. This is true even if the firm enjoys a monopoly in one of those markets. To find that the Defendants used monopoly power in one market to attempt to monopolize another market, you must find that it used its monopoly power and anticompetitive conduct in order to do so, and not simply the benefit of operating a business that participates in related markets.

To establish that the Defendants engaged in anticompetitive conduct by leveraging its position from one market to another market, the Plaintiffs must prove the following:

First, that the leveraging market was a relevant market under the instructions you have received concerning relevant market;

Second, that the Defendants had monopoly power in the leveraging market;

Third, that the leveraged market was a separate relevant market;

Fourth, that the Defendants, through anticompetitive conduct, used monopoly power in the leveraging market in an attempt to monopolize the leveraged market; and

Fifth, that the Defendants had a dangerous probability of monopolizing the leveraged market.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at C-88 (2005 ed.).

## PLAINTIFFS' POSITION

This is the ABA model antitrust instruction at C-41 to C-43. Plaintiffs have alleged that Defendants engaged in monopoly leveraging. *See, e.g.*, Doc. 57 at paragraphs 5, 117–123. Defendants assert that the Eleventh Circuit has not approved the monopoly leveraging theory. *Aquatherm Indus., Inc. v. Florida Power & Light Co.,* 145 F.3d 1258, 1262 (11th Cir.1998), however, involved a standalone claim for monopoly leveraging, which is what the Eleventh Circuit remains agnostic about (it has not, as Defendants suggest, rejected even a standalone claim for monopoly leveraging as a matter of law). *Id.* That is not the case here. Plaintiffs offer evidence of monopoly leveraging in support of their monopolization claims. The anticompetitive harm associated with leveraging monopoly power is not in question in any circuit and as the court in *Cobb Theatres III, LLC v. AMC Entm't Holdings, Inc.*, 101 F. Supp. 3d 1319, 1342 (N.D. Ga. 2015), recently discussed, the Supreme Court has clearly articulated the competitive concerns of monopoly leveraging:

> A man with a monopoly of theatres in any one town commands the entrance for all films into that area. If he uses that strategic position to acquire exclusive privileges in a city where he has competitors, he is employing his monopoly power as a trade weapon against his competitors. It may be a feeble, ineffective weapon where he has only one closed or monopoly town. But as those towns increase in number throughout a region, his monopoly power in them may be used with crushing effect on competitors in other places.

*United States v. Griffith*, 334 U.S. 100, 107-08 (1948).

## DEFENDANTS' POSITION:

The 11th Circuit does not recognize monopoly leveraging as a cause of action under the antitrust laws. *See Morris Comm. Corp. v. PGA Tour, Inc.,* 117 F.Supp.2d 1322, 1330 (M.D. Fla. 2000) (citing *Aquatherm* and noting that "neither the Eleventh Circuit nor the Supreme Court has yet accepted the monopoly leveraging theory").

**Element 2: Specific Intent and Relevant Market**

The second element that the Plaintiffs must prove is that the Defendant had a specific intent to monopolize a relevant market. To do so, the Plaintiffs must prove the market it is talking about—that is, the physician services market, ancillary services market, or the Medicare Advantage market—is a relevant market for antitrust purposes. The Plaintiffs must then prove that the Defendant had a specific intent to monopolize that market. The Court will begin by instructing you on the relevant market, and the Court will then discuss specific intent. If the Plaintiff proves both that the market at issue is a relevant market and that the Defendant had a specific intent to monopolize that market, you must find that the Plaintiff has proven this element of its attempted monopolization claim and you should consider the other elements of the claim. If you find that the Plaintiff fails to prove either of these points, then you must find for the Defendant on the Plaintiff's attempted monopolization claim.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at C-90 (2005 ed.).

*Relevant Market – General*

There are two aspects you must consider in determining whether each Plaintiff has met its burden to prove the relevant market by a preponderance of the evidence. The first is the relevant product market; the second is the relevant geographic market.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at C-6 (2005 ed.).

*Relevant Product Market*

The instructions I gave you earlier regarding what constitutes a relevant product market apply equally here.

In these claims, the Plaintiffs contend that the relevant product markets are the physician services market, the ancillary services market, and the Medicare Advantage insurance market. By contrast, the Defendants assert that the Plaintiffs have failed to allege a proper and relevant product market because the product markets are either smaller than Plaintiffs propose (physician services and ancillary services) or larger (Medicare Advantage insurance).

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at C-7 (2005 ed.).

*Relevant Geographic Market*

The instructions I gave you earlier regarding what constitutes a relevant geographic market apply equally here.

In this case, Plaintiffs claim that the relevant geographic market is Southern Brevard County.  By contrast, Defendants assert that the relevant geographic markets for some of the services  is larger than just Southern Brevard and is at least as large as  Southern and Central Brevard County.

*Relevant Market – Necessity of Proof*

If you find that the Plaintiff has failed to prove by a preponderance of the evidence either a relevant product market or a relevant geographic market for any of the markets at issue, then you must find for the Defendant and against the Plaintiff on that claim.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at C-15 (2005 ed.).

*Specific Intent to Monopolize that Market*

If you find that the Plaintiffs have proven a relevant market with respect to each attempted monopolization claim, you must then decide whether each Defendant had the specific intent to monopolize that market.  In other words, you must decide if the evidence shows that the Defendants acted with the conscious aim of acquiring the power to control prices or exclude or destroy competition in the relevant market.

There are several ways in which a Plaintiff may prove that the Defendants had the specific intent to monopolize.  There may be evidence of direct statements of the Defendants' intent to obtain a monopoly in the relevant market.  Such proof of specific intent may be established by documents prepared by responsible officers or employees of the Defendants at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of the Defendants. You must be careful, however, to distinguish between the  Defendants' intent to compete aggressively (which is lawful), which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decide that the evidence does not prove directly that the Defendants actually intended to obtain a monopoly in that particular market, specific intent may be inferred from what the Defendants did. For example, if the evidence shows that the natural and probable consequence of the Defendants' conduct in the relevant market was to give the Defendants control over prices or to exclude or destroy competition, and that this was plainly foreseeable by the Defendants, then you may (but are not required to) infer that the Defendants specifically intended to acquire monopoly power.

**DEFENDANTS' Element 3: Dangerous Probability of Success**

If you find that the Defendant had the specific intent to achieve a monopoly and engaged in significant anticompetitive conduct in a particular relevant market, you also must determine if the evidence shows the next element of attempt to monopolize: namely, that there was a dangerous probability that the Defendant would succeed in achieving monopoly power if it continued to engage in the same or similar conduct.

I have previously instructed you on what constitutes monopoly power in the context of Plaintiffs' monopolization claim. Those instructions apply equally here.

In determining whether there was a dangerous probability that the Defendant would acquire the ability to control price in the market, you should consider such factors as:

**First,** the Defendant's market share. In that regard I instruct you that where the Defendant's market share is less than 50%, there can be no dangerous probability of success as a matter of law;

**Second**, the trend in the Defendant's market share. In that regard I instruct you that where a Defendant's market share is above 50%, but has been declining, you should consider that decline in determining whether a dangerous probability of success exists;

**Third**, whether the barriers to entry into the market made it difficult for competitors to enter the market; and

**Fourth**, the likely effect of any anticompetitive conduct on the Defendant's share of the market.

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that a Defendant would ultimately acquire monopoly power.  A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that defendant would ultimately acquire monopoly power.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at C-95 to C-96 (2005 ed.).

## PLAINTIFFS' Element 3: Dangerous Probability of Success

If you find that the Defendant had the specific intent to achieve a monopoly and engaged in significant anticompetitive conduct in a particular relevant market, you also must determine if the evidence shows the next element of attempt to monopolize: namely, that there was a dangerous probability that the Defendant would succeed in achieving monopoly power if it continued to engage in the same or similar conduct.

I have previously instructed you on what constitutes monopoly power in the context of Plaintiffs' monopolization claim.  Those instructions apply equally here.

In determining whether there was a dangerous probability that the Defendant would acquire the ability to control price in the market, you should consider such factors as:

**First,** the Defendant's market share;

**Second**, the trend in the Defendant's market share;

**Third**, whether the barriers to entry into the market made it difficult for competitors to enter the market; and

**Fourth**, the likely effect of any anticompetitive conduct on the Defendant's share of the market.

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that a Defendant would ultimately acquire monopoly power.  A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that defendant would ultimately acquire monopoly power.

**PLAINTIFFS' POSITION**

**This instruction removes the statements regarding market share below 50% in Defendants' instruction. The Court will resolve this dispute in its summary judgment order. With respect to whether the jury SHOULD consider declining market share, the jury has been instructed in the preliminary instructions to base its decision on the evidence. The jury instructions are not an opportunity for one party to highlight and emphasize the evidence supporting its arguments. Moreover, *Bailey v. Allgas*, cited by Defendants, is a Robinson–Patman Act case, not a monopolization or attempted monopolization case, and it makes no mention of dangerous probability of successful monopolization (as opposed to monopolization itself).**

**DEFENDANTS' POSITION:**

**In the 11th Circuit, "[a] market share at or less than 50% is inadequate as a matter of law to constitute monopoly power." *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1250 (11th Cir. 2002) (citing *Yoder Bros., Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1368 (5th Cir. 1976) and *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1000 (11th Cir. 1993)).  The fact that a decline in market share is appropriately considered appears elsewhere in the instructions and is an accurate statement of the law.**

**PLAINTIFFS' JURY INSTRUCTION 16 –** Transitional Instruction

Counts 7 and 8 are federal antitrust claims against all Defendants, now including the individual Defendants Michael D. Means and Jerry Senne, based on an alleged common scheme or conspiracy to take anticompetitive action to restrain trade and create a vertically integrated healthcare monopoly in Southern Brevard County. Counts 9 and 10 allege violations of state law.

**DEFENDANTS' JURY INSTRUCTION 16 –** Transitional Instruction and Conspiracy

Counts 7 and 8 are federal antitrust claims against all Defendants, now including the individual Defendants Michael D. Means and Jerry Senne, based on an alleged common scheme or conspiracy to take anticompetitive action to restrain trade and create a vertically integrated healthcare monopoly in Southern Brevard County. Counts 9 and 10 allege conspiracies to violate state law.

Before describing the elements of each claim that Plaintiffs must prove, I will explain the law regarding conspiracy as it relates to these claims.

As you consider Counts 7 through 10,[1] I instruct you that under federal and Florida law, a parent corporation cannot conspire with its wholly owned subsidiaries, nor can an employee of a corporation, such as individual Defendants Michael Means and Jerry Senne, conspire with any of the corporate Defendants, because their interests were not previously separate. An exception to this doctrine applies when the employee who previously had a separate economic interest, joined with the employer to pursue their separate economic interests together.

**Source:** *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771-77 (1984*); Lockheed Martin Corp. v. Boeing Co.*, 390 F. Supp. 2d 1073, 1082-83 (M.D. Fla. 2005); *Microsoft Corp. v. Big Boy Distribution LLC*, 589 F. Supp. 2d 1308, 1323 (S.D. Fla. 2008) (applying Florida law); *Rivers v. Dillards Dept. Store*, 698 So. 2d 1328, 1333 (Fla. 1st DCA 1997); *Cedar Hills Props. Corp. v. E. Fed. Corp.*, 575 So. 2d 673, 676 (Fla. 1st DCA 1991).

---

[1] Plaintiffs contend that Counts 9 and 10 are not predicated upon a conspiracy.

**PLAINTIFFS' POSITION**

This instruction should replace both this and the following two Defendant instructions.

First, Defendants' instructions incorrectly limit Plaintiffs' allegations related to their state law claims to a conspiracy. As discussed above, the complaint does not do so, and the parties have both litigated this case on the assumption that the state law claims encompass all of the conduct Plaintiffs allege.

Second, Defendants' instructions regarding intercorporate conspiracy and separate economic interests of employees are irrelevant to the issues in this case—Plaintiffs have unequivocally stated that they do not allege a conspiracy between or among Health First entities or employees as a basis of liability. Moreover, the instructions are duplicative of the immediately following instructions on corporate agents and conspiracy generally.

Third, the instruction that the jury should only consider the remaining elements of the conspiracy claims if they find that a conspiracy existed is duplicative of the instruction on conspiracy generally and the instruction on Count 7 (last paragraph).

**DEFENDANTS' POSITION:**

As noted above, The Third Amended Complaint alleges that the state law claims are conspiracy-based. *See* Third Amended Complaint ("TAC"), D.E. 57, ¶¶ 406, 408-420 (tortious interference allegations based on conspiracy or "Defendants' common scheme"); *id.* ¶¶ 380-381, 383-386 ("common scheme" allegations re: FDUTPA). Plaintiffs' opposition to Defendants' motion to dismiss confirmed that their state law claims were based solely on allegations of a conspiracy. Plaintiffs Opposition to Defendants' Motion to Dismiss, D.E. 64 at 15 ("Plaintiffs' tortious interference claims rest on the Defendants' conspiracy. Under Florida law, conspiracy for tortious interference requires a combination of two or more person, having a common purpose, seeking to accomplish the underlying tort of interference."); *id.* at 14 (regarding FDUTPA: "The same business practices that Plaintiffs allege violate the federal antitrust laws—*e.g.*, excluding doctors and physician assistants for refusing to support Defendants' anticompetitive scheme—can also be characterized as "unfair").

Defendants are still uncertain as to what extent Plaintiffs intend to argue that agreements reached among Health First employees and/or the entities that employ them can be violations of the law.  If Plaintiffs do not intend to argue that such agreements violate any law, then the *Copperweld* "intra-corporate" conspiracy instruction may not be necessary.  However, Plaintiffs have not unequivocally stated that they will not argue that Defendants' agreements among themselves were unlawful.  Furthermore, with four corporate and two individual defendants, all of whom have "intra-corporate" agreements, Defendants believe that this instruction is required to ensure that the jury is not confused about which types of agreements may be considered unlawful.

**DEFENDANTS' JURY INSTRUCTION 17 –** Conspiracy Threshold

Only if you find that Defendants participated in a conspiracy should you go on to consider the other elements of Plaintiffs' claims in Counts 7 through 10.[2]

**Source:** *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771-77 (1984*); Microsoft Corp. v. Big Boy Distribution LLC*, 589 F. Supp. 2d 1308, 1323 (S.D. Fla. 2008) (applying Florida law); *Rivers v. Dillards Dept. Store*, 698 So. 2d 1328, 1333 (Fla. 1st DCA 1997); *Cedar Hills Props. Corp. v. E. Fed. Corp.*, 575 So. 2d 673, 676 (Fla. 1st DCA 1991); .

---

[2] Plaintiffs contend that Counts 9 and 10 are not predicated upon a conspiracy.

**JURY INSTRUCTION 18** – Acts by Corporate Agents

Generally, whatever any person is legally capable of doing himself or herself can be done through another person as agent. If the acts of an employee or agent are voluntarily and intentionally ordered or directed, or authorized or consented to by a person, then the law holds that person responsible for such acts, the same as if the acts had in fact been done by that person.

The law considers a corporation a person, but a corporation can act only through its directors, or officers, or employees, or other agents. The law therefore holds a corporation responsible for all unlawful acts of its directors, or officers, or employees, or other agents, provided the unlawful acts are done within the scope of their authority, as would usually be the case if done in the ordinary course of their employment, or in the ordinary course of the corporation's business.

Authority to act for a corporation in a particular matter, or in a particular way or manner, may be inferred from the surrounding facts and circumstances shown by the evidence in the case. Authority to act for a corporation, like any other fact in issue in a civil case, need not be established by direct evidence, but may be established by indirect or circumstantial evidence.

Every act of any director, or officer, or employee, or other agent, on behalf of, or in the name of a corporation, if done within the scope of the person's authority, is by law the act of the corporation itself.

Similarly, a parent corporation can be held liable for the acts of a subsidiary if the subsidiary acted as an agent on behalf of the parent. In order to demonstrate that a Health First subsidiary was acting on behalf of Health First, Inc., the Plaintiffs must demonstrate (1) that Health First, Inc., intended to have that subsidiary act on behalf of Health First, Inc.; (2) that the subsidiary accepted or understood that it would act on behalf of Health First, Inc.; and (3) an understanding between Health First, Inc., and its subsidiary that the subsidiary was to be in under the control of Health First, Inc.

**Source:** Kevin F. O'Malley, Jay E. Grenig, Hon. William C. Lee, FED-JI § 150:2, 3A Fed. Jury Prac. & Instr. § 150:2 (6th ed.) (Westlaw database updated Aug. 2015).

**JURY INSTRUCTION 19** – Conspiracy Generally

A combination or conspiracy is formed whenever two or more persons or corporations knowingly join together to accomplish an unlawful purpose by concerted action. The essence of a combination or conspiracy is an agreement between two or more persons or corporations to violate or disregard the law. However, the evidence in the case need not show that the members of an alleged conspiracy entered into any express or formal agreement.

What a preponderance of the evidence in the case must show is that the Defendants knowingly came to a common and mutual understanding to accomplish, or to attempt to accomplish, an unlawful purpose.

To act "knowingly" means to act voluntarily and intentionally, and not because of mistake or accident.

You will note that there must be at least two separate persons or corporations who reach an agreement or understanding in order to find that a conspiracy was formed.

One cannot conspire with one's self, and a single corporation cannot agree, combine, or conspire with its own officers or employees. Unincorporated divisions of a single corporation retain their overall legal identity as a single entity incapable of conspiring with itself. The same is normally true with respect to parent and subsidiary corporations subject to the same ownership and control; they will be regarded as a single business entity incapable of conspiring with itself.

**Source:** *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771-77 (1984); *Lockheed Martin Corp. v. Boeing Co.*, 390 F. Supp. 2d 1073, 1082-83 (M.D. Fla. 2005); Kevin F. O'Malley, Jay E. Grenig, Hon. William C. Lee, FED-JI § 150:2, 3A Fed. Jury Prac. & Instr. § 150:20 (6th ed.) (Westlaw database updated Aug. 2015) (from Eleventh Circuit sample jury instruction) (modified).

**JURY INSTRUCTION 20** – Section 1 of the Sherman Act – Contract, Combination, or Conspiracy in Restraint of Trade

(**Count 7**)

Plaintiffs OMNI, SOAR, Drs. Craig Deligdish, Brian Dowdell, Richard Gayles, Stan Golovac, Lance Grenevicki, Aleksander Komar, Scott Seminer, the Institute of Facial Surgery, and the Pain Institute claim all the Defendants violated Section 1 of the Sherman Act by conspiring with MIMA prior to the acquisition of MIMA in February 2013. Section 1 prohibits contracts, combinations and conspiracies that unreasonably restrain trade.

**Plaintiffs' Proposed Intervening Instruction: Statute Defining the Claim**

Section 1 of the Sherman Act provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

**<span style="color:red">PLAINTIFFS' POSITION</span>**

**<span style="color:red">Again, providing the text of the statute will help the jury understand the law and is the approach of certain model instructions.</span>**

**<span style="color:blue">DEFENDANTS' POSITION:</span>**

**<span style="color:blue">Reading the text of the statute is unnecessary as it is redundant with the instructions, will not likely be understood by the jury, and adds text to already very long instructions.</span>**

To establish a violation of Section 1 of the Sherman Act, these Plaintiffs must prove the following:

**First**, the existence of a contract, combination or conspiracy between or among at least two separate entities;

**Second,** that the contract, combination or conspiracy unreasonably restrains trade;

**Third**, that the restrained caused each Plaintiff to suffer an injury to its business or property.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at A-3 (2005 ed.).

## DEFENDANTS' Contract, Combination or Conspiracy

Plaintiffs allege that the Defendants participated in a conspiracy to restrain trade by an agreement with MIMA to exclusively refer patients to Health First and to punish those physicians who did not, and to boycott the Plaintiffs. A conspiracy is an agreement by two or more persons to accomplish some unlawful purpose or to accomplish a lawful purpose by unlawful means.

To establish the existence of a contract, combination or conspiracy, the Plaintiffs must prove both of the following by a preponderance of the evidence:

**First**, that the alleged conspiracy existed; and

**Second**, that each Defendant knowingly became a member of that conspiracy; knowingly means voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

A conspiracy is a kind of "partnership" in which each person found to be a member of the conspiracy is liable for all acts and statements of the other members made during the existence of and in furtherance of the conspiracy. To create such a relationship, two or more persons must enter into an agreement that they will act together for some unlawful purpose or to achieve a lawful purpose by unlawful means.

To establish the existence of a conspiracy, the evidence need not show that its members entered into any formal or written agreement; that they met together; or that they directly stated what their object or purpose was, or the details of it, or the means by which they would accomplish their purpose. The agreement itself may have been entirely unspoken. What the evidence must show to prove that a conspiracy existed is that the alleged members of the conspiracy in some way came to an agreement to accomplish a common purpose. It is the agreement to act together that constitutes the conspiracy. Whether the agreement succeeds or fails does not matter.

A conspiracy may be formed without all parties coming to an agreement at the same time, such as where competitors, without previous agreement, separately accept invitations to participate in a plan to restrain trade. The agreement may be shown if the proof establishes that the parties knowingly worked together to accomplish a common purpose. It is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement.

Direct proof of an agreement may not be available. A conspiracy may be disclosed by the circumstances or by the acts of the members. Therefore, you may infer the existence of an agreement from what you find the alleged members actually did, as well as from the words they used. Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have met or assembled together and discussed common aims and interests, does not establish the existence of a conspiracy unless the evidence tends to exclude the possibility that the persons were acting independently. If they acted similarly but independently of one another, without any agreement among them, then there would not be a conspiracy.

It is not necessary that the evidence show that all of the means or methods claimed by the Plaintiffs were agreed upon to carry out the alleged conspiracy; nor that all of the means or methods that were agreed upon were actually used or put into operation; nor that all the persons alleged to be members of the conspiracy actually were members. What the evidence must show is that the alleged conspiracy of two or more persons existed, that one or more of the means or methods alleged was used to carry out its purpose, and that that Defendant knowingly became a member of the conspiracy.

In determining whether an agreement has been proved, you must view the evidence as a whole and not piecemeal. In considering the evidence, you first should determine whether or not the alleged conspiracy existed. If you conclude that the conspiracy did exist, you should next determine whether each Defendant knowingly became a member of that conspiracy with the intent to further its purposes.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at B-2 to B-4 (2005 ed.).

**PLAINTIFFS' Contract, Combination or Conspiracy**

Plaintiffs allege that the Defendants participated in a conspiracy to restrain trade by an agreement with MIMA to exclusively refer patients to Health First and to punish those physicians who did not, and to boycott the Plaintiffs.  Plaintiffs also allege that Defendants participated in a conspiracy to restrain trade by requiring that independent participating providers refer only to other in-network providers. A conspiracy is an agreement by two or more persons to accomplish some unlawful purpose or to accomplish a lawful purpose by unlawful means.

To establish the existence of a contract, combination or conspiracy, the Plaintiffs must prove both of the following by a preponderance of the evidence:

> **First**, that the alleged conspiracy existed; and

> **Second**, that each Defendant knowingly became a member of that conspiracy; knowingly means voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

A conspiracy is a kind of "partnership" in which each person found to be a member of the conspiracy is liable for all acts and statements of the other members made during the existence of and in furtherance of the conspiracy.  To create such a relationship, two or more persons must enter into an agreement that they will act together for some unlawful purpose or to achieve a lawful purpose by unlawful means.

To establish the existence of a conspiracy, the evidence need not show that its members entered into any formal or written agreement; that they met together; or that they directly stated what their object or purpose was, or the details of it, or the means by which they would accomplish their purpose. The agreement itself may have been entirely unspoken.  What the evidence must show to prove that a conspiracy existed is that the alleged members of the conspiracy in some way came to an agreement to accomplish a common purpose.  It is the agreement to act together that constitutes the conspiracy. Whether the agreement succeeds or fails does not matter.

A conspiracy may be formed without all parties coming to an agreement at the same time, such as where competitors, without previous agreement, separately accept invitations to participate in a plan to restrain trade. The agreement may be shown if the proof establishes that the parties knowingly worked together to

accomplish a common purpose.  It is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement.

Direct proof of an agreement may not be available.  A conspiracy may be disclosed by the circumstances or by the acts of the members.  Therefore, you may infer the existence of an agreement from what you find the alleged members actually did, as well as from the words they used.  Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have met or assembled together and discussed common aims and interests, does not establish the existence of a conspiracy unless the evidence tends to exclude the possibility that the persons were acting independently.  If they acted similarly but independently of one another, without any agreement among them, then there would not be a conspiracy.

It is not necessary that the evidence show that all of the means or methods claimed by the Plaintiffs were agreed upon to carry out the alleged conspiracy; nor that all of the means or methods that were agreed upon were actually used or put into operation; nor that all the persons alleged to be members of the conspiracy actually were members.  What the evidence must show is that the alleged conspiracy of two or more persons existed, that one or more of the means or methods alleged was used to carry out its purpose, and that that Defendant knowingly became a member of the conspiracy.

In determining whether an agreement has been proved, you must view the evidence as a whole and not piecemeal.  In considering the evidence, you first should determine whether or not the alleged conspiracy existed.  If you conclude that the conspiracy did exist, you should next determine whether each Defendant knowingly became a member of that conspiracy with the intent to further its purposes.

**PLAINTIFFS' POSITION**

**This instruction clarifies that Plaintiffs also allege that Defendants participated in a conspiracy to restrain trade by requiring that independent participating providers agree to refer only to other in-network providers. Contrary to Defendants' assertions, Plaintiffs alleged this in-network referral conspiracy in their complaint, and the Court described it in its order denying the motion to dismiss. For a full discussion of this issue, see Plaintiffs' Trial**

**Brief. Plaintiffs incorporate their prior positions on Defendants arguments about the in-network referral agreements and the cases they cite.**

**DEFENDANTS' POSITION:**
**Plaintiffs' 11th-hour attempts to portray routine, in-network referral policies as somehow violative of the antitrust laws should not be permitted.  This theory was not pled and has no place in the jury instructions or in the verdict form.**

**Plaintiffs' "in-network conspiracy" theory is that doctors cannot agree with Health First to refer patients with Health First insurance to other doctors or hospitals that also accept Health First insurance.  The Eleventh Circuit has rejected the claim that this common arrangement between health insurance plans and participating doctors is an unlawful conspiracy under Section 1 of the Sherman Act.  *See Levine v. Central Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1549-53 (11th Cir. 1996) (affirming summary judgment on Section 1 claim challenging agreement between health insurer Healthchoice and doctors who accepted Healthchoice's insurance plan to refer Healthchoice patients to other doctors who accepted Healthchoice insurance); *see also Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376, 1381-1383 (1997).**

**DEFENDANTS' JURY INSTRUCTION 21** – Group Boycott - Unlawful
Horizontal Concerted Refusal to Deal

Counts 7 through 10[3] allege, among other conduct, a conspiracy between Health First and MIMA to refuse to deal with Plaintiffs. Under the law, a business generally has the right to deal, or refuse to deal, with whomever it likes, as long as it makes that decision on its own. The antitrust laws, however, prohibit two or more persons or businesses who compete with one another from agreeing with each other not to deal with a third party where certain circumstances exist, a situation sometimes referred to as a "group boycott."

To prevail on this claim against each Defendant, each Plaintiff must prove as to that Defendant each of the following elements by a preponderance of the evidence:

**First**, that the Defendant and MIMA refused to deal with the plaintiff by refusing to refer patients to the Plaintiff;

**Second**, that the refusal to deal was pursuant to an agreement between that Defendant and MIMA;

**Third**, that the Defendant and MIMA were direct competitors; and

**Fourth**, that the Plaintiff was injured in its business or property because of the conspiracy.

If you find that the evidence is insufficient to prove any one or more of these elements as to a Defendant, then you must find for that Defendant and against that Plaintiff on that Plaintiff's concerted refusal to deal claim. However, if you find that the evidence is sufficient to prove all of the above elements as to a Defendant, then you must next consider whether the refusal to deal was unreasonable.

In making this determination, you must first determine whether the Plaintiffs have proven that the challenged restraint has resulted in or is likely to result in a substantial harm to competition in a relevant market. If you find that it has done so or will do so, then you must consider whether the restraint produces countervailing competitive benefits. If you find that it does, then you must balance the competitive harm against the competitive benefit. The challenged restraint is illegal

---

[3] Plaintiffs contend that Counts 9 and 10 are not predicated upon a conspiracy

if you find that the competitive harm substantially outweighs the competitive benefit. I will now review each of the steps I just described in greater detail.

**PLAINTIFFS' JURY INSTRUCTION 21 –** Group Boycott - Unlawful Horizontal Concerted Refusal to Deal

Count 7 alleges a conspiracy between Health First and MIMA to refuse to deal with Plaintiffs. Plaintiffs separately challenge the Defendants' requirement that participating providers refer only to other in-network providers, but the instructions I am about to give you relate only to Plaintiffs' allegations of a group boycott agreement between Health First and MIMA.

With respect to Plaintiffs' allegations of an agreement with MIMA to boycott the Plaintiffs, I instruct you that a business generally has the right to deal, or refuse to deal, with whomever it likes, as long as it makes that decision on its own. The antitrust laws, however, prohibit two or more persons or businesses who compete with one another from agreeing with each other not to deal with a third party where certain circumstances exist, a situation sometimes referred to as a "group boycott."

To prevail on this, Plaintiffs must prove each of the following elements by a preponderance of the evidence:

**First**, that the Defendant and MIMA refused to deal with the Plaintiffs by steering patient referrals away from the Plaintiffs;

**Second**, that the refusal to deal was pursuant to an agreement between the Defendant and MIMA;

**Third**, that Health First and MIMA were direct competitors; and

**Fourth**, that the Plaintiff was injured in its business or property because of the conspiracy.

If you find that the evidence is insufficient to prove any one or more of these elements as to a Defendant, then you must find for that Defendant and against that Plaintiff on that Plaintiff's boycott claim. However, if you find that the evidence is sufficient to prove all of the above elements as to a Defendant, then you must next consider whether the refusal to deal was unreasonable.

If you find that the Plaintiffs have proven these elements, you are instructed to find that the agreement between the Defendants and MIMA unreasonably restrains trade. This is because a group boycott is automatically deemed to unreasonably restrain trade and is unlawful without any consideration of its competitive effects.

However, if you find that the Plaintiffs have not proven each of the elements above by a preponderance of the evidence, you are instructed to evaluate their claims under the rule of reason.

As to Plaintiffs' claim that the Defendants' in-network referral requirement unreasonably restrains trade, you should evaluate this claim only under the rule of reason.

## PLAINTIFFS' POSITION

**This instruction clarifies that Plaintiffs separately challenge the Defendants' in-network referral requirement under the rule of reason. Contrary to Defendants' assertions, Plaintiffs alleged this in-network referral conspiracy in their complaint, and the Court described it in its order denying the motion to dismiss. For a full discussion of this issue, see Plaintiffs' Trial Brief. The instruction also clarifies that Plaintiffs state law claims are not limited to conspiracy conduct, as discussed above. It also clarifies the nature of Plaintiffs' allegations with respect to the agreement between the Defendants and MIMA. Finally, in order to avoid confusion, it adds an explanation that if Plaintiffs have proven the elements of a per se unlawful boycott, then they have proven an unreasonable restraint of trade. *In re Disposable Contact Lens Antitrust Litig.*, No. MDL1030, 2001 WL 493244, at \*3 (M.D. Fla. Feb. 8, 2001) ("A group boycott is a *per se* violation of antitrust laws and the anticompetitive effects of such actions are a given.") (quoting *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 n. 33 (11th Cir.1991)). As discussed above, *Retina Associates*, cited by Defendants, involved a joint venture that did not fit the definition of a group boycott. Here, Plaintiffs have alleged that the MIMA conspiracy is a classic group boycott. Defendants have at no point asserted that it is part of any joint venture of ancillary to some procompetitive purpose. If the jury finds that Plaintiffs have proven the elements of a per se unlawful group boycott, then the jury should not balance the competitive effects of the agreement.**

**DEFENDANTS' POSITION:**

**"Claims under the Sherman Act are presumptively evaluated under the rule of reason."** *Levine v. Cent. Fla. Med. Affiliates*, **72 F.3d 1538, 1549 (11th Cir.1996). In a case with very similar allegations to those in the present case, where the alleged "boycott" was "an agreement among several individuals to refer retina cases solely to [one medical practice] and to thereby refuse to deal with [plaintiffs' medical practice]," the 11th Circuit explicitly rejected a** *per se* **approach.** *See Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*, **105 F.3d 1376 (1997). The Court cautioned that, despite an assertion that certain conduct was a "group boycott," "the recent jurisprudence of the Supreme Court and of the Court of Appeals of this Circuit cautions against the haphazard expansion of the 'group boycott label' and the concomitant imposition of** *per se* **liability."** *Id.* **at 1381.**

### PLAINTIFFS' Rule of Reason – Overview

I will now instruct you on the rule of reason. Plaintiffs' claim that the Defendants in-network referral requirement is an unreasonable restraint of trade is governed by the rule of reason. If you find that Plaintiffs have not proven every element of a per se unlawful group boycott but you find that a referral-steering agreement between the Defendants and MIMA did exist, you should go on to evaluate that agreement under the rule of reason as well.

Section 1 of the Sherman Act prohibits only those restraints of trade that are found to be unreasonable. If a restraint is not of a type that is deemed by its very nature to unreasonably restrain trade, it will be analyzed under the rule of reason. The rule of reason requires you to determine whether the challenged restraint is unreasonable. In making this determination, you must first determine whether the Plaintiffs have proven that the challenged restraint has resulted in or is likely to result in a substantial harm to competition in a relevant market. If you find that it has done so or will do so, then you must consider whether the restraint produces countervailing competitive benefits. If you find that it does, then you must balance the competitive harm against the competitive benefit. The challenged restraint is illegal if you find that the competitive harm substantially outweighs the competitive benefit. I will now review each of the steps I just described in greater detail.

**PLAINTIFFS' POSITION**

**This instruction clarifies that proof of competitive effects under the rule of reason is not an additional element if Plaintiffs satisfy the elements of a group boycott, as Defendants' instruction suggests it is. *In re Disposable Contact Lens Antitrust Litig.*, 2001 WL 493244, at *3. Plaintiffs allege and will prove that the MIMA conspiracy satisfies each element of a classic group boycott. This instruction also clarifies that Plaintiffs' allegation that the Defendants' in-network referral requirement unreasonably restrains trade is governed only by the rule of reason.**

**DEFENDANTS' POSITION:**

**"Claims under the Sherman Act are presumptively evaluated under the rule of reason."  *Levine v. Cent. Fla. Med. Affiliates*, 72 F.3d 1538, 1549 (11th Cir.1996).  In a case with very similar allegations to those in the present case, where the alleged "boycott" was "an agreement among several individuals to refer retina cases solely to [one medical practice] and to thereby refuse to deal with [plaintiffs' medical practice]," the 11th Circuit explicitly rejected a *per se* approach.  *See Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc*., 105 F.3d 1376 (1997).  The Court cautioned that, despite an assertion that certain conduct was a "group boycott," "the recent jurisprudence of the Supreme Court and of the Court of Appeals of this Circuit cautions against the haphazard expansion of the 'group boycott label' and the concomitant imposition of *per se* liability."  *Id.* at 1381.**

Rule of Reason – Proof of Competitive Harm

As I mentioned, the Plaintiffs must prove that the challenged restraint has resulted in or is likely to result in a substantial harm to competition. Although it may be relevant to this question, harm that is limited solely to the individual business of a plaintiff is not sufficient, by itself, to demonstrate harm to competition generally. Please keep in mind that, in the normal course of lawful competition, some businesses frequently suffer economic losses, or even go out of business. However, the antitrust laws only protect competition, not a competitor's losses, and are only violated when those losses are caused by unlawful anticompetitive practices. Harm to competition must also be shown within a relevant market. I have already provided you with the instructions on ascertaining the relevant product or service market and the relevant geographic market.

A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition. For instance, higher prices or lower quality are competitive harms. If these or some other competitive harm have not occurred and are not likely to occur, then you should find that the challenged restraint was not unreasonable.

In determining whether the challenged restraint has produced competitive harm, you may consider the following factors: the effect of the restraint on prices, output, or quality; the purpose of the restraint; the nature and structure of the relevant market, both before and after the restraint was imposed; the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and whether the Defendants possess market power.

Market power has been defined as an ability to profitably raise prices above those that would be charged in a competitive market for a sustained period of time. A firm that possesses market power generally can charge higher prices for the same good or services than a firm in the same market that does not possess market power. Another important factor in determining whether a firm possesses market power is market share—that is, its percentage of total products or services sold in the relevant market. Other factors that are relevant to an analysis of market power are described with respect to the Plaintiffs' monopolization claims in Jury Instruction No 14. If a defendant does not possess market power, it is less likely that the challenged restraint has resulted in or will result in a substantial harmful effect on competition in the market.

Rule of Reason – Evidence of Competitive Benefits

If you find that the Plaintiffs have proven that the challenged restraint resulted or will result in substantial harm to competition in a relevant market, then you must next determine whether the restraint also benefits competition in other ways. If you find that the challenged restraint does result in competitive benefits, then you must also consider whether the restraint was reasonably necessary to achieve those benefits. If the Plaintiffs prove that the same benefits could have been achieved by other, reasonably available alternative means that would pose substantially less harm to competition, then the competitive benefits offered by the Defendants do not justify the restraint.

Rule of Reason – Balancing the Competitive Effects

If you find that the challenged restraint was reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against any competitive harm resulting from the same restraint. If the competitive benefits outweigh any potential competitive harm, then the challenged restraint is reasonable and you must find for the Defendants. If the competitive benefits do not outweigh any competitive harm, then the challenged restraint is not reasonable. In conducting this analysis you must consider the benefits and harm to competition, not just to competitors.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at B-50 to B-51 (2005 ed.).

**JURY INSTRUCTION 22-** Section 2 of the Sherman Act - Conspiracy to Monopolize

(**Count 8**)

Plaintiffs OMNI, SOAR, Craig Deligdish, Brian Dowdell, Richard Gayles, Stan Golovac, Lance Grenevicki, Aleksander Komar, Scott Seminer, the Institute of Facial Surgery, and the Pain Institute also claim that all Defendants conspired to monopolize the markets for hospital services, physician services, ancillary services and Medicare Advantage insurance in Southern Brevard County in violation of Section 2 of the Sherman Act.

**Plaintiffs' Proposed Intervening Instruction: Statute Defining the Claim**

Section 2 of the Sherman Act makes it unlawful to "combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."

**PLAINTIFFS' POSITION**

**Providing the text of the statute will help the jury understand the law, and this is the approach of certain model instructions.**

**DEFENDANTS' POSITION:**

**Reading the text of the statute is unnecessary as it is redundant with the instructions, will not likely be understood by the jury, and adds text to already very long instructions.**

To prevail against the Defendants on their claim of conspiracy to monopolize, the Plaintiffs must prove by a preponderance of the evidence as to that Defendant each of the following elements:

**First**, that an agreement or mutual understanding between two or more persons to obtain or maintain monopoly power in the market for inpatient hospital services, physician services, ancillary services, or Medicare Advantage Plans existed;

**Second,** that the Defendant knowingly—that is, voluntarily and intentionally—became a party to that agreement or mutual understanding;

**Third**, that the Defendant specifically intended to obtain or maintain monopoly power in the market for inpatient hospital services, physician services, ancillary services, or Medicare Advantage insurance;

**Fourth**, that Defendant committed an overt act in furtherance of the conspiracy; and

**Fifth**, that the Plaintiff was injured in its business or property because of the conspiracy to monopolize.

If you find that the evidence is insufficient to prove any one or more of these elements as to a defendant, then you must find for that defendant and against plaintiff on plaintiff's conspiracy to monopolize claim.  If you find that the evidence is sufficient to prove each element as to a Defendant, then you must find for the Plaintiff and against that Defendant on that Plaintiff's conspiracy to monopolize claim.

## Agreement and Monopoly Power

I have previously instructed you regarding what evidence is necessary to find the existence of a conspiracy and how a corporation is not legally capable of conspiring with its own agents or within its unincorporated divisions or its wholly-owned subsidiaries.  Those instructions apply equally here.

You have also been previously instructed regarding what constitutes monopoly power.  Those instructions apply equally here. However, unlike their claims for monopolization and attempted monopolization, the Plaintiffs' claim for conspiracy to monopolize does not require the Plaintiffs to prove that the Defendants possesses monopoly power, or that there is a dangerous probability that the Defendants will ultimately obtain monopoly power.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at C-100 to C-101, C-103 to C-104 (2005 ed.).

## Specific Intent

If you determine that there was an agreement among Defendants to monopolize the relevant markets alleged, you must then decide whether the Plaintiffs have proven that that Defendant had specifically intended that the

members of the conspiracy would acquire or maintain monopoly power in the relevant markets alleged.  In other words, you must decide whether the evidence shows that the defendant entered into the agreement with the conscious aim of using anticompetitive conduct to acquire or maintain the power to control prices and exclude competition in the relevant market alleged.  Neither proof of use of the power to exclude, nor proof of actual exclusion of existing or potential competitors, is essential to sustain the charge of conspiracy to monopolize.

Because the Plaintiff must prove specific intent to monopolize a particular relevant market, if the Plaintiff does not prove a specific relevant market, you cannot find that specific intent is present.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at C-105 (2005 ed.).

*Relevant Markets*

The instructions I gave you earlier regarding what constitutes a relevant product market and a relevant geographic market apply equally here.

*Relevant Market – Necessity of Proof*

If, after considering all the evidence as to that Plaintiff, you find that the Plaintiff has proven by a preponderance of the evidence both a relevant product market and a relevant geographic market with respect to each relevant market alleged, then you must find that the Plaintiff has met the relevant market requirement and you must consider the remaining elements of this claim.

If you find that the Plaintiff has failed to prove by a preponderance of the evidence either a relevant product market or a relevant geographic market, then you must find for the Defendant and against the Plaintiff on that claim.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at C-15 (2005 ed.).

*Specific Intent*

The additional instructions I gave you earlier regarding what constitutes specific intent apply equally here.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at C-105 to C-107 (2005 ed.).

## Element 4: Overt Act

If you find that each Plaintiff has proven the prior elements, you must then next consider whether each Defendant committed an overt act in furtherance of the conspiracy.

An overt act is any transaction or event, even one that may be entirely innocent when viewed alone, that a conspirator commits to accomplish some object of the conspiracy.

**Source:** Adapted from Eleventh Circuit Criminal Pattern Jury Instructions 13.1 (2010 ed.; Feb. 2016 revisions).

**JURY INSTRUCTION 23**– Conspiracy – Circumstantial Evidence

As I have instructed you, Plaintiffs may prove their case using circumstantial evidence. However, antitrust law limits the range of permissible inferences you may draw from ambiguous evidence offered to prove a conspiracy. Conduct that is as consistent with lawful competition as it is with illegal conspiracy does not, standing alone, support an inference that an antitrust conspiracy existed. Plaintiffs also must present evidence that tends to exclude the possibility that Defendants and their alleged co-conspirators acted independently. So as to Counts 7 and 8, you may infer from the evidence that Defendants conspired with others only if you find that such inference is reasonable after considering competing inferences that Defendants and alleged co-conspirators acted independently.

**DEFENDANTS' VERSION**

If you find that the evidence does not support a reasonable inference that Defendants conspired with others by a preponderance of evidence, then your verdict is for the Defendants on Counts 7 through 10.[4]

**PLAINTIFFS' VERSION**

If you find that the evidence does not support a reasonable inference that Defendants conspired with others by a preponderance of evidence, then your verdict is for the Defendants on Counts 7 and 8.[5]

**PLAINTIFFS' POSITION**

**This version corrects Defendants' erroneous implication that Plaintiffs' state law claims are predicated only on a conspiracy. Plaintiffs' state-law counts in the Third Amended Complaint specifically allege numerous instances of unilateral conduct and incorporate numerous additional instances of unilateral conduct as violating state law, including ALL OF PLAINTIFFS' ANTITRUST COUNTS.  Doc. 57 at ¶¶397–422. Do Defendants seriously contend that Plaintiffs should not be permitted to prove their claims by way of conduct that was specifically enumerated and incorporated in their state law counts simply because they also discussed the conspiracies in those sections? This is an astonishing position to say the least. Moreover, Defendants' own**

---

[4] Plaintiffs contend that Counts 9 and 10 are not predicated upon a conspiracy
[5] Plaintiffs contend that Counts 9 and 10 are not predicated upon a conspiracy

citation regarding the FDUTPA claim shows that it is based on conduct that includes exclusion from the HFHP panel (a unilateral act).

**DEFENDANTS' POSITION:**

The Third Amended Complaint clearly alleges that the state law claims in Counts 9 and 10 are conspiracy-based. *See* Third Amended Complaint ("TAC"), D.E. 57, ¶¶ 406, 408-420 (tortious interference allegations based on conspiracy or "Defendants' common scheme"); *id.* ¶¶ 380-381, 383-386 ("common scheme" allegations re: FDUTPA). Plaintiffs' opposition to Defendants' motion to dismiss confirmed that their state law claims were based solely on allegations of a conspiracy. Plaintiffs Opposition to Defendants' Motion to Dismiss, D.E. 64 at 15 ("Plaintiffs' tortious interference claims rest on the Defendants' conspiracy. Under Florida law, conspiracy for tortious interference requires a combination of two or more person, having a common purpose, seeking to accomplish the underlying tort of interference."); *id.* at 14 (regarding FDUTPA: "The same business practices that Plaintiffs allege violate the federal antitrust laws—*e.g.*, excluding doctors and physician assistants for refusing to support Defendants' anticompetitive scheme—can also be characterized as "unfair").

**Source:** *Matsushita Elec. Indus. Co., Ltd., Zenith Radio Corp.*, 475 U.S. 574, 588, 597 n.21 (1986); *City of Tuscaloosa v. Harcros Chem., Inc.*, 158 F.3d 548, 570 (11th Cir. 1998); *Seagood Trading Corp. v. Jerrico*, Inc., 924 F.2d 1555, 1573-74 (11th Cir. 1991); *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 822 F. Supp. 2d 1201, 1209 (N.D. Ala. 2011).

**DEFENDANTS' JURY INSTRUCTION 24** – Transitional Instructions as to Defendants Means and Senne (Counts 7 through 10)

Mr. Means and Mr. Senne are defendants only in the Plaintiffs' Counts 7 through 10.  I have previously instructed you as to Counts seven and eight in regard to the Corporate Defendants.

In a moment, I will briefly summarize these counts or claims again for you, as they relate to Mr. Means and Mr. Senne, and I will instruct you as to your deliberations on each of these claims or counts insofar as they relate to Mr. Means and Mr. Senne. But first, as to all of Plaintiffs' claims in their seventh and eighth counts, insofar as they relate to Mr. Means and Mr. Senne, I instruct you generally as follows.

First if, from the preponderance of the evidence, you do not find that the Health First Corporate Defendants are liable to the Plaintiffs on any one or more of the Plaintiffs' claims in Counts 7 through 10, then you must also find that Mr. Means and Mr. Senne are not liable to the Plaintiffs on those same claims or counts.

Further, I instruct you that, should you find from the preponderance of the evidence that one or more of the Health First corporate is liable to the Plaintiffs on the Plaintiffs' claims in one or more of Counts 7 through 10, that is not sufficient by itself for you to also find that Mr. Means and/or Mr. Senne is liable to the Plaintiffs on any such claim or count.  More is required for you to find that Mr. Means and/or Mr. Senne are liable to Plaintiffs.  In order for you to find either of the two individual defendants to be liable to the Plaintiffs, you must find, from the preponderance of the evidence:

> **First**, that the one or more of the Health First Corporate Defendants engaged in an act alleged by the Plaintiffs in those counts that is prohibited by law, and

> **Second,** that Mr. Means and/or Mr. Senne knowingly and personally participated in the act, or that they authorized or directed the act.

You may not find Mr. Means or Mr. Senne liable to the Plaintiffs on any of their claims in Counts 7 through 10[6] merely because they held a corporate office in

---

[6] Plaintiffs contend that Counts 9 and 10 are not predicated upon a conspiracy

one or more of the Health First corporations. Nor may you engage in speculation or conjecture that he directed or personally participated in any act alleged by the plaintiffs simply because Mr. Means or Mr. Senne was an officer or director of one or more of the Health First corporations.

**Source**: *United States v. Wise,* 370 U.S. 405, 416 (1962); *Omni Healthcare v. Health First*, 2015 WL 275806, at *15 (M.D. Fla. Jan. 22, 2015); *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841, 852 (N.D. Cal. 1979).

## PLAINTIFFS' JURY INSTRUCTION 24 – Transitional Instructions as to Defendants Means and Senne (Counts 7 and 8)

Mr. Means and Mr. Senne are defendants only in the Plaintiffs' seventh, eighth, ninth, and tenth counts or claims.  I have previously instructed you as to counts seven and eight in regard to the Corporate Defendants.

In a moment, I will briefly summarize these counts or claims again for you, as they relate to Mr. Means and Mr. Senne, and I will instruct you as to your deliberations on each of these claims or counts insofar as they relate to Mr. Means and Mr. Senne. But first, as to all of Plaintiffs' claims in their seventh and eighth counts, insofar as they relate to Mr. Means and Mr. Senne, I instruct you generally as follows.

First if, from the preponderance of the evidence, you do not find that the Health First Corporate Defendants are liable to the Plaintiffs on any one or more of the Plaintiffs' claims in Counts 7 and 8, then you must also find that Mr. Means and Mr. Senne are not liable to the Plaintiffs on those same claims or counts.

Further, I instruct you that, should you find from the preponderance of the evidence that one or more of the Health First corporate Defendants is liable to the Plaintiffs on the Plaintiffs' claims in one or more of Counts 7 through 10, that is not sufficient by itself for you to also find that Mr. Means and/or Mr. Senne is liable to the Plaintiffs on any such claim or count. In order for you to find either of the two individual defendants to be liable to the Plaintiffs, you must also find, from the preponderance of the evidence, that Mr. Means and/or Mr. Senne knowingly and personally participated in the act, or that they authorized or directed the act.

You may not find Mr. Means or Mr. Senne liable to the Plaintiffs on any of their claims in Counts 7 through 10[7] merely because they held a corporate office in one or more of the Health First corporations. Nor may you engage in speculation or conjecture that he directed or personally participated in any act alleged by the plaintiffs simply because Mr. Means or Mr. Senne was an officer or director of one or more of the Health First corporations.

## PLAINTIFFS' POSITION

This instruction should replace both the Defendants' version of this instruction and the following Defendants' instruction. First, it shortens the Defendants' description of the circumstances required to find the individual defendants liable, reducing duplication with this and other instructions. It also adds the omitted word "Defendants" in the first sentence of the paragraph beginning "Further."

The following Defendants' instruction as to the individual defendants duplicates several earlier instructions on conspiracy, and reproduces this instruction almost verbatim in many places. It also improperly characterizes Plaintiffs' allegations with respect to the participation of the individual defendants in the agreements in restraint of trade. It also contains an irrelevant statement of evidence that does not apply to Mr. Means. Jury instructions are not an opportunity for a party to underscore the evidence that does not apply to that party.

Plaintiffs incorporate their prior discussion of the basis of the state law claims.

## DEFENDANTS' POSITION:

Counts 7-10 are all conspiracy based claims and the Defendants' proposed instructions clearly state the law. *See* Third Amended Complaint ("TAC"), D.E. 57, ¶¶ 406, 408-420 (tortious interference allegations based on conspiracy or "Defendants' common scheme"); *id.* ¶¶ 380-381, 383-386 ("common scheme" allegations re: FDUTPA). Plaintiffs' opposition to Defendants' motion to dismiss confirmed that their state law claims were based solely on allegations of a conspiracy. Plaintiffs Opposition to Defendants' Motion to Dismiss, D.E. 64 at 15 ("Plaintiffs' tortious interference claims rest on the Defendants' conspiracy. Under Florida law, conspiracy for tortious

---

[7] Plaintiffs contend that Counts 9 and 10 are not predicated upon a conspiracy

interference requires a combination of two or more person, having a common purpose, seeking to accomplish the underlying tort of interference."); *id.* at 14 (regarding FDUTPA:  "The same business practices that Plaintiffs allege violate the federal antitrust laws—*e.g.*, excluding doctors and physician assistants for refusing to support Defendants' anticompetitive scheme—can also be characterized as "unfair").

These instructions do not duplicate earlier instructions on conspiracy because they are focused on defendants Means and Senne and not other alleged conspirators.  As a matter of law, there must be evidence that established the direct and personal involvement of Mr. Means and Mr. Senne in any conspiracy—not just that Health First was involved.  The instruction as to Mr. Means' lack of involvement in certain conduct  is designed to avoid jury confusion.  Plaintiffs have stipulated to that fact.

**DEFENDANTS' JURY INSTRUCTION 25** – Instructions as to Defendants
Means and Senne (Count 7)

In Count 7, Plaintiffs assert that, through a common scheme, the Defendants engaged in a contract, combination, or conspiracy in restraint of trade, which is prohibited by Section 1 of the Sherman Act.  I have already instructed you as to your deliberations on Count 7 insofar as it asserts a claim against other defendants. All of those instructions apply equally to your deliberations on this claim or count in respect to the Plaintiffs' claim against Mr. Means and Mr. Senne.

As to Mr. Means and Mr. Senne specifically, in Count 7 plaintiffs assert that Mr. Means and Mr. Senne designed the scheme or personally participated in the "Common scheme" or conspiracy by doing the following:

- Inviting physicians to enter exclusive dealing arrangements Health First, and

- Convincing physicians to leave some of plaintiffs' medical practices because those plaintiffs refused to join the conspiracy.
- Plaintiffs to add any other alleged conduct

One of the allegations made by Dr. Deligdish is that his staff privileges at Holmes Regional Medical Center were revoked because he refused to admit patients exclusively to Health First facilities. I instruct you first that plaintiffs concede Mr. Means was not involved in any way in any revocation of Dr. Deligdish's staff privileges at Holmes Regional, nor was he involved in any threats to do so.

I further instruct you that if, from the preponderance of the evidence, you do not find that the Health First corporate defendants coerced MIMA physicians to admit their patients exclusively to medical facilities owned by Health First, Inc., and you find the Health First defendants did not conspire with MIMA to refuse do deal with the plaintiffs, then your verdict on this claim or count must be for Mr. Means and against the plaintiffs.

Moreover, if you find, from the preponderance of the evidence, that one or more of the Health First corporate defendants did commit one or more of those acts you may not find Mr. Means or Mr. Senne liable to the plaintiffs on Count 7, unless you also find, from a preponderance of the evidence, that Mr. Means or Mr. Senne directed or personally participated in:

- A conspiracy to coerce physicians to admit their patients exclusively to hospitals owned by Health First, Inc.,

- A conspiracy with non-Health First physicians to refuse do deal with the Plaintiffs; or

- A conspiracy with physicians to leave Plaintiffs' medical practices.

If you do not find from the preponderance of the evidence that Mr. Means or Mr. Senne, as the case may be, directed or personally participated in one or more of those acts, then your verdict as to Count 7 must be for Mr. Means and/or Mr. Senne and against the Plaintiffs.

On the other hand, if you do find, from the preponderance of the evidence, that either Mr. Means or Mr. Senne authorized or directed, or personally and knowingly participated in those acts, then your verdict should for Plaintiffs and against Mr. Means or Mr. Senne, as the case may be, on Count 7.

**Source:** *United States v. Wise,* 370 U.S. 405, 416 (1962); *Omni Healthcare v. Health First*, 2015 WL 275806, at *15 (M.D. Fla. Jan. 22, 2015); *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841, 852 (N.D. Cal. 1979)

**JURY INSTRUCTION 26 –** Instructions as to Defendants Means and Senne (Count 8)

In Count 8, Plaintiffs assert that the defendants engaged in a conspiracy with MIMA to monopolize the hospital market, the physician services market, the ancillary services market and the Medicare Advantage insurance market in Southern Brevard County. I have already instructed you as to your deliberations on Count 8 as it relates to the Corporate Defendants. All of those instructions apply equally to your deliberations on Count 8 against Mr. Means and Mr. Senne.

**Source**: *United States v. Wise,* 370 U.S. 405, 416 (1962); *Omni Healthcare v. Health First*, 2015 WL 275806, at *15 (M.D. Fla. Jan. 22, 2015); *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841, 852 (N.D. Cal. 1979)

**JURY INSTRUCTION NO. 27 –** Transitional Instruction

I have almost completed my instructions to you regarding the antitrust claims, which comprise the first seven claims by Plaintiffs OMNI, SOAR, Craig Deligdish, Brian Dowdell, Richard Gayles, Stan Golovac, Lance Grenevicki, Aleksander Komar, Scott Seminer, the Institute of Facial Surgery, and the Pain Institute.  I will now instruct you on the issues of injury, causation and damages, which are common issues for all seven of these Plaintiffs' antitrust claims.  You should consider these instructions only for any antitrust claim for which you have found that a Plaintiff has established the other elements of that claim.  You should not draw any inference one way or the other from the fact that I am providing instructions on these issues.

**Source:** Adapted from Jury Instructions, *Masimo Corp. v. Tyco Health Care Grp.*, Case No. CV 02-4770 MRP (AJWx) (C.D. Cal. March 2005), *available at* http://apps.americanbar.org/antitrust/at-committees/at-trial/pdf/jury-instructions/ji-masimo.pdf.

**JURY INSTRUCTION NO. 28 –** Injury and Causation

If you find that one or more Defendants have violated the Clayton Act or the Sherman Act as alleged by the Plaintiffs, then you must decide if that particular Plaintiff is entitled to recover damages from that Defendant.

A Plaintiff is entitled to recover damages for an injury to its business or property if it can establish three elements of injury and causation:

**First**, that the Plaintiff was in fact injured as a result of that Defendant's alleged violation of the antitrust laws;

**Second**, that the Defendant's alleged illegal conduct was a material cause of the Plaintiff's injury; and

**Third**, that the Plaintiff's injury is an injury of the type that the antitrust laws were intended to prevent.

## Element 1: Injury in Fact

The first element is sometimes referred to as "injury in fact" or "fact of damage." For the Plaintiff to establish that it is entitled to recover damages, it must prove that it was injured as a result of that Defendant's alleged violation of the antitrust laws. Proving the fact of damage does not require the Plaintiff to prove the dollar value of its injury. It requires only that the Plaintiff prove that it was in fact injured by that Defendant's alleged antitrust violation. If you find that the Plaintiff has established that it was in fact injured, you may then consider the amount of the Plaintiff's damages. It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that the Plaintiff has established that it was in fact injured.

## Element 2: Material Cause

The Plaintiff must also offer evidence that establishes as a matter of fact and with a fair degree of certainty that that Defendant's alleged illegal conduct was a material cause of that Plaintiff's injury. This means that the Plaintiff must have proved that some damage occurred to it as a result of that Defendant's alleged antitrust violation, and not some other cause. The Plaintiff is not required to prove that the Defendant's alleged antitrust violation was the sole cause of its injury; nor

need the Plaintiff eliminate all other possible causes of injury.  It is enough if the Plaintiff has proven that the alleged antitrust violation was a material cause of its injury.  However, if you find that the Plaintiff's injury was caused primarily by something other than the alleged antitrust violation, then you must find that the Plaintiff has failed to prove that it is entitled to recover damages from that Defendant.

## Element 3: Antitrust Injury

Finally, the Plaintiff must establish that its injury is the type of injury that the antitrust laws were intended to prevent.  This is sometimes referred to as "antitrust injury."  If the Plaintiff's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then the Plaintiff's injuries are antitrust injuries.  On the other hand, if the Plaintiff's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then the Plaintiff's injuries are not antitrust injuries and the Plaintiff may not recover damages for those injuries under the antitrust laws.  You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against—such as where a competitor offers better products or services or where a competitor is more efficient and can charge lower prices and still earn a profit—and the antitrust laws do not permit a plaintiff to recover damages for losses that were caused by the competitive process or conduct that benefits consumers.

However, if the Plaintiff can establish that it was in fact injured by that Defendant's conduct, that Defendant's conduct was a material cause of the Plaintiff's injury, and that Defendant's injury was the type that the antitrust laws were intended to prevent, then the Plaintiff is entitled to recover damages for the injury to its business or property.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at F-2 to F-5 (2005 ed.).

*Business or Property*

The Plaintiff must establish that the injury it claims to have suffered was an injury to its "business or property."  The term "business" includes any commercial interest or venture, and you are instructed that the Plaintiff has been injured in its "business" if you find that it has suffered injury to any of its commercial interests or enterprises as a result of that Defendant's alleged antitrust violation.  The term

"property" includes anything of value the Plaintiff owns, possesses, or in which the Plaintiff has a protectable legal interest.   You are instructed that the Plaintiff has been injured in its "property" if you find that anything of value that it owns, possesses, or has a legal interest in has been damaged as a result of that Defendant's alleged antitrust violation.   You are further instructed that the Plaintiff has been injured in its "property" if you find that it has paid an inflated price for goods, services, any legal interest of value, or has lost money as a result of that Defendant's alleged antitrust violation.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at F-7 (2005 ed.).

**JURY INSTRUCTION NO. 29 –** Damages

I am now going to instruct you on the issue of damages with respect to the Plaintiffs' antitrust claims.  The fact that I am giving you instructions concerning the issue of Plaintiffs' damages does not mean that I believe any Plaintiff should, or should not, prevail in this case.

If, for any reason, you reach a verdict for a Defendant on the issue of liability, you should not consider the issue of damages, and you may disregard the damages instructions that I am about to give with respect to any such claim. Instructions as to the measure of damages are given for your guidance in the event you should find in favor of the Plaintiffs on a claim based on a preponderance of the evidence in accordance with the other instructions I have given you.  You should only consider calculating damages if you first find that a Defendant violated the antitrust laws and that this violation caused injury to the Plaintiff.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at F-11 (2005 ed.).

*Antitrust Damages — Introduction and Purpose*

If you find that a Defendant violated the antitrust laws and that this violation caused injury to a Plaintiff, then you must determine the amount of damages, if any, that Plaintiff is entitled to recover.  The law provides that the Plaintiff should be fairly compensated for all damages to its business or property that were a direct result or likely consequence of the conduct that you have found to be unlawful.

The purpose of awarding damages in an antitrust action is to put an injured plaintiff as near as possible in the position in which it would have been if the alleged antitrust violation had not occurred.  The law does not permit you to award damages to punish a wrongdoer — what we sometimes refer to as punitive damages — or to deter a defendant from particular conduct in the future, or to provide a windfall to someone who has been the victim of an antitrust violation. You are also not permitted to award to the Plaintiff an amount for attorneys' fees or the costs of maintaining this lawsuit.  Antitrust damages are compensatory only. In other words, they are designed to compensation a plaintiff for the particular injuries it suffered as a result of the alleged violation of the law.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at F-12 (2005 ed.).

*Speculation Not Permitted*

Damages may not be based on guesswork or speculation.  If you find that a damages calculation cannot be based on evidence and reasonable inferences, and instead can only be reached through guesswork or speculation, then you may not award damages.  If the amount of damages attributable to an antitrust violation cannot be separated from the amount of harm caused by factors other than the antitrust violation except through guesswork or speculation, then you may not award damages.

You are permitted to make reasonable estimates in calculating damages.  It may be difficult for you to determine the precise amount of damage suffered by a Plaintiff.  If the Plaintiff establishes with reasonable probability the existence of an injury proximately caused by a Defendant's antitrust violation, you are permitted to make a just and reasonable estimate of the damages.  So long as there is a reasonable basis in the evidence for a damages award, the Plaintiff should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical certainty.  The amount of damages must, however, be based on reasonable, non-speculative assumptions and estimates.  Each Plaintiff must prove the reasonableness of each of the assumptions upon which the damages calculation is based.  If you find that a Plaintiff has failed to carry its burden of proving a reasonable basis for determining damages, then your verdict must be for the Defendant.  If you find that the Plaintiff has provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at F-15 to F-16 (2005 ed.).

*Causation and Disaggregation*

Plaintiffs claim that they suffered injury because they lost patients as a result of Defendants' antitrust violations.  In the normal course of competitive business activity, competitors often  lose sales to each other, and to third parties, for various reasons that have nothing to do with antitrust violations; and a business can be unprofitable for reasons that have nothing to do with the antitrust laws.

Each Plaintiff bears the burden of showing that its injuries were caused by a Defendant's alleged antitrust violation—as opposed to any other factors, such as those that I just described to you. If you find that a Plaintiff's alleged injuries were caused by factors other than a Defendant's alleged antitrust violation, then you

must return a verdict for the Defendant.  If you find that a Plaintiff's alleged injuries were caused in part by a Defendant's alleged antitrust violation and in part by other factors, then you may award damages only for that portion of the Plaintiff's alleged injuries that were caused by the Defendant's alleged antitrust violation.  Each Plaintiff bears the burden of proving damages with reasonable certainty, including apportioning damages between lawful and unlawful causes.  If you find that there is no reasonable basis to apportion a Plaintiff's alleged injury between lawful and unlawful causes, or that apportionment can only be accomplished through speculation or guesswork, then you may not award any damages at all.  If you find that a Plaintiff has proven with reasonable certainty the amount of damage caused by a Defendant's alleged antitrust violation, then you must return a verdict for the Plaintiff on that claim.

*Damages for Competitors — Lost Profits*

Some Plaintiffs claim that they were harmed because they lost profits as a result of Defendants' alleged antitrust violations.  If you find that a Defendant committed an antitrust violation and that this violation caused injury to a Plaintiff, you may calculate profits, if any, that the Plaintiff lost as a result of the Defendant's antitrust violation.  To calculate lost profits, you must calculate net profit: the amount by which that Plaintiff's gross revenues would have exceeded all of the costs and expenses that would have been necessary to produce those revenues.

The Plaintiffs have proposed to calculate the net profits each Plaintiff would have earned if there had been no antitrust violation by showing evidence of each Plaintiff's actual net profits in a period before the antitrust violation.  If you find that the earlier period is a reliable guide to estimate what a Plaintiff's actual net profits would have been later, in the absence of the antitrust violation, then you may calculate that Plaintiff's lost profits by comparing (a) that Plaintiff's actual net profits in the earlier period with (b) that Plaintiff's actual net profits (or loss) thereafter.  You may find, however, that a Plaintiff's profits in the prior period are not representative of what its profits would have been during the period in which the antitrust violation is alleged to have occurred, such as if the Plaintiff's profits were impacted by changed economic conditions, mismanagement, increased competition, changing technology, or other factors. If you find that the prior period is not representative of the later period, and that lost profits in the later period may only be calculated using speculation or guesswork, you may not award damages for lost profits based on the prior period.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at F-27 to F-28 (2005 ed.).

*Expert Testimony*

You have heard testimony from Plaintiffs' expert, Dr. Singer, and Defendants' expert, Dr. McCarthy, regarding the amount of damages to which each Plaintiff claims it is entitled and the proper amount of damages. If you find that any of the pertinent underlying assumptions made by one of these experts in preparing a damage report is not reasonable or is not proven by a preponderance of the evidence, or if you find that one of these expert's conclusions depend on a comparison of things which have not been proven to be comparable, then you should consider this in determining the weight—if any—you will give to these assumptions and the effect they have on that Plaintiff's damages claim.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at F-46 (2005 ed.).

*Mitigation of Damages*

A Plaintiff may not recover damages for any portion of its injuries that it could have avoided through the exercise of reasonable care and prudence. A Plaintiff is not entitled to increase any damages through inaction. The law requires an injured party to take all reasonable steps it can to avoid further injury and thereby reduce its loss. If a Plaintiff failed to take reasonable steps available to it, and the failure to take those steps results in greater harm to the Plaintiff than it would have suffered had it taken those steps, then the Plaintiff may not recover any damages for that part of the injury it could have avoided.

Defendants have the burden of proof on this issue. Defendants must prove by a preponderance of the evidence that a Plaintiff acted unreasonably in failing to take specific steps to minimize or limit its losses, that the failure to take those specific steps resulted in its losses being greater than they would have been had it taken such steps, and the amount by which the Plaintiff's loss would have been reduced had the Plaintiff take those steps.

In determining whether the Plaintiff failed to take reasonable measures to limits its damages, you must remember that the law does not require the Plaintiff to have taken every conceivable step that might have reduced its damages. The evidence must show that the Plaintiff failed to take commercially reasonable measures that were open to it. Commercially reasonable steps mean those

measures that a prudent businessperson in the Plaintiff's position would likely have adopted, given the circumstances as they appeared at that time. The Plaintiff should be given wide latitude in deciding how to handle the situation, so long as what the Plaintiff did was not unreasonable in light of the existing circumstances.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at F-47 to F-48 (2005 ed.).

## Multiple Plaintiffs

In awarding damages, if any, you will be asked what sum of money would fairly and reasonably compensate each Plaintiff for any injury sustained by that Plaintiff. Once a particular Plaintiff establishes that it is entitled to recover damages, the law permits that Plaintiff to recover only for those injuries it has sustained. Therefore, if you find that two or more of the Plaintiffs are entitled to recover damages, caution should be exercised to be sure that each Plaintiff is awarded only damages for injuries it sustained. If you find that a corporate Plaintiff has suffered damages, you cannot also award damages to an individual Plaintiff solely on the basis that the individual Plaintiff is a shareholder in the corporation or an employee of the corporation.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at F-49 (2005 ed.); *Mendenhall v. Fleming Co.*, 504 F.2d 879, 881 (5th Cir. 1974); *Fla. Seed Co. v. Monsanto Co.*, 915 F. Supp. 1167, 1176 (M.D. Ala. 1995), *aff'd*, 105 F.3d 1372 (11th Cir. 1997); *see Associated Gen. Contractors of Cal., Inc. v. Cal. Stat. Council of Carpenters*, 459 U.S. 519, 533, n.25 (1983).

**DEFENDANTS' Jury Instruction No.  30 Instructions as to Conspiracy Under Florida Law**

Plaintiffs' Florida law claims in Counts 9 and 10 are also based on their assertion that the Defendants conspired with MIMA to achieve a monopolistic vertically-integrated healthcare system in Southern Brevard County. Under Florida law, a civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose by unlawful means.

As under federal law, under Florida law, a corporation and its wholly owned subsidiaries cannot conspire with each other; and a corporation and its employees cannot conspire with each other. An exception exists if a corporate employee had a personal stake in the alleged conspiratorial activities that is separate and apart from the corporate interest, or acted in a personal capacity apart from his or her employee status. An employee's receipt of compensation for actions within the scope of employment does not create a financial interest separate from that of the employer.

As to the Health First Defendants, you must find that they conspired with MIMA in order to find that they participated in a conspiracy.

As to individual Defendants Michael D. Means and Jerry Senne, this means that in order to find that they participated in a conspiracy, you must find either that each: (1) had an interest or personal stake in the alleged conspiracy separate from Health First's interests; (2) acted outside his capacity as an employee of Health First; or (3) conspired with others outside the Health First entities.

Only if you find that Defendants participated in a conspiracy with MIMA should you go on to consider the other elements of Plaintiffs' claims in Counts 9 and 10.

**Source:** *Microsoft Corp. v. Big Boy Distribution LLC*, 589 F. Supp. 2d 1308, 1323 (S.D. Fla. 2008) (applying Florida law); *Rivers v. Dillards Dept. Store*, 698 So. 2d 1328, 1333 (Fla. 1st DCA 1997); *Cedar Hills Props. Corp. v. E. Fed. Corp.*, 575 So. 2d 673, 676 (Fla. 1st DCA 1991).

## PLAINTIFFS' POSITION

**This instruction should be deleted entirely. Once again, it limits Plaintiffs' state law claims to a conspiracy without any basis for doing so. It also totally**

misrepresents the law as to the individual defendants by stating the standard for an intercorporate conspiracy but implying that that is the standard to hold the individual defendants liable for ANY conspiracy. The list of elements in Defendants instruction on the individual Defendants' participation in a conspiracy is a confection whipped up by the Defendants and cannot be supported by the cases cited at the end of the Defendants' instruction or any other cases. It represents an amalgamation of unrelated standards. The reality is that the individual defendants are liable under Plaintiffs' state law claims if they participated in the conduct giving rise to those violations. *KC Leisure, Inc. v. Haber*, 972 So. 2d 1069, 1074 (Fla. Dist. Ct. App. 2008) (collecting cases). Finally, this instruction states that "you must find that they conspired with MIMA in order to find that they participated in a conspiracy." That is incorrect, as Plaintiffs challenge the in-network referral requirement, which all participating providers agree to. Plaintiff incorporate their prior positions on Defendants' arguments regarding that allegation and the cases they cite in support.

**DEFENDANTS' POSITION:**

The Third Amended Complaint clearly alleges that the state law claims in Counts 9 and 10 are conspiracy-based. *See* Third Amended Complaint ("TAC"), D.E. 57, ¶¶ 406, 408-420 (tortious interference allegations based on conspiracy or "Defendants' common scheme"); *id.* ¶¶ 380-381, 383-386 ("common scheme" allegations re: FDUTPA).  Plaintiffs' opposition to Defendants' motion to dismiss confirmed that their state law claims were based solely on allegations of a conspiracy.  Plaintiffs Opposition to Defendants' Motion to Dismiss, D.E. 64 at 15 ("Plaintiffs' tortious interference claims rest on the Defendants' conspiracy.  Under Florida law, conspiracy for tortious interference requires a combination of two or more person, having a common purpose, seeking to accomplish the underlying tort of interference."); *id.* at 14 (regarding FDUTPA:  "The same business practices that Plaintiffs allege violate the federal antitrust laws—*e.g.*, excluding doctors and physician assistants for refusing to support Defendants' anticompetitive scheme—can also be characterized as "unfair").

Plaintiffs' 11th-hour attempts to portray routine, in-network referral policies as somehow violative of the antitrust laws should not be permitted.  This theory was not pled and has no place in the jury instructions or in the verdict form.

Plaintiffs' "in-network conspiracy" theory is that doctors cannot agree with Health First to refer patients with Health First insurance to other doctors or hospitals that also accept Health First insurance.  The Eleventh Circuit has rejected the claim that this common arrangement between health insurance plans and participating doctors is an unlawful conspiracy under Section 1 of the Sherman Act.  *See Levine v. Central Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1549-53 (11th Cir. 1996) (affirming summary judgment on Section 1 claim challenging agreement between health insurer Healthchoice and doctors who accepted Healthchoice's insurance plan to refer Healthchoice patients to other doctors who accepted Healthchoice insurance); *see also Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376, 1381-1383 (1997).

**JURY INSTRUCTION 31 –** Conspiracy – Circumstantial Evidence (Florida law)

As to Counts 9 and 10, under Florida law, you may infer that Defendants conspired with alleged MIMA co-conspirators from circumstantial evidence only if Plaintiffs establish that the inference of conspiracy outweighs all reasonable inferences to the contrary.

**Source:** *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 1st DCA 1995) (citing *Diamond v. Rosenfeld*, 511 So. 2d 1031, 1034 (Fla. 4th DCA 1987), *rev. denied*, 520 So. 2d 586 (Fla. 1988)); Regions Bank v. Kaplan, CASE NO. 8:12-CV-1837-T-17MAP, 2016 WL 1592742, *4 (M.D. Fla. Apr. 19, 2016) (applying Florida law, citing *Raimi*); *see also Cohen v. Arvin*, 878 So. 2d 403 (Fla. 4th DCA 2004) (inference stacking is impermissible; original inference must be established to exclusion of all other reasonable inferences before another inference may be constructed from the first); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC*, No. 13-CIV-80371, 2015 WL 3905018, *23 (S.D. Fla. June 25, 2015) (applying Florida law, citing *Cohen*)).

**DEFENDANTS' JURY INSTRUCTION 32** – FDUTPA

**(Count 9)**

That concludes my instructions on the antitrust claims, that is, Plaintiffs' claims in Counts 1-4 & 6-8.

In Count 9, all Plaintiffs, including Hamilton Boone and Physician Assistant Services, have asserted a claim as "consumers" under the Florida Deceptive and Unfair Trade Practices Act against all Defendants.  Under Florida law, certain unfair trade practices are prohibited in order to protect consumers.

To prove its claim of a conspiracy to commit unfair and deceptive trade practices,[8] each Plaintiff must show each of the following elements by a preponderance of the evidence that:

**First**, as part of their conspiracy with MIMA, Defendants committed unfair and deceptive trade practices;

**Second,** Defendants, in the conduct of any trade or commerce, engaged in:
- Unfair methods of competition; or
- Unconscionable acts or practices;

**Third,** causation; (i.e., Plaintiffs are aggrieved as a result of Defendants' unfair trade practice).

An "unfair trade practice" is one that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.  An unfair act or practice may be a violation of a statute, regulation, or other law, but it does not have to amount to such a violation if it otherwise qualifies as an unfair or deceptive act. If you find for the Plaintiffs on any of their antitrust claims, you should find that the Defendants have engaged in an unfair or deceptive act or practice within the meaning of the FDUTPA.

**Source:** Adapted from Jury Instructions, ECF No. 62 at 9-11, *Eugene v. 3DON & Partner Estate Grp., LLC*, Case No. 07-80439-CIV-HURLEY/HOPKINS (S.D. Fla. July 30, 2008); *Tippens v. Round Island Plantation L.L.C.*, 2009 U.S. Dist. LEXIS 66224, *41 (S.D. Fla. 2009); *Hetrick v. Ideal Image Dev. Corp.*, 2010 U.S. App. LEXIS 7831, at *18-19 (11th Cir. Apr. 15, 2010).

---

[8] Plaintiffs contend that Count 9 is not predicated upon a conspiracy

**PLAINTIFFS' JURY INSTRUCTION 32** – FDUTPA

**(Count 9)**

That concludes my instructions on the antitrust claims, that is, the first seven claims.

In Count 9, all Plaintiffs, including Hamilton Boone and Physician Assistant Services, have asserted a claim under the Florida Deceptive and Unfair Trade Practices Act against all Defendants.   Under Florida law, certain unfair trade practices are prohibited in order to protect consumers and competitors.

To prove its claim of a conspiracy to commit unfair and deceptive trade practices, each Plaintiff must show each of the following elements by a preponderance of the evidence that:

> **First,** that the Defendants, in the conduct of any trade or commerce, engaged in:
> - Unfair methods of competition; or
> - Unconscionable acts or practices; or
> - Unfair or deceptive acts or practices; and

> **Second,** that Plaintiffs are aggrieved as a result of the unfair act or practice.

An "unfair trade practice" is one that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.  An unfair act or practice may be a violation of a statute, regulation, or other law, but it does not have to amount to such a violation if it otherwise qualifies as an unfair or deceptive act. If you find for the Plaintiffs on any of their antitrust claims, you should find that the Defendants have engaged in an unfair or deceptive act or practice within the meaning of the FDUTPA. However, if you do not find that the Plaintiffs have proven an antitrust violation, you may still find that the Defendants have violated the FDUTPA if you find that they have engaged in an unfair or deceptive act or practice.

## PLAINTIFFS' POSITION

**This instruction:**
1) **Corrects Defendants refusal to include competitors within the protections of the FDUTPA (paragraph 2, sentence 2).** *See, e.g.*, **jury instructions in** *Marco Island Cable, Inc. v. Comcast of the South, Inc.*, **2:04-cv-00026-JES-DNF (M.D. Fla. July 21, 2006) at 6. For a complete discussion of the issue of Plaintiffs' use of the word "consumers" in a single sentence in their Complaint, see Plaintiffs' Trial Brief.**
2) **Deletes Defendants' reference in the second paragraph to Plaintiffs challenging Defendants' conduct as consumers, which is an attempt to limit the scope of Plaintiffs' allegations.**
3) **Corrects Defendants' statement of the elements to remove the implication that Plaintiffs can only prove a FDUTPA violation if they prove a conspiracy.**
4) **Adds a sentence to the paragraph defining an unfair trade practice to clarify that Plaintiffs need not prove an antitrust violation in order to prove a FDUTPA violation.**

## DEFENDANTS' POSITION:

**The Third Amended Complaint clearly alleges that the state law claims in Counts 9 and 10 are conspiracy-based.** *See* **Third Amended Complaint ("TAC"), D.E. 57, ¶¶ 406, 408-420 (tortious interference allegations based on conspiracy or "Defendants' common scheme");** *id.* **¶¶ 380-381, 383-386 ("common scheme" allegations re: FDUTPA).   Plaintiffs' opposition to Defendants' motion to dismiss confirmed that their state law claims were based solely on allegations of a conspiracy.   Plaintiffs Opposition to Defendants' Motion to Dismiss, D.E. 64 at 15 ("Plaintiffs' tortious interference claims rest on the Defendants' conspiracy.  Under Florida law, conspiracy for tortious interference requires a combination of two or more person, having a common purpose, seeking to accomplish the underlying tort of interference.");** *id.* **at 14 (regarding FDUTPA:  "The same business practices that Plaintiffs allege violate the federal antitrust laws—***e.g.***, excluding doctors and physician assistants for refusing to support Defendants' anticompetitive scheme—can also be characterized as "unfair").**

**DEFENDANTS' JURY INSTRUCTION 33** – Tortious Interference with Advantageous Business Relationship

(**Count 10**)

In Count 10,[9] the Plaintiffs further allege that as part of their conspiracy with MIMA prior to February 15, 2013, the Defendants tortiously interfered with the following types of Plaintiffs' business relationships: 1) their relationships with patients; 2) their relationships with physicians who previously referred patients to them, or, in the case of Physician Assistant Services, L.L.C., utilized their services; and 3) relationships with certain physicians who were lured away from the Plaintiffs' practices by the Defendants to join other practices. All Plaintiffs assert these claims against all Defendants, including the individual defendants, Michael Means and Jerry Senne.

The issues for you to decide on each Plaintiff's claim against each Defendant are whether:

**First**, the Defendant conspired or agreed with MIMA to improperly and intentionally interfere with one or more of these business relationships I just described without justification:
     and

**Second**, whether such interference was the legal cause of damage to each Plaintiff

**PLAINTIFFS' JURY INSTRUCTION 33** – Tortious Interference with Advantageous Business Relationship

(**Count 10**)

In Count 10, the Plaintiffs further allege that the Defendants tortiously interfered with the following types of Plaintiffs' business relationships: 1) their relationships with patients; 2) their relationships with physicians who previously referred patients to them, or, in the case of Physician Assistant Services, L.L.C., utilized their services; and 3) relationships with certain physicians who were lured away from the Plaintiffs' practices by the Defendants to join other practices. All Plaintiffs assert these claims against all Defendants, including the individual defendants, Michael Means and Jerry Senne.

---

[9] Plaintiffs contend that Count 10 is not predicated upon a conspiracy

For their tortious interference claims, the Plaintiffs must prove by a preponderance of the evidence:

(1) that the Defendants improperly and intentionally interfered with one of the Plaintiffs' business relationships I just described; and

(2) that such interference was the legal cause of the Plaintiffs' damages.

**PLAINTIFFS' POSITION**

**This instruction avoids the implication in Defendants' instruction that Plaintiffs must prove a conspiracy in order to prove tortious interference. As discussed above, that is not the case.**

**DEFENDANTS' POSITION:**

**The Third Amended Complaint clearly alleges that the state law claims in Counts 9 and 10 are conspiracy-based.  *See* Third Amended Complaint ("TAC"), D.E. 57, ¶¶ 406, 408-420 (tortious interference allegations based on conspiracy or "Defendants' common scheme"); *id.* ¶¶ 380-381, 383-386 ("common scheme" allegations re: FDUTPA).  Plaintiffs' opposition to Defendants' motion to dismiss confirmed that their state law claims were based solely on allegations of a conspiracy.  Plaintiffs Opposition to Defendants' Motion to Dismiss, D.E. 64 at 15 ("Plaintiffs' tortious interference claims rest on the Defendants' conspiracy.  Under Florida law, conspiracy for tortious interference requires a combination of two or more person, having a common purpose, seeking to accomplish the underlying tort of interference."); *id.* at 14 (regarding FDUTPA:  "The same business practices that Plaintiffs allege violate the federal antitrust laws—*e.g.*, excluding doctors and physician assistants for refusing to support Defendants' anticompetitive scheme—can also be characterized as "unfair").**

**Element 1: Intentional and Unjustified Interference**

The first issue you will decide is whether the Defendants interfered with a Plaintiff's business relations described above by inducing or otherwise causing the former patients insured by Health First Health Plans not to seek care from a Plaintiff, inducing or otherwise causing the doctors who previously referred patients to that Plaintiff to stop referring patients to that Plaintiff, or inducing or

otherwise causing the doctors previously employed by the Plaintiff to terminate or bring to an end an employment contract with the Plaintiff.

If the preponderance of the evidence does not show that a Defendant interfered with a Plaintiff's business relations, your verdict should be for that Defendant.

However, if the preponderance of the evidence shows that one or more of the Defendants did interfere with one or more business relationships of a Plaintiff, as described above, you must then decide whether that Defendant's interference was improper.

A person who enjoys business relations with another is entitled to protection from improper interference with that relationship. However, another business is entitled to compete for the business or advance its own financial interest so long as it has a proper reason or motive and it uses proper methods.

A person who interferes with the business relations of another with the motive and purpose, at least in part, to advance or protect its own business or financial interests, does not interfere with an improper motive. But one who interferes only out of spite, or to do injury to others, or for other bad motive, has no justification, and the interference is improper.

Also, a person who interferes with another's business relations using ordinary business methods of competition does not interfere by an improper method. But one who uses misrepresentations, illegal conduct, including violation of the antitrust laws, or threats of illegal conduct has no privilege to use those methods, and interference using such methods is improper.

If the preponderance of the evidence does not show that defendants' interference was improper, your verdict should be for the defendants.

However, if the preponderance of the evidence shows that defendants' interference was improper, you must finally decide whether defendants' interference was intentional.

Interference is intentional if the person interfering knows of the business relationship with which he is interfering, knows he is interfering with that relationship, and desires to interfere or knows that interference is substantially certain to occur as a result of his action.

If the preponderance of the evidence supports the Plaintiffs' claim that one or more Defendants intentionally interfered with one of more of the Plaintiff's business relationships described above, then you should consider whether the Defendant's interference was the legal cause of damage to Plaintiff.

**Source:** Adapted from Florida Standard Jury Instructions 408.2, 408.4, and 408.6.

## Element 2: Legal Cause

I will now define the term "legal cause."

Interference with a business relationship is a cause of damage if it directly and in natural and continuous sequence produces or contributes substantially to producing such damage, so that it can reasonably be said that, but for the interference with a business relationship, the damage would not have occurred.

In order to be regarded as a legal cause of damage interference with a business relationship need not be the only cause. Interference with a business relationship may be a legal cause of damage even though it operates in combination with the act of another or some other cause if the interference with a business relationship contributes substantially to producing such damage.

If the preponderance of the evidence does not support the Plaintiff's claim that one or more Defendants' intentional interference with one or more of the Plaintiff's business relationships described above was the legal cause of damage to Plaintiff, then you should find for the Defendant. If the preponderance of the evidence does support the Plaintiff's claim, you should consider the matter of damages.

**Source:** Adapted from Florida Standard Jury Instruction 408.4 and 408.6.

## Damages

As I said before, if you find for the Defendants, you will not consider the matter of damages. But, if you find for a Plaintiff on this claim, you should award the Plaintiff an amount of money that the preponderance of the evidence shows will fairly and adequately compensate that Plaintiff for the damage that was caused by the intentional interference caused by one or more Defendants.

**Source:** Adapted from Florida Standard Jury Instructions 408.6.

**DEFENDANTS' JURY INSTRUCTION 34** – Transitional Instructions as to Defendants Means and Senne (Counts 9 and 10)

As I stated previously, Mr. Means and Mr. Senne are defendants only in the Plaintiffs' Counts 7 through 10.  I have previously instructed you as to those counts or claims in regard to the Corporate Defendants.

In a moment, I will briefly summarize Counts 9 and 10 again for you, as they relate to Mr. Means and Mr. Senne, and I will instruct you as to your deliberations on each of these claims or counts insofar as they relate to Mr. Means and Mr. Senne.  But first, as to all of Plaintiffs' claims in Counts 9 and 10, insofar as they relate to Mr. Means and Mr. Senne, I instruct you generally as follows.

First if, from the preponderance of the evidence, you do not find that the Health First Corporate Defendants are liable to the Plaintiffs on any one or more of the Plaintiffs' claims in Counts 9 and 10, then you must also find that Mr. Means and Mr. Senne are not liable to the Plaintiffs on those same claims or counts.

Further, I instruct you that, should you find from the preponderance of the evidence that one or more of the Health First Corporate Defendants is liable to the Plaintiffs on the Plaintiffs' claims in one or more of Counts 9 or 10, that is not sufficient by itself for you to also find that Mr. Means and/or Mr. Senne is liable to the Plaintiffs on any such claim or count. More is required for you to find that Mr. Means and/or Mr. Senne are liable to Plaintiffs.  In order for you to find either of the two individual defendants to be liable to the Plaintiffs, you must find, from the preponderance of the evidence:

> **First**, that the one or more of the Health First Corporate Defendants engaged in an act alleged by the Plaintiffs in those counts that is prohibited by law, and

> **Second,** that Mr. Means and/or Mr. Senne knowingly and personally participated in the act, or that they authorized or directed the act.

You may not find Mr. Means or Mr. Senne liable to the Plaintiffs on any of their claims in Counts 9 or 10 merely because they held a corporate office in one or more of the Health First corporations. Nor may you engage in speculation or conjecture that he directed or personally participated in any act alleged by the plaintiffs simply because Mr. Means or Mr. Senne was an officer or director of one or more of the Health First corporations.

**Source**: *United States v. Wise,* 370 U.S. 405, 416 (1962); *Omni Healthcare v. Health First*, 2015 WL 275806, at *15 (M.D. Fla. Jan. 22, 2015); *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841, 852 (N.D. Cal. 1979)

**PLAINTIFFS' JURY INSTRUCTION 34 –** Transitional Instructions as to Defendants Means and Senne (Counts 9 and 10)

As I stated previously, Mr. Means and Mr. Senne are defendants only in the Plaintiffs' seventh, eighth, ninth, and tenth counts or claims.  I have previously instructed you as to the standards for liability of individual officers or employees of a corporation. Those same instructions apply equally here.

**PLAINTIFFS' POSITION**

**This instruction may not be needed at all since it repeats instruction 24 almost verbatim and adds nothing new. If it is needed, it should be much shorter and should simply remind the jury of the earlier instructions, not repeat them as Defendants' instruction does.**

**DEFENDANTS' POSITION:**

**If the Court agrees that Counts 7-10 are all conspiracy based claims and gives the Defendants' version of Instruction No. 24 then this separate instruction is not necessary.**

**DEFENDANTS' JURY INSTRUCTION 35 –** Instructions as to Defendants Means and Senne (Count 9)

Again as to Count 9, I instruct you first that Plaintiffs concede that Mr. Means was not involved in any way in any revocation of Dr. Deligdish's privileges at Holmes Regional Medical Center or in any threat to do so.

I further instruct you that if, from the preponderance of the evidence, you do not find that the Health First Corporate Defendants did not engage in a conspiracy with MIMA physicians prior to February 2013  to refuse to deal with Plaintiffs, then your verdict on this claim or count must be for Mr. Means and Mr. Senne and against the Plaintiffs. [10]

Further, if you find, from the preponderance of the evidence, that one or more of the Health First Corporate Defendants committed any of those acts, you may not find Mr. Means or Mr. Senne liable to the Plaintiffs on Count 9, unless you also find, from the preponderance of the evidence, that Mr. Means and/or Mr. Senne directed or personally participated in the alleged conspiracy with MIMA.

On the other hand, if you do find, from the preponderance of the evidence, that Mr. Means or Mr. Senne personally authorized or directed, or personally and knowingly participated in those acts, then your verdict should for Plaintiffs and against Mr. Means or Mr. Senne, as the case may be, on Count 9.

**Source**: *United States v. Wise,* 370 U.S. 405, 416 (1962); *Omni Healthcare v. Health First*, 2015 WL 275806, at *15 (M.D. Fla. Jan. 22, 2015); *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841, 852 (N.D. Cal. 1979)

**PLAINTIFFS' POSITION**

**This instruction should be deleted entirely, as it once again duplicates instruction 24 almost verbatim and also limits Plaintiffs' state law claims to a conspiracy despite the pleadings, evidence, and argument of the parties to this point.**

---

[10] Plaintiffs contend that Count 9 is not predicated upon a conspiracy

**DEFENDANTS' POSITION:**

**If the Court agrees that Counts 7-10 are all conspiracy based claims and gives the Defendants' version of Instruction No. 24 then this separate instruction is not necessary.**

**DEFENDANTS' JURY INSTRUCTION 36** – Instructions as to Defendants Means and Senne (Count 10)

In Count 10,[11] the Plaintiffs assert that the Defendants conspired with MIMA prior to the acquisition of MIMA in 2013 to improperly interfere with the Plaintiffs' business relationships with their patients, with physicians employed by one or more of the plaintiff practices, and with Plaintiffs' referral business from other physicians.

I have already instructed you as to your deliberations on Count 10 against the Health First Corporate Defendants.  All of those instructions apply equally to your deliberations on this Count 10 against Mr. Means and Mr. Senne.

I further instruct you in regard to Mr. Means and Mr. Senne that if, from the preponderance of the evidence, you do not find that the Health First Corporate Defendants are liable to the Plaintiffs on Count 10, then you must also find that Mr. Means and Mr. Senne are not individually liable to the Plaintiffs on Count 10.

I further instruct you, as to Mr. Means and Mr. Senne, that if, from the preponderance of the evidence, you do not find that Mr. Means or Mr. Senne directed or personally participated in a conspiracy with MIMA to improperly and unjustifiably interfere with any Plaintiff's business relationships, then your verdict on Count 10 should be in favor of Mr. Means or Mr. Senne, as the case may be, and against the Plaintiffs.

On the other hand, if, from the preponderance of the evidence, you find that the Health First Corporate Defendants did in fact conspire with MIMA to improperly and unjustifiably interfere with the advantageous business relationships of one or more of the plaintiffs, and if you also find, by the preponderance of the evidence, that Mr. Means or  Mr. Senne directed or personally participated in such interference, then your verdict on Count 10 should be in favor of the Plaintiff as to whom you find Mr. Means or Mr. Senne, as the case may be, directed the improper interference or personally participated in the improper interference.

**Source:**  *United States v. Wise,* 370 U.S. 405, 416 (1962); *Omni Healthcare v. Health First*, 2015 WL 275806, at *15 (M.D. Fla. Jan. 22, 2015); *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841, 852 (N.D. Cal. 1979)

---

[11] Plaintiffs contend that Count 10 is not predicated upon a conspiracy

**PLAINTIFFS' POSITION**

  This instruction should be deleted entirely, as it once again duplicates instruction 24 almost verbatim and also limits Plaintiffs' state law claims to a conspiracy despite the pleadings, evidence, and argument of the parties to this point.

**DEFENDANTS' POSITION:**

If the Court agrees that Counts 7-10 are all conspiracy based claims and gives the Defendants' version of Instruction No. 24 then this separate instruction is not necessary.

**JURY INSTRUCTION 37 –** Affirmative Defense – Statute of Limitations

With respect to all Plaintiffs' claims, the laws do not permit recovery of damages for an injuries sustained by Plaintiffs prior to September 27, 2009.

If you find that a Plaintiff suffered injuries spanning both before and after September 27, 2009, then you must apportion the damages between the two periods and you may award damages only for the portion of the injuries suffered after September 27, 2009.  If you find that you cannot apportion the damages between the two periods, or that such apportionment can only be accomplished through guesswork or speculation, then you may not award damages at all.

**Source:** Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases at G-2 (2005 ed.).

**DEFENDANTS' JURY INSTRUCTION 38 –** Affirmative Defense – Equitable Estoppel

The elements of equitable estoppel are:

**First:** A representation of a material fact that is contrary to a later-asserted position; and

**Second:** Reliance on that representation; and

**Third:** A change in position detrimental to the party claiming estoppel, caused by the representation and reliance thereon.

Defendants must prove each of these elements by a preponderance of the evidence in order to prevail as to this affirmative defense.

This defense does not apply to Plaintiffs' Antitrust Claims in Counts 1 through 4 and Count 6 through 8.

Source: *State v. Harris*, 881 So. 2d 1079, 1984 (Fla. 2004); Marc A. Wites, *Florida Causes of Action*, § 18:120.1 (2012). *See also State ex. rel. Watson v. Gray*, 48 So. 2d 84, 87 (Fla. 1950) (The doctrine of estoppel is applicable in all cases where by word, act, or conduct one party willfully causes another party to believe the existence of a certain state of things and thereby induces the other party to act on that belief in a manner that results in injury.); *Pelican Island Prop. Owners Ass'n, Inc., v. Murphy*, 554 So. 2d 1179, 1181 (Fla. 2d DCA 1989) (Estoppel based on silence can exist where the parties do not have equal knowledge of the facts or the same means of ascertaining that knowledge.); *Rinker Materials Corp. v. Palmer First Nat'l Bank & Trust Co. of Sarasota*, 361 So. 2d 156, 159 (Fla. 1978) (generally, need proof of fraud, misrepresentation or affirmative deception); *Rubman v. Honig*, 817 So. 2d 1001, 1002 (4th DCA 2002). (Silence when there is a duty to speak should estop assertion of a right that otherwise may have existed.).

**DEFENDANTS' JURY INSTRUCTION 39 –** Affirmative Defense – Waiver

Waiver is the intentional relinquishment of a known right or conduct from which it can be inferred. Elements that must be established to prove waiver are:

**First:** Existence at the time of the waiver of a right, privilege, advantage or benefit that may be waived; and

**Second:** Actual or constructive knowledge thereof; and

**Third:** An intention to relinquish that right, privilege, advantage or benefit.

Defendants must prove each of these elements by a preponderance of the evidence in order to prevail as to this affirmative defense.

This defense does not apply to Plaintiffs' Antitrust Claims in Counts 1 through 4 and Count 6 through 8.

**Source:** *Jonas v. City of West Palm Bch.*, 79 So. 438 (Fla. 1918); *Cullum v. Packo*, 947 So. 2d 533, 537 (Fla. 1st DCA 2006); Marc A. Wites, *Florida Causes of Action*, § 18:220.1 (2012). *See Am. Somax Ventures v. Touma*, 547 So. 2d 1266, 1268 (Fla. 4th DCA 1989) (when waiver is implied, the conduct must make out a clear case); Marc A. Wites, *Florida Causes of Action*, § 18:220.5, n.1 (2012).

**JURY INSTRUCTION 40 –** Duty to Deliberate When Only the Plaintiff Claims Damages

As I stated earlier, the fact that I have given you instructions concerning the issue of Plaintiffs' damages should not be interpreted in any way as an indication that I believe that any Plaintiff should, or should not, prevail in this case.

Your verdict must be unanimous—in other words, you must all agree.  Your deliberations are secret, and you'll never have to explain your verdict to anyone.

Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors.  So you must discuss the case with one another and try to reach an agreement.  While you're discussing the case, don't hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong.  But don't give up your honest beliefs just because others think differently or because you simply want to get the case over with.

Remember that, in a very real way, you're judges—judges of the facts. Your only interest is to seek the truth from the evidence in the case.

**Source:** Eleventh Circuit Civil Pattern Jury Instruction 3.8.1.

**JURY INSTRUCTION 41 –** Election of Foreperson; Explanation of Verdict Forms

When you get to the jury room, choose one of your members to act as foreperson.  The foreperson will direct your deliberations and speak for you in court.

Verdict forms have been prepared for your convenience.  *[Explain verdict form]*

Take the verdict forms with you to the jury room.  When you've all agreed on the verdicts, your foreperson must fill in the forms, sign them and date them.  Then you'll return them to courtroom.

If you wish to communicate with me at any time, please write down your message or question and give it to the court security officer.  The court security officer will bring it to me and I'll respond as promptly as possible—either in writing or by talking to you in the courtroom.  Please understand that I may have to talk to the lawyers and the parties before I respond to your question or message, so you should be patient as you await my response.  But I caution you not to tell me how many jurors have voted one way or the other at that time.  That type of information should remain in the jury room and not be shared with anyone, including me, in your note or question.

**Source:** Eleventh Circuit Civil Pattern Jury Instruction 3.9.