**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

OMNI HEALTHCARE INC.;
INTERVENTIONAL SPINE INSTITUTE
OF FLORIDA; CRAIG DELIGDISH;
C. HAMILTON BOONE, PA; BRIAN
DOWDELL; RICHARD GAYLES; STAN
GOLOVAC; LANCE GRENEVICKI;
ALEKSANDER KOMAR; SCOTT
SEMINER; INSTITUTE OF FACIAL
SURGERY INC.; THE PAIN INSTITUTE
INC.; and PHYSICIAN ASSISTANT
SERVICES OF FLORIDA, LLC,

        Plaintiffs,

v.                               Case No. 6:13-cv-1509-Orl-37DAB

HEALTH FIRST, INC.; HOLMES
REGIONAL MEDICAL CENTER, INC.;
HEALTH FIRST PHYSICIANS, INC.;
HEALTH FIRST HEALTH PLANS, INC.;
MICHAEL D. MEANS; and JERRY
SENNE,

        Defendants.

_____

**ORDER**

    This cause is before the Court on the following:

1.    Plaintiffs' *Daubert* Motion to Exclude Defendants' Expert Testimony and
Incorporated Memorandum of Law (Doc. 197), filed January 22, 2016;

2.    Corporate Defendants' Memorandum in Opposition to Plaintiffs' *Daubert*
Motion to Exclude Defendants' Expert's Testimony (Doc. 214), filed
February 8, 2016;

3.    Defendants' Motion to Exclude the Testimony of Dr. H.E. Frech, III and
Incorporated Memorandum of Law (Doc. S-194), filed January 22, 2016;

4.    Plaintiffs' Opposition to Defendants' Motion to Exclude the Testimony of Dr. H.E. Frech, III and Incorporated Memorandum of Law (Doc. 212), filed February 5, 2016;

5.    Defendants' Motion to Exclude the Testimony of Dr. Hal J. Singer and Incorporated Memorandum of Law (Doc. S-199), filed January 22, 2016;

6.    Plaintiffs' Opposition to Defendants' Motion to Exclude the Testimony of Dr. Hal J. Singer and Incorporated Memorandum of Law (Doc. 213), filed February 5, 2016;

7.    Corporate Defendants' Joint Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. S-201), filed January 22, 2016;

8.    Plaintiffs' Response to Corporate Defendants' Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. S-235), filed February 22, 2016;

9.    Corporate Defendants' Reply on Motion for Summary Judgment (Doc. 249), filed March 4, 2016;

10.    Defendant Michael D. Means'[s] Motion for Summary Judgment (Doc. 189), filed January 21, 2016;

11.    Defendant Jerry Senne's Motion for Summary Judgment (Doc. 195), filed January 22, 2016;

12.    Plaintiffs' Response to Individual Defendants' Motion[s] for Summary Judgment and Incorporated Memorandum of Law (Doc. S-236), filed February 22, 2016;

13.    Defendant Means'[s] Reply as to His Motion for Summary Judgment

(Doc. S-248), filed March 4, 2016;

14.     Defendant Jerry Senne's Reply Memorandum (Doc. S-247), filed March 4,

2016; and

15.     Notice of Supplemental Authority (Doc. 274), filed May 18, 2016.

Upon consideration, the Court finds that: (1) the parties' *Daubert* motions are due to

denied; and (2) Defendants' respective motions for summary judgment are due to be

granted in part and denied in part as specified in this ensuing Order.

## BACKGROUND[1]

This monolithic action concerns claims brought under federal antitrust law,

Florida's Deceptive and Unfair Trade Practices Act ("**FDUTPA**"), and a common law claim

for tortious interference with business relationships. (*See* Doc. 57.) The litigation spans

close to three years and the docket reveals more than three hundred docket entries. In a

prior Order denying Defendants' motion to dismiss the operative ten-count, 101-page

Complaint (Doc. 57), the Court set forth a thirteen-page recitation of the factual

allegations underlying the instant action. (*See* Doc. 105 ("**Dismissal Order**").) As such,

here, the Court elects to provide only a short summary of Plaintiffs' claims, the relevant

parties, and the current posture of the proceedings.

Plaintiffs—Omni Healthcare Inc. ("**Omni**"), Interventional Spine Institute of Florida,

doing business as Spine Orthopedics and Rehabilitation ("**SOAR**"), Dr. Craig Deligdish

("**Dr. Deligdish**"), C. Hamilton Boone ("**Boone**"), Dr. Brian Dowdell ("**Dr. Dowdell**"),

---

[1] In their submissions, the parties utilize a variety of methods to pincite specific portions of the record. For ease of reference, the Court has consistently cited to the assigned page numbers in the header of the documents, with the exception of documents consistently organized by paragraph number or mini-deposition page numbers throughout, which the Court cited according to such designations.

Dr. Richard Gayles ("**Dr. Gayles**"), Dr. Lance Grenevicki ("**Dr. Grenevicki**"), Dr. Aleksander Komar ("**Dr. Komar**"), Dr. Scott Seminer ("**Dr. Seminer**"), the Institute of Facial Surgery Inc. ("**IFS**"), The Pain Institute Inc., doing business as Florida Pain ("**Florida Pain**"), and Physician Assistant Services of Florida, LLC ("**PAS**")—initiated the instant action on September 27, 2013. (Doc. 1.) In their Complaint, Plaintiffs allege that Defendants—Health First, Inc. ("**Health First**"), Holmes Regional Medical Center, Inc. ("**HRMC**"), Health First Physicians, Inc. ("**HF Physicians**"), and Health First Health Plans, Inc. ("**HFHP**") (collectively, "**the Corporate Defendants**")—have engaged in a continuing course of anticompetitive conduct, unfair trade practices, and tortious interference with Plaintiffs' business relationships in Southern Brevard County ("**SBC**") since the early 2000's. (Doc. 57, Doc. 194-1, pp. 86–87.)  Additionally, Plaintiffs allege that the individual Defendants, Michael D. Means ("**Means**")—co-founder and former President and Chief Executive Officer ("**CEO**") of Health First—and Jerry Senne ("**Senne**")—former president and CEO of HRMC—(collectively, "**the Individual Defendants**"), personally orchestrated and participated in such conduct. (Doc. 57, ¶¶ 30–31, 188–95.)

Plaintiffs comprise various medical practices and providers in SBC. Omni, SOAR, IFS, Florida Pain, and PAS (collectively, "**the Medical Practice Plaintiffs**") are medical practices and physician assistant Boone and Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, and Komar are medical providers.[2] (*See id.* ¶¶ 11–25.) As for Defendants, Health First is the parent corporation of the remaining Corporate Defendants, as well as three affiliated hospitals in Brevard County not named in this action—Cape

---

[2] Dr. Deligdish is the president of Omni. (Doc. 57, ¶ 22.) Dr. Grenevicki founded IFS. (*Id.* ¶ 22.)

Canaveral Hospital, Inc., Palm Bay Hospital, and Viera Hospital, Inc. (*Id.* ¶ 26.) For their part, HRMC is an inpatient hospital located in Melbourne, Florida, HFHP is a health insurance company, and HF Physicians is the managing member of Health First Medical Group, LLC ("**HFMG**")—Brevard County's largest multi-specialty physicians group.[3] (*Id.* ¶¶ 27–29.) Though not a party to this action, the parties frequently mention Wuesthoff Medical Center, Melbourne ("**Wuesthoff**"), seemingly the only hospital in SBC that competes with the Health First affiliated hospitals. (*See id.* ¶ 1.) Wuesthoff entered the SBC market in 2002.

Reduced to its simplest form, the allegations in the Complaint are as follows: Plaintiffs aver that Defendants collectively implemented a common and self-enforcing scheme of anticompetitive conduct in SBC ("**the Alleged Common Scheme**"), whereby they: (1) mandated exclusive referral and admission practices within the Health First system ("**Exclusive Referral Practice**"); (2) excluded from HFHP medical practices and providers who refused to participate in the Exclusive Referral Practice ("**Blacklisted Providers**"); and (3) prevented providers within the Health First system from referring patients to the Blacklisted Providers lest they too be boycotted. (*See generally* Doc. 57.) Additionally, Plaintiffs allege that Defendants further cemented their power and dominance in the SBC physician services market by acquiring Melbourne Internal Medicine Associations ("**MIMA**")—the second largest physician group in Brevard County—in 2013 ("**MIMA Acquisition**"). (*See id.* ¶ 260.) Indeed, in Count I of the Complaint, Plaintiffs allege that the MIMA Acquisition was itself an impermissible merger

---

[3] Lead Plaintiff Omni is also a multi-specialty physicians practice with various ancillary service facilities. (Doc. 57, ¶ 20.)

in violation of federal antitrust law. (*Id.* ¶ 299.) According to Plaintiffs, the Alleged Common Scheme substantially lessened competition in SBC, harmed Plaintiffs both monetarily and in their business relationships with former patients and fellow physicians, and resulted in higher prices and lower quality of care in SBC. (*Id.* ¶¶ 275–90, 409–22.)

Collectively, Omni, SOAR, Deligdish, Dowdell, Gayles, Golovac, Grenevicki, Komar, Seminer, IFS, and Florida Pain ("**the Antitrust Plaintiffs**") assert claims against Defendants for violations of federal antitrust law. (*Id.* ¶¶ 291–392.) All Plaintiffs join in the state law claims against Defendants. (*Id.* ¶¶ 393–422.) Specifically, Plaintiffs have sued Defendants for: (1) monopolization of the acute care inpatient hospital services market; (2) attempted monopolization of the physician services market, ancillary services market, and Medicare Advantage markets; (3) conspiracy to restrain trade and monopolize various markets; (4) unfair methods of competition; and (5) tortious interference with business relationships. (*Id.* ¶¶ 291–422.)

In January of 2016, the Corporate and Individual Defendants respectively moved for summary judgment on all ten counts of the Complaint. (*See* Docs. 189, 195, 201.) Additionally, the Corporate Defendants and Plaintiffs moved to exclude the testimony of three expert witnesses. (*See* Docs. 194, 197, 199.) Given the complexity of the arguments and claims, the Court held a full-day hearing on the foregoing motions on May 2, 2016. (*See* Doc. 272.) After taking the matters under advisement, the Court announced its rulings on the motions at the Final Pretrial Conference on July 21, 2016. (Doc. 298.) The instant Order memorializes such rulings.

## THE *DAUBERT* MOTIONS

### I.    Standards

In its gatekeeping role, a district court is tasked to ensure that juries only hear

"expert" opinions that satisfy the following requirements:

**Qualifications**—a witness that is "qualified as an expert by knowledge, skill, experience, training, or education" may testify as to his opinions of scientific, technical, or other specialized knowledge (Fed. R. Evid. 702) ("**Qualification Requirement**");

**Reliability**—the testimony is "based upon sufficient facts or data" (Fed. R. Evid. Rule 702(b)) and "is the product of reliable principles and methods" (Fed. R. Evid. Rule 703(c)), which the witness applied "reliably to the facts of the case" (Fed. R. Evid. Rule 702(d)) ("**Reliability Requirement**"); and

**Helpfulness**—the testimony will help the jury to "understand the evidence or to determine a fact in issue" (Fed. R. Evid. Rule 702(a)) ("**Helpfulness Requirement**").

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562–63 (11th Cir. 1998); *see*

*also Cooper v. Marten Transp., Ltd.*, 539 F. App'x 963, 965–67 (11th Cir. 2013).

Importantly, the Court must abstain from credibility determinations and any assessment

of the merits of an expert witness's opinion—which are matters exclusively reserved to

juries—and must instead narrowly focus on whether the proponent of the expert witness

has established the Qualification, Reliability, and Helpfulness Requirements. *See*

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594–95 (1993); *see also Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 155 (2000).

To determine whether the Qualification Requirement is met, "courts generally look

to evidence of the witness's education and experience" and determine whether such

qualifications and expertise sufficiently "fit" with "the subject matter of the witness's

proposed testimony." *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*,

711 F. Supp. 2d 1348, 1367 (M.D. Ga. 2010) (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)).

A determination on the Reliability Requirement requires consideration of a plethora of matters, which vary depending on the opinions and testimony at issue, and include the following well-known *Daubert* factors:

(1)     whether the expert's theory can be or has been tested;

(2)     whether the theory has been subject to peer review and publication;

(3)     the known or potential rate of error of the particular scientific technique; and

(4)     whether the technique is generally accepted in the scientific community.

*Daubert*, 509 U.S. 579; *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004). The factors pertinent to an analysis of the Reliability Requirement—including the *Daubert* factors—"are only illustrative and may not all apply in every case." *United States v. Abreu*, 406 F.3d 1304, 1307 (11th Cir. 2005). Ultimately, the district court must identify the pertinent factors, and it is accorded "wide latitude in deciding how to determine reliability." *Id.*

Finally, the Helpfulness Requirement turns on

the common sense inquiry [of] whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

*See* Fed. R. Evid. 702, Advisory Committee Notes (citation omitted).

The burden of establishing admissibility is borne by the proponent of the expert opinion. *See Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (citing

*McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002)); *see also Frazier*, 387 F.3d at 1260. The proponent does not have to prove that the opinion is scientifically correct, just that it is reliable and helpful. *See Lord v. Fairway Elec. Corp.*, 223 F. Supp. 2d 1270, 1279 (M.D. Fla. 2002) (citing Fed. R. Evid. 702, Advisory Committee Notes). If the proponent does so, then the court should open the gate by permitting the proponent to elicit testimony from the expert witness concerning his or her reliable opinions and by allowing the jury to fulfill its role of determining the weight to accord such testimony. Indeed, the Court's limited gatekeeping role "is not intended to supplant" presentation of contrary evidence to the jury or the practice of cross-examination in a courtroom. *See United States v. Ala. Power Co.*, 730 F.3d 1278, 1282–85 (11th Cir. 2013). Accordingly, once the proponent satisfies the minimum threshold for admissibility, the parties' remaining reliability and relevance disputes must be decided by the jury—preferably based on the litigants': (1) presentation of contrary evidence, such as testimony from the litigant's own expert witness providing both contrary opinions and criticism of—among other things—the opposing expert's qualifications and the inaccuracy or unreliability of his or her opinions; and (2) use of cross-examination and appropriate legal argument. *See id.*; *see also Costa v. Wyeth, Inc.*, No. 8:04-cv-2599-T-27MAP, 2012 WL 1069189, at *2 (M.D. Fla. Mar. 29, 2012).

## II.    Discussion

### a.    Dr. McCarthy

In their sole *Daubert* motion, Plaintiffs seek to exclude opinions set forth in defense expert Dr. Thomas McCarthy's ("**Dr. McCarthy**") respective liability and damages reports. (Doc. 197.) Plaintiffs contend that Dr. McCarthy's opinions are unreliable and do not fit

the issues to which they are applied. (*Id.* at 6.)

In his liability report, Dr. McCarthy opines that Health First does not possess market power in the inpatient hospital services market ("**Liability Opinion**"). (*See id.*) This Liability Opinion is based on Dr. McCarthy's comparison of Health First's actual hospital prices to "expected" hospital prices generated by Dr. McCarthy's regression analysis. (*Id.*) Dr. McCarthy also challenges the amount of damages calculated by Plaintiffs' expert, Dr. Hal J. Singer ("**Dr. Singer**"), based on a categorical breakdown Omni's operating costs ("**Damages Opinion**"). (*Id.*)

Per the Liability Opinion, Heath First does not exercise market power in the inpatient hospital services market because its prices are not higher than expected. (*Id.* at 15.) This opinion is based on a regression model which predicts that, as per-capita income within an area increases, hospital charges will decrease ("**Negative Correlation**"). (*Id.* at 21.) Plaintiffs contend that the Liability Opinion is contrary to: (1) longstanding, basic economic principles; (2) common sense; and (3) an econometric model developed and published by Dr. William Lynk, which consistently demonstrates a *positive* relationship between income and hospital prices—that is, as per-capita income within an area increases, hospital prices also increase. (*See id.* at 21–22.) Additionally, Plaintiffs take issue with the fact that Dr. McCarthy's model predicts a correlation between a hospital's share of revenue attributable to Medicaid and the hospital's charges, yet inexplicably predicts that such correlation was positive in 2007 and negative in 2013 ("**Flipped Correlation**"). (*Id.* at 22–23.) Plaintiffs posit that this model should not switch between a negative and positive correlation, but rather should be negative as in Dr. Lynk's model. (*Id.* at 23.) Plaintiffs maintain that the Negative and Flipped Correlations are

caused by a "specification error"—i.e., an incorrect key feature or assumption in the model. (*Id.*) As a result, Plaintiffs argue that Dr. McCarthy's model may yield incorrect or misleading results. (*Id.* at 23–24.)

In particular, Plaintiffs contend that "[t]he failure of a regression model to tell a coherent story about its independent variables means that it similarly will not confidently or coherently predict the dependent variable," which—in the present case—is hospital prices. (*Id.* at 24.) Moreover, Plaintiffs argue that standard economic tests as to the reliability of Dr. McCarthy's model reveal that his predicted hospital prices are severely inaccurate and yield a statistical confidence interval of 50 to 275 percent for HRMC. (*Id.* at 24–25.) As such, the predicted prices for HRMC may be significantly below or above HRMC's observed prices. (*Id.* at 25.) Consequently, Plaintiffs contend that Dr. McCarthy's opinion is inadmissible. (*See id.* at 20–26.)

Turning to the Damages Opinion, Plaintiffs primarily challenge Dr. McCarthy's reliance on a third-party valuation report prepared by Health Capital Consultants, LLC ("**HCC Valuation Report**") in determining Omni's fixed, variable, and partially variable costs. (*Id.* at 7, 9.) Plaintiffs argue that the cost estimates in the HCC Valuation Report: (1) do not reflect the economic realities of Omni's business; (2) lack a valid scientific connection to the disputed facts in the instant action; and (3) were unreasonably relied on by Dr. McCarthy. (*Id.* at 7.)

In particular, the authors of the HCC Valuation Report expressly disclaimed the reliability of the report for any purpose other than the estimation of Omni's fair market value.[4] (*Id.* at 9, 11.) Plaintiffs also seek exclusion of the Damages Opinion on the

---

[4] In its entirety, the disclaimer reads as follows:

grounds that Dr. McCarthy failed to independently verify the qualifications of the HCC Valuation Report's authors or the accuracy of their assumptions and conclusions. (*Id.* at 9.)

In their response, the Corporate Defendants raise several objections to Plaintiffs' *Daubert* Motion. (Doc. 214.) First, Corporate Defendants contend that Plaintiffs' criticism of Dr. McCarthy's Liability Opinion reflects "a fundamental misunderstanding of Dr. McCarthy's analysis and, ultimately, its purpose." (*Id.* at 10.) According to the Corporate Defendants, the purpose of Dr. McCarthy's regression analysis was to determine whether Health First's hospitals have high prices compared to their peer hospitals in Florida and whether market power was likely to be the cause of any pricing differentiation. (*Id.*) To achieve this purpose, Dr. McCarthy ran a regression to estimate how *non*-market power factors—including case-mix, patient demographics, input costs, and market power—affect prices on average; then he used the combined effect of those non-market factors to calculate the "expected" price for each hospital in Florida. (*Id.*)  In light of this methodology, the Corporate Defendants maintain that: (1) Dr. McCarthy's regression analysis purposefully controlled for non-market power factors; and (2)

---

"The objective of this REPORT is to provide an estimate of the *Fair Market Value* . . . as of the VALUATION DATE, of the SUBJECT INTEREST. The purpose and specific use of this REPORT is to assist [Omni] in its advertisement to the management of the SUBJECT ENTITY regarding the consideration of a prospective transaction of the SUBJECT INTEREST.

The opinions expressed in this REPORT are restricted to that use and not valid if used for any other purpose. Any other use of this REPORT may lead the user to an incorrect conclusion for which the VALUATOR assumes no responsibility. No other use of this REPORT is permitted without the express written authorization of the VALUATOR. Possession of this REPORT or a copy thereof does not carry with it the right of publication. It may not be used for any other purpose, in whole or in part, by anyone except [Omni], for whom this REPORT was prepared, or conveyed to any other third party without the previous express written consent of the VALUATOR." (Doc. 197-2, pp. 9)

therefore, the expected prices produced from the regression analysis contained no information about market power *by design*. (*Id.*)  The Corporate Defendants represent that, because market power is captured only in the residual—that is, the difference between the expected price and actual observed price—Dr. McCarthy's analysis compares the residuals for each hospital in Florida to assess the relative market power of the Health First hospitals. (*Id.* at 11.) Consequently, Dr. McCarthy explains that his regression analysis determines the portion of the price explained by the observable non-market power factors to better isolate the portion of the price attributable to market power. (*Id.* at 12.)

Based on the foregoing, the Corporate Defendants reject the criticism of Plaintiffs' liability expert, Dr. H.E. Frech, III ("**Dr. Frech**"), who avers that Dr. McCarthy should have applied the standard error of the forecast ("**SEF**")[5] to account for variation in the dependent variable—the actual, or observed, prices left unexplained by the expected prices as estimated by the regression. (*Id.* at 11–12.) According to Dr. McCarthy, applying the SEF in this manner would have double-counted the residual. (*Id.* at 12.) Additionally, Dr. McCarthy explains that the breadth of Dr. Frech's confidence intervals is not surprising because the expected prices, unlike the observed prices, do not account for any measure of possible market power. (*Id.*) The gist of this argument is that Dr. Frech's confidence intervals compare apples to oranges. According to Dr. McCarthy, a properly computed confidence interval for his analysis reveals a much narrower confidence interval. (*Id.* at 12–13.)

---

[5] According to Plaintiffs, SEF is a measure of the degree of accuracy of a forecast. (Doc. 197, p. 24.)

In addressing Plaintiffs' criticism of the Negative and Flipped Correlations, the Corporate Defendants contend that Dr. McCarthy's regression model is a "reduced form" model and, therefore, "does not presume a specific defined 'structural' relationship between the dependent variable and the explanatory variables of the regression." (*Id.* at 13.) The Corporate Defendants represent that: (1) a "reduced form" regression model can account for multiple and possibly competing structural relationships at the same time (*id.* at 13–14 (citing THAD W. MIRER, ECONOMIC STATISTICS & ECONOMETRICS 368–71 (3d ed. 1995))); and (2) as such, reduced form regression models often yield results that "have coefficient estimates that are statistically insignificant, . . . signs that are different than what economic theory may predict in a vacuum for any one variable, or that even change when estimated based on data from different time periods." (*Id.* at 14.)  Moreover, referencing case law from the U.S. Supreme Court and within the U.S. Court of Appeals for the Eleventh Circuit, the Corporate Defendants aver that purported errors in the way an economist performs a regression analysis go to the weight, and not the admissibility, of the expert's opinion. (*Id.* at 15–16.) Finally, the Corporate Defendants point to a lack of evidence tending to show that: (1) the results of Dr. McCarthy's regression would change if the model was "corrected" as suggested by Dr. Frech; (2) the reliability of the regression model is questionable; or (3) Dr. McCarthy's regression methodology was so incomplete or inaccurate that an economist would not have relied on it in rendering an opinion. (*Id.* at 16.)

As to Dr. McCarthy's Damages Opinion, the Corporate Defendants argue that it was reasonable for Dr. McCarthy to use the variable costs identified in the HCC Valuation Report to perform his alternative estimate of damages because: (1) such costs were

determined in 2009 and 2010—entirely independent of the instant litigation; (2) the authors of the HCC Valuation Report had the necessary expertise to determine the difference between a fixed and variable cost; and importantly, (3) the authors consulted with Omni management and ownership in preparing the valuation report and also considered historical trends. (*Id.* at 5, 6.) As such, Dr. McCarthy concluded that the HCC Valuation Report was "the best independent information available to identify each category of operating costs as fixed, variable or partially variable in response to changes in physician counts." (Doc. 225, ¶ 57.) To corroborate this conclusion, the Corporate Defendants cite deposition testimony from Dr. Deligdish, in which he stated that Omni "cooperated with the valuation and the individuals doing the valuations so that they could provide the most accurate valuation of the company," and "provided them with full and total access to any information they requested." (Doc. 214-7, p. 9.) Therefore, the Corporate Defendants contend that it was not unreasonable for Dr. McCarthy to rely on the HCC Valuation Report without further consultation with its authors and without conducting any further independent investigation. (Doc. 214, p. 8.)

As an initial matter, there is no challenge to Dr. McCarthy's qualifications. Plaintiffs' objections are primarily geared toward the reliability of his data. Pursuant to the principles espoused in *Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167 (1998), all expert testimony should be evaluated for its relevance and reliability under criteria appropriate to the given discipline. *See also SMS Sys. Maint. Serv. Inc. v. Dig. Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999) ("An expert must vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data was consistent with standards of the expert's profession.").

Upon consideration, the Court finds that Dr. McCarthy's regression analysis model is reliable and that his explanation in response to Plaintiffs' criticisms are reasonable. Importantly, the weight Dr. McCarthy's Liability Opinion is to be afforded, in light of the apparent inconsistencies in the Flipped and Negative Correlations, will have to be developed on cross examination and ultimately evaluated by the jury. Drs. McCarthy and Frech clearly disagree about the significance of such factors; however, this does not mean that the Court should "select" one expert over the other. Such a selection would usurp the function of the jury and counsel advocacy. Additionally, while the wide range of confidence interval values may indeed undercut the usefulness of Dr. McCarthy's opinion, it does not render the opinion inadmissible. The Court admits that the breadth of such range did present a close call as to whether Dr. McCarthy's opinion meets the *Daubert* "fit" or helpfulness prong. Nonetheless, for now, the Court concludes that the opinion is admissible.

As to Dr. McCarthy's Damages Opinion, while Plaintiffs challenge the propriety of Dr. McCarthy's wholesale adoption of Omni's fixed and variable costs as set forth in the HCC Valuation Report, they do not argue that the methodology employed in the report is itself unsound. Whether such use undermines the reliability of Dr. McCarthy's opinion is a "garbage in, garbage out" objection that is best left for cross examination. Standing alone, Dr. McCarthy's Damages Opinion may or may not be sufficient to support a defense verdict, but it is admissible. Therefore, Plaintiffs' *Daubert* motion is due to be denied.

**b.    Dr. Frech**

According to the Corporate Defendants, Dr. Frech intends to provide expert

testimony: (1) defining the relevant product markets for Defendants' alleged anticompetitive conduct; (2) determining whether Health First possessed monopoly power and caused anticompetitive effects; and (3) evaluating whether there are any efficiency justifications that might outweigh such anticompetitive effects. (Doc. 194, p. 2.) The Corporate Defendants contend that the Court should exclude Dr. Frech's testimony because his methodology is flawed and his opinions are based on insufficient or incorrect facts or data that are contradicted by the record. (*Id.* at 1, 3.) Specifically, the Corporate Defendants maintain that Dr. Frech has not conducted any competitive pricing analysis of any market but, instead, has relied solely on the allegations in the Complaint, Plaintiffs' interrogatory answers, and select documents provided to him by another expert's assistant. (*Id.* at 3.) The Corporate Defendants also maintain that Dr. Frech's theory of liability: (1) has not been subject to peer review; (2) has an uncertain potential rate of error; and (3) is not generally accepted. (*Id.* at 20–21.)

The Corporate Defendants primarily criticize Dr. Frech's definition of the SBC geographical market and the cluster markets for services within that market. The Court declines to exclude Dr. Frech's opinion on this basis. As a threshold matter, Dr. Frech's report sets forth, in painstaking detail, the economic and factual grounds for his definition of the geographical market. (*See* Doc. 194-1, pp. 110–127.) These grounds are well in line with the Supreme Court's instruction that the definition of a relevant market should be a "pragmatic" exercise, "not a formal, legalistic one." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962). Moreover, as set forth in Dr. Frech's report, the SBC geographic market is also supported by Health First's own internal documents and positions taken in prior litigation. (*See* Doc. 194-1, pp. 119, 121.) The Supreme Court has

also recognized that there is "no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities." *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966).

The remainder of the *Daubert* motion criticizes Dr. Frech's purported testimony as either contradicted by record evidence or factually unsupported. (*See* Doc. 194, pp. 13–20, 22–24.) Though the Corporate Defendants partially attack this testimony as "untested conclusions," the Court agrees with Plaintiffs' view that Health First's challenge largely amounts to a motion for summary judgment. (*See* Doc. 212, pp. 14–15.) "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). As such, the Court declines to follow the Corporate Defendants down the path of conflating admissibility with sufficiency. Indeed, "[t]he *Daubert* analysis should not supplant a trial on the merits." *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

On balance, the Court finds that the Corporate Defendants' *Daubert* motion as to Dr. Frech is also due to be denied.

### c.    Dr. Singer

In a second *Daubert* motion, the Corporate Defendants move to exclude the testimony of Dr. Singer on the grounds that his methodology is flawed and his opinions are based on insufficient or incorrect facts or data. (Doc. 199, p. 1.) Specifically, the Corporate Defendants argue that: (1) because Dr. Singer's testimony relies on the testimony of Dr. Frech, it is flawed to the same extent that Dr. Frech's testimony is flawed; (2) Dr. Singer purports to testify that Plaintiffs should be awarded damages that do not

flow from Defendants' alleged anticompetitive conduct; and (3) Dr. Singer's damage calculations are contradicted by the facts and based on erroneous assumptions. (*Id.* at 1–2.)

Importantly, the Corporate Defendants take issue with Dr. Singer's seemingly blind acceptance of testimony that Plaintiffs' injuries were caused by Defendants' Alleged Common Scheme. (*Id.* at 5–10.) That is, the Corporate Defendants contend that Dr. Singer failed to consider alternative explanations or independently investigate the basis for such testimony. (*See id.* at 8–9.) Other challenges to Dr. Singer's report include arguments that he misattributed damages (*see id.* at 11–12 15–16, 19) and assumed a zero attrition rate among Omni physicians alleged to have left the practice as a result of Defendants' conduct (*id.* at 9-10).

In response, Plaintiffs argue that a damages expert may properly assume causation. (Doc. 213, p. 3.) Plaintiffs also point to portions of Dr. Singer's deposition in which he testified that he independently reviewed Plaintiffs' evidence for corroboration and explicitly recognized that Omni has at times experienced attrition for reasons unrelated to Defendants' conduct. (*See* Doc. 199-1, pp. 25, 26, 88 n.22.)

The Court construes the Corporate Defendants' challenge as an attack on Dr. Singer's damages model based on the failure to include all possible variables with respect to causation. However, "[a]ntitrust law does not require that the defendant be the exclusive cause of the plaintiff's injury but only a 'material' one." *Gulf States Reorganization Grp. v. Nucor Corp.*, 466 F.3d 961, 965 (11th Cir. 2006). Thus, while Dr. Singer's testimony may very well be subject to scrutiny on cross-examination, the Court finds that it is not excludable on this basis.

Case 6:13-cv-01509-RBD-DCI   Document 322   Filed 08/13/16   Page 20 of 69 PageID 17606

In a similar vein, although the Corporate Defendants contend that Plaintiffs have the burden of disaggregating losses in the event that some losses are attributable to Defendants' illegal acts and other losses are not (Doc. 199, p. 4), the Court is persuaded by contrary authority. The Supreme Court has concluded that, where "the evidence sustain[s] verdicts for the plaintiffs,"

> in the absence of more precise proof, the jury [may] conclude as a matter of just and reasonable inference from the proof of the defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits[,] and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs."

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946). Referencing proof of damage in antitrust suits, the *Bigelow* Court reiterated that "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of uncertainty which his own wrong has created." *Id.* at 265. In such circumstances, "the wrongdoer may not object to the plaintiff's reasonable estimate of the cause of injury and of its amount, supported by the evidence, because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable." *Id.* Such authority supports Plaintiffs' contention that the burden should be on the violator—if liability is established— to disaggregate monetary losses. From there, the jury may be charged with carving out of Dr. Singer's testimony monetary losses unrelated to the challenged conduct, if any. As such, the Corporate Defendants' motion to exclude the testimony of Dr. Singer is due to be denied.

## THE SUMMARY JUDGMENT MOTIONS

## I.   Standards

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). As to issues for which the movant would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact, and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case." *Landolfi v. City of Melbourne, Fla.*, 515 F. App'x 832, 834 (11th Cir. 2012) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)). As to issues for which the non-movant would bear the burden of proof at trial, the movant has two options: (1) the movant may simply point out an absence of evidence to support the nonmoving party's case; or (2) the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *U.S. v. Four Parcels of Real Property in Green and Tuscaloosa Ctys. in State of Ala.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp.*, 477 U.S. at 325).

"The burden then shifts to the non-moving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The Court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the non-movant. *Battle v. Bd. of Regents*,

468 F.3d 755, 759 (11th Cir. 2006). However, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996).

## II.  Corporate Defendants' Motion for Summary Judgment ("MSJ")

### A.  Statute of Limitations

As a preliminary matter, the Court elects to address the Corporate Defendants' final argument in its MSJ—its contention that Plaintiffs' claims are partially barred by the four-year statute of limitations applicable to their antitrust and state law claims. *See* 15 U.S.C. § 15b; Fla. Stat. §§ 95.11(3)(f), 95.11(3)(p). Plaintiffs initiated the instant action on **September 27, 2013**. (*See* Doc. 1.) As such, the Corporate Defendants maintain that any claims or damages that accrued prior to **September 27, 2009**, are time barred. (Doc. 201, p. 33.) In particular, the Corporate Defendants argue that Plaintiffs may not seek any damages predicated on the termination of: (1) Omni's provider contracts with HFHP on October 1, 2008; (2) Dr. Dowdell's provider agreement with HFHP in February 2007; or (3) Dr. Komar's employment at the Heath First emergency intensive care unit in January 2009. (*Id.* at 33, 34, 37.) The Corporate Defendants also contend that, because Dr. Seminer disposed of his Omni shares in March 2009, any damages he suffered were sustained at that time and are thus barred. (*Id.* at 38.)

In response, Plaintiffs urge the Court to apply the continuing violation doctrine. (Doc. 235, p. 40.) In support, Plaintiffs argue that none of their claims are solely predicated on the termination of their provider agreements, but rather on Defendants' ongoing Alleged Common Scheme, inclusive of the 2013 MIMA Acquisition. (*Id.* at 39.)

Indeed, Plaintiffs point to Dr. Singer's damages report, which describes the effects of Omni's continuing exclusion from the HFHP network, inclusive of the 2008 termination. (Doc. 235-47, ¶ 10.)

The former Fifth Circuit thoroughly addressed the application of the continuing violation doctrine in *Poster Exchange, Inc. v. National Screen Service Corporation*, 517 F.2d 117 (5th Cir. 1975), a decision that is binding on this Court. *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981). The plaintiff in *Poster Exchange* alleged that the defendants engaged in a continued, unlawful antitrust conspiracy, monopoly, and attempted monopoly within the motion picture accessory industry. 517 F.2d at 119. One of the three issues on appeal was the applicability of the statute of limitations to the plaintiff's claim of a continuing antitrust conspiracy. *Id.* at 122. The Fifth Circuit agreed with the plaintiff's assertion that it was entitled to recover damages caused by the defendants' continuation of the alleged monopoly and conspiracy and that such actions should be treated "as a continuing series of acts upon which successive causes of action may accrue." *Id.* at 124–25. In so concluding, the Fifth Circuit highlighted that the plaintiff's complaint was "based on continuing antitrust behavior, not merely the continuing damage it feels from a single day's monopoly and refusal to deal" outside the limitations period. *Id.* at 125. Moreover, the *Poster Exchange* court stated that binding authority "la[id] to rest the theory that . . . suit upon a continued antitrust violation must be prosecuted from the first act of illegality (plus, of course, any period during which the limitations period was tolled.)" *Id.* at 126. The Fifth Circuit also distinguished between a violation that is final at its impact, such as the immediate and permanent destruction of a plaintiff's business, and the violation at issue in *Poster Exchange*, whereby "the action

complained of the was the exclusion of [the plaintiff] from any participation in the [relevant industry]," noting that in the latter example, "such action, while perhaps unequivocal, was not [necessarily] permanent." *Id.* at 126–27. However, the Fifth Circuit also clarified that "a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action"—that is, the plaintiffs must demonstrate that the defendant's actions during the limitations period caused it harm. *Id.* at 128.

In anticipation of Plaintiffs' continuing violation argument, the Corporate Defendants rely on case law providing that, "[w]here rights and liabilities are finalized by a contract or by denial of a contract, and damages are at that time provable with certainty, the statute of limitations begins to run at that time." *Midwestern Waffles Inc. v. Waffle House, Inc.*, 734 F.2d 705, 715 (11th Cir. 1984); *see also City of El Paso v. Darbyshire St. Co.*, 575 F.2d 521, 523 (5th Cir. 1978). In support, the Corporate Defendants contend that the termination of Omni and Dr. Dowdell's provider agreements were final and unequivocal as of October 1, 2008, and February 1, 2007, respectively. (Doc. 201, p. 35.) The Corporate Defendants also argue that HFHP did not create any new or accumulating injuries by any subsequent refusals to deal. (*Id.* at 36.) Indeed, the Corporate Defendants maintain that all damages claimed by Omni and Dr. Dowdell in the instant litigation stem from the original termination of their provider agreements and not from any subsequent refusals to deal, as these were merely reaffirmations of the initial termination. (*Id.* at 36, 37.) To this point, Plaintiffs counter that Health First genuinely entertained reinstating Omni's provider agreement on multiple occasions over the years following Omni's termination. (Doc. 235, p. 40.)

Under *Midwestern Waffles*, if Plaintiffs' subsequent requests for reinstatement as participating providers with HFHP were genuine—i.e., if Plaintiffs had reason to believe that their original terminations were subject to reconsideration—then "there would be a new alleged injury when a genuine subsequent request was denied." 734 F.2d at 715. Upon consideration of the record, the Court finds that Plaintiffs have produced evidence sufficient to warrant the application of the continuing violation doctrine. The instant action is more akin to the circumstances presented in *Poster Exchange* and the example of a genuine request for reinstatement as set forth in *Midwestern Waffles*. Plaintiffs cite to exhibits that demonstrate that HFHP considered reinstating Plaintiffs' provider agreements during the limitations period. (Doc. 238-36, 238-37, Doc. 238-38, Doc. 238-51, pp. 8–11.) This evidence shows that in two instances Health First conditioned Omni's reinstatement on its purchase of HFHP insurance for its employees (Doc. 238-36) and its individual physicians joining a physicians group, such as MIMA, that was "in line with Health First['s] interest" (Doc. 238-51, pp. 10–11). The record also supports Plaintiffs' contention that HFHP considered reinstating Dr. Dowdell in March of 2008. (Doc. 298-29.) Thus, HFHP's continued exclusion of Dr. Dowdell from the HFHP network despite his requests for reinstatement during the limitations period may also be fairly construed as new injuries under the continuing violation doctrine. (*See* Doc. 235-38, ¶¶ 15–16.)

Similarly, the Corporate Defendants argue that the state law claims of Omni, Dr. Deligdish, SOAR, Dr. Komar, Boone, PAS, and Dr. Dowdell are also barred by the statute of limitations. (Doc. 201, pp. 37–38.) While it is true, as Defendants argue, that under Florida law a cause of action accrues from the time the injury is first inflicted on the

plaintiff, *Carter v. Cross*, 373 So. 2d 81 (Fla. 3d DCA 1979), it is also true that Florida recognizes the continuing tort doctrine. *Seaboard Air Line R.R. Co. v. Holt*, 92 So. 2d 169, 170 (Fla. 1956). In light of the foregoing, the Court finds that the application of the continuing tort doctrine is also warranted under the circumstances. As such, Defendants are not entitled to judgment as a matter of law on their statute of limitations defense at this time.

## B.     Count I

In Count I of the Complaint, Plaintiffs allege that the MIMA Acquisition was an impermissible merger in restraint of trade, thus violating Section 7 of the Clayton Act. (Doc. 57, ¶¶ 291–99.) Section 7 prohibits acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly." *Polypore Int'l, Inc. v. Fed. Trade Comm'n*, 686 F.3d 1208, 1213 (11th Cir. 2012) (quoting 15 U.S.C. § 18). Importantly, "Congress used the words 'may be substantially to lessen competition' to indicate that its concern was with probabilities, not certainties." *Brown Shoe Co.*, 370 U.S. at 323 (1962).

The crux of the Corporate Defendants' MSJ as to Count I is that Plaintiffs have uncovered no evidence that the MIMA Acquisition substantially lessened competition or tended to create a monopoly in the relevant market for physician services in SBC. (Doc. 201, p. 3.) The Court disagrees.

In the Complaint, Plaintiffs aver that, by acquiring the largest independent physicians group in SBC, Health First substantially lessened competition in the market for physician services by: (1) requiring that former MIMA physicians no longer accept

Medicare Advantage plans not offered by Health First, thereby forcing patients who wished to maintain their relationships with their physicians to switch to Health First's Medicare Advantage plans; and (2) ensuring that all employed physicians referred patients exclusively to Health First's hospitals, physicians, and ancillary service providers. (*Id.* ¶¶ 3, 263, 294.)

The parties first dispute whether the MIMA Acquisition is a vertical or horizontal merger. (*See* Doc. 235, p. 9; Doc. 249, pp. 4–5.) As Plaintiffs' Complaint alleges that the MIMA Acquisition was a vertical merger *(see, e.g.*, Doc. 57, ¶ 261), Plaintiffs are entitled to proceed under this theory if supported by the evidence.

As defined by the Supreme Court, "[e]conomic arrangements between companies standing in a supplier-customer relationship are characterized as 'vertical.'" *Brown Shoe Co.*, 370 U.S. at 323. On the other hand, "[a]n economic arrangement between companies performing similar functions in the production or sale of comparable goods or services is characterized as 'horizontal.'" *Id.* at 334.

Defendants admit that Health First is a non-for-profit corporation, with its principal place of business in SBC, which bills itself as "Central Florida's only fully integrated health system." (Doc. 11, p. 11.) Additionally, Health First is the parent corporation of: (1) HRMC; (2) Cape Canaveral Hospital; (3) Palm Bay Hospital; (4) Viera Hospital; (5) HF Physicians; and (6) HFHP. (*Id.*) Moreover, at the time of the MIMA Acquisition, MIMA was the largest independent physicians group in SBC. (Doc. 111, p. 3.) In light of these admissions, the Court finds that Plaintiffs' characterization of the MIMA Acquisition as a vertical merger is supported by the evidence as MIMA and Health First's other subsidiaries can be fairly described as downstream suppliers in Health First's integrated,

vertical market. *See* Joshua S. Gans, *Concentration-Based Merger Tests and Vertical Market Structure*, 50 J.L. & ECON. 661, 670 (2007) (explaining that the nature of a vertically integrated firm is its function as a net supplier of inputs and that "[a] merger between any upstream and downstream firm is a pure vertical integration").

In evaluating how a vertically integrated firm may lessen competition in a geographic market, the Supreme Court explained that,

> [t]he primary vice of vertical merger or other arrangement tying a customer to a supplier is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a clog on competition, which deprives rivals of a fair opportunity to compete.

*Brown Shoe Co.*, 370 U.S. at 323–24 (citing *Standard Oil Co. of Cal. v. United States*, 337 U.S. 293, 314 (1949)). Therefore, "the diminution of the vigor of competition which may stem from a vertical arrangement results primarily from a foreclosure or share of the market otherwise open to competitors." *Id.* at 328.

Contrary to the Corporate Defendants' contention, Plaintiffs maintain that they have produced sufficient evidence to demonstrate that the MIMA Acquisition substantially lessened competition in SBC. (Doc. 235, pp. 3–4.) First, Plaintiffs point to Kimberley Nowakowski's deposition testimony that physicians employed by HF Physicians are required to refer patients to Health First facilities or providers, unless: (1) the patient chooses otherwise; (2) medical necessity requires otherwise; or (3) the patient's insurance payer provides otherwise. (Doc. 235-38, p. 21.) Second, in his expert report, Dr. Frech concludes that, through acquisition and alignment, Health First has foreclosed more than 25% of the physician services market by its Exclusive Referral Practice. (Doc. 235-1, p. 81.) Finally, Plaintiffs produced a document entitled "HFMG Medicare

Advantage Transition Plan Summary" which outlines a plan for eliminating all non-HFHP

Medicare Advantage plans, as established during the MIMA Acquisition. (Doc.235-4,

p. 2.)

Upon consideration of the evidence, the Court finds that there is a genuine issue

of material fact as to whether the MIMA Acquisition substantially lessens competition or

tends to create a monopoly in SBC, thus foreclosing judgment as a matter of law as to

Count I.[6]

### C. Count II

In Count II, Plaintiffs allege that Health First and HRMC[7] have monopolized the

acute care inpatient hospital services market in SBC in violation of Section 2 of the

Sherman Act. (Doc. 57, ¶¶ 300–314.) Specifically, Plaintiffs aver that Health First's

monopoly power in the inpatient hospital services market is demonstrated by: (1) its ability

to exclude rival providers of inpatient hospital services; (2) its ability to raise prices to

private health insurers and other third-party payors to above-competitive levels; and (3) its

near 70% market share. (*Id.* ¶ 302.) Plaintiffs also allege that Health First has exercised,

maintained, and exploited this monopoly power through exclusionary and anticompetitive

conduct, including the Exclusive Referral Practice, group boycotts, concerted refusals to

---

[6] The Court also rejects the Corporate Defendants' argument that Plaintiffs lack standing to sue because they have not been *totally* excluded from the market. (*See* Doc. 201, p. 3 n.2.) As previously stated, "[t]he primary vice of vertical merger or other arrangement tying a customer to a supplier is that, by foreclosing the competitors of either party from a *segment* of the market otherwise open to them, the arrangement may act as a clog on competition, which deprives rivals of a fair opportunity to compete." *Brown Shoe Co.*, 370 U.S. at 323–24 (emphasis added). Moreover, nowhere in the Corporate Defendants' cited authority does the Eleventh Circuit pronounce that antitrust injury requires complete exclusion from the relevant market. *See Gulf States*, 466 F.3d 961.

[7] For purposes of addressing the Corporate Defendants' MSJ as to Count II only, the Court will refer to Health First and HRMC collectively as "Defendants."

deal, and monopoly leveraging. (*Id.* ¶ 305.)

"Section 2 of the Sherman Act provides that every person who shall monopolize, or attempt to monopolize any part of the trade or commerce among the several States shall be deemed guilty of a felony." *Morris Commc'ns Corp. v. PGA Tour Inc.*, 364 F.3d 1288, 1293 (11th Cir. 2004) (citing 15 U.S.C. § 2). In particular,

> [t]he offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market[;] and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

*Id.* at 1293–94 (quoting *Grinnell Corp.*, 384 U.S. at 570–71). "The first element, monopoly power, is the power to control prices in or to exclude competition from the relevant market. The second element requires predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market." *Id.* at 1294. "In order for a practice to be exclusionary, it must harm the competitive process and thereby harm consumers." *Id.*

In their MSJ as to Count II, the Corporate Defendants contend that Plaintiffs have presented no evidence that either Health First or HRMC: (1) has the ability to control prices or exclude competition; or (2) engaged in any exclusionary conduct. (Doc. 201, pp. 5–8.) Plaintiffs counter that: (1) Health First's market share is prima facie evidence of monopoly power in the hospital market; and (2) the substantial barriers to entry in that market reinforce the power conferred by that market share. (*See* Doc. 235, p. 11–18.)

As stated by the Eleventh Circuit, "[t]he principal measure of actual monopoly power is market share." *U.S. Anchor Mfg., Inc. v. Rule Indus.*, 7 F.3d 986, 999 (11th Cir. 1993). Dr. Frech's expert report concludes that Health First's share of the

hospital market was 86.8% in 2014. (Doc. 235-1, p. 68 tbl.4.) Based on this evidence, the Court concludes that Plaintiffs have created a genuine issue of material fact as to Defendants' ability to exclude competition from the relevant market. *See Rule Indus.*, 7 F.3d at 999 (stating that "a sufficiently large market share may alone create a genuine dispute over whether the defendant possessed a dangerous probability of successfully monopolizing a market despite the existence of other facts tending to make monopolization unlikely, thereby precluding summary judgment for the defendant"). Indeed, the Eleventh Circuit has explicitly pronounced that binding circuit precedent compels the conclusion that "[a] market share estimated with reasonable confidence to fall between 60 and 65% suffices to raise a jury question concerning dangerous probability." *Id.* (citing *MaGhee v. N. Propone Gas Co.*, 858 F.2d 1487, 1506 (11th Cir. 1988)); *see also Grinnell Corp.*, 384 U.S. at 571 (finding that an 87% market share "leaves no doubt" as to monopoly power). In assessing whether an entity possesses monopoly power within a market, courts typically examine market structure in search of circumstantial evidence of monopoly power, such as whether the firm has a predominant market share and whether there is freedom of, or barriers to, entry. *McWane Inc. v. Fed. Trade Comm'n*, 783 F.3d 814, 830 (11th Cir. 2015).Therefore, evidence of Defendants' 86.8% market share in the inpatient hospital services market, coupled with Plaintiffs' evidence demonstrating the existence of high barriers to entry into the relevant market (*see* Doc. 235-1, pp. 69–70), presents a jury question as to the first element required for liability on Count II.

The Court similarly concludes that Plaintiffs have raised a factual issue for determination by the jury with respect to the second element of their claim in Count II—

the willful acquisition or maintenance of monopoly power as evidenced by the exclusion of competitors within the relevant market. Dr. Frech concluded that Defendants' exclusionary practices have resulted in antitrust injury—namely, the diversion of referrals from its providers—in multiple markets, including the acute-care inpatient services market. (Doc. 235-1, pp. 5–6, 87–90.) This evidence is corroborated by witness testimony elaborating on the specific ways in which Defendants engaged in exclusionary practices through its Exclusive Referral Practice. (*E.g.*, Doc. 235-38, pp. 5–6; Doc. 235-42, pp. 5–6; Doc. 238–45, pp. 4–5.) As such, the Corporate Defendants' MSJ as to Count III is due to be denied.

### D.    Counts III, IV, V, and VI

In Counts III through VI of the Complaint, Plaintiffs assert several attempted monopolization claims under Section 2 of the Sherman Act. (Doc. 57, ¶¶ 315–366.) Specifically, Plaintiffs allege that: (1) Health First and HF Physicians attempted to monopolize the physician services market (Count III); (2) Health First, HMRC, and HF Physicians attempted to monopolize the ancillary services market (Count IV); (3) Health First and HFHP attempted to monopolize the private health insurance market (Count V); and (4) Health First and HFHP attempted to monopolize the Medicare Advantage Market (Count VI). (*Id.*)

Under § 2 of the Sherman Act, "the conduct of a single firm [is] unlawful only when it actually monopolizes or threatens to do so." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993). Thus, to state a claim for attempted monopolization, a plaintiff must demonstrate: (1) that the defendant possessed the specific intent to achieve monopoly power by predatory or exclusionary conduct; (2) that the defendant did in fact commit

such anticompetitive conduct; and (3) a dangerous probability that the defendant might have succeeded in its attempt to achieve monopoly power. *Rule Indus.*, 7 F.3d at 993.

"Most attempts to measure monopoly power involve quantifying the degree of concentration in a relevant market and/or the extent of a particular firm's ability to control productive capacity in that market." *Id.* at 994. Other relevant determinants of the market power of a prospective predator include the absolute and relative market shares of competing firms, "the strength and capacity of current competitors, the potential for entry[,] the historic intensity of competition[,] and the impact of the legal or natural environment. *Id.* (quoting *In re Int'l Tel. & Tel. Corp.*, 104 F.T.C. 280, 412 (1984)). However, "[d]espite the seemingly broad array of factors employed by the Federal Trade Commission, the principal judicial device for measuring actual or potential market power remains market share, typically measured in terms of a percentage of total market sales." *Rule Indus.*, 7 F.3d at 994.

Moreover, "[i]n evaluating a § 2 attempt to monopolize claim, it is necessary to consider the relevant market . . ." *Tech. Res. Servs., Inc. v. Dornier Med. Sys., Inc.*, 134 F.3d 1458, 1466 (11th Cir. 1998) (citing *Spectrum Sports,* 506 U.S. at 459). As such, the Court will, in turn, discuss whether the respective Defendants are entitled to summary judgment on Plaintiffs' attempted monopolization claims within each relevant market.

### 1.    Physician Services Market

In their attempted monopolization claim in Count III, Plaintiffs allege that the relevant market is the physician services market in SBC. (Doc. 57, ¶ 316.) The Corporate Defendants contend that Plaintiffs' claim fails as a matter of law because: (1) a dangerous probability of success cannot be shown when the defendant possesses less than 50% of

the market;  (2) there  are  low  entry  barriers  into  the  physician  services  market;  and (3) there  is  no  evidence  of  any  specific  intent  by  HF  Physicians  to  monopolize  the physicians services market. (Doc. 249, p. 7; *see also* Doc. 201, p. 10.) The Corporate Defendants  also  maintain  that  Plaintiffs  failed  to  properly  define  a  relevant  market. (Doc. 201, p. 10.)

With respect to the Corporate Defendants' contention that Plaintiffs have failed to define a relevant market, Plaintiffs' point to their response to the Corporate Defendants' *Daubert* motion to exclude the testimony of Dr. Frech—a motion which the Court intends to deny. (Doc. 235, p. 21.) In similar fashion, the Court rests on its prior pronouncement that the markets defined by Dr. Frech are sufficient for admission under *Daubert*. The Court thus rejects the Corporate Defendants' conclusory argument that the physician services market is inadequately defined.

As to the first element of an attempted monopolization claim, the Court agrees with Plaintiffs that a reasonable juror could infer that Health First and HF Physicians possessed the specific intent to monopolize based on the unfair or predatory nature of their tactics, particularly in coercing market participants to maximize referrals within the Health First system and minimize referrals outside of it. (Doc. 235-39, ¶ 6); *see also Spectrum Sports*, 506 U.S. at 459 (explaining that a finding that a defendant has engaged in  unfair  or  predatory  tactics  may  be  sufficient  to  prove  the  necessary  intent  to monopolize). Additionally, Plaintiffs have produced evidence showing that physicians employed by Health First have unilaterally terminated all Medicare Advantage plans not offered by Health First (*see* Doc. 235-4), which Plaintiffs argue would cause Health First to forego significant sources of revenue. As the Eleventh Circuit has recognized, "[t]he

unilateral termination of a voluntary (and thus presumably profitable) course of dealing" may suggest "a willingness to forsake short-term profits to achieve an anticompetitive end," from which the intent to achieve monopoly power by exclusionary conduct may be inferred. *See Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 50 U.S. 398, 409 (2004); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 610–611 (1985). Such evidence is also sufficient to meet the second element of Plaintiffs' attempted monopolization claim in Count III.

Finally, the Court disagrees with the Corporate Defendants' interpretation of *Rule Industries* as containing a *per se* requirement that a defendant possess at least a 50% market share to constitute a dangerous probability of success under the third element of an attempted monopolization claim. The Court acknowledges that in concluding that there was insufficient evidence from which the jury could have found a dangerous probability of monopolization, the *Rule Industries* court held that, as a matter of law, there was no dangerous probability of success *because* the defendant possessed less than 50% of the market throughout the time of the alleged conduct. *Rule Indus.*, 7 F.3d at 1000–01. However, in the same decision, the *Rule Industries* court drew attention to the Fifth Circuit's cautionary remarks in *Cliff Ford Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 n.2 (5th Cir 1969), that "one must be particularly wary of the numbers game of market percentage when considering an attempt to monopolize suit under the dangerous probability standard." *Rule Indus.*, 7 F.3d at 999. Accordingly, the Undersigned elects to follow the approach taken in *Gen. Cigar Holdings, Inc. v. Altadis, S.A.*, in which the court stated that, "consistent with [*Rule Industries*], if a plaintiff is to sustain an attempted monopolization claim with an allegation of less than 50% market share, he must also

allege other reasons that make a monopoly dangerously probable." 205 F. Supp. 2d 1335, 1351 (S.D. Fla. 2002), *aff'd sub nom.*, 54 F. App'x 492 (11th Cir. 2002).

Here, notwithstanding the fact that Health First possesses only a 27% market share in the physician services market (Doc. 235-1, p. 81 n.245; *see also* Doc. 201-8, 48:17–23), Plaintiffs provide evidence from their liability expert suggesting that: (1) markets for specialist physicians are significantly concentrated and involve substantial barriers to entry (*see* Doc. 235-1, pp. 52, 55–56 & n.152); (2) Health First's vertical integration, combined with its dominance in the market for acute inpatient hospital services, allows it to impair competition in multiple markets through exclusionary tactics and facilitate the exercise of monopoly power in markets, such as physician services, where its market share appears relatively low when viewed in isolation (Doc. 235-38, ¶ 6); and (3) absent "the dramatic contraction in the scale of Omni's operations resulting from Omni's exclusion from [HFHP]," Health First's market share in physician services would have been lower (*id.* ¶ 8). Additionally, in his declaration, Dr. Frech vouches that HF Physicians' market share in certain specialties is substantially higher than its share in physician services overall. (*Id.* ¶ 10 & tbl.1.) In light of this showing and the factors enumerated in *Rule Industries*, the Court concludes that the combined effect of Health First's 86% market share in the inpatient hospital services market, its 27% market share in the physician services market, and its ability to exclude competitors throughout is sufficient to create a jury question as to Health First and HF Physicians' "dangerous probability of achieving market power." Thus, Count III survives the Corporate Defendants' MSJ.

## 2. Ancillary Services Market

Count IV of the Complaint alleges that Health First, HRMC, and HF Physicians attempted to monopolize the ancillary services market in SBC in violation of Section 2 of the Sherman Act. (Doc. 57, ¶¶ 328–40.) The Complaint defines the ancillary services market as "axillary or supplemental services provided by a licensed physician or medical practice to support diagnosis and treatment of a patient's condition." (*Id.* at ¶ 63.) As alleged, such services include: (1) diagnostic services (e.g., x-rays and laboratory testing); (2) durable medical equipment and medical devices (e.g., crutches and orthotics), (3) therapies (e.g., radiation therapy and dialysis); and (4) outpatient surgeries (e.g., in-house surgery suits and ambulatory surgery centers). (*Id.* at ¶ 64.) According to the Complaint, "[a]ncillary services are purchased in conjunction with medical or hospital care" and are most commonly "covered and paid for by the patient's insurance"; additionally, "patients are often directed to a particular ancillary service provider by their doctors or health plan." (*Id.*) Because patients' health plans typically only reimburse for services performed by approved ancillary service providers (*id.* ¶ 66), Plaintiffs allege that Health First has acquired a dominant share of the ancillary services market in SBC through its ownership and control of numerous subsidiaries (*id.* ¶ 70.) Finally, Plaintiffs allege that immediately following the MIMA Acquisition, the former MIMA physicians began: (1) terminating business relationships with ancillary service providers outside the Health First system; and (2) directing all ancillary services to Health First's own higher-priced providers. (Doc. 57, ¶ 270.) As a result, Plaintiffs aver that prices are higher, there are fewer alternatives for participants in the ancillary services market in SBC, and

that their ability to effectively compete in this market has been substantially limited. (*Id.* ¶¶ 332, 334.)

In support of their MSJ as to Count IV, the Corporate Defendants first present deposition testimony from Dr. Frech, in which he admits that he does not intend to offer any opinions as to the ancillary services market. (Doc. 201, p. 11 (citing Doc. 201-8, 23:12–21, 33:5–13, 46:8–9).) As "[c]onstruction of a relevant economic market or a show of monopoly power in that market" must be supported by expert testimony, the Corporate Defendants contend that Plaintiffs have abandoned this claim. (*Id.* (citing *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1529, 1579 (11th Cir. 1985).) Second, the Corporate Defendants maintain that, because Plaintiffs have failed to demonstrate that Defendants had a share of the market that was 50% or greater, they cannot prove that Defendants possessed a dangerous probability of success. (*Id.*) Finally, the Corporate Defendants contend that: (1) Plaintiffs cannot produce any evidence of specific intent by the relevant Defendants to monopolize the ancillary services market; and (2) there are low entry barriers into the ancillary services market. (Doc. 249, p. 7.)

In response, Plaintiffs cite numerous opinions in Dr. Frech's report as to the nature and effects of Health First's conduct in the ancillary services market. (Doc. 235, p. 21 (citing, *inter alia*, Doc. 235-1, ¶¶ 160, 165, 173, 197).) Additionally, Plaintiffs again maintain that *Rule Industries* did not set a bright-line rule requiring that a dangerous probability of success be demonstrated by possession of a market share that is greater than 50% during the relevant time period. (*Id.* at 22.) Instead, Plaintiffs argue that the conduct supporting their claim for attempted monopolization of the physician services market is sufficient to support their claim for attempted monopolization of the ancillary

services market because many of them are providers of both physician and ancillary services and sustained damages in the ancillary services market as a result of Health First's conduct. (*Id.*) Additionally, Plaintiffs contend that Health First has the power to force physicians to refer HFHP patients to Health First facilities for ancillary services by refusing to credential participating physicians to perform ancillary services at other locations. (*Id.* (citing Doc. 235-58, ¶ 8).)

Upon consideration of the evidence, the Court concludes that Plaintiffs have produced sufficient evidence to support the elements of an attempted monopolization claim in the ancillary services market. Here, Dr. Frech's report concludes, *inter alia*, that: (1) Health First has foreclosed 39% of radiologists in SBC through its exclusive relationship with Brevard Physicians Associates (Doc. 235-1, ¶¶ 165, 159); and (2) Health First's exclusive dealing arrangements have harmed competition in the physician and ancillary services markets (*id.* ¶ 197). The Court agrees with Plaintiffs that it is the role of counsel, not the expert, to procure the relevant testimony at trial to support Plaintiffs' claims. (*See* Doc. 235, p. 22.)

The declaration of Dr. Dowdell further corroborates the alleged exclusionary conduct. Dr. Dowdell specializes in interventional pain management and is the CEO, medical director, and sole shareholder of SOAR. (Doc. 235-58, ¶¶ 1, 3.) Dr. Dowdell declares that, during his tenure as an HFHP participating provider from 2003 to 2006, he was advised that Health First expected him to bring all his insured patients to Palm Bay Pain Clinic and to perform procedures on HFHP patients exclusively at Health First ambulatory surgery centers. (*Id.* ¶ 6.) HFHP also required its participating physicians to perform all X-rays, DEXA, MRIs, labs, physical therapy, and other ancillary services at a

Health First facility. (*Id.* ¶ 8.) According to Dr. Dowdell, this requirement greatly inconvenienced his patients and resulted in delays in diagnosis and treatment. (*Id.*)

On November 1, 2006, Peter Weiss ("**Dr. Weiss**")—CEO of HFHP—visited Dr. Dowdell's office to discuss pain management. (*Id.* ¶ 7.) At that time, Dr. Weiss learned that Dr. Dowdell was performing most of his surgical procedures at his in-office operating suite, as opposed to Health First facilities.[8] (*Id.*) According to Dr. Dowdell, Dr. Weiss was also aware that Dr. Dowdell was not bringing all his patients to Palm Bay Pain Clinic and Melbourne Same Day Surgery as previously instructed. (*Id.*) During the meeting, Dr. Dowdell requested credentialing with HFHP to perform X-rays and other ancillary services in his office. (*Id.* ¶ 8.) Two days later, Dr. Weiss informed Dr. Dowdell that the HFHP Board had voted to terminate his contract—effective February 2007—based on their belief that he potentially jeopardized patient care. (*Id.* ¶¶ 8, 9.) However, Dr. Dowdell believes that he was terminated because he did not comply with the requirement that he perform all of his surgical procedures at Health First facilities. (*Id.* ¶ 10.) Indeed, according to Dr. Dowdell's declaration, he met with Health First Medical Director Dr. Joe Collins ("**Dr. Collins**") and HFHP Director of Provider Relations Katie Fleming ("**Ms. Fleming**") on April 16, 2008, at which time Dr. Collins informed him that HFHP had no quantifiable evidence that any of his medical procedures jeopardized patient care. (*Id.* ¶ 11, 12.) Nonetheless, in response to Dr. Dowdell's request at the meeting as to whether he could bring an HFHP participating provider into his practice, Dr. Dowdell was told that if a

---

[8] In his declaration, Dr. Dowdell avers that his office operating suite was certified by the Department of Health. (Doc. 235-58, ¶ 7.)

participating HFHP provider joined his practice, then that provider's contract would be terminated. (*Id.* ¶ 13.)

Prior to and after his termination from HFHP, Dr. Dowdell continued to see patients at HRMC. (*Id.* ¶ 18.) However, the nurse managers at HRMC often ignored his orders to refer these patients to non-Health First facilities; instead, the HRMC nurses transferred such patients to Health First facilities. (*Id.*) Additionally, despite continued communications with Health First and HFHP and repeated attempts at reinstatement, Dr. Dowdell's application to rejoin HFHP was continuously denied. (*See id.* ¶¶ 11, 12, 15, 16.)

As previously mentioned, specific intent may be inferred from predatory or exclusionary conduct. *See Spectrum Sports*, 506 U.S. at 459. Consequently, the Court finds that, based on the foregoing evidence of exclusionary conduct, a reasonable juror could conclude that Health First possessed the specific intent to achieve monopoly power in the ancillary services market and that Health First did in fact commit such anticompetitive conduct. *See Rule Indus.*, 7 F.3d at 993.

Finally, the Court reiterates its prior conclusion that Plaintiffs need not demonstrate that a defendant possess a 50% or greater market share to constitute a dangerous probability of success for an attempted monopolization claim if other factors are present. Although market share is the principal device utilized by courts to measure monopoly power, the extent of a firm's ability to control productive capacity in a market may alternatively be indicative of monopoly power. *See Rule Indus.*, 7 F.3d at 994. Here, the interrelated nature of Health First's alleged exclusionary treatment, location, and referral practices supports Plaintiffs' contention that Health First has the ability to control

productive capacity in the ancillary services market. Notably, Dr. Frech concludes that Health First's foreclosure of the physician services market through acquisition and alignment has anticompetitive effects on the ancillary services market by directing referrals to Health First hospitals and foreclosing referrals to other sources of ancillary services. (Doc. 235-1, ¶ 165.) Further illustration of the interconnected nature of these markets is evidenced by Dr. Frech's correlation of the decline in Omni's collections on ancillary services as physicians left its practice. (Doc. 235-47, ¶ 27.) To this end, Dr. Frech has compiled multiple tables demonstrating Omni's forgone revenues for ancillary services. (Doc. 235-47 ¶¶ 27–29, 37, 38; *id.* at 17–18 tbls.5A–5D, 21–22 tbls.6A–6D, 28–29 tbls.8A–8D, 30–31 tbls.9A–9D).)

    Dr. Frech also concludes that, generally, a hospital's vertical integration into health plans "significantly increases health plans' bargaining power with independent physicians and ancillary service providers." (Doc. 235-1, ¶ 126.) Specific to Health First, Dr. Frech summarizes the anticompetitive nature of its vertical integration as a series of exclusionary activities designed to reduce competition among hospitals, physicians, health plans, and ancillary service providers, which it enforced through penalties for non-compliance—namely, termination of provider contracts. (*Id.* ¶¶ 147, 156, 197.) Given the parallel nature of the physician services and ancillary services markets, Dr. Dowdell's declaration, and Dr. Frech's conclusions—including his quantification of the foreclosure of radiologists in SBC—the Court is unable to conclude, as a matter of law, that Health First does not possess a dangerous probability of successfully achieving a monopoly of the ancillary services market in SBC. Not only does the evidence create a question of fact as to Health First's ability to control productive capacity in this market, but it also supports

a finding that there are substantial barriers to entry in the ancillary services market—i.e., the procurement of HFHP participating provider contracts predicated on the agreement to engage in exclusive referral and treatment practices that potentially violate the Sherman Act. Consequently, the Corporate Defendants' MSJ is due to be denied with respect to Count IV.

### 3.   Private Health Insurance Market

At the outset of its response to the Corporate Defendants' MSJ, Plaintiffs concede that there is insufficient evidence to support their claim under Count V of the Complaint for attempted monopolization of the private health insurance market. (Doc. 235, p. 7, n.1.) Consequently, Plaintiffs purport to voluntarily dismiss this claim. (*Id.*) As the Corporate Defendants have already filed a MSJ and do not stipulate to dismissal (*see* Doc. 201; Doc. 249, p. 7, n.7), the Court construes Plaintiffs' concession as a request for voluntary dismissal by Court order pursuant to Federal Rule of Civil Procedure 41(a)(2) and finds that it is due to be granted. Accordingly, the Court will dismiss Count V of the Complaint with prejudice.

### 4.   Medicare Advantage Market

Count VI of the Complaint alleges that Health First and HFHP attempted to monopolize the Medicare Advantage Market. (Doc. 57, ¶¶ 354–66.) In particular, Plaintiffs allege that Health First wields a dominant share of the Medicare Advantage market in SBC through its ownership and control of HFHP. (*Id.* ¶ 355.) According to Plaintiffs, Health First has enhanced and abused this market power through exclusionary conduct, which has harmed Plaintiffs, who participate in the relevant market as suppliers. (*Id.* ¶¶ 357, 359.) Specifically, Plaintiffs contract with private health insurers to offer services as part

of their provider networks, while insurers offering Medicare Advantage plans pay Plaintiffs for services rendered to their Medicare Advantage enrollees. (*Id.* ¶ 359.) Plaintiffs allege that Health First's exclusionary course of conduct has substantially limited their ability to effectively compete in this market. (*See id.* ¶ 360.)

In their MSJ as to Count VI, the Corporate Defendants argue that: (1) there is no evidence that Medicare Advantage is a separate market from traditional Medicare coverage (Doc. 201, p. 12); (2) Plaintiffs cannot produce any admissible evidence of a conspiracy and do not otherwise have proof of any unlawful exclusionary conduct (*id.* at 12–13); (3) HFHP's declining market share, new entry to market, and the lack of evidence of inhibited growth or competition therein support a finding that Health First and HFHP do not have a dangerous probability of success with respect to monopolization of the Medicare Advantage market (*id.* at 13–14); and (4) there is no evidence of specific intent to monopolize this market (Doc. 249, p. 8). Plaintiffs counter each of these arguments. (Doc. 235.)

As an initial matter, the Court agrees with Plaintiffs that Medicare Advantage is a product independent of Medicare, and thus the Medicare Advantage market is distinct from the traditional Medicare market. (*See* Doc. 235, pp. 22-23.) Importantly, this is the position taken by the Antitrust Division of the U.S. Department of Justice. *See United States v. UnitedHealth Grp. Inc.*, 1:08-cv-00322-ESH (D.D.C. Feb. 25, 2008), Doc. 1. This position is further supported by Dr. Frech's report, which cites at least two corroborating journal articles. (Doc. 235-1, ¶ 60.)

The remainder of the Corporate Defendants' arguments challenge the sufficiency of the evidence supporting the elements of an attempted monopolization claim. To

establish the intent element, Plaintiffs point to documentation outlining the steps of Health First's strategy—formulated during the MIMA Acquisition—to unilaterally terminate all non-Health First Medicare Advantage plans formerly accepted by MIMA. (Doc. 235-4.) The Corporate Defendants contend that, in light of the MIMA Acquisition, such termination constitutes a permissible unilateral refusal to deal because Health First hospitals have never contracted with any other Medicare Advantage plans. (Doc. 201, pp. 12–13.) However, the unilateral termination of a voluntary and presumably profitable course of dealing may be indicative of anticompetitive intent where it suggests a willingness to forsake short-term profits to achieve an anticompetitive end. *See Trinko*, 540 U.S. at 409 (summarizing the *Aspen Skiing* exception). Consequently, the Court finds this evidence sufficient to raise a jury question as to the intent element of an attempted monopolization claim.

Next, Plaintiffs argue that Health First's refusal to accept any Medicare Advantage plans outside its own constitutes anticompetitive conduct. (Doc. 235, p. 23.) Plaintiffs also maintain that the vertical integration of the Health First system injures competing Medicare Advantage plans because they are denied access to patients treated at HRMC, which Plaintiffs contend is the only hospital in SBC with Level II Trauma Center, Level II Neonatal Intensive Care Unit, and an air ambulance. (*Id.* at 23; *see also* Doc. 57, ¶ 116.) Additionally, Plaintiffs argue that Health First's Exclusive Referral Practice cements this effect within the physician services market. (Doc. 235, p. 24.) Upon consideration, the Court agrees that Health First's exclusion of HRMC—a "must have" hospital in SBC— from all competing Medicare Advantage plans evidences anticompetitive exclusive dealing on the part of Health First and HFHP.

As to the third element, the Corporate Defendants underscore HFHP's declining share of the Medicare Advantage market in SBC, which has fallen from 100% in 2005 to 50–60% currently. (Doc. 201, p. 13.) Consequently, the Corporate Defendants contend that this decline evidences a lack of market power, which the Court should consider in determining whether there is a dangerous probability of successfully monopolizing the market. (*Id.* at 14.) In particular, the Corporate Defendants represent that this significant decline was created by new entry and expansion in the market by competitors, which evidences a lack of barriers to entry. (*Id.*; *see also* Doc. 249, p. 8.) Additionally, the Corporate Defendants argue that there is no evidence that new Medicare Advantage plans have been unable to effectively compete and grow despite the Corporate Defendants' alleged exclusionary conduct. (Doc. 201, p. 14.)

Although Plaintiffs concede that Health First's market share has declined, they maintain that its remaining market share is well within the range associated with a dangerous probability of achieving monopoly power. (Doc. 235, p. 24.) The Court agrees. Indeed, the Corporate Defendants concede that HFHP currently possesses a 50 to 60% share of the Medicare Advantage market. (Doc. 201, p. 13.) As contemplated by the Eleventh Circuit, "a sufficiently large market share may alone create a genuine dispute over whether the defendant possessed a dangerous probability of successfully monopolizing a market despite the existence of other facts tending to make monopolization unlikely, thereby precluding summary judgment for the defendant." *Rule Indus.*, 7 F.3d at 999. The Court thus declines to depart from Eleventh Circuit precedent concluding that "a dangerous probability of achieving monopoly power may be established by a 50% share," *Rule Indus.*, 7 F.3d at 1000. While the Corporate

Defendants are free to argue at trial that low barriers to entry and a declining market share negate the attempted monopolization claim that Plaintiffs allege in Count VI, the Court may not weigh the evidence to foreclose Plaintiffs' claim at this stage of the proceedings. As such, the Corporate Defendants' MSJ as to Plaintiffs' attempted monopolization claim in Count VI is due to be denied.

### E.    Count VII

In Count VII, Plaintiffs assert a claim against all Defendants for a contract, combination, or conspiracy in restraint of trade in violation of Section 1 of the Sherman Act ("**Section One Conspiracy Claim**"). (Doc. 57, ¶¶ 367–379.) Specifically, Plaintiffs allege that Defendants participated in a common scheme with co-conspirators[9] to restrain trade and exclude competition in the aforementioned markets by engaging in: (1) exclusive dealing arrangements; (2) tying arrangements; and (3) a group boycott/concerted refusal to deal. (*Id.* ¶¶ 367–69.) Plaintiffs Omni, SOAR, IFS, and Florida Pain allege that they were harmed by such conduct because: (1) they either had their provider contracts terminated or were denied access to the Health First network for refusing to agree to the exclusive dealing arrangements, which caused them to be denied access to Health First's enrollees; (2) the physicians who agreed to the exclusive dealing arrangements have subjected them to a group boycott/concerted refusal to deal; (3) they have stopped receiving inpatient referrals from HRMC; and (4) the exclusionary practices have prevented them from growing their businesses due to a lack of referrals and the inability to access a substantial segment of insured persons in SBC. (*Id.* ¶¶ 375–

---

[9] According to Plaintiffs, all physicians and medical practices that agreed to Health First's exclusive dealing arrangements are Defendants' co-conspirators—including MIMA and its physicians prior to the MIMA Acquisition.

378). Additionally, Omni and SOAR allege that Health First has actively lured physicians away from their practices. (*Id.* ¶¶ 375, 376.) Meanwhile, the individual Antitrust Plaintiffs—Drs. Deligdish, Seminer, Dowdell, Gayles, Golovac, Grenevicki, and Komar—allege that they were harmed by Defendants' exclusionary practices because they have been: (1) denied access to Health First's members; and (2) blacklisted by Health First and, thus, received no patient referrals from HF Physicians or its co-conspirators, regardless of the patient's insurance provider. (*Id.* ¶ 379.)

Section One of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1. Therefore, to survive the Corporate Defendants' motion for judgment as a matter of law on their Section One Conspiracy Claim, Plaintiffs must prove the existence of an agreement to restrain trade between two or more persons evidenced by "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Harcros Chems.*, 158 F.3d at 569.

In their MSJ, the Corporate Defendants contend that they are entitled to judgment as a matter of law because: (1) Plaintiffs cannot present any admissible evidence of any agreement or conspiracy; and (2) no legitimate inference may be drawn from any circumstantial evidence. (Doc. 201, p. 14.) In particular, the Corporate Defendants argue that the only evidence Plaintiffs can produce in support of a conspiracy between MIMA and Health First is inadmissible hearsay testimony from Dr. Deligdish. (*Id.* at 17–18.) Additionally, the Corporate Defendants aver that purely circumstantial evidence implying that HF Physicians and MIMA doctors conspired to admit patients only to Health First hospitals—and not Wuesthoff—cannot defeat their MSJ because the record evidence

shows legitimate reasons why doctors would not want to admit patients to Wuesthoff—namely, lack of the same services as Health First's hospitals and quality concerns. (Doc. 249, p. 9.)

In response, Plaintiffs point to documentary evidence that arguably raises questions of material fact with respect to their Section One Conspiracy Claim, thus precluding the grant of summary judgment. (Doc. 235, pp. 18–19.) First, Plaintiffs produce an email from Joseph.McClure@MIMA.com to Peter.Weiss@health-first.org in which the sender references "the political relationship, now years in duration between HFHP and MIMA" which "drives PET/CT and MRI to HRMC for [MIMA] patients." (Doc. 238-15, p. 2.) The email explains that "MIMA physicians do not have any choice in consulting radiologists for health plan patients as [they] do in all other fields" and continues to identify some of the sender's concerns regarding two erroneous diagnoses and the quality and standard of care by the HRMC radiologists. (*Id.*) The sender states that he does not know how to fix the problem and that he cannot refer to anyone but these physicians. (*Id.*) Additionally, Plaintiffs produced deposition testimony from a witness who points to the behavior of MIMA as evidence of a conspiracy—specifically, that: (1) MIMA has over 100 doctors and 10,000 hospital admissions a year, yet only one percent of those admissions is at Wuesthoff; and (2) MIMA has offices within one to three miles of Wuesthoff and has moved its building and main headquarters closer to Wuesthoff, yet still does not utilize Wuesthoff.[10] (Doc. 235-41, p. 6.)

Based on the foregoing, the Court finds that there is a genuine dispute of material

---

[10] Contrary to Defendants' arguments, none of Plaintiffs' proffered testimony constitutes hearsay.

fact as to whether an illegal conspiracy existed between MIMA and Health First to refer patients only to Health First physicians and admit patients only to Health First hospitals. Such circumstantial evidence is sufficient to defeat the MSJ. Rarely will a plaintiff be able to establish the existence of a conspiracy with direct evidence of an explicit agreement; indeed, "most conspiracies are inferred from the behavior of the alleged conspirators." *Id.* (quoting *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir. 1991)). Thus, "[w]hen a plaintiff seeks to prove a conspiracy by inference, courts must be mindful that on summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.'" *Id.* (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

The Court acknowledges that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Notably, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* However, the Court finds that Plaintiffs' evidence does not fall into the latter category. Though the Corporate Defendants argue that there were legitimate reasons why doctors would not want to admit patients to Wuesthoff, they point only to Plaintiffs' response stating that the scope and sale of Wuesthoff's services are significantly more limited than those of Health First. (Doc. 249, p. 9, n.12 (citing Doc. 238, pp. 13–14).) A reasonable juror could conclude that MIMA physician Joseph McClure's email referencing the political relationship between MIMA and Health First  and his inability to refer patients to radiologists outside HRMC—despite quality concerns—is more consistent with an illegal conspiracy than permissible competition. Consequently,

the Corporate Defendants' motion as to Count VI is due to be denied.[11]

### F.    Count VIII

In Count VIII of the Complaint, Plaintiffs allege that all Defendants violated Section 2 of the Sherman Act by engaging in a conspiracy to monopolize the market for physician services, ancillary services, and Medicare Advantage plans in SBC ("**Section Two Conspiracy Claim**"). (Doc. 57, ¶¶ 380–92.) According to Plaintiffs, Defendants have participated in a common scheme designed to leverage Health First's market power and create a vertically-integrated healthcare monopoly in SBC through multiple forms of exclusionary conduct. (*Id.* ¶ 380.) As in the alleged Section One Conspiracy Claim, Plaintiffs aver that Health First's co-conspirators consist of all the physicians and medical practices that agreed to Health First's exclusive dealing arrangements—including MIMA and its physicians prior to the MIMA Acquisition. (*Id.* ¶ 382.) Plaintiffs allege that such exclusionary conduct has hindered their ability to effectively compete in the relevant markets in SBC, thereby causing injury to competition and consumers.  (*Id.* ¶ 386, 385.)

Unlike a § 2 attempted monopolization claim, a claim for conspiracy to monopolize does not require a showing of monopoly power. *Levine v. Cent. Fla. Med. Affiliates*, 72 F.3d 1538, 1556 (11th Cir. 1996). "Instead, a plaintiff proves a section 2 conspiracy to monopolize by showing: '(1) concerted action deliberately entered into with the specific intent of achieving a monopoly; and (2) the commission of at least one overt act in furtherance of the conspiracy.'" *Id.* (quoting *Todorov v. DCH Healthcare Auth.*,

---

[11] The Court also rejects the Corporate Defendants' contention that portions of Plaintiffs' evidence falls outside the scope of the Complaint. (*See* Doc. 249, p. 9.)  To the contrary, Plaintiffs alleged a conspiracy based on exclusive dealing arrangements between MIMA and Health First. (*E.g.*, Doc. 57, ¶¶ 146–152, 368.) The evidence produced by Plaintiffs supports exactly that.

921 F.2d 1439, 1460 n.35 (11th Cir. 1996)).

Incorporating the same arguments advanced in its MSJ as to Count VII, the Corporate Defendants contend that Plaintiffs cannot produce any admissible evidence of a conspiracy between the Corporate Defendants and any other entity. (Doc. 201, p. 20.) Specifically, the Corporate Defendants maintain that their conduct constitutes a unilateral refusal to deal based on legitimate business decisions. (*Id.*) Moreover, the Corporate Defendants again posit that Plaintiffs have not set forth sufficient evidence to: (1) define the ancillary services market; or (2) demonstrate that Health First possessed the required intent to monopolize the markets for hospital services, physician services, and Medicare Advantage insurance. (*Id.*) Plaintiffs similarly rely on their arguments in response to the Corporate Defendants' MSJ as to Count VII. (Doc. 235, p. 27.)

As it has done twice before in the instant Order, the Court again rejects the Corporate Defendants' contention that Plaintiffs have not adequately defined the ancillary services market. Similarly, the Court declines to revisit the Corporate Defendants' challenge as to the sufficiency of the evidence supporting a finding of specific intent to monopolize the hospital services, physician services, and Medicare Advantage insurance markets. Finally, the Court has already rejected the Corporate Defendants' contention that Plaintiffs' proffered evidence is probative only of a permissible unilateral refusal to deal, rather than an illegal conspiracy. As such, the Corporate Defendants' MSJ as to Count VIII also fails.

## G.    Count IX

Turning to Plaintiffs' state law claims, in Count IX of the Complaint, Plaintiffs seek damages and injunctive relief against all Defendants for alleged violations of FDUTPA.

(Doc. 57, ¶¶ 393–405.) Plaintiffs predicate their FDUTPA claim on the Alleged Common Scheme (*see id.* ¶ 397), which they contend constitutes immoral, unethical, oppressive, and unscrupulous conduct that offends public policy and is substantially injurious to consumers. (*Id.* ¶ 396.)

Under FDUTPA, Plaintiffs must demonstrate only that: (1) the alleged conduct was unfair or deceptive; and (2) they were damaged by such unfair or deceptive conduct. *True Title, Inc. v. Blanchard*, No. 6:06-cv-1871-Orl-19DAB, 2007 WL 430659, at *3 (M.D. Fla. Feb. 5, 2007). A practice is unfair under FDUTPA if "it offends established public policy, is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Suris v. Gilmore Liquidating, Inc.,* 651 So. 2d 1282, 1283 (Fla. 3d DCA 1995) (citing *Spiegel, Inc. v. Fed. Trade Comm'n*, 540 F.2d 287, 293 (7th Cir. 1976)). "Antitrust violations are included within the conduct proscribed by the FDUTPA." *Marco Island Cable, Inc. v. Comcast Cablevision of South, Inc.*, No. 2:04-cv-26-FTM-29DNF, 2006 WL 1814333, at *6 (M.D. Fla. July 3, 2006). Given that the Court has already determined that the evidence supporting the antitrust violations alleged in Counts I through VIII is sufficient to survive the Corporate Defendants' MSJ, the Antitrust Plaintiffs have met their burden with respect to the first element of a FDUTPA claim.[12] The

---

[12] The Corporate Defendants also appear to dispute whether Plaintiffs are consumers of services within the purview of FDUTPA. (*See* Doc. 201, pp. 200, 201.) Though immaterial, the Court rejects this argument. Florida law has clearly established that the 2001 amendment to FDUTPA eradicated the prior requirement that a plaintiff be a consumer to seek relief under the statute. *N. Am. Clearing, Inc. v. Brokerage Comput. Sys., Inc.*, 666 F. Supp. 2d 1299, 1310 n.9 (M.D. Fla. 2009) (stating that "the 2001 Amendments to FDUTPA broadened its scope to allow any person or entity who has suffered a loss as a result of unfair or deceptive acts or practices to commence a private action for actual damages"); *see also Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty.*, 169 So. 3d 164 (Fla. 4th DCA 2015) (same). Moreover, a claim under FDUTPA need not even arise out of a consumer transaction. *Furmanite America, Inc. v.*

remaining Plaintiffs—Boone and PAS—have also produced sufficient evidence of unfair and deceptive conduct on the part of Defendants. (*E.g.*, Doc. 235-57.)

With respect to the second element, the Corporate Defendants first maintain that the absence of evidence of actual damages, as defined by FDUTPA, is fatal to Plaintiffs' claim for damages under the statute. (Doc. 201, pp. 20–23, Doc. 249, p. 9.) Specifically, the Corporate Defendants maintain that Plaintiffs cannot demonstrate that the "things of value" they have purchased have diminished in valued as a result of Defendants' alleged actions. (Doc. 201, p. 22.) The Court agrees.

Under Florida law, "[t]he measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered and its market value and the condition in which it should have been delivered according to the contract of the parties."[13] *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. 3d DCA 1984). Neither the Complaint, Plaintiffs' response to the Corporate Defendants' MSJ, nor Dr. Singer's damages report reveals a calculation of damages that fit within this definition. (*See* Doc. 57, ¶¶ 393–405; *see also* Doc. 199-1, pp. 80–84; *cf.* Doc. 235, p. 22–23.) As such, Plaintiffs' claim for damages in Count IX fails as a matter of law.

Nonetheless, under FDUTPA,

> anyone aggrieved by a violation of [the statute] may bring an action to obtain a declaratory judgment that an act or practice violates [the statute] and to enjoin a person who has violated, is violating, or is otherwise likely to violate [the statute].

---

*T.D. Williamson, Inc.,* 506 F.Supp.2d 1134, 1145–46 (M.D. Fla. 2007).
[13] The only notable exception to this rule is "when the product is rendered valueless as a result of the defect." *Rollins, Inc.*, 454 So. 2d at 585. In that circumstance, "the purchase price is the appropriate measure of actual damages." *Id.*

Fla. Stat. § 501.211. Thus, "regardless of whether an aggrieved party can recover 'actual damages' under section 501.211(2), it may obtain injunctive relief under section 501.211(1)." *Wyndham Vacation Resorts v. Timeshares Direct, Inc.*, 123 So. 3d 1149, 1152 (Fla. 5th DCA 2012). As mentioned above, Plaintiffs also seek injunctive relief. (Doc. 57, ¶ 393.) To this point, the Corporate Defendants maintain that Plaintiffs offer no evidence that Dr. Gayles, Dr. Golovac, Dr. Dowdell, Dr. Grenevicki, or Boone were "aggrieved" within the meaning of FDUTPA. (Doc. 201, p. 23.)

Florida's Fifth District Court of Appeals ("**Fifth DCA**") has stated that, for purposes of § 501.211(1), an "aggrieved" person "must be able to demonstrate some specific past, present, or future grievance." *Ahearn v. Mayo Clinic*, 180 So. 3d 165, 173 (Fla. 5th DCA 2015). Consistent with prior case law, the *Ahearn* court concluded that an aggrieved party is not required to suffer monetary damages to maintain an action for an injunction under § 501.211(1). *Id.* at 171–73, 175. Rather, the *Ahearn* court found that the meaning of "aggrieved" as used in § 501.211(1) is more consistent with the *Black's Law Dictionary* definition describing a person "angry or sad on grounds of perceived unfair treatment" and, therefore, provides broader relief than FDUTPA's damages provision. *Id.* at 172, 175. However, the injury claimed cannot be merely speculative. *Id.* at 173.

Here, the Court finds that Dr. Singer's damages report sets forth affirmative evidence demonstrating that Dr. Gayles, Dr. Golovac, Dr. Dowdell, Dr. Grenevicki, and Boone were aggrieved by Defendants' alleged actions, which they contend harmed their respective practices. (Doc. 199-1, pp. 116–137.) Such evidence, *inter alia*, is sufficient to create a genuine issue of material fact as to Plaintiffs' FDUTPA claim for injunctive relief.

Finally, the Corporate Defendants contend—once again—that HFHP is exempt from suit pursuant to § 501.212(4)(a) of the Florida Statutes. (*Id.* at 23–24.) The Court previously resolved this issue against Defendants in its Dismissal Order. (*See* Doc. 105, pp. 29–31.) The Corporate Defendants do not present any new basis or evidence for their exemption argument. As such, the Court construes their argument as an attempt to re-litigate an issue already determined by the Court, and finds that it is due to be denied.

### H.    Count X

In their tenth count, Plaintiffs assert a state law claim for tortious interference with business relationships against all Defendants. (Doc. 57, ¶¶ 406–422.) Under Florida law,

> "[t]he elements of the tort of intentional interference with an advantageous business relationship are: 1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; 2) knowledge of the relationship on the part of the defendant; 3) an intentional and unjustified interference with that relationship by the defendant; and 4) damage to the plaintiff as a result of the breach of the relationship."

*Magre v. Charles*, 729 So. 2d 440, 443–44 (Fla. 5th DCA 1999). In particular, Plaintiffs allege that Defendants interfered with three different types of business relationships: (1) Plaintiffs' relationships with patients insured by HFHP ("**Patient Relationships**"); (2) Plaintiffs' relationship with other doctors who previously referred patients to them or otherwise utilized their services ("**Referral Relationships**"); and (3) Plaintiffs' relationships with physicians in their practices whom Health First lured away to join other practices ("**Practice Relationships**"). (Doc. 57, ¶ 406; *see also* Doc. 235, p. 30.)

The Corporate Defendants raise several grounds in support of their MSJ as to Count X. First, the Corporate Defendants contend that: (1) Plaintiffs' claim with respect to their Referral Relationships fails as a matter of law because payment or compensation

for referrals is illegal and, therefore, business relationships relating to patient referrals are not legally cognizable (Doc. 201, p. 24); (2) Plaintiffs cannot prove a business relationship with identifiable patients and physicians or Defendants' knowledge thereof (*id.* at 25, 26, 28); and (3) the record is devoid of any evidence of causation (*id.* at 25, 26, 28). The Corporate Defendants also argue that Plaintiffs cannot prove that HFHP's termination of Plaintiffs' provider contracts constituted unlawful interference because: (1) a claim for tortious interference cannot exist against a party to the relationship interfered with; and (2) such terminations were expressly permitted under the terms of the provider contracts. (*Id.* at 26–27.) Finally, the Corporate Defendants contend that their actions are protected under Florida's competition privilege. (*Id.* at 28.)  Upon consideration, the Court finds that Plaintiffs have established a prima facie claim for tortious interference based on the exhibits cited in their response. Therefore, the Corporate Defendants' MSJ as to Count X is due to be denied.

As an initial matter, the Court rejects the Corporate Defendants' argument that a physician-referral relationship cannot form the basis of a tortious interference claim as it is squarely at odds with existing Florida law. *See, e.g.*, *Magre*, 729 So. 2d 440. Indeed, Plaintiffs' alleged damage does not turn on the procurement of an illegal referral fee but, rather, on their loss of paying patients as a result of Defendants' interference with their provider contracts stemming from their refusal to refer all patients to Health First facilities. (*See, e.g.*, Doc. 199-1, p. 38.)

In *Magre*, Florida's Fifth DCA reversed a grant of summary judgment in favor of the defendant on a tortious interference claim. *Id.* at 444. The facts of the case involved a surgeon's allegedly defamatory letter to his colleagues criticizing the plaintiff—

Dr. Magre—following the hospital's full reinstatement of Dr. Magre's previously suspended staff privileges. *Id.* at 442. In his complaint, Dr. Magre alleged that the defendant had intentionally interfered with his relationship with the hospital and members of its medical staff who referred patients to him because the letter contained "untrue statements concerning his professional skill and reputation." *Id.* at 442, 444. Ultimately, the *Magre* court concluded that, because the letter came after Dr. Magre's reinstatement with full staff privileges, it did not constitute intentional interference with a business relationship with the hospital, but may have constituted intentional and unjustified interference with Dr. Magre's business relationship with other doctors who refer patients to him. *Id.* at 444.

In a similar case, Florida's Third DCA reversed the lower court's dismissal of the plaintiffs' tortious interference claim on the ground that the plaintiffs sufficiently alleged a cause of action for tortious interference and that the competition privilege was a question of fact to be resolved at trial. *Greensberg v. Mount Sinai Med. Ctr. of Greater Miami, Inc.*, 629 So.2d 252, 256 (Fla. 3d DCA 1993). Specifically, in *Greensberg*, two cardiac surgeons experienced difficulty obtaining operating room time and assisting hospital personnel after Dr. Greensberg resigned as chairman of the department. *Id.* at 254. The newly-appointed chairman allegedly: (1) induced referring physicians to send patients to him instead of plaintiffs; and (2) refused to honor the recommendations of referring physicians who sent patients to plaintiffs. *Id.* at 254–55. According to the *Greensberg* plaintiffs, the defendants also told patients that plaintiffs no longer practiced cardiac surgery at the hospital and set up numerous obstacles to prevent plaintiffs from performing even emergency surgeries. *Id.* at 255. On appeal, the Third DCA agreed that

the *Greensberg* plaintiffs had adequately alleged intentional interference with their relationships with referring physicians and patients. *Id.* at 255–56.

Finally, in *Scheller v. American Medical International Inc.*, 502 So.2d 1268 (Fla. 4th DCA 1987), the doctor-plaintiff brought a claim for tortious interference with an advantageous business relationship, alleging that the defendants interfered with his relationship with other physicians and their patients by preventing plaintiffs from offering pathology services at the hospital and interfering with his billing. *Id.* at 1271–72. As a result, the *Scheller* plaintiff alleged that he lost patients and patient referrals. *Id.* at 1272. In reversing the lower court's dismissal, the Fourth DCA held that the plaintiff's allegations were sufficient to state a cause of action for tortious interference. *Id.* In light of the foregoing authorities, the Court finds that the Corporate Defendants' first contention is not well taken.

The Corporate Defendants' second argument is equally unfounded. Indeed, Plaintiffs have produced sufficient evidence to demonstrate Defendants' knowledge of Plaintiffs' business relationship with identifiable patients and physicians and, contrary to the Corporate Defendants' contention, Plaintiffs do not allege a business relationship with the public at large. First, Plaintiffs produced a form letter sent from Dr. Collins to insured patients following the termination of its provider contract with Dr. Dowdell, encouraging Dr. Dowdell's patients to select a new physician from an enclosed list of participating providers in order to retain coverage for services. (Doc. 235-17.) Plaintiffs also present correspondence from MIMA physician Stephen Blythe to Dr. Weiss at Health First, informing Dr. Weiss: (1) that HFHP's termination of Omni's provider agreement had precipitated the receipt of ten to twenty daily phone calls from patients seeking new

primary care physicians; and (2) of the problem created by his inability to refer patients to a physician not yet credentialed by HFHP. (*See* Doc. 235-16.) Plaintiffs contend that the foregoing evidence supports their position that Health First: (1) intended for patients insured by HFHP to seek out other treating physicians; (2) had knowledge of the substantial numbers of patients who did exactly that; and (3) was aware of the importance to patients of seeking in-network providers. (Doc. 235, p. 31.) The Court agrees.

Based on the record evidence, a reasonable juror could also conclude that the Corporate Defendants had knowledge of Plaintiffs' prior Referral Relationships with HFHP participating physicians. At his deposition, Dr. Weiss testified that, "[i]f any participating physician in [HFHP] was referring routinely to doctors that were not participating in the plan, that would have caused a great deal of attention on the part of the leadership." (Doc. 235-50, p. 7.) Finally, it is beyond genuine dispute that the Corporate Defendants would have had knowledge of the relationship between Plaintiffs and the physicians they recruited to join HF Physicians, who were members of Plaintiffs' respective practices at the time.

Plaintiffs have also set forth sufficient evidence to create a factual issue as to whether Defendants' interference with Plaintiffs' Patient, Referral, and Practice Relationships was intentional or unjustified. Importantly, the parties offer contradicting theories with respect to the reasons for Defendants' conduct. Though the Corporate Defendants contend that their actions are shielded by Florida's competition privilege, this determination is more appropriately reserved to the jury under the present circumstances. To establish the competition privilege, the Corporate Defendants must show, *inter alia*, that it did not employ improper means and it did not intend to create or continue an illegal

restraint on competition. *Int'l Sales & Serv., Inc. v. Austral Insulated Prods.*, 262 F.3d 1152, 1159 (11th Cir. 2001). Such elements are hotly-debated issues in the instant litigation and both parties have produced evidence from which a reasonable juror could reach different conclusions. As such, summary judgment on the Corporate Defendants' competition privilege defense is not warranted. Indeed, "when there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question." *Mfg. Research Corp. v. Greenlee Tool Corp.*, 693 F.2d 1037, 1040 (11th Cir. 1982).

The Corporate Defendants' final basis for summary judgment on Count X is that Plaintiffs are unable to produce any evidence of causation. (Doc. 201, p. 25.) This challenge is thus directed to the fourth element of a tortious interference claim, which requires Plaintiffs to prove damages *as a result of* Defendants' interference with their Patient, Referral, and Practice Relationships. Upon consideration, the Court finds that Dr. Singer's damage report presents enough evidence to withstand the Corporate Defendants' summary judgment challenge on this issue. (*See* Doc. 199-1, pp. 85–141); *see also Wolicki-Gables v. Arrow Int'l., Inc.*, 641 F. Supp. 2d 1270, 1288 (M.D. Fla. 2009) (recognizing that proximate causation is ordinarily determined by the jury, unless the court finds that the issue is undisputed after considering all facts and reasonable inferences in favor of the nonmoving party). Nonetheless, the Corporate Defendants are free to reassert their challenges to Dr. Singer's damage calculations during cross examination at trial.

I.     **Refusals to Deal**

As a final matter, the Corporate Defendants advance a catchall argument that the absence of any admissible evidence of a conspiracy renders their conduct lawful unilateral refusals to deal. (Doc. 201, pp. 29–33; Doc. 249, p. 2.) The Corporate Defendants also argue that the *Aspen Skiing* exception is inapplicable here because Plaintiffs lack evidence of anticompetitive intent or effect. (Doc. 249, pp. 2–4.) As outlined in its analysis of Plaintiffs' individual claims, the Court disagrees.

However, even if the Court were to accept the Corporate Defendants' argument that their conduct was done for legitimate business reasons, Plaintiffs have produced evidence to raise a material issue of fact as to this contention. Pursuant to Eleventh Circuit case law, "[o]nce the defendant has met its burden to show its valid business justification, the burden shifts to the plaintiff to show that the proffered business justification is pretextual." *Morris Commc'ns*, 364 F.3d at 1295. Plaintiffs point to multiple pieces of evidence, which suggest that the Corporate Defendants' purported business reasons are pretextual. (*See* Doc. 235, pp. 33–39.) As such, the Court declines to grant the Corporate Defendants' MSJ on this basis. "It is well-established that summary judgment is inappropriate to decide questions of scienter, knowledge, and intent." *Ross v. Bank South, N.A.*, 885 F.2d 723, 751 n.8 (11th Cir. 1989). Finally, the Court is mindful of the Supreme Court's instruction that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles[.]" *Poller v. Columbia Broad. Sys., Inc.*, 386 U.S. 464, 491 (1962).

III.   **Individual Defendants' Motion for Summary Judgment**

Defendants Means and Senne also move for summary judgment on Counts VII

through X of the Complaint. (Docs. 189, 195.)

According to the Complaint, Means and Senne were executive members of Health First and HRMC, respectively, during the time of the alleged unlawful conduct. (*See* Doc. 57, ¶¶ 30, 31.) Specifically, Plaintiffs allege that Means and Senne initiated conversations with physicians in the Medical Practice Plaintiffs' practice groups following the termination of the relevant practice's provider contracts with HFHP. (*Id.* ¶¶ 154, 155.) Plaintiffs allege that, during these conversations, the Individual Defendants "actively lured" physicians away from the Medical Practice Plaintiffs by informing the physicians that "they could regain access to Health First's patients and referrals if they left their practice and joined HF Physicians or an independent group more loyal to Health First"— that is, one in which the physicians had agreed to enter into exclusivity arrangements pursuant the Exclusive Referral Practice. (*Id.* ¶ 153, 154.) The Medical Practice Plaintiffs allege that the foregoing conduct caused them injury by creating conditions which prevented them from achieving growth. (*Id.* ¶ 153.)

The Complaint also alleges that Means and Senne authorized, participated in, directed, and/or ratified the unlawful acts described therein, thus demonstrating that they actively and knowingly engaged in a scheme designed to achieve anticompetitive ends— namely, unlawfully maintaining Health First's hospital monopoly and attempting to monopolize several other healthcare-related markets. (*Id.* ¶¶ 189, 191, 193, 195.) As examples of such affirmative conduct, Plaintiffs represent that: (1) Means instructed the CEO of Wuesthoff to stay out of SBC and told physicians at a HRMC medical staff meeting, "if you sign letters of support for Wuesthoff, we will know who you are"; and

(2) Senne explicitly instructed Omni that it could participate in HFHP's network if it agreed to admit its patients exclusively to Health First's hospitals. (*Id.* ¶¶ 190, 194.)

In their respective MSJs, Means and Senne contend that Plaintiffs cannot produce any admissible evidence to demonstrate that they participated in, directed, or ratified the alleged illegal conduct. (Doc. 189, p. 2; Doc. 195, p. 2.) In response, Plaintiffs argue that there is a genuine dispute of material fact with respect to Senne and Means's individual liability and personal participation. (Doc. 236.) Upon review of the record, the Court concludes that, while it is not particularly strong, Plaintiffs' proffered evidence is sufficient to raise issues of material fact from which a reasonable juror could infer knowing participation on the part of the Individual Defendants.

## A.    Counts VII and VIII

A director, officer, or agent of a corporate entity may be individually liable for violations of the Sherman Act if he or she authorizes, orders, or participates in any of the actions constituting an antitrust violation. *See* 15 U.S.C. § 24; *see also United States v. Wise*, 370 U.S. 405, 416 (1962); *Longleaf Mitigation Dev. Co. v. Fla. Mitigation Providers, LLC*, 519 F.Supp.2d 1233, 1236 (M.D. Fla. 2007).

### 1.    Count VII

To survive the Individual Defendants' motion on their Section One Conspiracy Claim, Plaintiffs must prove the existence of an agreement to restrain trade between two or more persons evidenced by "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Harcros Chems.*, 158 F.3d at 569. Here, Plaintiffs allege that Means and Senne "directly participated in the common scheme by, *inter alia*, inviting physicians to enter exclusive dealing

arrangements [with] Health First and convincing physicians to leave those practices which refused to join the conspiracy." (Doc. 57, ¶ 370.) Upon consideration, the Court finds that Plaintiffs have produced sufficient evidence of Means and Senne's personal participation in such common scheme to subject them to individual liability for Plaintiffs' Section One Conspiracy Claim.

In particular, Plaintiffs point to correspondence from Senne from which a reasonable juror could infer that he helped perpetuate the alleged conspiracy by requiring MIMA physicians to refer cancer patients exclusively to Health First's cancer center as a condition of MIMA's participation in HFHP. (*See* Doc. 236-4.) Additionally, in its Dismissal Order, the Court previously held that Plaintiffs' meetings with Health First representatives, coupled with their subsequent exclusion from HFHP and "blacklisting" by HFHP network providers, adequately provided the context for the alleged agreement to boycott physicians who refused to enter into exclusive referral arrangements with Health First. (Doc. 105, p. 29.) To that end, Dr. Seminer's declaration (Doc. 236-12) provides supporting evidence of the alleged conspiracy. Indeed, Dr. Seminer's declaration recounts a conversation in which Senne agreed to contract with Omni for inclusion of its Sheridan Surgery Center within HFHP's network on the condition that Omni admit all its patients to Health First institutions and turn over several of its best primary care physicians to Health First. (*Id.* ¶ 6.) In another declaration, former Omni shareholder and current Omni employee Dr. Peter Tarashi ("**Dr. Tarashi**") stated that he met with Senne and Means following HFHP's termination of Omni's participation agreement. (Doc. 236-13, ¶¶ 2, 3.) In that meeting, Dr. Tarashi was told that he could become a participating provider with HFHP only if: (1) he signed an individual contract with HFHP

and left Omni; or (2) Dr. Deligdish and Dr. Seminer no longer had leadership roles at Omni and were not included in such contract. (*Id.* ¶ 5.) The Court finds that these declarations demonstrate that Senne and Means knowingly participated in and helped perpetrate the alleged conspiracy.

### 2.    Count VIII

In Count VIII, Plaintiffs allege the same conduct on the part of the Individual Defendants as they do in Count VII. (*See* Doc. 57, ¶ 383.) The elements of a Section Two Conspiracy Claim, as alleged in Count VIII, include: (1) concerted action deliberately entered into with the specific intent of achieving a monopoly; and (2) the commission of at least one overt act in furtherance of the conspiracy. *Levine*, 72 F.3d at 1556.

As an initial matter, the Court concludes that Dr. Tarashi and Dr. Seminer's declarations (Docs. 236-12, 236-13), as well as Senne's correspondence regarding MIMA's exclusive referral of cancer patients to Health First facilities (Doc. 236-4), are also sufficient to support the contention that Senne and Means participated in the alleged Section Two Conspiracy Claim. Additionally, at his deposition, Emil Miller testified that, during discussions with Means about the opportunities for Wuesthoff and Health First to work collectively together, he was told that Wuesthoff should withdraw its application to build a hospital in SBC and "get out of the market." (Doc. 236-15, p. 5.) Such testimony is certainly probative of Means's personal perpetuation of the alleged Section Two Conspiracy Claim and, specifically, his intent to achieve a monopoly.

### B.    Counts IX and X

Finally, the Court finds that Plaintiffs have produced sufficient evidence to support their FDUTPA and tortious interference claims against the Individual Defendants.

As previously iterated, to bring a claim under FDUTPA, a plaintiff need only plead that: (1) the alleged conduct was unfair or deceptive; and (2) the plaintiff was damaged by such conduct. *True Title*, 2007 WL 430659, at *3. A reasonable juror could conclude that the above-cited evidence is probative of unfair and deceptive conduct. Additionally, Plaintiffs contend that such conduct was part of the Alleged Common Scheme perpetuated through the Corporate Defendants. The Court has already concluded that the record contains adequate proof that Plaintiffs were aggrieved by this common scheme and may, thus, seek injunctive relief under FDUTPA. However, as aforementioned, Plaintiffs' damages evidence is insufficient to support a claim for actual damages under the statute.

Lastly, the elements of tortious interference require Plaintiffs to demonstrate: (1) the existence of a business relationship; (2) that Defendants had knowledge of that relationship; (3) that Defendants intentionally and unjustifiably interfered with that relationship; and (4) that Plaintiffs were damaged as a result of such interference. *Magre*, 729 So. 2d at 443–44. The Individual Defendants' primary challenges to Plaintiffs' tortious interference claim are that: (1) Plaintiffs lack admissible evidence as to Means and Senne's participation in the common scheme; and (2) the termination of the Omni contract was proper and based on legitimate business reasons. (Doc. 189, p. 14, Doc. 195, pp. 10–11.) However, the record evidence previously discussed supports the contrary conclusion that Senne and Means individually participated in the Alleged Common Scheme, which Plaintiffs also allege as the basis for their tortious interference claim. Indeed, the alleged interference with Plaintiffs' Patient, Referral, and Practice Relationships includes luring Omni providers to other medical practices, persuading Omni

patients to switch to alternative medical providers, terminating Omni's provider contracts, and blacklisting physicians. As the Court concluded in its analysis of the Corporate Defendants' MSJ, there are genuine issues of material fact as to the propriety of such conduct, which the Court must leave for the jury's determination at trial.

## CONCLUSION[14]

Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

1.  Plaintiffs' Daubert Motion to Exclude Defendants' Expert Testimony and Incorporated Memorandum of Law (Doc. 197) is **DENIED**.

2.  Defendants' Motion to Exclude the Testimony of Dr. H.E. Frech, III and Incorporated Memorandum of Law (Docs. S-194, 207) is **DENIED**.

3.  Defendants' Motion to Exclude the Testimony of Dr. Hal J. Singer and Incorporated Memorandum of Law (Docs. S-199, 208) is **DENIED**.

4.  Corporate Defendants' Joint Motion for Summary Judgment and Incorporated Memorandum of Law (Docs. S-201, 209), Defendant Michael D. Means'[s] Motion for Summary Judgment (Doc. 189), and Defendant Jerry Senne's Motion for Summary Judgment (Doc. 195) are **GRANTED IN PART AND DENIED IN PART**.

    a.  Pursuant to Federal Rule of Civil Procedure 41(a)(2), Count V of the Third Amended Complaint (Doc. 57, ¶¶ 341–53) is **DISMISSED WITH PREJUDICE**.

    b.  Plaintiffs' claim for actual damages in Count IX is **DISMISSED WITH**

---

[14] Any remaining arguments raised in the parties' motions but not expressly addressed in this Order are rejected.

**PREJUDICE**. However, Plaintiffs are entitled to proceed on their claim for injunctive relief in Count IX.

c.  In all other respects, Defendants' Motions for Summary Judgment are **DENIED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on August 13, 2016.



ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record